CULLEN AND DYKMAN LLP
80 State Street, Suite 900
Albany, New York 12207
Matthew G. Roseman, Esq. (admission pro hac vice pending)
Bonnie L. Pollack, Esq. (admission pro hac vice pending)
Kelly McNamee Esq. (admission pro hac vice pending)
Kyriaki Christodoulou, Esq. (admission pro hac vice pending)
(516) 357-3700

*Proposed Attorneys for The College of Saint Rose*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| THE COLLEGE OF SAINT ROSE, | : Case No. 24-11131 (REL) |
| | : |
| Debtor. | :: |

--------------------------------------------------------------- x

### DECLARATION OF MARCIA J. WHITE
### PURSUANT TO LOCAL BANKRUPTCY RULE 2015-2

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | )ss: |
| COUNTY OF ALBANY | ) |

Marcia J. White, being duly sworn, deposes and says:

1.     I am the President of The College of Saint Rose, debtor herein (the "**Debtor**"). In this capacity, I am familiar with the history of the Debtor, the day-to-day operations of the Debtor, and the events leading up to the filing of this bankruptcy case.

2.     I submit this affidavit pursuant to Rule 2015-2 of the Local Bankruptcy Rules for the Northern District of New York (the "**Local Rules**") in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"). Except as otherwise indicated, all facts set forth in this affidavit are based upon personal knowledge, my review of relevant documents, or my opinion based upon

experience, knowledge, and information concerning the Debtor's operations. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtor.

## I.   INFORMATION REQUIRED BY LOCAL RULE 2015-2

3.     Local Rule 2015-2 requires certain information related to the Debtor, which is set forth below and in the schedules annexed hereto. Unless otherwise indicated, the financial information contained herein is unaudited.

4.     <u>Local Rule 2015-2(b)(1)</u>: The nature of the Debtor's business and the circumstances leading to the Debtor's filing of its Chapter 11 case are as follows:

The College of Saint Rose (the "College" or the "Debtor") was founded by the Sisters of Saint Joseph of Carondelet Albany Province with a commitment to educational excellence, care for the dear neighbor, and providing opportunities for women so their dreams of higher learning could be realized. Established by provisional charter granted by the New York State Board of Regents on June 24, 1920 to issue bachelor's degrees, the College enrolled its first class of 19 women from across upstate New York in September of 1920. Founded on the grounds of the Keeler estate in the Pine Hills neighborhood of Albany, New York with one house and $1,000, the College was intentionally located in New York's capital city due to its intellectual resources.  Today, the College owns 72 buildings on 92 parcels of real estate (the "Real Property") contiguous to its original house on Madison Avenue in Albany and has more than 50,000 alumni living across the United States and the world.

The College's provisional charter was made absolute on March 19, 1931, and was amended in 1949 to authorize the offering of master's degrees. It was again amended in 2019 to authorize the offering of an associate's degree as part of its jointly registered BSN program with St. Peter's Healthy Partners Schools of Nursing.

In 1969, the College became fully coeducational, and in the ensuing decades added Division II athletics, and a four-school structure with programs in arts and humanities, business, education, and mathematics and sciences. Many of these programs were nationally recognized and/or accredited. Between 2000 and 2011, the College embarked on capital improvement/renovation plan to meet the needs of its students and faculty.

For more than 10 years, as the College's structural deficit grew—caused by unachieved enrollment goals, a rising tuition discount rate, the financing structure of the College's bond debt, and a relatively low unrestricted endowment—the Board of Trustees (the "Board") and College leadership worked to achieve financial sustainability. The College experienced a steady enrollment decline for more than a decade from 5,130 total enrollment in 2010 (3,048 undergraduates and 2,082 graduate students) to a total enrollment of 2,566 in Fall 2023 (1,256 undergraduates and 1,310 graduate students). This was due in part to a shrinking pool of high school graduates in New York State and the northeast region overall and, in recent years, the prolonged negative

3

impact of the COVID-19 pandemic. Many of the College's undergraduate programs were feeder programs for the College's graduate programs especially in education and related fields so as undergraduate enrollment declined, graduate enrollment was negatively impacted.

In December 2015, the College implemented a comprehensive plan to consolidate or eliminate low-enrolled academic programs and invest in programs experiencing student demand. Investments were made in academic programs, retention efforts, and restructuring financial aid and scholarships. Enrollment stabilized during this time and the first-year class increased to 641 students in 2016. However, the College's first-year discount rate increased from 54% in 2015-2016 to 67% in 2022-2023, which, as enrollment declined, contributed to a significant decrease in net tuition revenue.

The College's restructuring efforts were impacted and the College's financial challenges were exacerbated by the COVID-19 pandemic. In March of 2020, the Governor's Emergency Executive Orders required that all colleges and universities transition immediately to remote instruction and close residence halls for the balance of the Spring 2020 semester, necessitating the College to provide room and board refunds to students.

The pandemic continued into the Fall of 2020, and New York State imposed operating restrictions that modified the student experience and curtailed in-person recruiting for the next two academic years, particularly in the hard-hit metro NYC area, one of the College's primary recruitment territories.

4

Fundraising was hampered by the lack of in-person events, visits, and travel to see donors and alumni.

The effect of the COVID-19 pandemic on the enrollment of first-year students was immediate and significant, dropping from 640 in Fall 2019 to 491 in Fall 2020, 309 in Fall 2021, and 239 in Fall 2022. In July 2020, the College began the implementation of a multi-year deficit reduction plan (the "Deficit Plan"), which included, reducing administrative expenses by $8 million and the development of a recommendation to the Board to reduce academic expenses by $6 million to be finalized by December 2020. From July to November 2020, the College implemented phase one of the Deficit Plan, effectuating $8 million in administrative reductions for fiscal year 2021 by eliminating administrative positions, freezing of the pension plan for hourly wage employees, reducing salaries, offering an early retirement plan for long-serving faculty, reducing departmental operating expenses, and selling certain non-essential properties.

In December 2020, the Board reviewed and considered the report of the Joint Working Group, comprised of the Representative Committee of the Faculty and the College's management team, which identified $5.9 million in potential academic expense reductions. These reductions included the elimination of programs with net negative or marginal revenue. The Board then approved the implementation of these reductions which resulted in the College providing one year's notice of termination to tenured and tenured-track faculty, and reducing some academic administrative and staff positions. That phase was implemented by the College through December 2021. In connection with the Deficit Plan,

5

the College provided teach-out plans for all impacted students to complete their degrees at the College.

From September 2021 through September 2022, College leadership continued to assess the College's financial condition, which remained challenged due to the prolonged impact of the COVID-19 pandemic on enrollment and the lack of a large endowment to underwrite institutionally awarded scholarships and grants. The academic program eliminations combined with the COVID-19 pandemic significantly impacted the College's retention of Fall 2020 first-year students, resulting in only a 58% first- to second-year retention rate in Fall 2021. The College anticipated that a 3-year strategic plan approved in 2021 to strengthen academic programming and improve retention would expand enrollment and revenue. Other initiatives, including restructuring the College's bond debt, would reduce the structural deficit going forward. In November 2021, the College refinanced its bond debt, resulting in a restructuring of the bond covenants, deferred principal payments, and a reduced interest rate of 4.0%.

From January to July 2022, the College initiated the sale of certain non-essential properties. In June 2022, the College retained a national enrollment consultant to devise new enrollment strategies and a national marketing firm to conduct market research and work on the College's branding. In June 2022, the College also retained legal counsel experienced in higher education strategic alternatives to provide guidance and advice and engaged a national financial advisory firm with a focus on higher education to evaluate strategic alternatives

22484.3 21201822v1

and provide guidance on stabilizing finances and operations. Throughout 2022, the College continued to evaluate alternative sources of funding to support the College's cash flow needs. These strategies included working with donors to modify or eliminate limitations on restricted endowed funds. In addition, the College terminated its long-term operating lease with the University at Albany for residence hall space, resulting in budget savings in excess of $1,000,000.

Notwithstanding considerable efforts to implement the strategic plan and increase enrollment, the College experienced a significant enrollment decline in first-year students to 239 in Fall 2022, with a slight increase to 288 in Fall 2023. Despite a more than 10% increase in first-year retention to 69% for Fall 2021 and 73% for Fall 2022, the small incoming class sizes for those years continued to negatively impact the College's budget. Following approval by the faculty, on July 1, 2023, the Board approved the next phase of the plan to achieve institutional stability by moving from a four-school to a two-school structure, reducing the number of deans and academic administrative support.

On September 13, 2023, the Board voted not to renew the ratings process with Fitch Ratings with respect to the College's revenue refunding bonds (Series 2021).

Over the course of a year, the President, Trustee leaders, management team, and consultants explored several potential opportunities for a merger or similar transaction with other institutions of higher education. When it was clear more time was needed, President White and Board leadership met multiple times

7

with the Mayor of the City of Albany, the Albany County Executive, and elected leaders representing the College's district, including its Congressman, NYS Senator, and NYS Assemblypersons, to emphasize the critical and immediate need for bridge funding.  This bridge funding would allow the College to continue serving students and the public good, while a potential affiliation, partnership, merger, or other possible relationship was formalized to sustain the College's mission. Unfortunately, these efforts did not come to fruition in the timeframe needed to provide certainty of sufficient financial resources to complete the 2024-2025 academic year.

On November 30, 2023, the Board determined, based on the College's financial and enrollment projections, and in order to avoid as much disruption as possible, that it was in the best interests of the students and the College to cease academic instruction no later than June 30, 2024. At the time the College ceased academic instruction, the College offered 31 bachelor's, 5 undergraduate certificate, 23 master's and 16 advanced certificate programs.

The Board directed the implementation of a closure plan that provided for the cessation of academic instruction no later than June 30, 2024, and thereafter, for the wind-down of operations and settlement of the affairs of the College (the "Closure Plan"). The Closure Plan included the authorization to the College's leadership to develop a Teach-Out Plan that would provide all students with seamless pathways to complete their degrees at Saint Rose and/or other institutions. It also included the authorization to develop plans for the orderly reduction and eventual discharge of the College's workforce,

8

distribution of College assets, maintenance of College records, and such other activities as are required for the wind-down and settlement of the College's affairs and eventual dissolution of the College in accordance with applicable state and federal laws and regulations and accreditor policies.

Prior to the College ceasing academic instruction on June 21, 2024, the College offered a summer session that enabled another 460 students to graduate from the College.

The College's teach-out plan was approved by the Middle States Commission on Higher Education ("MSCHE") on June 20, 2024. The Teach-Out Plan included teach-out agreements with 21 institutions and provided all enrolled undergraduate and graduate Saint Rose students with at least one teach-out option. The teach-out agreements included the waiver of application fees, maximum transfer of credits, and were program-specific designed to enable the students to complete their degrees on time as they had planned.

As of mid-September, 720 students are enrolled with one of the College's 22 (one more was added following MSCHE's approval of the Teach-Out Plan) teach-out partner institutions to continue their education and complete their degrees.

As part of the Teach-Out Plan, MSCHE granted the College's request to retain its accreditation until December 31, 2024 so that the College can provide students who are able to complete the degree programs in Fall 2024 the option to receive a degree from The College of Saint Rose.  The New York State

Education Department also approved the College's request to retain degree-granting authority through December 31, 2024 for this purpose. In August 2024, 173 primarily graduate students completed their degrees. It is anticipated that another 27 students will complete their degrees in December 2024.

In connection with the Closure Plan, on May 2, 2024, the College retained Jones Lang LaSalle ("JLL") to market the College's real property.

Over the past several months, the Board and/or its Executive Committee has met weekly, considered presentations by the College's administration and its financial and legal advisors regarding the liabilities and liquidity situation of the College, the strategic alternatives available to it, and the effect of the foregoing on the College's operations, creditors, and other parties in interest. The Board has also had the opportunity to consult with the College's administration, financial and legal advisors, and other professionals.

Based on its review of all available alternatives and advice provided by such advisors and professionals, the Board determined that it is in the best interests of the College to file a chapter 11 case to provide for an orderly liquidation of its assets, including a sale of the Real Property, for the benefit of creditors while implementing the academic components of the Closure Plan. Thus, on the Petition Date, the College filed for chapter 11 protection.

5.      Local Rule 2015-2(b)(2): A summary of the Debtor's assets and liabilities is annexed hereto as Schedule "A".

6.      Local Rule 2015-2(b)(3): Not applicable because none of the Debtor's property is

10

in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

7.    Local Rule 2015-2(b)(4):  A list of a real and personal property owed, under lease, or held under any other arrangement is included on Schedule "B".

8.    Local Rule 2015-2(b)(5): The location of the Debtor's assets and its books and records are its campus in Albany, New York, with a primary address of 432 Western Avenue. There are no assets held by the Debtor outside the territorial limits of the United States.

9.    Local Rule 2015-2(c)(1): Schedule "C" hereto provides the estimated amount of weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the Petition Date.

10.    Local Rule 2015-2(c)(2):  The Debtor is a non-profit entity and, therefore, has no shareholders. Schedule "D" sets forth the amounts proposed to be paid for the thirty (30) day period following the Petition Date to officers. The Debtor does not pay any members of its Board of Trustees for their services.

11.    Local Rule 2015-2(c)(3): Schedule "E" hereto provides a schedule of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing for the thirty (30) day period following the Petition Date

## II.    SUMMARY OF FIRST DAY MOTIONS[1]

12.    To enable the Debtor to operate effectively and to minimize adverse effects from its chapter 11 filing, the Debtor has requested or will be requesting various relief in "first day" motions (the "**First Day Motions**") filed with the Court and described below.  In connection with

---

[1] Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

22484.3 21201822v1

preparing for this case, I have reviewed each of the First Day Motions referenced below. I believe

that the information contained in the First Day Motions is accurate and correct. As set forth more

fully below, I believe that the entry of orders granting the relief requested in these motions is

critical to the Debtor's ability to preserve the value of its estate and succeed in its reorganization

efforts.

A.   *Motion for Entry of an Order Authorizing the Debtor to (I) Continue Its Cash Management System, (II) Maintain Existing Bank Accounts, and (III) Waive Certain Operating Guidelines Relating to Bank Accounts*

13.   Pursuant to this Motion (the "Cash Management Motion"), the Debtor seeks entry

of an order authorizing the Debtor operate its cash management system in accordance with its

prepetition operations and maintain its prepetition bank accounts. The Debtor maintains a cash

management system comprised of approximately eight (8) bank accounts (the "Bank Accounts")

at various bank accounts including Key Bank ("Key") and Bank United ("United"; together with

Key, the "Banks"), and a credit card account at M&T Bank (the "Credit Card"), all of which

provide established mechanisms for the collection, management, and disbursement of funds used

in the Debtor's operations (the "Cash Management System"). The Cash Management System

enables the Debtor to manage and control funds and ensure cash availability and to provide

segregation of endowment and other restricted funds.

14.   The Debtor's cash management system operates as follows. The Debtor has its

main operating accounts at Key and United. United is the Debtor's main bank. It holds the

following accounts at United:

- Operating Account (#0430)
- Golden Knights Cash Account (from which certain vendors can pull payments directly) (#0494)
- EFT Account (#7037) into which NY State reimburses the College for outstanding expenses

15.     The EFT Account is swept into the Operating Account daily. The Operating Account is used to pay all operating expenses of the Debtor, and to fund the Key General Checking Account discussed below.

16.     The Debtor also holds accounts at Key Bank, consisting of the following:

- General Checking Account (#8078)
- Self-Insurance Plan Account (from which its self-insured insurance claims processed through MVP are directly pulled)(#8136)
- Payroll Account (#8094)
- Security Deposit Account (for bankruptcy utility security deposits) (#8102)

17.     The Key general checking account is funded by the United operating account as needed, and those monies are then used to fund the payroll account, pay payroll taxes and pay student refunds.

18.     The Debtor's P Card Account at M&T Bank (#0381) operates as the account from which payments on the Credit Card are made.

19.     In addition to the foregoing, the Debtor holds the following restricted accounts (the "Restricted Accounts"):

- Broadview Federal Credit Union (#4100). These funds are from a restricted pledge by Broadview itself, and will be transferred to another institution upon approval of the Albany County Supreme Court and New York State Attorney General.
- Charitable Gift Annuity- Key Private Bank (#7430). These funds are restricted gifts and will be transferred to another institution upon approval of the Albany County Supreme Court and New York State Attorney General.
- Heuther Bequest- Fidelity (#1082). These funds are from a restricted bequest and will be transferred to another institution upon approval of the Albany County Supreme Court and New York State Attorney General.
- Restricted Endowment- Wilmington Trust (#0107). These funds are from restricted gifts and bequests and will be transferred to another institution upon approval of the Albany County Supreme Court and New York State Attorney General.
- Donor Restricted Funds- Key Bank (#7008). These funds are from the endowment earnings based on the donor authorized spend rate and will be transferred to another institution upon approval of the Albany County Supreme Court and New York State Attorney General.
- Pension Plan Account- Key Trust (#8860)

13

20.     None of the Restricted Accounts are being used for deposits or payments by the Debtor, and all will be transferred to another institution upon Albany County Supreme Court and New York State Attorney General approval, except for the Pension Plan Account. These monies will be distributed to participants of the pension plan as required by the pension plan documents.[2]

21.     The Debtor has historically also used the Credit Card to pay various business expenses as necessary. Maintenance of the Credit Card on an ongoing and uninterrupted basis is essential to the Debtor's operations because, among other things, the Credit Card provides a source of immediate liquidity. As of the Petition Date, the current amount outstanding on the Credit Card was $3,533.02 and the credit limit is $300,000.

22.     If the Debtor's operations are interrupted and payments are halted, the Debtor will be unable to maximize the value of its estate. It is therefore essential to be permitted to continue to use its Cash Management System to manage its cash flow in accordance with its procedures employed prior to the Petition Date. Accordingly, the relief requested in the Cash Management Motion should be approved by the Court.

B.     *Application for Order Extending Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs*

23.     Pursuant to this Motion, the Debtor seeks entry of an order extending the time by

---

[2] There were also three (3) accounts established in connection with the Bonds issued by the City of Albany Capital Resource Corporation ("CRC"). All of these accounts were swept by the Pre-Petition Bondholders prior to the Petition Date and the Debtor has not been able to obtain any information on how the Bondholders applied the funds:

- Debt Service Reserve Account- Wilmington Trust (#190-001). This fund was established upon issuance of the Bonds and transfers are made from this account to the Bond Fund Account for payments of principal and interest to the Bondholders. This account is restricted.
- Bond Fund Account- Wilmington Trust (#190-000). This account is used for payments of principal and interest to the Bondholders. This account is restricted.
- Project Fund Account- Wilmington Trust (#190-004). This account is comprised of funds from the proceeds of the sale of eight (8) properties. This account is not restricted, but CRC would not release these funds for any purpose other than reinvestment into other properties.

which the Debtor must file its schedules and statement of financial affairs in its bankruptcy case. The Debtor seeks an extension of an additional thirty (30) day period to finalize and file its extensive schedules and statements. By virtue of the myriad of issues leading up to the filing and attendant to the early days of filing, the Debtor was unable to complete its statements and schedules prior to filing and therefore request the additional time that is set forth in this Motion. Accordingly, the Debtor believes that the relief requested in this Motion is warranted and should be granted.

C.    *Motion Pursuant to Rule 9007 of the Federal Rules of Bankruptcy Procedure for Authority to Establish Notice Procedures*

24.    Pursuant to this Motion, the Debtor seeks to establish procedures for certain notices required during the pendency of the Debtor's bankruptcy. It is believed that given the size this case, implementing the notice procedures contained in this Motion will facilitate the efficient administration of the case. Through the Motion, the Debtor proposes to establish a Master Service List containing the entities described in the Motion to which notice will be limited, with certain exceptions including notice of the Section 341 meeting, notice of the bar date for filing claims in the Debtor's case, the sale of all or substantially all of the Debtor's assets, the time fixed for filing objections to, and the hearing to consider approval of, a disclosure statement and a confirmation of a plan of reorganization, and notice of transmittal of ballots accepting and rejecting the plan of reorganization.

D.    *Application for Order Authorizing Payment of Prepetition Salaries, Wages and Employee Benefits and Granting Related Relief*

25.    The Debtor seeking order of an entry authorizing it to pay prepetition wages, salaries and other compensation, and to continue payment of compensation and wages of benefits post-petition in accordance with existing company policy (the "Wage Motion").

26.     As of the Petition Date, the Debtor's aggregate workforce consisted of approximately forty-four (44) employees, twenty-none (29) of which are regular salaried or hourly paid employees and the remaining employees are temporary or on-call employees. Approximately two (2) employees (the "Union Employees") are members of the United Professional & Service Employees Union Local 1222 ("UPSEU"). Furthermore, approximately five (5) are members of The Security Officers and Drivers, Association Employed at The College of Saint Rose ("SODA"). The Debtor is obligated to UPSEU through a collective bargaining agreement ("CBA"). The SODA collective bargaining agreement has expired and the union has not requested negotiation.

27.     As of the Petition Date, the Debtor's average two-week gross payroll for the employees is approximately $124,551[3]. The Debtor's payroll process is administered in-house. The employees are paid every other Wednesday by the Debtor from a payroll account (Account No. 8094) held at Key Bank. Salaried employees are paid on the tenth (10th) day of the two-week pay period and hourly employees are paid for the two weeks ending ten (10) days prior to the pay date. For example, salaried employees were paid on October 2, 2024 for the period of September 23, 2024 through October 6, 2024, and hourly employees were paid on October 2, 2024 for the period of September 9, 2024 through September 22, 2024. Thus, on each pay day, there are four (4) days of paid, but unearned (i.e. prepaid) wages for salaried employees and ten (10) days accrued, but unpaid wages for hourly employees. The first payroll due following the Petition Date would therefore be made on Wednesday October 16, 2024 covering unpaid wages (the "Wages") for the time period from October 7, 2024 to October 20, 2024 for salaried employees and September 23, 2024 to October 6, 2024 for hourly employees. The Debtor therefore estimates

---

[3] This amount varies based on the payroll for hourly employees during any given pay period.

16

that, prior to the Petition Date, their hourly employees will have accrued pre-petition Wages in the aggregate amount of approximately $86,626. As of the Petition Date, no employee is owed ordinary Wages in an amount exceeding the $15,150 priority cap imposed by section 507(a)(4) of the Bankruptcy Code.

28.     In connection with its payroll, the Debtor, as an employer, is required by law to withhold federal, state and local taxes, including Social Security taxes, unemployment taxes, Medicare taxes, and garnishments (collectively, the "Withholding Obligations") from Wages for remittance to appropriate authorities every two (2) weeks.   The Debtor's estimated total Withholding Obligations for the October 16, 2024 payroll is approximately $29,158.33.

29.     In addition, the Debtor is required to match, from its own funds, the Social Security and Medicare taxes and pay, based on a percentage of gross payroll, and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (the "Payroll Taxes") and remit the same to the appropriate authorities. The Debtor pays these Payroll Taxes every two (2) weeks to various taxing authorities in accordance with the Internal Revenue Code and applicable state law. The Debtor's estimated total obligation for Payroll Taxes for the October 16, 2024 payroll is approximately $6,274.23.

30.     Prior to each payroll, the Debtor calculates the Withholding Obligations and Payroll Taxes for the applicable pay period. The Debtor's payroll account is funded so that disbursements can be made in accordance with the appropriate payment schedule. Thereafter, the Debtor withholds the Withholding Obligations from Employee paychecks and remits the Withholding Obligations, together with the Payroll Taxes, to third parties.   Withholding Obligations to taxing authorities are remitted on a bi-weekly basis. As a result, as of the Petition

Date, the Debtor is in possession of Withholding Obligations and/or Payroll Taxes relating to the prepetition period.

31.     The Debtor believes that such withheld funds, to the extent they remain in the Debtor's possession, constitute monies held in trust and therefore do not constitute property of the Debtor's bankruptcy estate.  Moreover, the Withholding Obligations and Payroll Taxes likely give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code if not paid. Accordingly, the Debtor requests authority in the Wage Motion to pay any accrued and unpaid Withholding Obligations and Payroll Taxes that may relate to the prepetition period as and when they become due in the ordinary course of the Debtor's business.

32.     The Debtor also withholds certain amounts from the Employees' paychecks for the payment of dues to UPSEU (the "Union Dues").  These withheld amounts are remitted to UPSEU in accordance with the terms of the CBA.  The Union Dues are collected bi-weekly from the Union Employees and remitted to UPSEU on a bi-weekly basis.

33.     The Debtor offers employer-funded health insurance through Mohawk Valley Physicians Health (the "Health Care Programs"). The Health Care Programs include medical, dental and life insurance premiums. The Debtor's expected cost for the Health Care Programs in October 2024 is approximately $34,283.07.

34.     By the Wage Motion, the Debtor therefore seeks authority to continue to provide the Health Care Programs for its Employees in the ordinary course of business and to continue to honor obligations under such programs including, without limitation, the payment of all amounts owed under the Health Care Programs to the extent that any may be owed related to the prepetition period.

22484.3 21201822v1

35.     Furthermore, the Debtor provides its Employees with paid time off vacation benefits that allow salaried Employees four (4) weeks of paid time off, earned five (5) days each quarter, and hourly Employees paid time off based on their years of service earned each pay period. Employees are also offered paid time off for illness, personal reasons, and paid holidays. The Debtor seeks authority in the Wage Motion to continue to honor its paid vacation and holiday policies (the "PTO Policies") in the ordinary course of business during this chapter 11 case.

36.     Finally, the Debtor customarily reimburses Employees who incur business expense in the ordinary course of performing their duties on behalf of the Debtor including travel expenses, automobile expenses, and cell phone expenses (the "Business Expenses"). On a monthly basis, the Debtor reimburses approximately $2000 in Business Expenses incurred by the Employees.

37.     The Debtor submits that it would be inequitable to require Employees to bear personally any approved Business Expenses they incurred in furtherance of their responsibilities to the Debtor. Accordingly, the Debtor requests authority to continue to honor all of its Business Expense obligations in the ordinary course of business, regardless of when such obligations arose.

38.     The employees provide the Debtor with services necessary to conduct its business and absent these payments, the Debtor will experience an instability in its work force during a critical time in this case.  Accordingly, the Debtor believes that the relief requested in the Wage Motion is necessary and appropriate and should be approved by the Court.

E.     *Motion for Entry of an Order (I) Authorizing the Debtor To (A) Continue to Maintain Prepetition Insurance Programs, and (B) Pay or Honor Prepetition Obligations Arising Thereunder, and (II) Granting Related Relief*

39.     Prior to the Petition Date, in the ordinary course of business, the Debtor maintained insurance policies providing coverage for, *inter alia*: general liability, workers compensation,

automobile liability, umbrella, excess liability, professional liability, fiduciary liability, cyber liability, and environmental liability (collectively, the "Policies" or the "Insurance Policies"). The Debtor obtains the Policies through its insurance broker, Arthur J. Gallagher & Co. (the "Insurance Broker").

40.     All of the Policies have a term of 6 months from July 1, 2024 through December 31, 2024, with the exception of property insurance which has a term of one year expiring on August 31, 2025; and the general liability, automobile, inland marine, cyber liability and storage tank liability coverages with a term of one year expiring June 30, 2025. The annual premium cost of the Policies in place as of the Petition Date is approximately $1,419,487.30, and such premium has been or will be paid directly to the carriers. All Policy premiums are paid upfront except General Liability, which is paid quarterly, and Automobile and Inland Marine, which are paid monthly. The Debtor is current on its premium payments for the current policies.

41.     The Policies are essential to the preservation of the Debtor's operation and assets and, in many cases, such insurance coverage is required by various regulations, laws and contracts that govern the Debtor's business conduct. Moreover, the operating guidelines established by the Office of the United States Trustee for debtor-in-possession to supervise the administration of chapter 11 cases (the "U.S. Trustee Guidelines") require the Debtor to maintain insurance coverage throughout this chapter 11 case.

42.     The Debtor's ability to continue making payments under the Insurance Policies without any lapse when the Policies renew is essential to the continued operation of the Debtor's business in chapter 11. Even a temporary suspension of the Debtor's ability to pay the premium amounts due under the Policies would create a significant risk of the Debtor losing its insurance coverage. The ability to maintain coverage during the pendency of this chapter 11 case is critical

20

to the Debtor. Any payments made for the Debtor's insurance obligations will be in accordance with any Debtor-in-Possession financing and the Budget in connection herewith.

43.    Accordingly, the Debtor believes it is in the best interest of its estate to continue to honor its obligations under the current insurance contracts and continue its Policies in the ordinary course of business. Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtor's efforts to preserve its assets and maximize the value of its estate.

F.    *Motion for Entry of Interim And Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief*

44.    In connection with the operation of the College, the Debtor obtains, among other things, electricity, telephone, telecommunications, data service, internet, and other similar services (collectively, the "Utility Services") from a number of utility providers or their brokers (collectively, the "Utility Providers").

45.    Preserving Utility Services on an uninterrupted basis is essential to the wind down of the Debtor's operations as a College serving the Albany area. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's efforts would be severely disrupted, and such disruption would jeopardize its ability to administer this chapter 11 case, particularly since the Debtor's real estate holdings consist of 72 buildings on 92 parcels which need to remain operational pending the sale of same through the bankruptcy process. Any utility service disruption would negatively affect the Debtor's revenues from the sale of its assets. Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11 case.

21

46.     On average, the Debtor pays approximately $69,286 each month for third-party Utility Services.[4] Accordingly, the Debtor estimates that the cost for Utility Services during the next thirty (30) days (not including any deposits to be paid) will be approximately the same amount.

47.     The Debtor intends to continue to pay post-petition obligations to the Utility Providers in a timely manner. Cash held by the Debtor, cash generated in the ordinary course of business, and cash available to the Debtor, including through proposed debtor-in-possession financing, will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

48.     To provide additional assurance of payment, the Debtor proposes to deposit $34,000 into a segregated account (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one-half of the Debtor's average monthly cost of Utility Services. The Adequate Assurance Deposit will be held in the segregated account for the benefit of the Utility Providers (the "Adequate Assurance Account") for the duration of this chapter 11 case and may be applied to any post-petition defaults in payment to the Utility Providers. The Adequate Assurance Deposit will be held by the Debtor; no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account. The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in accordance with its prepetition practices (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

---

[4] This amount is based on an average of the utility costs incurred in June and July 2023 and 2024 (to the extent available), when the campus was not occupied, the same conditions as presently exists.

49.     Nevertheless, if any entity believes that they are a Utility Provider and seeks to make a request for adequate assurance of future payment (each, an "Adequate Assurance Request"), the Debtor requests they do so pursuant to the following procedures (the "Adequate Assurance Procedures") set forth in this Motion. The Adequate Assurance Procedures set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtor to administer the chapter 11 estate uninterrupted. More specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by serving an Adequate Assurance Request upon the Notice Parties. The Debtor, in its discretion, may then resolve any Adequate Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Adequate Assurance Request.

G.      *Motion for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief*

50.     The Debtor has filed, or will file, applications to retain the following professionals: (a) Cullen and Dykman LLP as lead chapter 11 counsel and to continue in its capacity as regulatory counsel; (b) FTI Consultants as financial advisor; and (c) Nolan Heller Kauffman LLP as special counsel to the Board of Trustees. The Debtor anticipates that they also may retain other professionals pursuant to section 327 of the Bankruptcy Code during the course of this chapter 11 case as the need arises. Moreover, a Committee, if one is appointed by the Office of the United States Trustee, will likely retain counsel and may retain a financial advisor or other professionals to represent them in connection with this chapter 11 case (collectively, the "Retained Professionals").

23

51.     The Debtor also intends to file a separate motion pursuant to which it will propose procedures for the compensation of various ordinary course business professionals whom the Debtor currently employs or may employ in the ordinary course of business (the "Ordinary Course Professionals"). As set forth in that motion, Ordinary Course Professionals will not be subject to the procedures set forth in this Motion.

52.     Given the size and complexity of this chapter 11 case, the Debtor anticipates that it will require assistance from a number of professionals to effectively manage these proceedings. Establishing orderly procedures to pay professionals whose retentions are approved by this Court pursuant to sections 327, 328, or 1103 of the Bankruptcy Code, and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, will streamline the administration of this chapter 11 case while promoting efficiency for the Court, the Office of the United States Trustee for Region 2 (the "U.S. Trustee"), and all other parties in interest. In particular, this process will allow for the effective review of the Retained Professionals' fees and expenses and will save the Debtor from incurring unnecessary copying and mailing expenses.

53.     By this Motion, the Debtor therefore proposes the procedures set forth therein for interim compensation (the "Compensation Procedures"), which substantially comply with the U.S. Trustee's Guidelines, and believes that it is the best interest of the estate that this Motion be granted. It should be noted that although this Motion will be filed on the Petition Date, it will not be heard as a first day motion.

H.     *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to Obtain Post-Petition Financing, (B) Authorizing the Use of Cash Collateral, (C) Granting Adequate Protection, (D) Scheduling a Final Hearing and (E) Granting Related Relief (the "DIP Motion")*

54.     Although filed at the commencement of this case, the Debtor is not seeking relief

under the DIP Motion on an interim basis and this motion is therefore not a true first day motion. Prior to the filing of the Debtor's chapter 11 case, the Debtor negotiated the terms of senior secured Debtor-in-Possession financing (the "DIP Loan") with Summit National Investments VIII LLC (the "DIP Lender"). Those arm's length negotiations culminated in the DIP Loan Agreement. The DIP Loan Agreement provides a commitment of up to $10,800,000 and will be documented as provided for in the DIP Loan Agreement. The DIP Loan Agreement will permit the Debtor to obtain funding in accordance with an approved budget (the "Budget"), attached to the proposed DIP Order as an Exhibit thereto, and adequate protection to the DIP Lender for use of the DIP Loan.

55.     The DIP Order also provides for the Debtor's use of Cash Collateral, consisting of collateral held by the Debtor's Pre-Petition Bondholders. To be clear, the Debtor does not believe that any of its cash constitutes the cash collateral of the Pre-Petition Bondholders, since the monies held in the Debtor's accounts as of the Petition Date are not proceeds of their collateral. However, in an abundance of caution, the DIP Order provides for adequate protection to both the DIP Lender and the Pre-Petition Bondholders in the unlikely event that such funds are determined to constitute the Bondholders cash collateral.

56.     I believe that the Debtor and its estate will suffer immediate and irreparable harm if the DIP Order is not entered since the Debtor will have no ability to use any monies to operate in chapter 11.  Without such funds, the Debtor would be forced to liquidate its assets at "fire sales", to the detriment of all creditors.

57.     The DIP Loan Agreement is the result of the Debtor's reasonable and informed determination that the DIP Lender offered favorable terms on which to obtain needed post-petition funding, and of the extended arm's length good-faith negotiation between the Debtor and

the DIP Lender. The terms and conditions of the DIP Loan Agreement are favorable and reasonable and the proceeds under the DIP Loan will only be used for purposes that are permissible under the Bankruptcy Code and the Budget.

58.     Moreover, the adequate protection being provided to both the DIP Lender and the Pre-Petition Lenders satisfy the requirements of the Bankruptcy Code. The Debtor has an immediate need for access to liquidity in order to achieve its objectives in the chapter 11 case and to pay employees, vendors and essential other third-parties during that process. Based on the circumstances, Debtor requires funding under the DIP Loan as well as use of Cash Collateral to avoid immediate irreparable harm to the Debtor's estate. Further support for the DIP Motion is set forth in the Declaration of Sean Harding submitted in connection therewith.

THE COLLEGE OF SAINT ROSE

By: s/ Marcia J. White_____
Name: Marcia J. White
Title: President

Sworn to on the
10th day of October, 2024

s/ Ann K. Phillips__
Notary Public
Registration No. 02PH0021453
Qualified in Rensselaer County
Commission Exp. February 23, 2028

26

## Schedule "A"

### Summary of Debtor's Assets and Liabilities

See Attached

The College of Saint Rose
Balance Sheet as of 10.7.2024

**Assets**

| | | |
|---|---|---:|
| Unrestricted Cash | $ | 1,691,936 |
| Restricted Cash and Investments | | 19,074,433 |
| Accounts Receivable | | 417,348 |
| Prepaid Expenses and Deposits | | 377,950 |
| Inventories | | 231,518 |
| Fixed Assets, net of depreciation* | | 77,464,294 |
| Other Assets | | 694,708 |
| **Total Assets** | $ | 99,952,186 |

**Liabilities**

| | | |
|---|---|---:|
| Accounts Payable | $ | 2,062,836 |
| Accrued Expenses-Employee Benefits | | 1,497,260 |
| Accrued Expenses and Other Liabilities | | 5,647,268 |
| Long Term Debt, net of set offs | | 47,264,057 |
| **Total Liabilities** | $ | 56,471,422 |
| | | |
| **Net Assets** | $ | 43,480,765 |
| | | |
| **Total Liabilities and Net Assets** | $ | 99,952,186 |

* This represents the net book value of the buildings, equipment and furniture. The actual fair market value is unknown and cannot be determined until the sale of the property is completed.

## Schedule "B"

**List of Real Property**

See Attached

The College of Saint Rose

Property List

| Tax Map # | Street # | Street Name | |
|---|---|---|---|
| 64.58-1- 19 | 90 | S Manning | |
| 64.59-4- 3 | 1020 | Madison | |
| 64.60-1- 4 | 399 | Western | |
| 64.60-1- 8 | 415 | Western | |
| 64.60-1- 8.401 | 401 (415) | Western | |
| 64.60-1- 8.405 | 405 (415) | Western | |
| 64.60-1- 8.409 | 409 (415) | Western | |
| 64.60-1- 9 | 417 | Western | driveway |
| 64.60-1- 20 | Paper Street | Hudson (157 Erie) | parking/driveway |
| 64.60-2- 1 | 420 (400) | Western | |
| 64.60-2- 2 | 420 (404) | Western | |
| 64.60-2- 3 | 420 (408) | Western | |
| 64.60-2- 4 | 428 | Western | riley plaza (Western) |
| 64.60-2- 5 | 432 | Western | |
| 64.60-2- 6 | 438 | Western | driveway |
| 64.60-2- 7 | 442 | Western | |
| 64.60-2- 8 | 444 | Western | |
| 64.60-2- 9 | 450 | Western | |
| 64.60-2- 10 | 454 | Western | |
| 64.60-2- 11 | 458 | Western | |
| 64.60-2- 12 | 460 | Western | |
| 64.60-2- 13 | 464 | Western | |
| 64.60-2- 18 | 1009 (1015) | Madison | |
| 64.60-2- 19 | 1009 (1009) | Madison | |
| 64.60-2- 20 | 1009 (1007) | Madison | |
| 64.60-2- 21 | 1009 (1005) | Madison | |
| 64.60-2- 22 | 1009 (1003) | Madison | |
| 64.60-2- 23 | 1001 | Madison | |
| 64.60-2- 25 | 993 | Madison | |
| 64.60-2- 26 | 989 | Madison | riley plaza (Madison) |
| 64.60-2- 27 | 985 (983) | Madison | |
| 64.60-2- 28 | 979 | Madison | |
| 64.68-1- 1 | 392 (394) | Western | |
| 64.68-1- 2 | 384 | Western | |
| 64.68-1- 3 | 380 | Western | |
| 64.68-1- 4 | 376 (378) | Western | |
| 64.68-1- 5 | 374 | Western | |
| 64.68-1- 6 | 368 (370) | Western | |
| 64.68-1- 7 | 366 A&B (366) | Western | |
| 64.68-1- 8 | 358 | Western | |
| 64.68-1- 9 | 354 | Western | |
| 64.68-1- 10 | 350 | Western | |
| 64.68-1- 11 | 178 | Partridge | |
| 64.68-1- 12 | 186 | Partridge | |
| 64.68-1- 13 | 188 | Partridge | |
| 64.68-1- 14 | 190 | Partridge | |
| 64.68-1- 15 | 192 | Partridge | vacant lot |
| 64.68-1- 16 | 194 | Partridge | vacant lot |

4/23/2024

1 of 2

22484.1 2]022527v1

The College of Saint Rose

Property List

| Tax Map # | | Street # | Street Name | |
|---|---|---|---|---|
| 64.68-1- | 17 | 196 | Partridge | vacant lot |
| 64.68-1- | 18 | 198 | Partridge | |
| 64.68-1- | 20 | 200/202 | Partridge | |
| 64.68-1- | 21 | 204 | Partridge | |
| 64.68-1- | 22 | 206 | Partridge | |
| 64.68-1- | 23 | 210 | Partridge | |
| 64.68-1- | 24 | 212 | Partridge | |
| 64.68-1- | 44 | 917 | Madison | |
| 64.68-1- | 45 | 919 (915) | Madison | |
| 64.68-1- | 46 | 921 | Madison | |
| 64.68-1- | 47 | 923 | Madison | |
| 64.68-1- | 48 | 935 | Madison | |
| 64.68-1- | 49 | 939-943 (937) | Madison | |
| 64.68-1- | 50 | 939-943 (943) | Madison | |
| 64.68-1- | 51 | 947 | Madison | |
| 64.68-1- | 52 | 953 (955) | Madison | |
| 64.68-1- | 53 | 959 | Madison | |
| 64.68-1- | 54 | 963 | Madison | |
| 64.68-1- | 55 | 967 | Madison | |
| 64.68-1- | 56 | 971 | Madison | |
| 64.68-1- | 57 | 975 | Madison | Alumni garden |
| 64.68-2- | 1 | 1006 | Madison | |
| 64.68-2- | 2 | 1002 | Madison | |
| 64.68-2- | 3 | 996-1000 (1000) | Madison | |
| 64.68-2- | 3.637 | R637-659 | Morris | |
| 64.68-2- | 4.2 | 994 | Madison | |
| 64.68-2- | 7 | 968-974 (968) | Madison | |
| 64.68-2- | 8.2 | 962 | Madison | vacant lot |
| 64.68-2- | 10 | 956 | Madison | |
| 64.68-2- | 12 | 946-950 | Madison | |
| 64.68-2- | 13 | 944 | Madison | |
| 64.68-2- | 14 | 940 | Madison | |
| 64.68-2- | 17 | 930 | Madison | |
| 64.68-2- | 23 | 912 | Madison | |
| 64.68-2- | 25 | 908 | Madison | |
| 64.68-2- | 70 | R573-583 | Morris | parking |
| 64.68-2- | 72 | R936-958 | Madison | parking |
| 64.68-3- | 12 | 568 | Morris | |
| 65.61-2- | 1 | 340 | Western | |
| 76.70-1- | 28 | NA | S O'Connell | vacant lot |
| 76.70-1- | 29 | NA | S O'Connell | vacant lot |
| 76.70-1- | 30 | NA | S O'Connell | vacant lot |
| 76.70-1- | 31 | NA | S O'Connell | vacant lot |
| 76.70-1- | 32 | NA | S O'Connell | vacant lot |
| 76.70-1- | 33 | NA | S O'Connell | vacant lot |
| 76.70-1- | 34 | NA | S O'Connell | vacant lot |

4/23/2024

2of 2

## Schedule "C"

### Estimated Weekly Payroll- Employees

Pursuant to Local Rule 2015-2(c)(1), the estimated amount of gross weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the Petition Date is approximately $29,781.82 per week.

## Schedule "D"

### Estimated Monthly Payroll- Officers

Pursuant to Local Rule 2015-2(c)(2), the estimated amount of gross monthly payroll to officers for the thirty (30) day period following the Petition Date is approximately $72,738.00 with a weekly pay of approximately $18,184.62.

## Schedule "E"

### Cash Receipts and Disbursements, Net Cash
### Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Bankruptcy Rule 2015-2(c)(3), the following provides the estimated aggregated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid (other than professional fees) for the 30-day period following the Petition Date.

| | |
|---|---|
| **Cash Receipts** | $256,525 |
| **Cash Disbursements** | $1,836,000 |
| **Net Cash Gain (Loss)** | ($579,475) |
| **Unpaid Obligations (excluding professional fees)** | $131,220 (pre-petition invoices received after filing) |
| **Unpaid Receivables (excluding professional fees)** | $171,125 |