CULLEN AND DYKMAN LLP
80 State Street, Suite 900
Albany, New York 12207
Matthew G. Roseman, Esq. (admission pro hac vice pending)
Bonnie L. Pollack, Esq. (admission pro hac vice pending)
Kyriaki Christodoulou, Esq. (admission pro hac vice pending)
Kelly McNamee, Esq. (admission pro hac vice pending)
(516) 357-3700

*Proposed Attorneys for The College of Saint Rose*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| THE COLLEGE OF SAINT ROSE, | : Case No. 24-11131 (REL) |
|  | : |
| Debtor. | : |
|  | : |

------------------------------------------------------------------ x

**DEBTOR'S APPLICATION FOR AN ORDER PURSUANT TO SECTIONS 327(a) AND 328 OF THE BANKRUPTCY CODE AUTHORIZING THE EMPLOYMENT OF JONES LANG LASALLE BROKERAGE, INC. AS REAL ESTATE CONSULTANT, BROKER AND ADVISOR FOR THE DEBTOR AS OF THE PETITION DATE**

The College of Saint Rose, debtor and debtor-in-possession in the above-captioned case (the "Debtor"), respectfully submits this application (the "Application") for an order, pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 2014-1 of the Local Bankruptcy Rules for the Northern District of New York (the "Local Rules"), and sections 327(a) and 328 of title 11, United States Code (the "Bankruptcy Code"), for entry of an order authorizing the employment and retention of Jones Lang LaSalle Brokerage, Inc. ("JLL") as real estate consultant, broker and advisor for the Debtor effective as of the Petition Date (as defined below), and respectfully states as follows:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. § 1334.  This

is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28

U.S.C. §§ 1408 and 1409.

## **BACKGROUND**

2.      On October 10, 2024 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under Chapter 11 of the Bankruptcy Code in this Court.

3.      The Debtor continues to manage and operate its business as a debtor-in-

possession under sections 1107 and 1108 of the Bankruptcy Code.

4.      Simultaneously with the filing of its petition, the Debtor filed the Declaration of

Marcia J. White pursuant to Local Bankruptcy Rule 2015-2 (the "First Day Declaration"). A

more detailed factual background of the Debtor's business and operations, as well as the events

leading to the filing of this chapter 11 case, is more fully set forth in the First Day Declaration,

the contents of which are incorporated herein by reference.

5.      The Debtor's primary asset is its campus located in Albany, New York (the

"Property").

6.      The Debtor had determined prior to the Petition Date, in consultation with their

advisors and in the exercise of their sound business judgment, that a real estate consulting and

advisory firm was required to enhance the Debtor's efforts to maximize the value of their

Property.

7.      Accordingly, before the Petition Date, the Debtor engaged JLL as its exclusive real

estate consultant, broker and advisor to assist it in selling the Property pursuant to a certain Exclusive

Listing and Advisory Services Agreement dated as of May 2, 2024 (the "Agreement"), a copy of

which is attached hereto as **Exhibit "A"**. Pursuant to the Agreement, JLL has provided advice and

guidance in relation to the sale of the Property in accordance with the Debtor's goals, objectives and

financial parameters, created and assessed a list of potential Property disposition options, prepared

a marketing plan for the sale of the Property, met with representatives of the City of Albany and

local resident groups, and provided regular update reports to the Debtor and its lenders. JLL is

therefore very familiar with the Property and issues attendant to a sale of same.

## **RELIEF REQUESTED**

8.      The Debtor seeks approval, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1 to employ and retain JLL as its real estate consultant, broker and advisor in connection with this Chapter 11 case pursuant to the terms of the Agreement.

9.      JLL is a leading global commercial real estate and investment management company, has helped clients buy, build, occupy, manage and invest in a variety of commercial, industrial, hotel, residential and retail properties. A Fortune 500 company with annual revenue of $20.8 billion and operations in over 80 countries around the world, JLL's more than 110,000 employees bring the power of a global platform combined with local expertise. JLL offers a range of services to owners of, and lenders to and investors in, commercial real estate assets including, but not limited to, property sales and related valuation services. JLL has extensive knowledge and experience in valuing commercial real estate, and providing commercial real estate related services in Chapter 11 reorganization cases.

10.     JLL was engaged prepetition and worked effectively with the Debtor to analyze the Property. In that capacity, JLL gained valuable institutional knowledge regarding the Property and the value associated therewith.  In providing these services to date to the Debtor, JLL has committed significant time and resources toward analyzing the Property and working with the Debtor to create a going forward plan with regards to the Property. As such, the Debtor believes that JLL has the requisite knowledge and background to address many issues that may arise in this chapter 11 case related to the Property. Accordingly, the Debtor believes that JLL is uniquely qualified and well positioned to continue performing these services and further assist the Debtor in this chapter 11 case.  In addition, the Debtor has determined that the services provided by JLL are necessary for the Debtor to maximize the value of its estate.

11.     Section 327(a) of the Bankruptcy Code provides that the Debtor is permitted to

3

employ professional persons "that do not hold or represent an interest adverse to the estate, and

that are disinterested persons." 11 U.S.C. §327(a). Section 328 of the Bankruptcy Code provides,

in pertinent part, that under section 327 of the Bankruptcy Code, a professional may be employed

"on any reasonable terms and conditions of employment, including... on a contingent fee basis."

11 U.S.C. § 328.

12.    Bankruptcy Rule 2014 provides that an application for retention of a professional

person is to include:

> [S]pecific facts showing the necessity for the employment, the names of the person to
> be employed, the reasons for the selection, the professional services to be rendered, any
> proposed arrangement for compensation, and to the best of the applicant's knowledge,
> all of the person's connections with the debtor, creditors, and any other party in interest,
> their respective attorneys and accountants, the United States Trustee, or any person
> employed in the office of the United States Trustee.

13.    By this Application, the Debtor requests that the Court approve the employment

and compensation arrangements described in the Agreement and described below, pursuant to

sections 327(a) and 328(a) of the Bankruptcy Code. The employment arrangement with JLL will

be beneficial to the Debtor's estate because it will provide the Debtor with much needed

assistance in selling the Property, the Debtor's primary asset.

14.    Further, the Debtor believes that the compensation arrangement detailed in the

Agreement and described below provides both certainty and the proper inducement for JLL to

act expeditiously and prudently with respect to the matters for which it will be employed.

### SERVICES TO BE PROVIDED

15.    As set forth above, the Debtor employed JLL pre-petition on or about May 2,

2024 to assist the Debtor in marketing and selling the Property. Since then, JLL has become

familiar with the Property and is well qualified and uniquely able to sell the Property in a cost-

effective and efficient manner.

16.    As more fully set forth in the Agreement, JLL will perform services for the Debtor

(collectively, the "Services") that, include, but are not limited to, the following:[1]

   a.   accepting, delivering and presenting to Debtor offers and counteroffers to buy, sell, or lease the Property;

   b.   assisting the Debtor in developing, communicating, negotiating, and presenting offers and counteroffers until a sale or lease agreement is signed and all contingencies are satisfied or waived;

   c.   answering the Debtor's questions relating to any offer, counteroffer, notice or contingency;

   d.   marketing the Property to prospective purchasers;

   e.   undertaking a comprehensive research and evaluation process of all relevant information on each of the individual parcels/buildings comprising the Property as necessary to deliver a refined analysis of the estimated valuation of the Property the items listed in the preliminary timeline for a "4-8 month process" described in Exhibit "C" to the Agreement; and

   f.   providing support to the Debtor with regard to discussions concerning the Property with interested third parties and stakeholders, including bondholders, government representatives, potential lenders and community civic associations.

   17.   The Debtor submits that JLL is particularly well-suited to act as the Debtor's real estate consultants and advisors because of the firm's strong Higher Education Practice, recent and intimate knowledge regarding the Property and its globally well-known reputation and experience as a real estate consultant, broker and advisor.

## **SUMMARY OF THE TERMS OF THE AGREEMENT**

   18.   The Agreement entitles JLL to payment of a fee at closing of a sale(s) of the Property out of the sale proceeds equal to 3.5% of the Gross Proceeds[2] with an additional .25% earned if the sale(s) of all or substantially all of the Property closes before December 31, 2024,

---

[1] This list is provided only as a summary. The Services being provided are more fully set forth in the Agreement. To the extent that this summary is inconsistent with the Services listed in the Agreement, the Agreement shall control.

[2] Gross Proceeds means the total consideration paid or payable to the Debtor which shall include any mortgages or loans which may be assumed by the purchaser or which the purchaser takes title "subject to", including any purchase money loans or mortgages taken back by the seller.

22484.3 21147269v2

plus reimbursement of JLL actual, reasonable, third party out-of-pocket expenses up to a cap of $25,000, with prior approval required for any expense in excess of $5,000 (collectively, the "Fee Structure").

19.    The Debtor believes that the Fee Structure is comparable to compensation generally charged by real estate advisors of similar structure to JLL for comparable engagements, both in and out of bankruptcy.  Furthermore, the Debtor believes that the Fee Structure is consistent with JLL's normal and customary billing practices for cases of comparable size and complexity that require the level and scope of services to be provided in this case.

20.    Moreover, the Fee Structure has been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of JLL and its professionals, and in light of the fact that such commitment may foreclose other opportunities for JLL.

21.    JLL's expertise and experience in the realm of the type of Services that the Debtor requires were important factors in determining the Fee Structure. The Debtor believes that the ultimate benefit of the Services cannot be measured by reference to the number of hours to be expended by JLL's professionals in the performance of such Services.  The Debtor also believes that by using a transactional fee structure, JLL's compensation is directly tied to and contingent upon the amount of proceeds from sales of the Debtor's Property and aligns the interests of JLL with those of the Debtor.

22.    The Debtor respectfully submits that the Fee Structure set forth above is reasonable and should be approved under section 328(a) of the Bankruptcy Code, which specifically authorizes compensation of a professional person on a "percentage fee" or "contingent fee" basis. 11 U.S.C. § 328(a). The compensation terms negotiated with JLL were the result of arm's-length negotiations, and the Debtor believes such terms are fair and reasonable.

23.    Furthermore, the Debtor respectfully submits that, inasmuch as JLL's compensation is results-oriented and directly related to benefits received by the Debtor's estate,

6

requiring JLL to file periodic and final fee applications pursuant to Sections 330 and 331 of the Bankruptcy Code and in compliance with Bankruptcy Rule 2016 and Local Rule 2016-1 is unnecessary. JLL will be employed by the Debtor to perform a highly specialized task. It is JLL's general practice and the general practice of other similar type professionals who provide similar services, to be paid on a contingency fee basis, rather than keeping detailed time records similar to those customarily kept by attorneys. Because (i) JLL will not be paid unless and until it sells the Property for the Debtor, and (ii) pursuant to the terms of the Agreement, JLL's compensation will be based on the sale price for the Property rather than the number of hours that its professionals expend providing the services to the Debtor, the Debtor requests that JLL be excused from filing time records in accordance with United States Trustee Guidelines for the Northern District of New York and Local Rule 2016-1 and the requirement to file a final fee application. Instead, the compensation and reimbursement of expenses to JLL shall be included in the order approving the sale of the Property in such amounts as will be identified on the record of the hearing to approve the sale of the Property.

24.     This Court and other Courts in the Second Circuit has recognized in other cases that professionals need not file detailed time records in connection with providing services to a debtor on a contingency fee basis. *See e.g.*, *In re M. Burton Marshall*, Case No. 23-60263 (PGR) (Bankr. N.D.N.Y. Oct. 26, 2023) (allowing fee application without time records for real estate broker); *In re The College of New Rochelle*, Case No. 19-23694 (RDD) (Bankr. S.D.N.Y. Mar. 11, 2020) (allowing the submission of fee applications without time records for a real estate consultant retained on a contingency basis); *In re General Growth Properties, Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. Apr. 16, 2009) (allowing the submission of fee applications without time records for a property tax consultant retained on a contingency basis); In re *Musicland Holding Corp.*, Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Mar. 22, 2006) (allowing the submission of fee applications without time records for a real estate consultant on retainer and contingency basis); *In re Spiegel, Inc.*, Case No. 03-11540 (CB) (Bankr. S.D.N.Y.

May 29, 2003) (allowing the submission of a summary invoice for real estate consulting services on a contingency basis); *In re Teligent, Inc.*, Case No. 01-12974 (Bankr. S.D.N.Y. Nov. 20, 2001) (allowing the same for auctioneer services on a contingency basis).

### The Waiver, Indemnification and Limitation of Liability Provisions of the Agreement Are Reasonable Under the Circumstances

25.     Sections 10 through 12 of the Agreement provide waivers of claims for consequential damages, limitations of liability and limited indemnification for both JLL and the Debtor. Specifically, these sections state:

> 10. **Waiver of Claims**. Because damages under this Agreement that may be incurred by either party hereto are speculative in nature and are not subject to being estimated at the time of the execution of this Agreement, Broker and Owner hereby agree that neither Broker nor Owner shall be liable to the other for any special, consequential, incidental or punitive damages with respect to any claims relating to the Transaction(s) contemplated hereunder, even if the other party has been advised of the possibility of such damages and regardless of the nature of such other party's acts or failures to act. Furthermore, by their respective execution, Broker and Owner waive any right to claim or seek such damages. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

> 11.  **Indemnities**.

>> (a) Owner agrees to indemnify, defend and hold harmless "Broker" from and against any third party Claims (as hereinafter defined) as and to the extent arising as a result of, or otherwise in connection with (a) any misrepresentations or material omissions in any marketing information approved in writing by Owner or any other information Owner may elect to provide to (or refrain from providing to) "Broker" or any other party to any Transaction; (b) any photographic images, time lapse renderings, sketches or other media, provided to Broker by the Owner for use in connection with the marketing of the Property; (c) any Owner default under any agreement relating to the Transaction; and (d) Owner's gross negligence or willful misconduct.

>> (b) Broker agrees to indemnify, defend and hold harmless, "Owner" from and against any third party Claims as and to the extent arising as a result of or otherwise in connection with (a) any breach by Broker under this Agreement; (b) Broker's gross negligence or willful misconduct in the performance of its duties hereunder; and/or (c) any claim by another broker or co-broker who claims to have worked with Broker alleging the right to payment of a real estate commission.

8

(c) As used herein, (i) "Claims" means any and all fines, losses, damages, suits, claims, actions, demands, liabilities, costs and expenses (including, without limitation, attorney's fees), and (ii) "Owner" and "Broker" (in each instance with quotations included) shall include any officer, director, shareholder, partner, member or employee thereof.

12. **Limitation of Liability**. Notwithstanding the terms of the preceding paragraph, Broker and Owner both agree that if Broker should become liable to Owner for any cause whatsoever arising out of, or in any way related to this Agreement (including but not limited to any indemnification obligations hereunder, then the liability of Broker shall not exceed the Success Fee earned on this project. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

Agreement, §§ 10-12.

26.     The Debtor and JLL believe that the indemnification provisions, limited waiver and limitations of liability contained in the Agreement are customary and reasonable for JLL and comparable firms providing real estate brokerage services. Moreover, the terms and conditions of the indemnification and limitation of liability provisions were negotiated by the Debtor and JLL at arm's length and in good faith and largely run both ways between the parties. They are just as beneficial for the Debtor's estate as they are for JLL. Consequently, the Debtor requests that these provisions be approved in connection with the approval of the Agreement.

27.     Based on the foregoing, the Debtor submits that the relief requested is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted in all respects.

## JLL'S DISINTERESTEDNESS

28.     JLL has reviewed the list of parties in interest provided by the Debtor. To the best of the Debtor's knowledge, information, and belief, and except to the extent disclosed herein and in the Declaration of David Carlos in Support of Debtor's Application for order Pursuant to Sections 327(a) and 328 of the Bankruptcy Code Authorizing the Employment of Jones Lang

LaSalle Brokerage, Inc. as Real Estate Consultant, Broker and Advisor for the Debtor as of the Petition Date (the "Declaration"), attached hereto as **Exhibit "B"**, JLL: (a) does not hold any interest materially adverse to the Debtor's estate; (b) has no connection with the Debtor, its creditors, equity security holders, or related parties herein; and (c) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code (as modified by section 1107(b) of the Bankruptcy Code). The Debtor's knowledge, information, and belief regarding the matters set forth herein are based, and made in reliance, upon the Declaration.

29.    Despite the efforts to identify and disclose JLL's relationships with parties in interest in this chapter 11 case, JLL is unable to state with certainty that every client relationship or other connection has been disclosed in the Declaration. The Debtor has been informed that JLL will conduct ongoing reviews of their files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, JLL will promptly inform the Court as required by Bankruptcy Rule 2014(a).

30.    JLL has represented to the Debtor that it has not provided services to any parties other than the Debtor in this case or in conjunction with any matters that would be adverse to the Debtor arising from, or related to, this Chapter 11 case. JLL has further represented to the Debtor that neither it, nor its employees, have any connection to the U.S. Trustee or any person employed in the Office of the U.S. Trustee in the Northern District of New York.

31.    Because JLL is a full-service real estate services firm and a financial intermediary, it is possible that JLL may represent one or more prospective parties to a transaction involving the Property ("Transaction"). To market the Property properly and maximize the Debtor's recoveries, JLL cannot exclude those prospective parties from this process. To that end, as set forth in Section 16 of the Agreement, the Debtor has consented to JLL's potential dual representation of a prospective party to a Transaction. Notwithstanding that consent, JLL has agreed that Mr. Carlos and the other JLL personnel rendering services to the Debtor shall not represent or provide professional services to any prospective Transaction party with respect to

10

the Property.  In addition, as set forth in Section 16, of the Agreement, in the course of its professional duties, JLL may also be contacting select lending or financial institutions regarding their interest in financing a purchase of the Property in order to maximize proceeds for the benefit of the Debtor's estate.  In some cases, potential purchasers may request JLL's assistance in placing debt to consummate the purchase of the Property.  JLL will disclose to the Debtor all potential relationships between potential purchasers and JLL with respect to any such financing and may request the Debtor's permission to assist potential purchasers with financing.

32.    As set forth in the Declaration, JLL has not shared or agreed to share any of its compensation from the Debtor with any other person, other than other principals and employees of JLL, as permitted by section 504 of the Bankruptcy Code.

33.    Except as described herein, no commitments have been made or received by JLL, nor any member thereof, as to compensation or payment in connection with this chapter 11 case.

34.    Based on the Declaration, the Debtor believes that JLL is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code. The Debtor has been informed that JLL will conduct ongoing reviews of its files to ensure that no disqualifying circumstances arise, and if any new relevant facts or relationships are discovered, JLL will supplement its disclosure to this Court.

35.    The Debtor's retention of JLL pursuant to the terms and conditions set forth herein is necessary and in the best interests of the Debtor, its creditors and its estate.

36.    Accordingly, the Debtor seeks approval of JLL's retention effective as of the Petition Date, since the marketing of the Property after the filing of the Debtor's case will be continuous.

## NOTICE

37.    Notice of this Application has been provided to: (i) the Office of the United States Trustee for the Northern District of New York; (ii) the parties listed on the Debtor's top 20 largest unsecured creditors; (iii) the Debtor's prepetition bondholders; (iv) the proposed DIP lender; and

22484.3 21147269v2

(v) any other parties required to be served under any applicable Bankruptcy Rule or Local Rule.

The Debtor submits that, under the circumstances, no other or further notice is necessary.

## NO PRIOR REQUEST

38.      No previous application for the relief sought herein has been made to this or any

other Court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of the order substantially in the form

annexed as **Exhibit "C"**, authorizing the retention of JLL as real estate consultant, broker and

advisor to the Debtor and approving the terms of the Agreement, together with such other and

further relief as is just and proper.

Dated: Albany, New York
       October 10, 2024

CULLEN AND DYKMAN LLP

By: /s/  *Bonnie Pollack*
         Matthew G. Roseman, Esq.
         Bonnie L. Pollack, Esq.
         Kyriaki Christodoulou, Esq.
         Kelly McNamee Esq.
         80 State Street, Suite 900
         Albany, New York 12207
         (516) 357-3700

         *Proposed Attorneys for The College
         of Saint Rose*

12

# EXHIBIT "A"

## Exclusive Listing and Advisory Services Agreement

### FIRST AMENDMENT TO EXCLUSIVE LISTING AND ADVISORY SERVICES AGREEMENT

THIS FIRST AMENDMENT TO EXCLUSIVE LISTING AND ADVISORY SERVICES AGREEMENT ("Amendment") is to be effective as of September 26, 2024 (the "Effective Date"), and is made by and between THE COLLEGE OF SAINT ROSE ("Owner"), and JONES LANG LASALLE AMERICAS, INC. ("Broker"), with respect to the following:

<u>RECITALS</u>

A.     Broker and Owner entered into a certain Exclusive Listing and Advisory Services Agreement dated May 2, 2024_ ("Agreement"), pursuant to which Owner engaged Broker to sell the property located at 432 Western Avenue, Albany, NY (the "Property").

B.     Broker and Owner desire to amend the Agreement to reflect an extension of the term and other modifications, upon and subject to the terms, covenants and conditions hereinafter set forth.

<u>A G R E E M E N T</u>:

NOW, THEREFORE, in consideration of the foregoing Recitals, the mutual covenants and agreements contained in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     The term of the Agreement shall be extended so that it will expire on June 30, 2025.

2.     Section 19 (Confidentiality) is hereby modified by adding the following: "Notwithstanding the foregoing, in the event that Owner files for bankruptcy protection, the confidentiality obligations hereunder shall no longer apply."

3.     Capitalized terms not otherwise defined herein shall be defined as in the Agreement. This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. In all other respects, the Agreement shall remain unmodified and in full force and effect. There have been no additional oral or written representations or agreements with respect to the matters described herein. The parties hereby ratify the Agreement as amended by this Amendment as well as any actions taken by Broker and confirm that it is in full force and effect. In case of any inconsistency between the provisions of the Agreement and this Amendment, the latter provisions shall govern and control.

4.     This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which shall be deemed one and the same instrument.


REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

The parties have executed this Amendment as of the day and year first written above.

THE COLLEGE OF SAINT ROSE

By: _____
Name: _____
Title: _____

JONES LANG LASALLE AMERICAS, INC.

By: _____
Name:  Andrew Scandalios
Title:   Senior Managing Director



## EXCLUSIVE LISTING AND ADVISORY SERVICES AGREEMENT

This Exclusive Listing and Advisory Services Agreement ("Agreement") is dated as of May 2, 2024 (the "Effective Date"), between The College of Saint Rose ("Owner") and Jones Lang LaSalle Brokerage, Inc. ("JLL" or "Broker").

1.  **Basic Agreement Information**. This Section 1 contains the basic terms of this Exclusive Listing Agreement (this "Agreement") between the Owner (as herein defined) and the Broker (as herein defined). All other Sections of this Agreement are to be read in conjunction with the basic terms contained in this Section.

    a.  **Effective Date:**      May 2, 2024

    b.  **Owner:**      The College of Saint Rose, Albany, New York

    c.  **Broker:**      Jones Lang LaSalle Americas, Inc. ("JLL"), a Maryland corporation

    d.  **Property:**      432 Western Avenue located in Albany, NY and further described in Exhibit A
        attached hereto.

    e.  **Term:**      From the Effective Date until December 31, 2024.

    f.  **Post Term Protection Period:**   180 days following the expiration of the Term.

    g.  **Success Fee:**      As defined in Section 4 and computed and payable in accordance with Exhibit B

    h.  **Expense Reimbursement:** Broker shall be reimbursed for Reimbursable Expenses (as defined herein) up to
        an amount not to exceed $25,000 in accordance with the terms of Section 5.

2.  **Renewal of Term**. The Term shall be as set forth in Section 1 (e) above; provided, however, that if Owner and Broker agree, as evidenced by and subject to the execution by Owner and Broker of a written amendment to this Agreement so stating, then the Term shall be extended to such date as set forth more particularly in such written amendment.

3.  **Exclusive Agency and Post Term Protection Period**. Owner engages Broker as Owner's exclusive agent with respect to the sale of the Property for the Term. The Owner agrees to refer all inquiries by prospective purchasers, capital sources, brokers and any other interested parties to Broker during the Term.

    Owner shall pay the Success Fee listed in 1(g) to Broker if Owner (a) sells the Property to a prospective purchaser within the Term, (b) sells the Property to a prospective purchaser pursuant to a contract for sale (as the same may be amended) entered into during the Term, or (c) sells the Property to a prospective purchaser pursuant to a contract for sale (as the same may be amended) entered into during the Post Term Protection Period, provided that in the instance of sale described in item (c) above, (i) Broker shall have submitted to Owner in writing the name of the prospective purchaser during the Term or prior to the date which is five business (5) days after the termination of the Term and (ii) such prospective purchaser shall be a party with whom Broker had presented offering materials regarding the sale of the Property.

    The terms "prospective purchaser" and "purchaser" as used herein shall include any nominee, affiliate, successor or assign of a prospective purchaser or purchaser.

    Any and all references to the words "Property", "sells the Property" or "sale of the Property" contained herein shall be deemed to include a sale of all or any portion of the fee interest, leasehold interest and/or all or any portion of any beneficial ownership interests of the entity that directly or indirectly owns the Property (including but not limited to the sale of all or any portion of any partnership interests, stock, etc. in the ownership entity).

4.  **Success Fee**. In consideration of the services to be rendered by Broker pursuant to this Agreement, Owner shall pay to Broker the Success Fee noted in Section 1(g) above on the date of the closing of the sale of the Property via wire transfer or certified check. Owner hereby authorizes the title company, escrow agent or other closing agent to pay the fee to Broker at closing in the manner specified in the preceding sentence.

The term "Gross Purchase Price" as used herein shall mean the total consideration for the purchase and sale of the Property. In the event that Touro University, or any other higher education institution, merges with or into Client, or there is a change the control of Client, including, but not limited to merger of school charters or the purchase of secured bonds and not necessarily a sale of the real property (an "Alternative Transaction"), the Gross Purchase Price shall be calculated based on the value attributed to the Property as a part of such Alternative Transaction.

If the closing of a sale is not completed for any reason whatsoever, then no Success Fee shall be due Broker with respect to that sale, however, Broker shall be entitled to the receipt of the Reimbursable Expenses as detailed in Section 1(h) and Section 5. Notwithstanding the above, if a purchase contract is entered into and the Owner willfully defaults on the contract through no fault of the prospective purchaser, Owner shall pay Broker the Success Fee as well as the Reimbursable Expenses (as hereinafter defined).

5.    **Expense Reimbursement.** Owner agrees to reimburse Broker within 10 business days after receipt of an invoice thereof, but in no event later than the earlier to occur of (a) the Closing Date (if any) or (b) the expiration or termination of this Agreement, whichever occurs first, for any and all out of pocket expenses incurred in connection with the Transaction up to an amount not to exceed that set forth in Section 1 (h), including but not limited to, airfare, train fare, car rental, hotel expenses, other miscellaneous travel expenses, meals, entertainment, videos, photographs (including aerial photographs), marketing reports and Broker's graphics design fee (the "Reimbursable Expenses"). Broker shall obtain prior written approval from Owner before incurring a Reimbursable Expense in excess of $5,000.00.

6.    **Owner Approval of All Offering Materials.** Owner shall pre-approve all sales and marketing materials (and the statements contained therein) in writing before use by Broker.

7.    **Marketing of the Property and Marketing Status Reports.** Upon Owner's written request, Broker shall submit to Owner for Owner's review and approval (not to be unreasonably withheld or delayed) the names of any prospective purchaser prior to dissemination of any sales and marketing materials to such prospective purchaser. If Owner has not responded or objected to any name within five (5) business days of Broker's submission of the names, then the list shall be deemed approved by Owner.

Broker shall reasonably cooperate with any licensed real estate brokers or agents (the "Cooperating Agent") representing a prospective purchaser; provided, (a) the prospective purchaser has not been previously contacted by Broker as part of Broker's marketing of the Property; (b) prospective purchaser notifies Broker in writing that (i) the Cooperating Agent is representing the prospective purchaser in the acquisition of the Property and (ii) the prospective purchaser and the Cooperating Agent both agree in writing (A) that the prospective purchaser will pay the Cooperating Agent's fees, commissions, costs and expenses in connection with any transaction or potential transaction involving the purchase of the Property (any such transaction or potential transaction, a "Transaction") and (B) to indemnify, defend and hold both Broker and Owner harmless from and against any claims, costs or expenses that the Cooperating Agent might make against Broker or Owner; and (C) Broker shall not be obligated to share any part of its Success Fee as herein above with any Cooperating Agent.

Broker shall provide Owner with updated weekly, written reports summarizing all activities of Broker in connection with the Property, including summaries of marketing and media efforts. The City of Albany Capital Resource Corporation issued its Tax-Exempt Revenue Refunding Bonds, Series 2021 (The College of Saint Rose) in the original aggregate principal amount of $48,150,000 (the "Series 2021 Bonds"), which are secured by a mortgage on certain parcels of the real estate included within the Property. Upon written request from the Trustee for the Series 2021 Bonds or its legal counsel, and with reasonable prior written notice to Owner, the Broker shall participate in periodic conference calls with the Trustee and/or its counsel to provide a verbal update on the activities of Broker in connection with the Property. The Owner in its sole discretion may participate in such calls.

Broker shall maintain records of the offering package or the portions of the offering package delivered to a prospect and the dates such deliveries were made. Broker shall also keep other adequate books and records pertaining to its services under this Agreement and shall allow Owner upon prior written notice to examine such books and records, at any time prior to the date that is one hundred eighty (180) days following the end of the Term. During such period, Broker shall make available to Owner all records and correspondence relative to specific prospective purchasers as may be necessary or helpful to Owner.

8.    **Broker's Duties and Responsibilities.** Without limitation of any other service to be provided by Broker as described herein, during the Term Broker shall provide the following services: (1) accept, deliver and present to Owner offers and counteroffers to buy, sell, or lease the Property; (2) assist Owner in developing, communicating, negotiating, and presenting

offers and counteroffers until a sale or lease agreement is signed and all contingencies are satisfied or waived; and (3) answer Owner's questions relating to any offer, counteroffer, notice or contingency. Broker shall market the Property to prospective purchasers as Broker deems appropriate in its sole and absolute discretion, unless Owner otherwise so specifies to Broker in writing pursuant to the Notice provision below.

   Broker shall undertake a comprehensive research and evaluation process of all relevant information on each of the individual parcels/buildings comprising the Property as necessary to deliver a refined analysis of the estimated valuation of the Property (which will not be considered an appraisal, but a broker's opinion of value) within thirty (30) days after the Effective Date, showing an estimated opinion of value for the Property if the campus is sold in its entirety, and estimated valuations for alternative sales scenarios. The services provided under this Agreement shall include (1) the items listed in the preliminary timeline for a "4-8 month process" described in Exhibit C, and (2) providing support to the Owner with regard to discussions concerning the Property with interested third parties and stakeholders, including bondholders, government representatives, potential bridge lenders and community civic associations.

9.    **Broker's Independent Contract Status**. Broker is an independent contractor under this Agreement. Nothing contained herein or in the relationship of Owner and Broker shall be deemed to constitute a partnership, joint venture or any other relationship between Owner and Broker except as may be expressly set forth in this Agreement. Broker does not have the authority to bind Owner or any potential purchaser to any contract to purchase or sell the Property. Owner fully understands that Broker has no authority to bind any potential purchaser and Owner has not and will not rely on any representation or statement to the contrary unless contained in a writing signed by the potential purchaser to be bound.

10.   **Waiver of Claims**. Because damages under this Agreement that may be incurred by either party hereto are speculative in nature and are not subject to being estimated at the time of the execution of this Agreement, Broker and Owner hereby agree that neither Broker nor Owner shall be liable to the other for any special, consequential, incidental or punitive damages with respect to any claims relating to the Transaction(s) contemplated hereunder, even if the other party has been advised of the possibility of such damages and regardless of the nature of such other party's acts or failures to act. Furthermore, by their respective execution, Broker and Owner waive any right to claim or seek any such damages. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

11.   **Indemnities.**

      (a) Owner agrees to indemnify, defend and hold harmless "Broker" from and against any third party Claims (as hereinafter defined) as and to the extent arising as a result of, or otherwise in connection with (a) any misrepresentations or material omissions in any marketing information approved in writing by Owner or any other information Owner may elect to provide to (or refrain from providing to) "Broker" or any other party to any Transaction; (b) any photographic images, time lapse renderings, sketches or other media, provided to Broker by the Owner for use in connection with the marketing of the Property; (c) any Owner default under any agreement relating to the Transaction; and (d) Owner's gross negligence or willful misconduct.

      (b) Broker agrees to indemnify, defend and hold harmless, "Owner" from and against any and all third party Claims as and to the extent arising as a result of or otherwise in connection with (a) any breach by Broker under this Agreement: (b) Broker's gross negligence or willful misconduct in the performance of its duties hereunder; and/or (c) any claim by another broker or co-broker who claims to have worked with Broker alleging the right to payment of a real estate commission.

      (c) As used herein, (i) "Claims" means any and all fines, losses, damages, suits, claims, actions, demands, liabilities, costs and expenses (including, without limitation, attorney's fees), and (ii) "Owner" and "Broker" (in each instance with quotations included) shall include any officer, director, shareholder, partner, member or employee thereof.

12.   **Limitation of Liability**. Notwithstanding the terms of the preceding paragraph, Broker and Owner both agree that if Broker should become liable to Owner for any cause whatsoever arising out of, or in any way related to this Agreement (including but not limited to any indemnification obligations hereunder), then the liability of Broker shall not exceed the Success Fee earned on this project. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

13.   **Legal Costs and Expenses**. Without limiting any other provisions set forth herein, in the event that Broker is subjected to legal process, discovery or called as a witness in any proceedings regarding any aspect of the Transaction, Owner agrees to pay any third-party costs (including, without limitation, attorney fees) incurred in connection with Broker's response to, or participation in, such proceedings (unless and to the extent such proceedings arise solely as a result of Broker's breach of contract, negligence or willful misconduct). If either party shall institute any action or proceeding against the other relating to enforcement of this Agreement, the unsuccessful party in the action or proceeding will reimburse the prevailing party for all reasonable expenses, attorneys' fees, and disbursements.

14.   **Notice Provisions**. Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed given when delivered (a) by registered or certified mail, United States Postal Service, postage prepaid, return receipt requested to the respective address listed below; (b) by email, with confirmation of receipt, followed by a copy given in accordance with the provisions in subparagraph (a) or (b); or (c) by a generally recognized commercial courier service or overnight delivery service, with receipt for delivery. Addresses for purposes of the foregoing are:

|  |  |
|---|---|
| To Broker: | Jones Lang LaSalle Brokerage, Inc. |
|  | 330 Madison Avenue, 5th Floor |
|  | New York, NY 10017 |
|  | Attn: David Carlos |
|  | Phone: (917) 541-5888 |
|  | Email: David.carlos@jll.com |
| With a copy to: | Jones Lang LaSalle Brokerage, Inc. |
|  | 200 East Randolph Street |
|  | Chicago, IL 60601 |
|  | Attn: Regional Counsel – NY |
|  | Phone: |
|  | Email: michelle.fellows@jll.com |
| To Owner: | The College of Saint Rose |
|  | 432 Western Avenue |
|  | Albany, NY 12203 |
|  | Attn: President's Office |
|  | Phone: (518) 454-5121 |
|  | Email: thomsonl@strose.edu |
| With a copy to: | Cullen and Dykman LLP |
|  | 333 Earle Ovington Blvd, 2nd Floor |
|  | Uniondale, NY 11553 |
|  | Attn: Kevin P. McDonough, Esq. |
|  | Phone: (516) 357-3787 |
|  | Email: kmcdonough@cullenllp.com |

15.   **Owner's Disclosures**. Owner shall disclose to Broker and to prospective purchasers any information relevant to a sale of the Property that Owner has, to the best of Owner's knowledge, regarding the physical and financial condition of the Property, including, but not limited to, rent rolls, operating statements, general ledgers, the presence and location of asbestos, mold, PCB transformers, and other toxic, hazardous or contaminated substances in, on, under or about the Property, as well as any other environmental or engineering or structural issues the Owner is aware of. Additionally, Owner shall disclose material adverse changes to any of the above during the Term or Post Term Protection Period.

16.   **Broker's Disclosures**. Owner acknowledges that Broker is a full service real estate services firm and a financial intermediary and may represent, through listing agreements, debt placement engagements, correspondent production and servicing contracts or otherwise, (a) prospective purchasers and/or tenants of the Property, and/or (b) owners, mortgagees or tenants of property that have the same or similar qualities and characteristics as the Property and which may compete with the Property and/or (d) parties having a security interest in the Property. Subject to the terms set forth below, Owner hereby consents to any dual representation or competitive relationship that may be created by Broker's various engagements and agrees not to use any such relationship as the basis for a claim against Broker (provided that Broker shall disclose any such competing relationships to Owner). Broker shall also disclose to Owner

at the time of presenting any offer on the Property whether the prospective purchaser is a client or affiliate of the Broker.

Without limiting the foregoing, Owner understands that Broker may also be contacting select lending or financial institutions regarding their interest in financing the Property in order to maximize proceeds for Owner. In some cases, potential purchasers may request Broker's assistance in placing debt on the Property to consummate the purchase of the Property. Broker will disclose to Owner all potential relationships between potential purchaser and Broker with respect to any such financing and request Owner's permission to assist potential purchasers with the financing of the Property. Owner shall have the right, in its sole and absolute discretion, to either approve or decline to grant permission for Broker's representation of a purchaser in connection with obtaining financing for the acquisition of the Property.

17.  **Purchase and Sale Agreement, Partnership Agreement and Closing Statement.** Owner agrees to provide to Broker no later than within five (5) business days: (i) a copy of the fully executed purchase and sale and/or partnership agreement for the Property when executed by all parties; and (ii) a copy of the fully executed closing statement when the sale of the Property is closed.

18.  **Advertising.** Upon the consummation of a sale of the Property, Broker shall have the right to issue press releases regarding the transaction. Additionally, Broker may advertise such sale, provided that such advertisement shall not include any details of the terms of the sale other than Broker's participation in the Transaction, and the identity of the purchaser and seller. Broker may request to include additional details regarding the terms of the sale, but any such additional details shall be subject to Owner's written consent, not to be unreasonably withheld or delayed.

19.  **Confidentiality.** During the term of this Agreement, and for two (2) years following the expiration or termination of this Agreement, Owner and Broker both agree to keep the contents of this Agreement confidential, provided that Broker may disclose the contents of the agreement in connection with the payment or collection of its Success Fee and either party may disclose information to its prospective lenders and their respective attorneys, accountants, or other financial advisors in connection with performing their obligations hereunder.

20.  **Severability.** If any term or provision of this Agreement is held to be void or unenforceable, such term or provision will be ineffective and separable from the remaining terms and provisions of this Agreement without invalidating the remaining terms or provisions of this Agreement. In lieu of any invalid or unenforceable provision, a valid and enforceable provision will automatically be added containing terms as similar as possible to the ineffective provision and the parties request the court or any arbitrator to whom disputes relating to this Agreement are submitted to reform the ineffective provision in accordance with this paragraph.

21.  **Right to Assign.** Any Transaction arising under this Agreement is intended to constitute the sale or financing of real estate or an interest therein, and not the sale of a security. In the event that, in the reasonable judgement of Broker, a Transaction under this Agreement may constitute the sale of a security, Broker shall have the right to assign its rights and obligations hereunder to any of its affiliates that hold appropriate securities broker dealer licenses, and such affiliate shall assume all rights and obligations of Broker hereunder with respect to services requiring a securities broker dealer license.

22.  **Photography and Drawings.** If the photography, media, time lapse images and other work product (collectively referred to as the "Work Product") of a professional photographer engaged in connection with the marketing of the Property, is requested by Owner for use in any way other than Broker's marketing efforts, Broker shall use commercially reasonable efforts to ensure that Owner may (at its sole cost and expense) obtain usage rights of the Work Product at an additional charge from the photographer.

23.  **Waiver of Jury Trial.** EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY PERFORMANCE OR FAILURE TO PERFORM OF ANY OBLIGATION HEREUNDER.

24.  **OFAC.** Owner represents and warrants that neither it nor any of its employees is a person or entity with whom U.S. entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action.

25.  **Miscellaneous.** This Agreement contains the entire agreement between the parties and supersedes any and all discussions or agreements, representations or statements, oral or written, made prior to or contemporaneously with the execution hereof. This Agreement may be executed in one or more counterparts, each of which counterpart a) shall be deemed an original, b) shall be binding upon and inure to the benefit of the parties hereto and their heirs, successors and assigns, and c) shall be effective and valid under applicable state law. The parties agree that an electronic signature will be considered an original signature. Any agreement hereafter made shall be ineffective to modify this Agreement, unless such agreement is in writing and signed by both Owner and Broker. The individual(s) executing this Agreement on behalf of Owner, warrant and represent that, with respect to the agreements contained herein, he or she has the authority to bind Owner, persons owning an interest in Owner. Each of Owner and Broker agrees to offer the Property in compliance with all applicable anti-discrimination laws, statues, and ordinances.  Owner agrees to comply with all applicable federal, state, and local, laws, regulations, codes, ordinances, and administrative orders which pertain to and have jurisdiction over the Property and Owner, including without limitation, the 1964 Civil Rights Act, the Foreign Investment in Real Property Tax Act (FIRPTA), the Comprehensive Environmental Response Compensation Act, the Americans with Disabilities Act, and all amendments thereto as may apply. This Agreement shall be governed by the laws of the State of New York and the venue for any legal proceedings regarding this Agreement shall be in Albany County, New York.

## *[SIGNATURE BLOCKS FOLLOW]*

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first above written.

**BROKER: Jones Lang LaSalle Brokerage, Inc. ("JLL"), a Maryland corporation**

By: _____        By: _____
    **Approved Signatory**                   **David Carlos**
                                             **Sponsoring Licensed Broker**

Agreed and accepted as of the _2_ day of _MAY_, _2024_

**OWNER**

Name:  **THE COLLEGE OF SAINT ROSE**

By: _____

Name:  Jeffrey Stone _____

Title:  Chair of the Board of Trustees _____

## EXHIBIT A

**See Attached Property List for Identification of Real Estate Comprising "Property"**

The College of Saint Rose                                                                 Property List

| Tax Map # | Street # | Street Name | |
|---|---|---|---|
| 64.58-1- 19 | 90 | S Manning | |
| 64.59-4- 3 | 1020 | Madison | |
| 64.60-1- 4 | 399 | Western | |
| 64.60-1- 8 | 415 | Western | |
| 64.60-1- 8.401 | 401 (415) | Western | |
| 64.60-1- 8.405 | 405 (415) | Western | |
| 64.60-1- 8.409 | 409 (415) | Western | |
| 64.60-1- 9 | 417 | Western | driveway |
| 64.60-1- 20 | Paper Street | Hudson (157 Erie) | parking/driveway |
| 64.60-2- 1 | 420 (400) | Western | |
| 64.60-2- 2 | 420 (404) | Western | |
| 64.60-2- 3 | 420 (408) | Western | |
| 64.60-2- 4 | 428 | Western | riley plaza (Western) |
| 64.60-2- 5 | 432 | Western | |
| 64.60-2- 6 | 438 | Western | driveway |
| 64.60-2- 7 | 442 | Western | |
| 64.60-2- 8 | 444 | Western | |
| 64.60-2- 9 | 450 | Western | |
| 64.60-2- 10 | 454 | Western | |
| 64.60-2- 11 | 458 | Western | |
| 64.60-2- 12 | 460 | Western | |
| 64.60-2- 13 | 464 | Western | |
| 64.60-2- 18 | 1009 (1015) | Madison | |
| 64.60-2- 19 | 1009 (1009) | Madison | |
| 64.60-2- 20 | 1009 (1007) | Madison | |
| 64.60-2- 21 | 1009 (1005) | Madison | |
| 64.60-2- 22 | 1009 (1003) | Madison | |
| 64.60-2- 23 | 1001 | Madison | |
| 64.60-2- 25 | 993 | Madison | |
| 64.60-2- 26 | 989 | Madison | riley plaza (Madison) |
| 64.60-2- 27 | 985 (983) | Madison | |
| 64.60-2- 28 | 979 | Madison | |
| 64.68-1- 1 | 392 (394) | Western | |
| 64.68-1- 2 | 384 | Western | |
| 64.68-1- 3 | 380 | Western | |
| 64.68-1- 4 | 376 (378) | Western | |
| 64.68-1- 5 | 374 | Western | |
| 64.68-1- 6 | 368 (370) | Western | |
| 64.68-1- 7 | 366 A&B (366) | Western | |
| 64.68-1- 8 | 358 | Western | |
| 64.68-1- 9 | 354 | Western | |
| 64.68-1- 10 | 350 | Western | |
| 64.68-1- 11 | 178 | Partridge | |
| 64.68-1- 12 | 186 | Partridge | |
| 64.68-1- 13 | 188 | Partridge | |
| 64.68-1- 14 | 190 | Partridge | |
| 64.68-1- 15 | 192 | Partridge | vacant lot |
| 64.68-1- 16 | 194 | Partridge | vacant lot |

4/23/2024                                                                                  1of 2

The College of Saint Rose

Property List

| Tax Map # | | Street # | Street Name | |
|---|---|---|---|---|
| 64.68-1- | 17 | 196 | Partridge | vacant lot |
| 64.68-1- | 18 | 198 | Partridge | |
| 64.68-1- | 20 | 200/202 | Partridge | |
| 64.68-1- | 21 | 204 | Partridge | |
| 64.68-1- | 22 | 206 | Partridge | |
| 64.68-1- | 23 | 210 | Partridge | |
| 64.68-1- | 24 | 212 | Partridge | |
| 64.68-1- | 44 | 917 | Madison | |
| 64.68-1- | 45 | 919 (915) | Madison | |
| 64.68-1- | 46 | 921 | Madison | |
| 64.68-1- | 47 | 923 | Madison | |
| 64.68-1- | 48 | 935 | Madison | |
| 64.68-1- | 49 | 939-943 (937) | Madison | |
| 64.68-1- | 50 | 939-943 (943) | Madison | |
| 64.68-1- | 51 | 947 | Madison | |
| 64.68-1- | 52 | 953 (955) | Madison | |
| 64.68-1- | 53 | 959 | Madison | |
| 64.68-1- | 54 | 963 | Madison | |
| 64.68-1- | 55 | 967 | Madison | |
| 64.68-1- | 56 | 971 | Madison | |
| 64.68-1- | 57 | 975 | Madison | Alumni garden |
| 64.68-2- | 1 | 1006 | Madison | |
| 64.68-2- | 2 | 1002 | Madison | |
| 64.68-2- | 3 | 996-1000 (1000) | Madison | |
| 64.68-2- | 3.637 | R637-659 | Morris | |
| 64.68-2- | 4.2 | 994 | Madison | |
| 64.68-2- | 7 | 968-974 (968) | Madison | |
| 64.68-2- | 8.2 | 962 | Madison | vacant lot |
| 64.68-2- | 10 | 956 | Madison | |
| 64.68-2- | 12 | 946-950 | Madison | |
| 64.68-2- | 13 | 944 | Madison | |
| 64.68-2- | 14 | 940 | Madison | |
| 64.68-2- | 17 | 930 | Madison | |
| 64.68-2- | 23 | 912 | Madison | |
| 64.68-2- | 25 | 908 | Madison | |
| 64.68-2- | 70 | R573-583 | Morris | parking |
| 64.68-2- | 72 | R936-958 | Madison | parking |
| 64.68-3- | 12 | 568 | Morris | |
| 65.61-2- | 1 | 340 | Western | |
| 76.70-1- | 28 | NA | S O'Connell | vacant lot |
| 76.70-1- | 29 | NA | S O'Connell | vacant lot |
| 76.70-1- | 30 | NA | S O'Connell | vacant lot |
| 76.70-1- | 31 | NA | S O'Connell | vacant lot |
| 76.70-1- | 32 | NA | S O'Connell | vacant lot |
| 76.70-1- | 33 | NA | S O'Connell | vacant lot |
| 76.70-1- | 34 | NA | S O'Connell | vacant lot |

4/23/2024

2 of 2

22484.121022527v1

## EXHIBIT B

**SALE TRANSACTION**

Rate of Commission of the Gross Sales Price is 3.75% with an additional .25% earned if the sale of all or substantially all of the Property closes before the expiration of the Term on December 31, 2024.

Computation of Gross Sales Price: The commission shall be computed in accordance with the above rates based upon the Gross Sales Price, which shall include any mortgages or loans which may be assumed by the purchaser or which the purchaser takes title "subject to", including any purchase money loans or mortgages taken back by the seller.

Time of Payment: In the event of a sale, commission shall be earned, due and payable in full at the time of the closing or transfer of title to the property.

## EXHIBIT C

## Preliminary Timeline

### 4-8 month process

| Strategy | Pre-marketing | Marketing | Bidding | Documentation and Close |
|---|---|---|---|
| • Kick-off meeting<br>• Full due diligence review<br>• Zoning analysis<br>• Environmental report<br>• Financing consultation<br>• Property conditions assessments<br>• Valuation refinement<br>• Investor database<br>• Due diligence library<br>• Confidentiality agreement<br>• Marketing collateral | • Electronic launch<br>• Investor monitoring<br>• Lender discussions<br>• Partnership arrangement<br>• Due diligence questions<br>• Continuous reporting<br>• Update meeting<br>• Bid deadline<br>• Bid documents | • Multiple rounds of bidding<br>• Follow-up<br>• Short list<br>• Best-and-final discussions<br>• Final-round bids<br>• Bidder interviews<br>• Decision meeting<br>• Awarding the deal<br>• Timing considerations | • PSA negotiation<br>• Final documentation<br>• Contract signing<br>• Closing statements |
| 2-4 Weeks | 6-9 Weeks | 4-6 Weeks | 8-12 Weeks |

 JLL

10

The College of Saint Rose

# EXHIBIT "B"

## Declaration of David Carlos

CULLEN AND DYKMAN LLP
80 State Street, Suite 900
Albany, New York 12207
Matthew G. Roseman, Esq. (admission pro hac vice pending)
Bonnie L. Pollack, Esq. (admission pro hac vice pending)
Kelly McNamee, Esq. (admission pro hac vice pending)
(516) 357-3700

*Proposed Attorneys for The College of Saint Rose*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                             :
In re:                                                       :  Chapter 11
                                                             :
THE COLLEGE OF SAINT ROSE,                                   :  Case No. 24-11131 (REL)
                                                             :
                    Debtor.                                  :
                                                             :
------------------------------------------------------------- X

## DECLARATION OF DAVID CARLOS IN SUPPORT OF THE APPLICATION OF THE CHAPTER 11 DEBTOR'S MOTION FOR AN ORDER AUTHORIZING THE EMPLOYMENT OF JONES LANG LASALLE BROKERAGE, INC. AS REAL ESTATE CONSULTANT, BROKER AND ADVISOR FOR THE DEBTOR AS OF THE PETITION DATE

STATE OF NEW YORK      )
                       )ss:
COUNTY OF NEW YORK  )

David Carlos, declares the following under the penalty of perjury:

1.      I am Vice Chairman and Head of Nonprofit, Education & Government Practice  of Jones Lang LaSalle Brokerage, Inc. ("JLL"), which maintains an office at 330 Madison Avenue in New York, New York.

2.      I submit this Affidavit pursuant to section 327(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure

22484.3 21147269v2

(the "Bankruptcy Rules") in support of the application (the "Application")[1] of the above-captioned

Debtor to employ and retain JLL to serve as the Debtor's real estate consultant, broker and advisor

as set forth in the Application and the Agreement, a true and correct copy of which is attached to

the Application as Exhibit "A". Except as otherwise indicated, I have personal knowledge of the

matters set forth herein and, if called as a witness, would testify competently thereto.[2]

3.      JLL is a qualified and experienced and nationally recognized brokerage firm that

has the resources, capabilities, and experience to assist the Debtor in pursuing a Transaction with

respect to the Property.

4.      JLL's depth of experience in property management, marketing, and brokerage

services makes JLL uniquely qualified to deal effectively with the issues that may arise in the

context of this Chapter 11 Case.

5.      JLL and its professionals have extensive experience working with companies from

a variety of industries in complex financial restructurings, both out-of-court and in chapter 11

cases. JLL professionals have been retained as brokers in numerous cases, including, among

others: *In re Stanadyne LLC et al.*, Case No. 23-10207 (TMH) (Bankr. D. Del.) [Docket No. 439];

*In re Lighthouse Resources, Inc. et al.*, Case No. 20-13056 (JTD) [Docket No. 155], *In re Pier 1

Imports, Inc., et al.*, Case No. 20-30805 (KRH) (Bankr. E.D. Va.) [Docket No. 899]; *In re Celadon

Grp., Inc., et al.*, Case No. 19-12606 (KBO) (Bankr. D. Del.) [Docket No. 706]; *In re Sears

Holdings Co., et al.*, Case No. No. 18-23528 (RDD) (Bankr. S.D.N.Y.) [Docket No. 1390]; and *In*

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Application.

[2] Certain of the disclosures herein may relate to matters within the knowledge of other professionals at JLL and are based on information provided by them.

*re SFX Entm't, Inc.*, Case No. No. 16-10238 (MFW) (Bankr. D. Del.) [Docket No. 647].  JLL has extensive experience working efficiently with debtors in possession as well as trustees and their other retained professionals.

A.    **Scope of Services**

6.    JLL will perform services for the Debtor, upon the request of the Debtor, as set forth in the Agreement, including, but not limited to the following:

    a.  accept, deliver and present to Debtor offers and counteroffers to buy, sell, or lease the Property;

    b.  assist Debtor in developing, communicating, negotiating, and presenting offers and counteroffers until a sale or lease agreement is signed and all contingencies are satisfied or waived;

    c.  answer Debtor's questions relating to any offer, counteroffer, notice or contingency;

    d.  market the Property to prospective purchasers;

    e.  undertake a comprehensive research and evaluation process of all relevant information on each of the individual parcels/buildings comprising the Property as necessary to deliver a refined analysis of the estimated valuation of the Property the items listed in the preliminary timeline for a "4-8 month process" described in Exhibit "C" to the Agreement; and

    f.  providing support to the Debtor with regard to discussions concerning the Property with interested third parties and stakeholders, including bondholders, government representatives, potential lenders and community civic associations.

B.    **Professional Compensation**

7.    Pursuant to the terms of the Agreement, JLL is entitled to payment of a fee at closing of a sale(s) of the Property out of the sale proceeds equal to (i) 3.5% of the Gross Proceeds[3] with an additional .25% earned if the sale(s) of all or substantially all of the Property closes before

---

[3] Gross Proceeds means the total consideration paid or payable to the Debtor which shall include any mortgages or loans which may be assumed by the purchaser or which the purchaser takes title "subject to", including any purchase money loans or mortgages taken back by the seller.

December 31, 2024, plus reimbursement of JLL actual, reasonable, third party out-of-pocket expenses, up to a limit of $25,000 (collectively, the "Fee Structure").

8.    The Fee Structure summarized above and described fully in the Agreement is consistent with JLL's normal and customary billing practices for comparably sized and complex cases and transactions, both in and out-of-court, involving the services to be provided in connection with the chapter 11 case. It is JLL's general practice and the general practice of other similar professionals who provide similar services, to be paid on a contingency fee basis, rather than keeping detailed time records similar to those customarily kept by attorneys.

**C.    Disinterestedness and Eligibility**

9.    The Debtor has numerous creditors, equity holders, and other parties in interest with which they maintain business relationships. In connection with the Debtor's proposed retention of JLL in this chapter 11 case, to determine whether it had any conflicts or other relationship that might cause it to not be disinterested or to hold or represent an interest adverse to the Debtor. JLL conducted a comprehensive review of these interested parties in this chapter 11 case as set forth in the list provided by the Debtor, a copy of which is attached hereto as **Schedule 1** (the "Potential Parties in Interest").

10.    JLL team members entered the Potential Parties in Interest into JLL's computer database containing the names of all clients and conflict information concerning such clients of JLL for the past six months.  This inquiry revealed that certain of the Potential Parties in Interest are current or former JLL clients.  The list of such clients is attached hereto as **Schedule 2** and incorporated herein.

11.    JLL has not provided services to any of the entities on Schedule 2 in connection with the matters for which JLL is being retained by the Debtor.  In addition, none of those entities

have had any involvement with the services that JLL has rendered to the Debtor and I do not anticipate that any of the entities listed in Schedule 2 will have any involvement with the services that JLL will render to the Debtor or that these representations will impact the services rendered to the Debtor in any way. Furthermore, none of the entities listed in Schedule 2 account for even one percent of gross annual revenues for JLL and its affiliated entities.

12.    To the best of my knowledge and belief, JLL (i) does not hold any interest materially adverse to the Debtor's estate, (ii) has no connection with the Debtor, its creditors, equity security holders, or related parties herein except as set forth on Schedule 2, and (iii) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code (as modified by section 1107(b) of the Bankruptcy Code).

13.    To the best of my knowledge, information, and belief, insofar as I have been able to ascertain after reasonable inquiry, JLL has not been retained to assist any entity or person other than the Debtor on matters relating to, or in direct connection with, this chapter 11 case, except as otherwise disclosed herein. The Agreement between JLL and the Debtor does contemplates that, under certain circumstances, JLL personnel may represent an entity with whom the Debtor may wish to enter into a Transaction with respect to the Property. Under those circumstances, neither I nor the other professionals providing services to the Debtor will provide any services to any other such party and JLL will timely inform the Debtor, the United States Trustee, and any committee of unsecured creditors formed in the Debtor's chapter 11 case of such dual representation. In addition, JLL will continue to provide professional services to entities that may be creditors or equity security holders of the Debtor or other parties in interest in the Debtor's chapter 11 case, provided that such services do not relate to, or have any direct connection with, the chapter 11 case or the Debtor.

14.     I am not related or connected to and, to the best of my knowledge after reasonable inquiry, no other professional of JLL who will work on this engagement is related or connected to, any United States Bankruptcy Judge for the Northern District of New York, any of the District Judges for the Northern District of New York, the United States Trustee for the Northern District of New York, or any employee in the Office of the United States Trustee for the Northern District of New York.

15.     As part of its diverse practice, JLL appears in numerous cases, proceedings, and transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who may represent claimants and parties in interest in the Debtor's chapter 11 case. Also, JLL has performed in the past, and may perform in the future, real estate consulting and advisory services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings. In addition, JLL may have in the past, may currently, and may in the future work with or against other professionals involved in this case in matters unrelated to the Debtor and this chapter 11 case. Based on my current knowledge of the professionals involved in this chapter 11 case, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtor in matters upon which JLL is to be employed, and none are in connection with this chapter 11 case.

16.     Despite the efforts to identify and disclose JLL's relationships with parties in interest in this chapter 11 case, I am unable to state with absolute certainty that every client relationship or other connection has been disclosed in this Declaration. JLL, therefore, has informed the Debtor that JLL will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are

22484.3 21147269v2

discovered or arise, JLL will promptly file a supplemental declaration with the Court as required by Local Bankruptcy Rules.

17.    I do not believe that JLL is a "creditor" with respect to fees and expenses of any of the Debtor within the meaning of section 101(10) of the Bankruptcy Code. Further, neither I nor any other member of the JLL engagement team serving the Debtor, to the best of my knowledge, is a holder of any outstanding debt instruments or other equity interests or securities of the Debtor.

18.    As such, to the best of my knowledge, JLL is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that JLL:

(a)    is not a creditor, equity security holder or insider of the Debtor;

(b)    is not and was not an investment banker for any outstanding security of the Debtor;

(c)    has not been, within three years before the date of the filing of the Debtor's Chapter 11 petition, (i) an investment banker for a security of the Debtor or (ii) an attorney for such an investment banker in, connection with the offer; sale, or issuance of a security of the Debtor; and

(d)    was not, within two years before the date of filing of the Debtor's chapter 11 petition, a director, officer, or employee of the Debtor or any investment banker as specified in subparagraph (b) or (c) of this paragraph.

19.    In addition, to the best of my knowledge and based upon the results of the relationship search described above and disclosed herein, JLL neither holds nor represents an interest adverse to the Debtor within the meaning of Section 327(a) of the Bankruptcy Code.

20.  It is JLL's policy and intent to update and expand its ongoing relationship search for additional parties in interest in an expedient manner. If any new material relevant facts or relationships are discovered or arise, JLL will promptly file a Bankruptcy Rule 2014(a) Supplemental Declaration.

21.  In accordance with section 504 of the Bankruptcy Code, I hereby state that there is no agreement or understanding between JLL and any other entity, other than a partner or associate of JLL for the sharing of compensation received or to be received for services rendered in connection with these proceedings.

22.  This Declaration is provided in accordance with Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014.

23.  Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       October 7, 2024

s/  *David Carlos*
David Carlos

## **SCHEDULE 1**

<u>Creditors</u>

- Sodexo Operatings LLC
- Barnes and Noble
- Watermark
- EAB
- Elsevier
- Crown Castle
- First Light

<u>Contract Parties:</u>

- Adirondack Combustion Technologies
- Albany Fire Extinguisher
- Albany Fire Protection, Inc.
- Cap Financial Partners, LLC dba Captrust Financial Advisors
- Center for Integrated Teacher Education, Inc.
- Century Line (Lumen)
- City of Albany
- County Waste and Recycling
- DDCues LLC
- Eastern Heating and Cooling Inc.
- Envisions LLC
- Ferilli
- Fire, Security & sound Systems, Inc.
- H.T. Lyons
- Heartland
- IBM
- Integrated Security and Communications
- LVW Advisors
- Mark's Organic Pest Control
- Michael Sutter Company
- MVP Select Care Inc.
- National Student Clearinghouse

- MERCOMP
- Otis Elevator
- RAVE Mobile Safety
- SmartCatalog
- Tab Service Company
- TIAA
- Touchnet Information Systems
- Tri County Refrigeration
- Usherwood
- Vertical Transportation Consulting LLC
- Zoom Video Communications Inc.

Utilities:

- Albany Water Board
- National Grid
- NRGB Direct Energy
- Spectrum
- Verizon

CGD Provider:

- Bullrock
- Green Street Power Partners
- Hope Solar Farm LLC
- Salmon River Solar LLC
- Saratoga Solar II, LLC
- Sunvestment Energy Group
- Washington Avenue Solar
- First Light Fiber/Tech Valley Communication

Insurance:

- Hartford Fire Insurance Co.
- Twin City Fire Insurance Co.
- Great American Insurance Group
- Indian Harbor Insurance Company
- United Educators Insurance

- Princeton Excess & Surplus Lines Inc. Co.
- Evanston Insurance Company
- Trisura Specialty Insurance Company
- RSUI Indemnity Company
- Berkshire Hathaway
- Berkley Insurance Company
- MEMIC Indemnity Co.

Secured Creditors:

- Canon Financial Services Inc.
- Summitbridge National Investments VIII LLC
- Manufacturers and Traders Trust Company, as Trustee
- Invesco Advisers, Inc.
- Blackrock Advisors, LLC
- City of Albany Capital Resource Corporation

{JLL/001/00066022.DOCX/}

## **SCHEDULE 2**

- Berkshire Hathaway
- Berkshire Hathaway Commercial Division
- Berkshire Hathaway Fox and Roach
- Berkshire Hathaway Home Services
- Berkshire Hathaway Maui Properties
- IBM
- National Grid USA Service Co., Inc.
- Otis Elevator Company
- Sodexo Inc. and Affiliates
- Verizon
- Verizon Accounts Payable
- Verizon AP
- Verizon Business
- Verizon Wireless
- Zoom Video Communications Inc.

## EXHIBIT "C"

## Proposed Order

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

In re:                                          :     Chapter 11
                                                :
THE COLLEGE OF SAINT ROSE,                      :     Case No. 24-11131 (REL)
                                                :
                    Debtor.                     :
                                                :
                                                :
------------------------------------------------------------------ x

**ORDER PURSUANT TO SECTIONS 327(a) AND 328 OF THE BANKRUPTCY CODE
AUTHORIZING THE RETENTION AND EMPLOYMENT OF JONES LANG
LASALLE BROKERAGE, INC. AS REAL ESTATE CONSULTANT, BROKER AND
ADVISORS FOR THE DEBTOR AS OF THE PETITION DATE**

Upon the considering of the application (the "Application")[1] of the debtor in the above-

captioned case (collectively, the "Debtor"), for entry of an order pursuant to sections 327(a) and

---

[1] Capitalize terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Application.

328 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), Rule 2014 of the

Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules") and Rule 2014-1 of the Local

Rules for the United States Bankruptcy Court for the Northern District of New York (the "Local

Rules") approving the retention of Jones Lang LaSalle Brokerage, Inc. ("JLL") as the Debtor's

real estate consultant, broker and advisor to assist the Debtor in selling the Debtor's Property upon

the terms of the Agreement annexed to the Application as Exhibit "A"; and upon the Declaration

of David Carlos in Support of Debtor's Application for order Pursuant to Sections 327(a) and 328

of the Bankruptcy Code Authorizing the Employment of Jones Lang LaSalle Brokerage, Inc. as

Real Estate Consultant, Broker and Advisor for the Debtor as of the Petition Date (the

"Declaration"), annexed to the Application as Exhibit "B"; and it appearing that the Court has

jurisdiction to consider the Application; and it appearing that the relief requested in the Application

is in the best interests of the estate; and the Court being satisfied, based on the representations

made in the Application and the Declaration, that JLL represents or holds no interest adverse to

the Debtor's estate and is disinterested under section 101(14) of the Bankruptcy Code, as modified

by section 1107(b) of the Bankruptcy Code; and it appearing that due and appropriate notice of the

Application has been given; and it appearing that no other or further notice be provided; and good

and sufficient cause appearing therefore, it is

     ORDERED, that the Application is GRANTED as provided herein; and it is further

     ORDERED, that in accordance with sections 327(a) and 328 of the Bankruptcy Code, the

Debtor is hereby authorized to retain JLL as its real estate consultant, broker and advisor; and it is

further

     ORDERED, that the terms of the Agreement, including the Fee Structure set forth therein,

and the provisions relating to waivers of claims, indemnification and limitations of liability, are

2

hereby approved; and it is further

ORDERED, that given the percentage-based fee structure and the limitation on expense reimbursement provided for in the Agreement, and given that JLL does not earn their fee until a sale(s) is approved by this Court and title passes to a buyer, JLL is excused from filing time records and interim and final fee applications in accordance with United States Trustee Guidelines for the Northern District of New York and Local Rule 2016-1, provided that the compensation and reimbursement of expenses to JLL shall be included in the order approving the sale of the Property in such amounts as will be identified on the record of the hearing to approve the sale of the Property; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

22484.3 21147269v2