**Hearing Date: November 13,
2024
Hearing Time: 10:00 a.m.
Location: Albany, New York or
Via the Court's Teleconference
Line – DIAL IN # 518-217-2288
Conference ID: 939500229#
Objection Deadline: November 6,
2024 at 5:00 p.m.**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                         :

In re:                       :    Chapter 11
                         :

THE COLLEGE OF SAINT ROSE,      :    Case No. 24-11131 (REL)
                         :

           Debtor.         :
                         :
                         :
------------------------------------------------------------ x

**NOTICE OF HEARING ON MOTION FOR ENTRY OF ORDERS (I) (A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S CAMPUS;
(B) APPROVING THE FORM OF PURCHASE AGREEMENT; (C) APPROVING BID
PROTECTIONS IN FAVOR OF ANY STALKING HORSE PURCHASER; (D)
APPROVING THE FORM AND MANNER OF SERVICE OF AUCTION NOTICE; AND
(E) SCHEDULING AN AUCTION; (II) APPROVING SALE OF THE CAMPUS FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS,
<u>AND (III) GRANTING RELATED RELIEF</u>**

**PLEASE TAKE NOTICE**, that on the 13th day of November, 2024 at 10:00 a.m, or as

soon thereafter as counsel may be heard, a hearing will be held at the United States Bankruptcy

Court, James T. Foley U.S. Courthouse, 445 Broadway, Albany, New York. Appearances may

be made in-person at the courthouse **OR** by telephone via call-in number: 518-217-2288; and

Conference ID 939500229#, on the for entry of an order (the "<u>Bidding Procedures Order</u>"): (a)

approving bidding procedures ("<u>Bidding Procedures</u>"), substantially in the form annexed to the

Bidding Procedures Order as <u>Exhibit "1"</u>, related to the sale and proposed auction of the Campus

pursuant to sections 363(b), (d) (f), and (m) of the Bankruptcy Code; (b) approving the form of

proposed asset purchase agreement (the "Purchase Agreement, solely to the extent of its use as a

form which all bidders for the Campus must follow; (c) approving proposed bid protections in

favor of a stalking horse purchaser (a "Stalking Horse Purchaser"), if one is selected; (d)

scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") to approve the sale of

the Campus; and (e) approving the form and manner of notice (the "Auction Notice") of the

Auction and Sale Hearing (the "Motion") of The College of Saint Rose, Debtor and Debtor-in-

Possession herein.

**PLEASE TAKE FURTHER NOTICE**, that responses in opposition to the relief

requested in the Motion, if any, must be in writing and filed with the United States Bankruptcy

Court Clerk's Office in Albany, New York, and served upon (i) counsel for the Debtor, Cullen

and Dykman LLP, 80 State Street, Suite 900, Albany, New York 12207, Attn: Bonnie. L Pollack,

Esq., bpollack@cullenllp.com; and (iii) the Office of the United States Trustee, Leo O'Brien

Federal Building, 11A Clinton Avenue, Room 620, Albany, New York 12207, Attn: Harrison

Strauss, Esq., Harrison.Strauss@usdoj.gov, so as to be received by all at least seven (7) days

prior to the return date on the Motion in accordance with Local Bankruptcy Rule 9013-1(g).

**PLEASE TAKE FURTHER NOTICE**, that the hearing may be adjourned by

announcement in open court and without further written notice.

Dated: Albany, New York
        October 16, 2024

                        CULLEN AND DYKMAN LLP


                        By: _/s/Elizabeth Usinger_____
                        Elizabeth Usinger, Esq.
                        Matthew G. Roseman, Esq.
                        Bonnie L. Pollack, Esq.
                        80 State Street, Suite 900
                        Albany, New York 12207
                        (516) 357-3700
                        mroseman@cullenllp.com
                        bpollack@cullenllp.com

                        *Proposed Counsel for The College of Saint Rose*

CULLEN AND DYKMAN LLP
80 State Street, Suite 900
Albany, New York 12207
Matthew G. Roseman, Esq. (admission pro hac vice pending)
Bonnie L. Pollack, Esq. (admission pro hac vice pending)
Kelly McNamee Esq. (admission pro hac vice pending)
Kyriaki Christodoulou, Esq. (admission pro hac vice pending)
(516) 357-3700

*Proposed Attorneys for The College of Saint Rose*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
:
In re:                                    :    Chapter 11
:
THE COLLEGE OF SAINT ROSE,                :    Case No. 24-_____ (REL)
:
            Debtor.                       ::
------------------------------------------------------------- x

**DEBTOR'S MOTION FOR ENTRY OF ORDERS (I) (A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S CAMPUS;
(B) APPROVING THE FORM OF PURCHASE AGREEMENT; (C) APPROVING BID
PROTECTIONS IN FAVOR OF ANY STALKING HORSE PURCHASER; (D)
APPROVING THE FORM AND MANNER OF SERVICE OF AUCTION NOTICE; AND
(E) SCHEDULING AN AUCTION; (II) APPROVING SALE OF THE CAMPUS FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS,
AND (III) GRANTING RELATED RELIEF**

The College of Saint Rose, as debtor and debtor-in-possession (the "Debtor"), hereby

submits this motion (the "Motion"), pursuant to sections 105, 363, 365 and 503 of chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532, et seq. (the "Bankruptcy Code"), and

Rules 2002, 6004, 9006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), for entry of an order (the "Bidding Procedures Order"), substantially in the form annexed

hereto as Exhibit "A": (a) approving bidding procedures ("Bidding Procedures"), substantially in

the form annexed to the Bidding Procedures Order as Exhibit "1", related to the sale and proposed

auction of the Campus (as defined herein) pursuant to sections 363(b), (d) (f), and (m) of the

Bankruptcy Code; (b) approving the form of proposed asset purchase agreement (the "Purchase Agreement"), a copy of which is annexed hereto as Exhibit "B", solely to the extent of its use as a form which all bidders for the Campus must follow; (c) approving proposed bid protections in favor of a stalking horse purchaser (a "Stalking Horse Purchaser"), if one is selected; (d) scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") to approve the sale of the Campus; and (e) approving the form and manner of notice (the "Auction Notice") of the Auction and Sale Hearing substantially in the form annexed hereto as Exhibit "C".

The Debtor further requests that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter an order (the "Sale Order"), substantially in the form annexed hereto as Exhibit "D", approving and authorizing the sale (the "Sale") of Campus, free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon, pursuant to the Purchase Agreement, as modified to incorporate the terms of any Successful Bid (as defined herein).  In support of the Motion, the Debtor respectfully represents as follows:

## **INTRODUCTION**

1.      On October 10, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.

2.      The Debtor has remained in possession of its property and continues in the operation and management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      No official committee of unsecured creditors ("Committee") has been appointed by the Office of the United States Trustee for the Northern District of New York (the "U.S. Trustee") in this chapter 11 case.

4.      Simultaneously with the filing of its petition, the Debtor filed the Declaration of Marcia J. White (the "First Day Declaration").  A more detailed factual background of the Debtor's business and operations, as well as the events leading to the filing of this chapter 11 case, is more fully set forth in the First Day Declaration, the terms of which are incorporated herein by reference.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      The statutory predicates for the relief requested herein are sections 105, 363, 365 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9006 and 9007.

## FACTUAL BACKGROUND

### A.    General Background

7.      The College was established by provisional charter granted by the New York State Board of Regents on June 24, 1920 to issue bachelor's degrees, which charter was made absolute on March 19, 1931 and was amended in 1949 to authorize the offering of master's degrees. It was again amended in 2019 to authorize the offering of an associate's degree as part of its jointly registered BSN program with St. Peter's Colleges of Nursing. The College is located in Albany, New York and operates out of 72 buildings on 92 parcels of real estate (the "Real Property").

8.      For more than 10 years, as the College's structural deficit grew- caused by unachieved enrollment goals, a rising tuition discount rate, the financing structure of the

3

College's bond debt, and a relatively low unrestricted endowment - the Board of Trustees (the "Board") and College leadership have been working to achieve financial sustainability. The College experienced a steady enrollment decline for more than a decade from 5,130 total enrollment in 2010 to a total of 2,566 in Fall 2023 due in part to a shrinking pool of high school graduates in New York and the northeast region overall and, in recent years, the prolonged negative impact of the COVID-19 pandemic.

9.      The College implemented several deficit reduction and strategic plans since 2015, but ultimately the Board determined, based on the College's financial and enrollment projections, that it was in the best interests of the students and the College to cease academic instruction no later than June 30, 2024, and thereafter wind-down the operations and settle the affairs of the College. On November 30, 2023, the Board directed the implementation of a closure plan, which included the authorization to the College's leadership to develop a Teach-Out Plan that would provide all students with seamless pathways to complete their degrees at Saint Rose and other institutions. Thus far, 720 students have taken advantage of the Teach-Out Plan by enrolling with teach-out partner institutions to continue their education. In addition, the College offered a summer session through June 21, 2024 that enabled another 460 students to graduate from the College.

10.      The filing of the College's chapter 11 case is a key part of the closure plan, and the College intends to provide for an orderly liquidation of its assets, including a sale of the Real Property, for the benefit of creditors while implementing the academic components of the Closure Plan. Thus, on the Petition Date, the College filed for chapter 11 protection.

11.      The Debtor has determined that a sale of its Campus in whole or in Lots (defined below), is the best and only way to maximize the value of the estate.

**B.    Summary of Campus**

12.    The Campus consists of 72 buildings on 92 separate parcels of land. Eighteen (18) of the buildings consist of academic, student and administrative buildings, three (3) are dormitories and the remaining fifty-one (51) are residential houses. The Campus is located in downtown Albany, along and abutting Madison Avenue.

**C.    Summary of Obligations Secured by the Campus**

13.    The Debtor has significant secured debt obligations, with the entirety of the Campus subject to (or to be subject to) one or more liens in favor of two (2) lenders.  As of the Petition Date the Debtor was indebted to the bondholders (the "Pre-Petition Bondholders") in the principal amount of $48,150,000 ("Pre-Petition Indebtedness") pursuant to a Trust Indenture between City of Albany Capital Resource Corporation and Manufacturers and Traders Trust Company, as Trustee dated as of November 1, 2021.[1] The Debtor is also obligated to Pre-Petition Bondholders for interest, costs, fees, and expenses, including professional fees (together with Pre-Petition Indebtedness, "Pre-Petition Obligations"). The Pre-Petition Obligations are secured by, inter alia, security interests and liens against several parcels of property in the Campus, identified on Exhibit "E" hereto (the liens securing the Pre-Petition Obligations hereinafter referred to as the "Pre-Petition Liens" and the assets securing the Pre-Petition Liens are hereinafter referred to as the "Pre-Petition Collateral"). [please provide this Exhibit "E" along with all other referenced exhibits]

14.    Pursuant to the DIP Financing Motion, the Debtor is seeking approval of debtor-in-possession financing in the amount of $10,800,000 (the "DIP Loan") from SummitBridge National Investments VIII LLC (the "DIP Lender"), pursuant to the loan agreement between the Debtor and

---

[1] The applicable bond documents are described in more detail in the Debtor's motion to authorize Debtor-in-Possession Financing and the use of cash collateral (the "DIP Financing Motion").

the DIP Lender (the "DIP Loan Agreement"). The DIP Loan is secured by, inter alia, security interests and liens against several parcels of property in the Campus, identified on Exhibit "F" hereto (the liens securing the DIP Loan hereinafter referred to as the "DIP Liens" and the assets securing the DIP Liens are hereinafter referred to as the "DIP Collateral"). The DIP Lender will not obtain DIP Liens against the Pre-Petition Collateral.

### D.    *Marketing of the Campus*

15.    On or about the Petition Date, the Debtor filed an application seeking to retain Jones Lang LaSalle Brokerage, Inc. ("JLL") to market and sell the Campus. JLL has been assisting in the marketing efforts since April, 2024. Annexed hereto as Exhibit "G" is the declaration of David Carlos of JLL (the "Carlos Declaration") describing JLL's pre-petition marketing efforts.

16.    JLL is a diversified real estate consulting and advisory firms with offices located throughout the country. JLL has evaluated, restructured, facilitated the acquisition of, and disposed of all types of real estate. Additionally, JLL has significant experience in the disposition and renegotiation of properties in bankruptcy. JLL has been retained as real estate consultants in a variety of bankruptcy cases involving issues relating to the review, analysis, renegotiation, and disposition of key real property and lease agreements.

17.    At the beginning of JLL's retention by the Debtor, JLL engaged in information gathering including several tours of the property and discussions with staff, prepared and finalized marketing materials and participated in initial discussions with local elected officials, the Pine Hills Neighborhood Association, and the City's Planning Department. Beginning in June 2024, and continuing to the Petition Date, JLL has conducted property tours with potential purchasers and prepared and distributed offering memoranda to potential buyers.

6

18.    More specifically, since the launch of the marketing campaign, JLL has disseminated eBlast and Email teaser ads, an offering memorandum for bidders and a marketing strategy and activity report for the Debtor. JLL sent an email advertisement to 22,631 prospective investors, developers, brokers, schools and intermediaries, contacted more than 1100 priority buyers, obtained 71 signed non-disclosure agreements, conducted 32 tours and has arranged for 4,186 documents to be downloaded from a data room established for this transaction.

19.    Preliminary interest in purchasing the Campus has run the spectrum from Capital Region, New York and National developers, corporate end users, and other education, public sector or nonprofit users. In addition, the Albany County Pine Hills Land Authority, convened in September 2024, is exploring development options for the Campus[2]. (The Authority was created through the passage of legislation by the NYS Legislature in June and signed by governor Hochul on June 30, 2024). Subject to the Court's approval, JLL will continue the marketing process that has been underway for several months and solicit and manage offers to purchase the Campus.

### E.    *The Purchase Agreement*

20.    The Successful Bidder(s) for the Campus will be party to the proposed Purchase Agreement with the Debtor, as modified to incorporate the terms of the Successful Bid(s). If the Debtor enters into a Purchase Agreement with a proposed Stalking Horse Purchaser (a "Stalking Horse Agreement") prior to the Stalking Horse Selection Deadline (as defined herein), the Debtor will file notice with the Bankruptcy Court, the Notice Parties (as defined herein), and all Potential

---

[2] A former member of the Debtor's Board of Trustees, Kevin O'Connor, is presently the CEO of the Pine Hills Land Authority and the Advance Albany County Alliance. In addition, a former consultant of the Debtor, Harold Iselin, was involved with the legislation process that led to the creation of the Pine Hills Land Authority.

Bidders (as defined in the Bidding Procedures). The principal terms of the Purchase Agreement are summarized and highlighted as follows:[3]

| Summary of Purchase Agreement | |
|---|---|
| Parties | Seller:  The College of Saint Rose<br>Purchaser:  TBD |
| Asset | All Owned Real Property of Seller listed on Schedule 4.8(a) of the Purchase Agreement, including all fixtures and improvements owned by Seller and located on the Owned Real Property |
| Purchase Price | TBD |
| Conditions to Closing | Entry of Sale Order and other criteria set forth in Section 10.1 of the Purchase Agreement |
| Closing Date | On or about thirty (30) days following the entry of Sale Order |
| Termination Fee | An amount to be negotiated (but in no event more than 2% of the cash purchase price without additional Court approval) with a Stalking Horse Purchaser as needed in the event a Stalking Horse Purchaser is selected and is not the Successful Bidder for the Campus |

The full terms and conditions of the proposed transaction are set forth in the Purchase Agreement annexed as **Exhibit "B"** hereto and reference should be made to the Purchase Agreement for additional terms.

### F.  Bidding Procedures

---

[3] To the extent there is any inconsistency between the description of the Purchase Agreement in this Motion and the terms of the Purchase Agreement itself, the Purchase Agreement shall control.

21.    To ensure that the Debtor receives the maximum value for the sale of the Campus, either in whole or in one or more Lots, the Debtor has begun actively marketing the Campus and soliciting bids and, based on the level of interest to date, intends to conduct an Auction.  In connection with the Sale of the Campus, the Debtor seeks the approval of the Bidding Procedures and certain bid protections, as further described below, for any Stalking Horse Purchaser which the Debtor, in consultation with the Consultation Parties[4], believes would be necessary to induce a Stalking Horse Purchaser to enter into a Stalking Horse Agreement.

22.    The proposed Bidding Procedures are attached as Exhibit 1 to the Bidding Procedures Order (Exhibit A hereto), and below is a summary of the proposed procedures:[5]

(a)    **Provisions Governing Qualification of Bids and Bidders:** To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (other than any party designated as a Stalking Horse Purchaser) (each, a "Bidder"), must be reasonably determined by the Debtor, in consultation with the Consultation Parties, to satisfy each of the following conditions:

- Bid Deadline: Each Bid must be delivered to the Bid Notice Parties in writing on or before [December 6], 2024 at 5:00 p.m. (EST).

- Good Faith Deposit: Each Bid must be accompanied by a cash deposit, paid by wire transfer of immediately available funds or a certified check, in the amount of five percent (5%) of the purchase price contained in the Purchase Agreement (as defined below), which deposit shall be held in an escrow account to be identified and established by the Seller (the "Good Faith Deposit").  In addition, if a Stalking Horse Purchaser is selected, each Potential Bidder must also supplement its Good Faith Deposit by an additional one and one-half (1.5%) percent of the purchase price contained in the Purchase Agreement with the Debtor in the form  of a certified check or wire transfer before the Auction.

- Higher and Better Terms: In connection with any Bid for the Campus, either in whole or for the Lots, such Bid must be on terms that the Debtor, in its business judgment and after consulting with the Consultation Parties, determines is higher

---

[4] The Consultation Parties are defined in the Bidding Procedures to mean (i) the indenture trustee for the Bonds, (ii) the DIP Lender, and (iii) the Committee, if one is appointed, and each of their respective counsel and advisors.
[5] In the event of any inconsistency between this summary and Bidding Procedures, the Bidding Procedures will govern and control.

and better for the Debtor on a cash (or cash equivalent) basis than the terms of any Stalking Horse Agreement. In the absence of a Stalking Horse Agreement for the Campus, the Debtor, in consultation with the Consultation Parties, shall determine which Bid(s) are the highest and best Bids for the Campus, either in whole or for the Lots.

- <u>Executed Agreement</u>: Each Bid must be based on the form Purchase Agreement or, if applicable, any Stalking Horse Agreement for the Campus, and such Bid must include binding, executed, irrevocable transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an alternate transaction of the entire campus or one or more lots (an "<u>Alternate Transaction</u>"). A Bid must also include a copy of the Purchase Agreement (including all exhibits thereto) marked against the form Purchase Agreement or, if applicable, Stalking Horse Agreement, to show all changes requested by the Bidder (including those related to purchase price and to remove any Bid Protections that apply only to a Stalking Horse Purchaser, such as the break-up fee provisions contained in any Stalking Horse Agreement, which terms shall not be in any Purchase Agreement). Both the Purchase Agreement and the marked copy thereof must be provided in both Microsoft Word and PDF format.

- <u>Scope of Bid/Lots</u>: A Bid must be for the entire Campus or for one or more of the Lots identified on Schedule A to the Bidding Procedures:

- <u>Minimum Bid</u>: Except in connection with any Bid for one or more (but not all) of the Lots, if there is a Stalking Horse Purchaser, a Bid must have a purchase price that exceeds the purchase price in any Stalking Horse Purchase Agreement by at least the amount of the Bid Protections and Minimum Overbid Amount (each as hereinafter defined).

- <u>Corporate Authority</u>: A Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; <u>provided</u> that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

- <u>Disclosure of Identity of Bidder:</u> A Bid must fully disclose the identity of each entity and principal that will be bidding for or purchasing the Campus or any Lot(s), including any equity holders in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation. A Bid must also fully disclose any connections or agreements with the Seller, any Stalking Horse Purchaser or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer or trustee of the Debtor.

10

- <u>Proof of Financial Ability to Perform:</u>  A Bid must include detailed, written evidence that the Debtor and its advisors may conclude, in consultation with the Consultation Parties, demonstrates that the Bidder has and will continue to have the necessary financial ability to close the Alternate Transaction.  Such information must include, *inter alia,* the following:

  (a)    contact names and numbers for verification of financing sources;

  (b)    evidence of the Bidder's internal resources and proof of funding commitments in an aggregate amount equal to the cash portion of such Bid as are needed to close the Alternate Transaction;

  (c)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Seller;

  (d)    a description of the Bidder's pro forma capital structure; and

  (e)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction.

- <u>Contact Information and Affiliates</u>:  A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

- <u>Contingencies</u>:  Each Bid (a) may not contain representations and warranties, covenants, or termination rights of any kind except and solely to the extent expressly set forth in any Stalking Horse Agreement, and (b) may not be conditioned on (i) obtaining financing, (ii) any internal approvals or credit committee approvals, or (iii) the outcome or review of due diligence.

- <u>Irrevocable</u>:  Each Bid must be irrevocable until the earlier of (i) ninety (90) days following entry of the final Sale Order, (ii) closing of the Sale with the Successful Bidder(s), or (iii) the date the Bid is otherwise rejected under the Bidding Procedures.

- <u>Compliance with Diligence Requests</u>:  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Debtor to the reasonable satisfaction of the Debtor, in consultation with the Consultation Parties.

11

- **As-Is, Where-Is**: Each Bid must include a written acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Campus or applicable Lot(s) prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Campus or applicable Lot(s) in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Campus or applicable Lot(s) or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in any applicable Stalking Horse Agreement.

- **Termination Fees**: The Bid (other than a Bid pursuant to (a) a Stalking Horse Agreement or (b) the written agreement of Debtor after consultation with the Consultation Parties) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

- **Adherence to Bid Procedures**: By submitting its Bid, each Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(b) **Auction, Auction Procedures and Overbids**: If multiple Qualified Bids (including any Stalking Horse Agreement) with respect to the entire Campus and/or the Lot(s) are submitted by the Bid Deadline, the Debtor will conduct the Auction to determine the highest and otherwise best Qualified Bid with respect to such Campus, either as a whole or in Lots.

- **Participation**: Only the Debtor, the Consultation Parties, any Stalking Horse Purchaser and any other Qualified Bidder, in each case, along with their respective representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Purchaser and any such other Qualified Bidders will be entitled to make any Bids at the Auction.

- **The Debtor Shall Conduct the Auction**. The Debtor and its advisors shall direct and preside over the Auction, and the Auction shall be transcribed. The Debtor (in consultation with the Consultation Parties) may conduct the Auction and may augment or modify the procedures described herein in any manner it reasonably determines will result in the highest and otherwise best Qualified Bid(s), including, without limitation, by establishing rules at any Auction that include, without limitation, a single or multiple rounds of bulk and/or Lot bidding, the combination of Lots for purposes of bidding, the use of sealed bidding, open outcry, or any other form of Bid submission (including in connection with any bulk or Lot bidding). The Debtor will consult in good faith with the Consultation Parties throughout the Auction process to the extent reasonably practicable. Any rules developed by the

12

Debtor will provide that each Qualified Bidder will be permitted what the Debtor determines to be an appropriate amount of time to respond to the previous bid at the Auction. Any Auction rules adopted by the Debtor that would modify any of the terms of any Stalking Horse Agreement or the rights of the Stalking Horse Purchaser to Bid Protections (as may be consensually modified at the Auction) requires the consent of the Stalking Horse Purchaser.

- Auction Baseline Bids. Prior to commencement of the Auction, the Debtor may, but shall not be required to, provide each Qualified Bidder participating in the Auction with a copy of the Purchase Agreement(s) that are the highest and otherwise best Qualified Bid for the Campus and/or applicable Lot(s) as determined by the Debtor, in consultation with the Consultation Parties (such highest and otherwise best Qualified Bid(s), the "Auction Baseline Bid"). In addition, at the start of the Auction, the Debtor may, but shall not be required to, describe the terms of the Auction Baseline Bids.

- Anti-Collusion Representations. Each Qualified Bidder participating in the Auction must confirm that it (1) has not engaged in any collusion with respect to the bidding or Sale, (2) has reviewed, understands and accepts the Bidding Procedures and (3) has consented to the core jurisdiction of the Court.

- Terms of Overbids. The Debtor will accept Overbids, as further described below. An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

  (a) Initial Overbid:  The initial Overbid after and above the Auction Baseline Bid (the "Initial Overbid") shall be in an amount of 105 percent of the Auction Baseline Bid for any Auction Baseline Bid that is less than $1 million, otherwise not less than $100,000 in excess of the Auction Baseline Bid plus the amount of any Bid Protections.

  (b) Minimum Overbid Increments:  Any Overbid after and above the Initial Overbid shall be made in increments (the "Minimum Overbid Increment") valued at not less than 105 percent of the Auction Baseline Bid for any Auction Baseline Bid that is less than $1 million, otherwise $100,000, in cash or in cash equivalents or, once the cash (or cash equivalent) amount of such Overbid exceeds the cash (or cash equivalent) amount of the next highest Bid, other forms of consideration acceptable to the Debtor in consultation with the Consultation Parties. The Debtor, in consultation with the Consultation Parties, reserves the right to modify the Minimum Overbid Increment during the Auction.

13

(c)     <u>Remaining Terms Are the Same as for Qualified Bids</u>: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, <u>provided</u>, <u>however</u>, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to any Stalking Horse Agreement or Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder as provided herein.

At the Seller's discretion, in consultation with the Consultation Parties, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written disclosure (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor), reasonably demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

- <u>Jurisdiction of the Court</u>: All Qualified Bidders (including any Stalking Horse Purchaser) at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the determination of what constitutes a Qualified Bid and the procedures used to make that determination, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and transaction documents, as applicable.

- <u>Additional Bids; Modifications</u>: All Qualified Bidders, including any Stalking Horse Purchaser, shall have the right to submit additional Bids and make additional modifications to any Stalking Horse Agreement or Purchase Agreement at the Auction, as applicable, provided that any such modifications to such Stalking Horse Agreement or Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Debtor's business judgment, in consultation with the Consultation Parties, be less favorable to the Debtor than the terms of such original agreement.

- <u>Subsequent Bids</u>: Each Qualified Bidder must submit a subsequent Bid that satisfies the Minimum Overbid Increment in each round of bidding in order to continue participating in the Auction. Unless approved by the Debtor, in consultation with the Consultation Parties, Qualified Bidders shall not be allowed to skip rounds of bidding for the entire Campus and/or applicable Lot(s) once they participate in the Auction for the entire Campus and/or applicable Lot(s).

- <u>Continuance/Adjournment of Auction</u>:  Subject to the deadlines set forth herein, the Debtor reserves the right, in its reasonable business judgment, in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtor and

14

individual Qualified Bidders, allow individual Qualified Bidders to consider how they wish to proceed, modify or supplement any or all of the Auction procedures or rules, or give Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, in consultation with the Consultation Parties may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.

- Sale Is As Is/Where Is. Except as otherwise may be provided in any Stalking Horse Agreement, any Purchase Agreement, or any order by the Court approving any Sale as contemplated hereunder, the property sold pursuant to the Bidding Procedures, whether as an entire Campus or in one or more Lots, shall be conveyed at the closing of the purchase and sale in its then-present condition, "**AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

(c)    **Closing the Auction**:  The Auction will continue until the Debtor selects, after consulting with the Consultation Parties, the Bid(s) that represent the highest and otherwise best offer(s) for the entire Campus and/or Lot(s) (a "Successful Bid," and the Bidder(s) submitting such Successful Bid(s), a "Successful Bidder"). The Successful Bidder(s) shall have the rights and responsibilities of the purchaser as set forth in the Stalking Horse Agreement or Purchase Agreement. In selecting each Successful Bid, the Seller, in consultation with the Consultation Parties, will consider the Bid Assessment Criteria.

The Debtor will announce that the Auction is closed upon receipt of fully executed sale and transaction documents memorializing the terms of the Successful Bid(s) from the Successful Bidder(s).  Within one (1) business day after the conclusion of the Auction, each Successful Bidder(s) shall supplement its Good Faith Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Good Faith Deposit equals five (5%) percent of the Successful Bid(s) plus the amount required for the payment of Bid Protections, if any.  The Debtor shall not consider any Bids submitted after the conclusion of the Auction.

(d)    **Backup Bidder:**  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest and otherwise best Bid at the Auction with respect to the entire Campus and/or one or more Lot(s), as applicable, as determined by the Debtor, in the exercise of its business judgment and after consulting with the Consultation Parties, will be designated as a backup bidder (a "Backup Bidder").  A Backup Bidder shall be required to keep its last submitted Bid (the "Backup Bid") open and irrevocable until the earlier of (i) ninety (90) days following entry of the final Sale Order, and (ii) closing of the Sale.

15

Following the Sale Hearing, if a Successful Bidder fails to consummate the purchase of the entire Campus and/or one or more Lot(s), as applicable, the Debtor, in consultation with the Consultation Parties, may deem the Backup Bidder for such property to have the new Successful Bid, and the Debtor will be authorized, without further order of the Court, to consummate the transaction with such Backup Bidder at the price of its last bid. Such Backup Bidder will be deemed to be the Successful Bidder and the Debtor will be authorized, but not directed, to effectuate a sale to such Backup Bidder subject to the terms of the Backup Bid without further order of the Court. All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Debtor on and as of the date that the Court approves the Successful Bid. The Debtor, on its behalf and on behalf of each of its estate, specifically reserves the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

For the avoidance of doubt, in the event that there is a Successful Bidder (other than a Stalking Horse Purchaser) with respect to the entire Campus and/or one or more Lot(s), as applicable, and the Stalking Horse Purchaser is the Backup Bidder, the Stalking Horse Purchaser will be deemed to be the Backup Bidder at the price of its last overbid with respect to such property and will be subject to the terms contained in the immediately preceding paragraph.

23.     Subject to the execution of an acceptable confidentiality agreement, the Debtor will permit potential parties to receive access to due diligence materials with respect to the sale of all or a portion of the Campus and will assist them in connection with such efforts.

### G.  The Proposed Bid Protections

24.     To provide an incentive and to compensate a Stalking Horse Purchaser for negotiating a Stalking Horse Agreement, the Debtor may agree to a breakup fee of no more than 2% of the cash purchase price without additional Court approval in a Stalking Horse Agreement (the "Termination Fee") executed by a Stalking Horse Purchaser.

25.     By this Motion, the Debtor also seeks approval to provide the Termination Fee to any Stalking Horse Purchaser, if one is identified prior to the Bid Deadline, in accordance with the Stalking Horse Agreement.  The Debtor believes that offering the Termination Fee to any Stalking

16

Horse Purchaser will benefit the Debtor's estate by establishing a floor and promoting more competitive bidding. Without such a fee, bidding on the Campus would likely be reduced. The availability of the Termination Fee is necessary in order to provide any Stalking Horse Purchaser with some assurance of compensation for the time and expense spent in putting together an offer for the Campus.

### H. *Proposed Notices*

26.     To ensure that all parties-in-interest receive adequate notice of the Sale, not later than three (3) days after the entry of the Bidding Procedures Order, the Debtor will cause the Bidding Procedures Order, the Bidding Procedures and the Auction Notice, substantially in the form attached to this Motion as **Exhibit "C"**, to be sent by first-class mail postage prepaid or, if no mailing address is available, via electronic mail, to (i) the U.S. Trustee, (ii) counsel for the Committee, if one is appointed, (iii) all known creditors of the Debtor, (iv) the indenture trustee for the Bonds, (v) the DIP Lender, (vi) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (vii) the following taxing and regulatory authorities: (a) the United States Attorney for the Northern District of New York, (b) the Attorney General of the State of New York, not-for-profit office, (c) United States Department of Education, (d) New York State Department of Education, (e) the IRS, (f) the NYS Tax Dept., and (g) the Securities and Exchange Commission, (viii) all parties who are known to assert a lien, claim, encumbrance or other interest on any portion of the Campus, and (ix) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Campus (collectively, the "Notice Parties"). Accordingly, the Debtor submits that all parties in interest will have adequate notice of the Auction and Sale.

### I. *Request to Set Dates for the Auction and Bid Deadline*

27.    As set forth below, the Debtor has formulated the following timeline to effectuate

the Sale contemplated herein, and seek hearings and deadlines to be set as follows:

| Date | Activity/Deadline |
|------|-------------------|
| November 6, 2024 EST | • Objections due to bid procedures |
| November 13, 2024 at 10:00 a.m. EST | • Hearing on bid procedures |
| December 17, 2024 at 12:00 p.m. EST | • Last day to object to sale |
| [December 4], 2024] at 5:00 p.m. EST | • Stalking Horse Selection Deadline |
| [December 6, 2024], at 5:00 p.m. EST | • Bid Deadline |
| [December 12, 2024], at 10:00 a.m. EST | • Auction |
| [December 13, 2024], at 4:00 p.m. EST | • Deadline to File Results of Auction |
| [December 17, 2024], at 12:00 p.m. EST | • Sale Objection Deadline |
| [December 19, 2024], or as soon as possible thereafter subject to the Court's calendar | • Sale Hearing |
| Thirty (30) days following entry of the Sale Order | • Last day to close sale |

The Debtor proposes that objections, if any: (i) to the Bidding Procedures shall be filed with this

Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven (7) days prior

to the hearing to consider approval of the Bidding Procedures (the "Bidding Objection Deadline"),

and (ii) to the Sale shall be filed with this Court, so as to be received no later than 4:00 p.m.

(prevailing Eastern Time) seven (7) days prior to the Sale Hearing (the "Sale Objection

Deadline"), provided any party that files a timely objection may supplement such objection not

later than 2:00 p.m. (prevailing Eastern Time) one (1) day prior to the Sale Hearing to address

matters determined at the Auction, if any, by: (a) United States Trustee for Region 2, 11A Clinton

Avenue, Room 620, Albany, New York 12207, Attn: Lisa M. Penpraze, Esq.; (b) proposed counsel

to the Debtor: Cullen and Dykman LLP, 80 State Street, Suite 900, Albany, New York 11207,

Attn: Matthew G. Roseman, Esq. and Bonnie L. Pollack, Esq.; (c) counsel to the Debtor's

prepetition and post-petition secured lenders: (i) Eversheds Sutherland(US) LLP, 999 Peachtree

18

Street, NE, Atlanta, GA 30309, Attn. Todd Meyers, Esq.; and (ii) Mintz, Levin, Cohn, Ferris,

Glovsky & Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Ian A. Hammel

and P. Miyoko Sato, Esq.; and (d) counsel to the Committee.

## RELIEF REQUESTED

28.     By this Motion, the Debtor requests the entry of certain orders: (a) approving the

Bidding Procedures related to the Sale and proposed Auction of the Campus pursuant to sections

363(b), (d) (f), and (m) of the Bankruptcy Code; (b) approving the Purchase Agreement as a form

to be followed by Potential Bidders; (c) approving proposed bid protections in favor of any

Stalking Horse Purchaser, if one is identified; (d) scheduling an Auction, if necessary, and the Sale

Hearing to approve the Sale of the Campus; and (e) approving the form and manner of Auction

Notice.

29.     The Debtor further requests that at the Sale Hearing, subject to the results of the

Auction and the Bidding Procedures set forth herein, this Court enter the Sale Order approving

and authorizing the Sale, free and clear of any pledges, liens, security interests, encumbrances,

claims, charges, options and interests thereon, pursuant to the Purchase Agreement, as modified to

incorporate the terms of any Successful Bid.

## BASIS FOR RELIEF REQUESTED

### I.     The Bidding Procedures Are Consistent and Appropriate in the Context of Bankruptcy Sales and Should be Approved

30.     The Bidding Procedures, which are standard for the sale of assets in large chapter

11 cases, will ensure that the Debtor's estate receives the greatest benefit available from the sale

of the Campus.  The Bidding Procedures have been structured to attract the maximum number of

Qualified Bids for the Campus while allowing the Debtor the flexibility to select the bid or bids

that provide the greatest overall value to the Debtor's estate.  Finally, the Bidding Procedures set out a time frame that will allow potential purchasers sufficient time to construct and submit informed Qualified Bids, while still providing for the expeditious sale of the Campus, which is appropriate under the circumstances given the extensive pre-petition marketing efforts.  Given the significant duration of pre-petition marketing efforts, the Debtor believes that the time frame proposed herein and in the Bidding Procedures is appropriate to facilitate the final round of interest without overly saturating the marketplace.

31.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R, 650, 656-57 (Bankr. S.D.N.Y. 1992). The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 (same); *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Products, Inc.)*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) (same).

32.    In furtherance of maximizing the value of the assets sold, bidding procedures, such as those proposed here, may be used in court-supervised sales because they streamline the acquisition process and "help to provide an adequate basis by which to compare offers." *Integrated Res.*, 147 B.R. at 659 (bidding procedures and bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets").  In overseeing a sale subject to an auction process, a bankruptcy court must weigh "on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to

20

participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate." *In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992).

33.    The Debtor submits that the Bidding Procedures are reasonably designed to ensure that the Debtor's estate receives the maximum benefit available from the sale of the Campus, and therefore warrant Court approval.

**II.    A Termination Fee is Appropriate**

34.    In this Motion, the Debtor seeks approval of payment, in certain circumstances set forth in any Stalking Horse Agreement, a Termination Fee to the extent required.  The Debtor submits that, under the circumstances of this case, a Termination Fee would be appropriate.

35.    To compensate the Stalking Horse Purchaser, if one is identified, for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Debtor seeks authority to pay any Stalking Horse Purchaser a Termination Fee in the event that such Stalking Horse Purchaser is not the Successful Bidder at the Auction.  As noted above, approval of the Termination Fee would likely be an integral part of obtaining a quality Stalking Horse Purchaser. The Debtor submits that the Termination Fee would be in an amount that is reasonable in relation to any potential Stalking Horse Purchaser's efforts and to the magnitude of the transaction. Further, if a Stalking Horse Purchaser is selected, the Stalking Horse Purchaser's bid will establish an appropriate floor value for the Campus.

36.    Bid incentives such as the Termination Fee encourage a potential purchaser to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor's property, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts in this Circuit have

21

approved bidding incentives similar to the Termination Fee under the "business judgment rule," which, as set forth above, proscribes judicial second-guessing of the actions of a corporation's board of directors, provided that such actions are taken in good faith and in the exercise of honest judgment.  *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"); *see also Integrated Res., Inc.*, 147 B.R. at 657-58 (addressing the validity of break-up fees pursuant to a sale under section 363 of the Bankruptcy Code by considering the following three factors: (i) whether the relationship of the parties who negotiated the break-up fee was tainted by self-dealing or manipulation; (ii) whether the fee hampers, rather than encourages bidding; and (iii) whether the amount of the fee is unreasonable relative to the proposed purchase price).

37.     In the instant case, the Termination Fee is believed to be a necessary bid protection in order to attract a quality Stalking Horse Purchaser. The Termination Fee will provide a material benefit to the estate by enabling the Debtor to obtain a commitment from any Stalking Horse Purchaser which will expend money, time and effort formulating and negotiating an offer for the Campus, notwithstanding the fact that any Stalking Horse Agreement will be subject to higher or better offers. In the Debtor's business judgment, a proposed Termination Fee is fair and reasonable when considering the potential amount of time, effort, cost, and expense that any Stalking Horse Purchaser will likely incur in negotiating a Stalking Horse Agreement, and necessary to compensate the Stalking Horse Purchaser for its time in the event an Alternate Transaction is thereafter consummated.

22

38.     The Debtor submits that approval of a Termination Fee if needed is in the best interest of the Debtor's estate and its creditors and is the exercise of independent and prudent business judgment.

### III. The Sale of the Campus Pursuant to the Purchase Agreement is Authorized by Section 363(b) of the Bankruptcy Code

39.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(l).  The terms of such sale are generally within the sound discretion of the Debtor.  *See In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 679 (Bankr. S.D.N.Y. 1989).

40.     Courts have uniformly held that approval of a proposed use of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor.  *See e.g., In re Chrysler LLC*, 405 B.R. 84, 97–100 (Bankr. S.D.N.Y. 2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009); *In re General Motors Corp.*, 407 B.R. 463 (S.D.N.Y. 2009); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Ionosphere Clubs, Inc.*, 100 B.R. at 675; *In re Apex Oil Co.*, 92 B.R. 847, 867 (Bankr. E.D. Mo. 1988).

41.     Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *Integrated Resources, Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkam*, 488 A.2d 858, 872 (Del. 1985)).

42.     Furthermore, courts have authorized chapter 11 debtors, in some circumstances, to sell all or substantially all of their assets pursuant to section 363(b) prior to confirmation of a plan. *Lionel Corp.*, 722 F.2d at 1065, 1071.  Such a sale can even be made prior to filing a plan of reorganization.  *In re Naron & Wagner, Chartered*, 88 B.R. 85, 87 (Bankr. D. Md. 1988). However, in approving such a sale, a court must be able, based on the evidence, "to articulate

24

sound business justifications for [its] decisions." *Lionel Corp.*, 722 F.2d at 1066. A court should

consider all of the salient factors and act to further the diverse interests of the debtors, creditors

and equity holders alike. *Id.* at 1071; *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir.

1992); *Ionosphere Clubs, Inc.*, 100 B.R. at 675.

43.     The Second Circuit has indicated that the following factors should be considered

during the sale approval process: (i) the proportionate value of the asset to the estate as a whole;

(ii) the amount of elapsed time since the filing; (iii) the likelihood that a plan of reorganization

will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on

future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any

appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions;

and (vii) whether the asset is increasing or decreasing in value. *See Lionel Corp.*, 722 F.2d at

1071. The factors highlighted by the *Lionel* decision are often cited and applied by other courts

when determining requests to approve a sale of all or substantially all of the assets of a debtor's

estate. *See, e.g., In re* GSC*, Inc.*, 453 B.R. 132, 156 (Bankr. S.D.N.Y. 2011); *In re CPJFK, LLC*,

496 B.R. 290, 303-04 (Bankr. E.D.N.Y. 2011); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169,

175-76 (D. Del. 1991); *In re Thomson McKinnon Sec., Inc.*, 120 B.R. 301, 307-08 (Bankr.

S.D.N.Y. 1990).

44.     As indicated above, the decision to sell the Campus was one of necessity and

resulted from a lack of remaining viable alternatives. Unfortunately, the Debtor has no option of

that involves a continued operation as a higher education institution. Absent a negotiated sale of

its Campus to a third party in this chapter 11 case, the Debtor would likely be forced to sell the

Campus at a fire-sale without the opportunity for any reasonable and appropriate market test of

value. Indeed, a reasonably prompt marketing and sale of the Campus is necessary because the

25

Debtor has limited independent liquidity and access to funding under a proposed post-petition financing facility will be limited in duration. It is therefore critical that the Debtor expeditiously proceed towards a sale.

45.     Based on the foregoing, the Sale of the Campus is justified by sound business reasons and in the best interests of the Debtor and its estate.  Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Debtor requests approval of the Sale to one or more Successful Bidders as set forth herein.

**IV.   Section 363(d) of the Bankruptcy Code is Satisfied by the Proposed Sale**

46.     Pursuant to section 363(d) of the Bankruptcy Code, a transfer of property by a not-for-profit entity must be made in compliance with applicable nonbankruptcy law governing such transfer. Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section - (1) in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust." 11 U.S.C. § 363(d)(1).

47.     The inclusion of section 363(d) of the Bankruptcy Code was not intended to provide states with a "veto" of sales of a debtor's assets under the Bankruptcy Code that otherwise take into account legitimate interests of the state over the transfer or sale of a non-profit's assets. See H. REP. NO. 109-31, pt. 1, title XII (Judiciary. Comm.) (listing section 1221 of the BAPCPA under the heading "Technical Amendments").

48.     Here, the Debtor requests that this Court approve the Sale as satisfying applicable non-bankruptcy law including without limitation the New York Not-for-Profit Corporation Law. Outside of bankruptcy, an insolvent not-for-profit corporation that is seeking to sell all or

26

substantially all of its assets is required, pursuant to Sections 510 and 511 of the New York Not-for-Profit Corporation Law, to submit a verified petition to the Supreme Court where the corporation has its principal office for approval of such sale transaction, on notice to the Attorney General. The Supreme Court will approve the proposed sale transaction if it finds that "the consideration and the terms of the transaction are fair and reasonable to the corporation and that the purposes of the corporation or the interests of the members will be promoted." N.Y. Not-for-Profit Corp. Law § 511(d).

49.     The Debtor requests that this Court approve the Sale, including any approval required under applicable non-bankruptcy law, on the grounds that the Sale does not violate Sections 510 and 511 of the New York Not-for-Profit Corporation Law. The Campus consists primarily of real estate and its transfer does not invoke specific regulatory requirements which might restrict the transfer of the property. The Debtor thus submits that the terms of the Purchase Agreement comply with all applicable not-for-profit laws, including the not-for-profit laws of the State of New York, and any applicable federal laws. Accordingly, the proposed Purchase Agreement satisfies the requirements of Section 363(d) of the Bankruptcy Code.

50.     The Purchase Agreement provides that the Successful Bidder shall confer with the appropriate regulators to obtain any approvals required for the transfer of the Campus. The Debtor shall cooperate, to the extent necessary, in the preparation and prosecution of any applications for such approvals. In accordance with these provisions, the Debtor and the Successful Bidder will request and expect to obtain all required Regulatory Approvals for the Sale prior to the closing. The Debtor requests authority to obtain such approvals from this Court directly (taking into account applicable New York State law) or, if this Court is not so inclined to grant the requested relief, from the New York State Attorney General, as well as any other regulatory authority

27

asserting jurisdiction over the Debtor. To the extent any regulatory body or governmental agency fails to provide approval for the Sale, the Debtor reserves all rights to challenge any such determination.

## V.    The Sale of the Campus Free and Clear of Liens, Claims, and Interests is Authorized Under Section 363(f) of the Bankruptcy Code

51.    Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in a bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

52.    As quoted above, section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale of the Campus free and clear of all interests. *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *Mich. Employment Sec. Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co., Inc.)*, 930

28

F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) written in disjunctive; holding that court may approve sale "free and clear" provided at least one of subsections of Bankruptcy Code section 363(f) is met).

53.    In accordance with the provisions of the Purchase Agreement and section 363(f) of the Bankruptcy Code, the Debtor requests that it be authorized to conduct the Sale free and clear of all Liens, other than the Permitted Exceptions (as set forth in the Purchase Agreement). All parties holding liens on the Debtor's assets, including the Campus, will be provided notice of the proposed Sale and shall be granted an opportunity to object to the relief requested in the instant Motion, and any such entity that does not object to the Sale shall be deemed to have consented. *See, e.g., Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) (standing for the proposition that the lack of an objection to a proposed sale of assets counts as consent); *Hargrave v. Township of Pemberton (In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. 343, 345-46 (E.D. Pa. 1988) citing *In re Gabel*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985); *see also In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

54.    Thus, to the extent any parties holding a lien on the Campus fail to object to the relief requested in this Motion, or otherwise consents, a Sale of the Campus free and clear of all Liens, with the exception of the Permitted Exceptions, satisfies section 363(f)(2) of the Bankruptcy Code.

## VI.    The Purchaser is a Good Faith Purchaser and is Entitled to the Full Protections of Section 363(m) of the Bankruptcy Code

55.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

56.    The Second Circuit has indicated that a party would have to show fraud or collusion
between the buyer and the debtor-in-possession or trustee or other bidders in order to demonstrate
a lack of good faith. *See In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically,
the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud,
collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly
unfair advantage of other bidders").

57.    The Debtor intends to make an appropriate showing at the Sale Hearing that the
Purchase Agreement with the Successful Bidder is the result of a negotiated, arm's-length
transaction, in which such Successful Bidder at all times acted in good faith. The Debtor thus
requests that the Court find that the Successful Bidder will be purchasing the Campus in good faith
within the meaning of section 363(m) of the Bankruptcy Code.

**VII.    The Sale Should Be Exempt from Transfer and Similar Taxes**

58.    Pursuant to N.Y. Tax Law §1405(b)(8), the Debtor submits that the Sale is exempt
from New York State real estate transfer tax because it is being consummated under the
Bankruptcy Code. See N.Y. Tax Law §1405(b)(8) ("The [real estate transfer] tax shall not apply
to . . . [c]onveyances given pursuant to the federal bankruptcy act"). Accordingly, the Debtor

30

respectfully requests that the Court find that these exemptions apply and that the Debtor's estate is exempt from real estate transfer taxes.

## VIII. The Proposed Notice Procedures With Respect to the Auction and Sale Hearing Should be Approved

59.     Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtor is required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale. The Auction Notice sets forth all the information a Potential Bidder and any other party in interest should require about the bidding process for the Campus, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date and location of the Sale Hearing.

60.     Not later than three (3) days after the entry of the Bidding Procedures Order, the Debtor will cause the Bidding Procedures Order, the Bidding Procedures and the Auction Notice, to be sent by first-class mail postage prepaid to the Notice Parties. The Debtor submits that the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtor's creditors and those persons potentially interested in bidding on the Campus and, thus, that such notice is sufficient for entry of the Bidding Procedures Order and the Sale Order.

## NO PRIOR REQUEST

61.     No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

62.     The Debtor's proposed Sale of the Campus as described in this Motion and the Purchase Agreement is supported by sound business reasons, as set forth herein. The proposed

31

Sale is proper and necessary, and serves the best interests of the Debtor, its estate, and its creditors. The Debtor thus requests that the Court approve the proposed Sale of the Campus free and clear of all liens, claims, encumbrances, and interests, as requested.

## NOTICE

63.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee for Region 2; (ii) the Indenture Trustee for the Bonds and proposed DIP Lender or their respective attorneys; (iii) the attorneys for the statutory committee of unsecured creditors should one be appointed in these cases (the "Committee"); (iv) the Debtor's twenty (20) largest unsecured creditors; (v) any party whose interests are directly affected by the Bid Procedures and Sale Motion; (vi) those persons who have formally appeared and requested service in these cases pursuant to Rule 2002 of the Bankruptcy Rules; (vii) NY Attorney General, not-for-profit office; (x) NYS Education Department; (viii) US Department of Education; (ix) the Internal Revenue Service; (x) the NYS Department of Taxation and Finance; and (xi) any other government agency, to the extent required by the Bankruptcy Rules or the Local Bankruptcy Rules for the Northern District of New York. The Debtor submits that, under the circumstances, no other or further notice is required.

32

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and grant the Debtor such other and further relief as this Court deems just and proper.

Dated: Albany, New York
        October 16, 2024

                                    CULLEN AND DYKMAN LLP


                                    By: /s/  *Elizabeth Usinger*
                                    Matthew G. Roseman, Esq.
                                    Bonnie L. Pollack, Esq.
                                    Elizabeth Usinger, Esq.
                                    80 State Street, Suite 900
                                    Albany, New York 12207
                                    (516) 357-3700
                                    mroseman@cullenllp.com
                                    bpollack@cullenllp.com
                                    *Proposed Counsel for The College of Saint Rose*

33

**Exhibit A**

**Bidding Procedures Order**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------

In re:                                              Chapter 11

THE COLLEGE OF SAINT ROSE,

                        Debtor.                     Case No. 24-11131  (REL)

--------------------------------------------------------------------

### ORDER (I) (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S CAMPUS; (B) APPROVING FORM OF PURCHASE AGREEMENT; (C) APPROVING BID PROTECTIONS IN FAVOR OF ANY STALKING HORSE PURCHASER; (D) APPROVING THE FORM AND MANNER OF SERVICE OF THE AUCTION NOTICE; AND (E) <u>SCHEDULING AN AUCTION; AND (II) GRANTING RELATED RE RELIEF</u>

Upon the motion (the "Motion")[1] filed by The College of Saint Rose, the above captioned debtor and debtor-in-possession (the "Debtor"), by and through its proposed attorneys, Cullen and Dykman LLP, for entry of an order (this "Bidding Procedures Order"), pursuant to sections 105, 363, 365, and 503 of chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532, et seq. (the "Bankruptcy Code"), and Rules 2002, 6004, 9006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) approving bidding procedures ("Bidding Procedures"), substantially in the form annexed hereto as Exhibit "1", related to the sale and proposed auction of the Campus pursuant to sections 363(b), (d) (f), and (m) of the Bankruptcy Code; (b) approving the proposed asset purchase agreement (the "Purchase Agreement"), a copy of which is annexed to the Motion as Exhibit "B", solely to the extent of its use as a form which all bidders for the Campus must follow; (c) approving proposed bid protections in favor of any stalking horse purchaser (a "Stalking Horse Purchaser"), if one is selected; (d) scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") to approve the sale of the Campus; (e) approving the form and manner of notice (the "Auction Notice") of the Auction and Sale Hearing substantially in the form annexed to the Motion as Exhibit "C"; and due and sufficient notice of the hearing on the Motion (the "Bidding Procedures Hearing") and the relief sought therein having been given under the particular circumstances; and upon the declaration of David Carlos in support of the Motion; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest; and after due deliberation thereon and good cause appearing therefore, it is hereby:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

22484.3 21176667v2

**FOUND, CONCLUDED AND DETERMINED THAT:**[2]

A.      This Court has jurisdiction over the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The relief granted herein is in the best interests of the Debtor, its estate and creditors, and other parties in interest.

C.      Due, sufficient and adequate notice of the Motion and the Bidding Procedures Hearing and the relief granted in this Bidding Procedures Order has been given in accordance with applicable law and orders of this Court and such notice is appropriate in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required.

D.      The proposed Auction Notice is reasonably calculated to provide timely and adequate notice to the Debtor's creditors and those persons potentially interested in bidding on the Campus, and no further notice is necessary or required upon service of the Auction Notice by first-class mail postage prepaid or, if no mailing address is available, via electronic mail, upon (i) the U.S. Trustee, (ii) counsel for the Committee, if one is appointed, (iii) all known creditors of the Debtor, (iv) the indenture trustee for the Bonds; (v) the Debtor's proposed DIP Lender, SummitBridge National Investments VIII LLC (the "DIP Lender"), (vi) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (vii) the following taxing and regulatory authorities: (a) the United States Attorney for the Northern District of New York, (b) the Attorney General of the State of New York, not-for-profit office, (c) United States Department of Education, (d) New York State Department of Education, (e) the IRS, (f) the NYS Tax Dept., and (g) the

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, when appropriate. See FED. R. BANKR. P. 7052.

22484.3 21176667v2

Securities and Exchange Commission; (viii) all parties who are known to assert a lien, claim, encumbrance or other interest on any portion of the Campus; and (ix) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Campus (collectively, the "Notice Parties").

  E.  The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, including this Court's (i) approval of the Bidding Procedures, attached hereto as Exhibit 1, (ii) approval of the form of Purchase Agreement, (iii) approval of the Bid Protections in favor of a Stalking Horse Purchaser, if one is selected and is not the Successful Bidder at an Auction, and (iv) approval of the form and manner of service of the Auction Notice.

  F.  The Debtor has articulated good and sufficient reasons for, and the best interests of the Debtor's estate will be served by, this Court scheduling a Sale Hearing to consider whether to grant the remainder of the relief requested in the Motion, including approving and authorizing the proposed Sale of the Campus, free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon, pursuant to the Purchase Agreement, as modified to incorporate the terms of any Successful Bid.

  G.  The Termination Fee, to the extent payable under certain circumstances set forth in the Motion and in the Bidding Procedures, is (i) an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of section 503(b) of the Bankruptcy Code, (ii) providing a material benefit to the estate by enabling the Debtor to obtain a commitment from a Stalking Horse Purchaser for its money, time and effort formulating and negotiating an offer for the Campus, and (iii) fair and reasonable when considering the potential amount of time, effort, cost, and expense that a Stalking Horse Purchaser will likely incur in negotiating a Stalking Horse Agreement.

22484.3 21176667v2

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is GRANTED, to the extent set forth herein.

2.    All objections to entry of this Bidding Procedures Order or to the relief provided herein and requested in the Motion that have been withdrawn, waived, resolved, or settled are hereby denied and overruled in their entirety.

## The Bidding Procedures

3.    The Bidding Procedures, as set forth in Exhibit 1 hereto and incorporated herein by reference, are hereby APPROVED in all respects and shall govern all bids and bid proceedings relating to the Campus, and the Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.  The failure to specifically include or reference any particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

4.    As further described in the Bidding Procedures, each Bid must be delivered on or before **[December 6], 2024 at 5:00 p.m. (EST)** (the "Bid Deadline").

5.    The Debtor is authorized to extend the deadlines set forth in this Bidding Procedures Order and/or adjourn, continue or suspend the Auction and/or the Sale Hearing as it may reasonable determine to be in the best interest of its estate, in consultation with the Consultation Parties.

## The Auction

6.    The Auction, if necessary, shall commence at 10:00 a.m. (prevailing Eastern Time) **[December 12], 2024** at the offices of Cullen and Dykman LLP, 80 State Street, Suite 900, Albany,

New York 12207, or such other place and time as the Debtor shall notify all Qualified Bidders and the Consultation Parties; provided, however, in the event that no Qualified Bids are received by the Bid Deadline, then the Auction shall be cancelled, or if the only Qualified Bid is the Bid of the Stalking Horse Purchaser, then the Stalking Horse Agreement shall be the Successful Bid for the Campus and the Debtor shall not be required to conduct an Auction, and in such event the Debtor shall proceed with the approval of the Stalking Horse Agreement with the Stalking Horse Purchaser as the Successful Bidder.

## The Termination Fee

7.     The Debtor is authorized and directed to pay the Termination Fee, to the extent one is incurred in accordance with the Bidding Procedures and solely in the event of the consummation of an Alternate Transaction for the Campus, from the first proceeds of such transaction to the extent set forth in any Stalking Horse Agreement, without further order of the Court.

8.     The terms of any Stalking Horse Agreement shall govern (i) the conditions under which the bid of the Stalking Horse Purchaser is terminable and (ii) the Termination Fee payable in the event of an Alternate Transaction for the Campus.

## Auction Notice

9.     The Auction Notice substantially in the form attached to the Motion as Exhibit C is hereby approved.

10.     Not later than three (3) days after the entry of this Bidding Procedures Order, the Debtor will cause a copy of this Bidding Procedures Order, the Bidding Procedures and the Auction Notice, to be sent by first-class mail postage prepaid to the Notice Parties or, if no mailing address is available, via electronic mail.

22484.3 21176667v2

**Objections to Motion**

11.     Objections, if any, to the Motion must be made in writing, must state with particularity the reasons for the objection or response, and must be filed with the Clerk of the Bankruptcy Court, with copies delivered to the Bankruptcy Court and received by the Chambers of the Honorable Robert E. Littlefield, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court, Northern District of New York, 445 Broadway, Suite 330, Albany, New York, 12207, must conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and basis of the objection and the specific grounds therefore and must be served upon: (a) United States Trustee for Northern District New York, 10 Broad Street, Room 105, Utica, New York 13501; (b) proposed counsel to the Debtor, Cullen and Dykman LLP, 80 State Street, Suite 900, Albany, New York 12207, Attn: Matthew G. Roseman, Esq. and Bonnie L. Pollack, Esq.; (c) counsel to the indenture trustee for the Bonds and proposed DIP Lenders: (i) Eversheds Sutherland LLP, 999 Peachtree Street, NE, Atlanta, BA 30309, Attn. Todd Meyers, Esq.; and (ii) Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Ian A. Hammel and P. Miyoko Sato, Esq.; and (d) counsel to any the Committee appointed, so as to be received no later than 12:00 p.m. (prevailing Eastern Time) on [**December 17**], 2024 (the "Sale Objection Deadline").

**The Sale Hearing**

12.     The Sale Hearing shall be held before the Honorable Robert E. Littlefield, Jr., United States Bankruptcy Judge, on [**December 19**], 2024 at 10:00 a.m. (EST) at the United States Bankruptcy Court for the Northern District of New York, 445 Broadway, Suite 330, Albany, New York, 12207, at which time this Court shall consider (i) approval of the Sale of the Campus to a Successful Bidder; (ii) the entry of the proposed Sale Order, substantially in the form attached to

the Motion as Exhibit D; (iii) any issues or objections that are timely interposed by any parties; and (iv) such other or further relief as this Court may deem just or proper.

13.    The Sale Hearing may be adjourned by the Court upon request of the Debtor, in consultation with the Consultation Parties and the Successful Bidder, without further order of this Court, in which event a notice of adjournment will be filed with this Court and served on all Qualified Bidders and Consultation Parties or by announcing such adjournment on the record of the Sale Hearing.

## **Additional Provisions**

14.    The Debtor is authorized and empowered to take such steps, incur and pay such costs and expenses, and do such things as may be reasonably necessary to fulfill the requirements established by this Bidding Procedures Order.

15.    Nothing contained in this Bidding Procedures Order precludes any party in interest from objecting to the Sale in accordance with the objection procedures set forth herein and no party shall be deemed to have consented to the Sale by virtue of not having objected to the Motion.

16.    The Debtor is hereby authorized and empowered to take such actions as may be reasonably necessary to implement and effect the terms and requirements established by this Bidding Procedures Order.

17.    This Bidding Procedures Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

18.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7052, 9014 or otherwise, the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

22484.3 21176667v2

19.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order.

## Exhibit 1

## Bidding Procedures

## BIDDING PROCEDURES AND TERMS AND CONDITIONS OF SALE

These bidding procedures (the "Bidding Procedures") set forth the process by which The College of Saint Rose, the debtor and debtor-in-possession herein (the "Debtor" or the "Seller") shall conduct a sale (the "Sale") by auction (the "Auction") of certain real property consisting of the parcels itemized on Schedule A hereto (the "Campus"), in whole or in Lots (as hereinafter defined), free and clear of liens, claims and encumbrances.

On [●], 2024, the United States Bankruptcy Court for the Northern District of New York (the "Court") authorized the Seller to determine the highest and otherwise best offer(s) for the Campus through the process and procedures set forth below.

The Court presides over the Seller's chapter 11 bankruptcy case (the "Chapter 11 Case") captioned *In re The College of Saint Rose,* Ch. 11 Case No. 24-11131 (Bankr. N.D.N.Y.).

On [●], 2024, the Court entered an order (the "Bidding Procedures Order") granting the Seller's motion (the "Bidding Procedures Motion")[1] insofar as it sought approval of the Bidding Procedures. The Bidding Procedures Order and the order approving the Sale are referred to herein, collectively, as the "Sale Orders."

The Seller reserves the right to enter into and publicly announce an agreement (the "Stalking Horse Agreement") with a stalking horse purchaser (the "Stalking Horse Purchaser") in consultation with the Consultation Parties provided Seller must do so on or before December 4, 2024. In that event, the Stalking Horse Agreement will be filed with the Court and the bidding will continue as set forth herein.

## I.    PROPERTY TO BE SOLD

The Bidding Procedures Motion contemplates one or a combination of multiple offers to purchase the Campus, in whole or in lots.   A party may participate in the bidding process by submitting a Bid (as defined below) for the entire Campus or for smaller subsets of the Campus (as described in more detail below, the "Lots").

Subject to the terms of the Sale Orders, and with all rights of the Consultation Parties (as defined below) reserved, all of the Seller's right, title and interest in and to the Campus shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Liens"), with such Liens to attach to the proceeds of the Sale(s) with the same validity and priority as such Liens applied against the Campus or the Lots, except as otherwise specifically provided in an Asset Purchase Agreement (as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto) and consented to by the Secured Parties (as defined below) and reflected in the Sale Orders.

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Bidding Procedures Motion.

## II.    THE CONSULTATION PARTIES

The Seller will consult (a) (i) SummitBridge National Investments VIII LLC and (ii) the indenture trustee for the Bonds (each a "Secured Party" and collectively, the "Secured Parties"), (b) any official committee of unsecured creditors appointed to represent unsecured creditors in the Chapter 11 Case pursuant to Bankruptcy Code Section 1102 (the "Committee"), and (c) each of their respective counsel and advisors (each, a "Consultation Party" and collectively, the "Consultation Parties") as provided in these Bidding Procedures; provided, however, that the Seller shall not be required to consult with any Consultation Party during the Auction process to the extent such Consultation Party has submitted a Bid (as defined below) or has had a Bid submitted on its behalf for so long as such Bid remains open, if the Seller determines, in its reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to the goal of maximizing value for the Seller's estate from the sale process; provided, further, however, that no Consultation Party shall independently communicate with any prospective purchaser, Potential Bidder (as defined below), or Bidder (as defined below), in each case, without the prior express consent of Seller.

To the extent the Bidding Procedures require the Seller to consult with any Consultation Party in connection with making a determination or taking an action, or in connection with any other matter related to the Bidding Procedures or the Auction, the Seller will do so in a regular and timely manner prior to making such determination or taking such action.

Subject to the terms of any Orders entered in the Chapter 11 Case, after consultation with the Consultation Parties, and with all rights of the Consultation Parties to seek or oppose any relief in the Chapter 11 Case reserved, the Seller shall have the right and obligation to make all decisions regarding Bids and the Auction as provided herein as it determines to be in the best interest of its estate.

## III.    BIDDING PROCESS

### A.    Overview

The Seller and its advisors will, subject to the other provisions of these Bidding Procedures, in consultation with the Consultation Parties:

1.    coordinate the efforts of Potential Bidders (as defined below) in conducting their due diligence investigations;

2.    receive offers from Bidders (as defined below);

3.    determine whether any person is a Qualified Bidder (as defined below); and

4.    conduct the Auction and further negotiate any offers made to purchase the Campus, either as a whole or in Lots.

B.     Key Dates

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Seller and to submit competing bids for the Campus, either as a whole or in Lots.  The Seller will assist Potential Bidders in conducting their respective due diligence investigations and may accept Bids until **[December 6], 2024 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

The key dates for the Sale process are as follows:[2]

| | |
|---|---|
| [December 4], 2024 at 5:00 p.m. EST | **Stalking Horse Selection Deadline**: Due date to enter into a Stalking Horse Agreement. |
| [December 6], 2024 at 5:00 p.m. EST | **Bid Deadline**: Due date to submit a Qualified Bid and Good Faith Deposit (each as defined below) |
| [December 12], 2024 at 10:00 a.m. EST | **Auction**: To be held at the offices of Cullen and Dykman LLP, 80 State Street, Suite 900, Albany, New York 12207 |
| [December 13], 2024 at 4:00 p.m. EST | **Deadline to File Results of Auction** |
| [December 17], 2024 at 12:00 p.m. EST | **Sale [and Cure] Objection Deadline** |
| [December 19], 2024, or as soon thereafter as is convenient for the Court | **Sale Hearing**: To be held at the United States Bankruptcy Court for the Northern District of New York, 445 Broadway, Suite 330, Albany, NY  12207 |

C.     Access to Diligence Materials

To participate in the bidding process either as a Stalking Horse Purchaser or to effectuate on alternative sale transaction for all or a portion of the Campus (a "Transaction") and to receive access to due diligence materials (the "Diligence Materials"), a party must submit to the Seller an executed confidentiality agreement in substantially the same form as that which was previously

---

[2]These dates are subject to extension or adjournment as provided for herein and in consultation with the Consultation Parties.  The schedule set forth above may be delayed and the qualification of bids may be relaxed in the event that the Seller, in consultation with the Consultation Parties, determines that additional time or adjustment to qualifications will likely result in greater overall value for the Seller's estate based on an expression(s) of interest or bid(s) received from an identified party which the Seller, in consultation with the Consultation Parties, believes could be a Qualified Bid (as hereinafter defined).

22484.3 21085169v3

circulated to Prospective Purchasers, and otherwise in form and substance satisfactory to the Seller (a "Confidentiality Agreement").

A party who executes such a Confidentiality Agreement for access to Diligence Materials shall be a "Potential Bidder." The Seller will afford any Potential Bidder the time and opportunity to conduct reasonable due diligence in accordance with a diligence protocol determined by the Seller and its advisors; provided, however, that the Seller shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below) on or before the Bid Deadline and may, in consultation with the Consultation Parties, limit the amount of further due diligence available to Qualified Bidders after the Bid Deadline.

Neither the Seller nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder.

All due diligence requests must be directed to the Seller's real estate advisors, Jones Lang LaSalle Brokerage, Inc., Attn: David Carlos (David.Carlos@jll.com).

D.    Due Diligence from Bidders

Each Potential Bidder and each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Seller or its advisors regarding such Potential Bidder or Bidder, as applicable, and its contemplated Transaction. Failure by a Potential Bidder or Bidder to comply with requests for additional information and due diligence access may be a basis for the Seller to determine that such Bidder is not a Qualified Bidder.

## IV.    AUCTION QUALIFICATION PROCESS

A.    Qualifying Bids

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be reasonably determined by the Seller, in consultation with the Consultation Parties, to satisfy each of the following conditions:

1.    Good Faith Deposit: Each Bid must be accompanied by a cash deposit, paid by wire transfer of immediately available funds or a certified check, in the amount of five percent (5%) of the purchase price contained in the Asset Purchase Agreement (as defined below), which deposit shall be held in an escrow account to be established by the Seller (the "Good Faith Deposit"). In addition, each Potential Bidder must also supplement its Good Faith Deposit by an additional one and one-half (1.5%) percent of the purchase price contained in the Asset Purchase Agreement with the Seller in the form of a certified check or wire transfer before the Auction.

2.    Higher and Better Terms: In connection with any Bid for the Campus, either in whole or for the Lots, such Bid must be on terms that the Seller, in its business judgment and after consulting with the Consultation Parties,

determines is higher and better for the Seller on a cash (or cash equivalent) basis than the terms of any Stalking Horse Agreement (including all exhibits, schedules and ancillary agreements related thereto, and as amended and in effect); provided, however, a Secured Party shall be permitted to submit a credit bid pursuant to section 363(k) of the Bankruptcy Code, including at any Auction, so long as such bid includes cash in an amount necessary to satisfy any Bid Protections (as defined in Section VII herein).

3.    Executed Agreement: Each Bid must include a binding, executed, irrevocable asset purchase agreement (an "Asset Purchase Agreement"), signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate a Transaction. A Bid must also include a copy of the Asset Purchase Agreement (including all exhibits thereto) marked against the form of Asset Purchase Agreement to be provided by the Seller or any Stalking Horse Agreement to show all changes requested by the Bidder and to remove Bid Protections that only apply to a Stalking Horse Purchaser. Both the Asset Purchase Agreement and the marked copy thereof must be provided in both Microsoft Word and PDF format.

4.    Scope of Bid/Lots:  A Bid must be for the entire Campus or for one or more of the Lots identified on Schedule A hereto.

5.    Minimum Bid:  Except in connection with any Bid for one or more (but not all) of the Lots, and if there is a Stalking Horse Purchaser, a purchase price must exceed the purchase price in the Stalking Horse Agreement by at least the amount of the Bid Protections and Initial Overbid Amount (each as hereinafter defined).

6.    Corporate Authority:  A Bid must include written evidence reasonably acceptable to the Seller demonstrating appropriate corporate authorization to consummate the proposed Transaction; provided that, if the Bidder is an entity specially formed for the purpose of effectuating the Transaction then the Bidder must furnish written evidence reasonably acceptable to the Seller of the approval of the Transaction by the equity holder(s) of such Bidder.

7.    Disclosure of Identity of Bidder:  A Bid must fully disclose the identity of each entity and principal that will be bidding for or purchasing the Campus or any Lot(s), including any equity holders in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated Transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation.  A Bid must also fully disclose any connections or agreements with the Seller, or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer or trustee of the Seller.

22484.3 21085169v3

8.    <u>Proof of Financial Ability to Perform</u>: A Bid must include detailed, written evidence that the Seller and its advisors may conclude, in consultation with the Consultation Parties, demonstrates that the Bidder has and will continue to have the necessary financial ability to close the Transaction. Such information must include, *inter alia,* the following:

    (a)    contact names and numbers for verification of financing sources;

    (b)    evidence of the Bidder's internal resources and proof of funding commitments in an aggregate amount equal to the cash portion of such Bid as are needed to close the Transaction;

    (c)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Seller;

    (d)    a description of the Bidder's pro forma capital structure; and

    (e)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Seller, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Transaction.

9.    <u>Contact Information and Affiliates</u>:  A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

10.    <u>Contingencies</u>:    Each Bid (a) may not contain representations and warranties, covenants, or termination rights of any kind and (b) may not be conditioned on (i) obtaining financing, (ii) any internal approvals or credit committee approvals, or (iii) the outcome or review of due diligence.

11.    <u>Irrevocable</u>:  Each Bid must be irrevocable until the earlier of (i) ninety (90) days following entry of the final Sale Order, (ii) closing of the Sale with the Successful Bidder(s), or (iii) the date the Bid is otherwise rejected under these Bidding Procedures.

12.    <u>Compliance with Diligence Requests</u>:  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Seller to the reasonable satisfaction of the Seller, in consultation with the Consultation Parties.

13.    <u>As-Is, Where-Is</u>:  Each Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Campus or applicable Lot(s) prior to

making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Campus or applicable Lot(s) in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Campus or applicable Lot(s) or the completeness of any information provided in connection therewith or the Auction.

14.   Termination Fees:  The Bid (other than a Bid pursuant to (a) the Stalking Horse Agreement or (b) the written agreement of Seller after consultation with the Consultation Parties) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

15.   Adherence to Bid Procedures:  By submitting its Bid, each Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

16.   No Late Bids:  Unless otherwise ordered by the Court, the Seller shall not consider any Bids submitted after the conclusion of the Auction, and any and all such bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

17.   Additional Information: The Debtor, in consultation with the Consultation Parties, reserves the right to request additional information from a Bidder in connection with its Bid.

18.   Bid Notice:  The following parties (the "Bid Notice Parties") must receive a Bid in writing, on or before the Bid Deadline:

| Debtor | Proposed Counsel to the Debtor |
|---|---|
| The College of Saint Rose<br>432 Western Ave<br>Albany, NY 12203<br>Attn: Marcia White and<br>Debbie Polley | Cullen and Dykman LLP<br>80 State Street, Suite 900<br>Albany, New York 12207<br>Attn: Matthew G. Roseman Esq.<br>Bonnie L. Pollack, Esq.<br>mroseman@cullenllp.com<br>bpollack@cullenllp.com |
| **Office of the United States Trustee** | **Proposed Real Estate Advisor to the Debtor** |
| United States Trustee for Region 2<br>11A Clinton Avenue, Room 620<br>Albany, NY 12207<br>Attn: Lisa M. Penpraze | Jones Lang LaSalle<br>330 Madison Avenue<br>New York, NY 10017<br>Attn: David M. Carlos<br>david.carlos@jll.com |
| **Counsel to Summit<br>National Investments<br>VIII LLC** | **Counsel to the Indenture Trustee for the<br>Bonds** |
| Kilpatrick Townsend & Stockton LLP<br>1100 Peachtree Street NE, Suite 2800<br>Atlanta, GA 30309-4528<br>Attn: Paul Rosenblatt, Esq.<br>prosenblatt@kilpatricktownsend.com | Mintz, Levin, Cohn, Ferris, Glovsky and<br>Popeo, P.C.<br>One Financial Center<br>Boston, MA 02111<br>Attn:  Ian A. Hammel, Esq.,<br>Miyoko Sato, Esq.<br>Iahammel@mintz.com<br>Msato@mintz.com |

A Bid received from a Bidder before the Bid Deadline that meets all of the above requirements for the entire Campus and/or applicable Lot(s) shall constitute a "Qualified Bid" and such Bidder shall constitute a "Qualified Bidder"; provided that if the Seller receives a Bid prior to the Bid Deadline that is not a Qualified Bid, the Seller may, in consultation with the Consultation Parties, provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction; provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Seller to its satisfaction, the Seller, in consultation with the Consultation Parties, may disqualify any Qualified

8

Bidder and Qualified Bid, in the Seller's discretion, and such Bidder shall not be entitled to attend or participate in the Auction.

Any amendments, supplements or other modifications to any Bids (including pursuant to this paragraph) shall be delivered to the Bid Notice Parties. All Qualified Bids will be considered, but the Seller reserves the right to reject any or all Bids, in consultation with the Consultation Parties. However, Bids that are unconditional and contemplate sales that may be consummated on or soon after the Sale Hearing are preferred. Additionally, notwithstanding anything herein to the contrary, a Stalking Horse Agreement submitted by a Stalking Horse Purchaser and a Bid from a Secured Party shall be deemed a Qualified Bid, and the Stalking Horse Purchaser or Secured Party, as applicable, shall be deemed a Qualified Bidder. The Seller will, after consultation with the Consultation Parties, inform counsel to the Consultation Parties, counsel to a Stalking Horse Purchaser and any Qualified Bidders whether the Seller considers any Bid to be a Qualified Bid as soon as practicable but in no event later than one (1) day before the Auction.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Seller and its agents and representatives (other than as may be set forth in a definitive agreement executed by the Seller), regarding the Seller, any of the Campus, the Auction, these Bidding Procedures or any information provided in connection therewith.

Without the consent of the Seller, after consultation with the Consultation Parties, a Qualified Bidder may not amend, modify or withdraw its Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Bid, during the period that such Bid is required to remain irrevocable and binding.

## V.    AUCTION

### A.    Auction

If multiple Qualified Bids with respect to the entire Campus and/or the Lot(s) are submitted by the Bid Deadline, the Seller will conduct the Auction to determine the highest and otherwise best Qualified Bid with respect to such Campus, either as a whole or in Lots.

### B.    Assessment Criteria

The Seller's determination of the highest and otherwise best Qualified Bid with respect to the entire Campus and/or the Lot(s) will take into account any factors the Seller, in consultation with the Consultation Parties, reasonably deems relevant to the value of the Qualified Bid to the estate and may include, but are not limited to, the following:

1.    the amount and nature of the consideration;

2.    the type and nature of any modifications to the Asset Purchase Agreement requested by each Bidder in such Bidder's Asset Purchase Agreement;

9

3.       the extent to which such modifications are likely to delay closing of the sale of the entire Campus and/or Lot(s) and the cost to the Seller of such modifications or delay;

4.       the likelihood of the Bidder's ability to close a Transaction and the timing thereof, including the ability to obtain, or waive, as applicable, regulatory and Court approvals;

5.       compliance with section 541(f) of the Bankruptcy Code;

6.       the net benefit to the Seller's estate (collectively, the "Bid Assessment Criteria").

C.       Cancellation of the Auction

If multiple Qualified Bids for the entire Campus and/or Qualified Bids for Lot(s) have not been timely received, then the Auction will be cancelled. If the only Qualified Bid is the Bid of a Stalking Horse Purchaser, then the Stalking Horse Agreement shall be the Successful Bid for those portions of the Campus described in its Bid, and the Stalking Horse Purchaser shall be the Successful Bidder.

## VI.    PROCEDURES FOR THE AUCTION

If multiple Qualified Bids for the entire Campus and/or Lot(s) have been timely received by the Bid Deadline, then the Seller may, after consulting the Consultation Parties, commence the Auction on **[December 12], 2024 at 10:00 a.m.** (prevailing Eastern Time) at the offices of Cullen and Dykman LLP, 80 State Street, Suite 900, Albany, New York 12207, or such other place and time as the Seller shall notify all Qualified Bidders and the Consultation Parties.

The Auction will be conducted according to the following procedures:

A.       Participation

Only the Seller, the Consultation Parties, any Stalking Horse Purchaser, and any other Qualified Bidder, in each case, along with their respective representatives and counsel, may attend the Auction (such attendance to be in person) and only the Qualified Bidders and the Stalking Horse Purchaser will be entitled to make any Bids at the Auction.

B.       The Seller Shall Conduct the Auction

The Seller and its advisors shall direct and preside over the Auction, and the Auction shall be transcribed. The Seller (in consultation with the Consultation Parties) may conduct the Auction and may augment or modify the procedures described herein in any manner it reasonably determines will result in the highest and otherwise best Qualified Bid(s), including, without limitation, by establishing rules at any Auction that include, without limitation, a single or multiple rounds of bulk and/or Lot bidding, the combination of Lots for purposes of bidding, the use of sealed bidding, open outcry, or any other form of Bid submission (including in connection with any bulk or Lot bidding). The Seller will consult in good faith with the Consultation Parties

10

throughout the Auction process to the extent reasonably practicable. Any rules developed by the Seller will provide that each Qualified Bidder will be permitted what the Seller determines to be an appropriate amount of time to respond to the previous bid at the Auction.

C.     Auction Baseline Bids

Prior to commencement of the Auction, the Seller may provide each Qualified Bidder participating in the Auction with a copy of the Asset Purchase Agreement(s) that are the highest and otherwise best Qualified Bid for the Campus and/or applicable Lot(s) as determined by the Seller, in consultation with the Consultation Parties (such highest and otherwise best Qualified Bid(s), the "Auction Baseline Bid"). In addition, at the start of the Auction, the Seller may describe the terms of the Auction Baseline Bid.

D.     Anti-Collusion Representations

Each Qualified Bidder participating in the Auction must confirm that it (1) has not engaged in any collusion with respect to the bidding or Sale, (2) has reviewed, understands and accepts the Bidding Procedures and (3) has consented to the core jurisdiction of the Court.

E.     Terms of Overbids

The Seller will accept Overbids, as further described below. An "Overbid" is any bid made at the Auction subsequent to the Seller's announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

1.     Initial Overbid: The initial Overbid after and above the Auction Baseline Bid (the "Initial Overbid") shall be in an amount of not less than 105 percent of the Auction Baseline Bid for any Auction Baseline Bid that is less than $1 million, otherwise $100,000 in excess of the Auction Baseline Bid plus the amount of any Bid Protections. [*comment is addressed to smaller lots*]

2.     Minimum Overbid Increments: Any Overbid after and above the Initial Overbid shall be made in increments (the "Minimum Overbid Increment") valued at not less than 105 percent of the next highest Bid for any Bid that is less than $1 million, otherwise $100,000, in cash or in cash equivalents or, once the cash (or cash equivalent) amount of such Overbid exceeds the cash (or cash equivalent) amount of the next highest Bid, other forms of consideration acceptable to the Seller in consultation with the Consultation Parties. The Seller, in consultation with the Consultation Parties, reserves the right to modify the Minimum Overbid Increment during the Auction.

3.     Remaining Terms Are the Same as for Qualified Bids: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement or the Asset

11

Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder as provided herein.

At the Seller's discretion, in consultation with the Consultation Parties, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Seller), reasonably demonstrating such Bidder's ability to close the Transaction proposed by such Overbid.

F.    Other Procedures

1.    <u>Jurisdiction of the Court</u>: All Qualified Bidders (including the Stalking Horse Purchaser) at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the determination of what constitutes a Qualified Bid and the procedures used to make that determination, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and Transaction documents, as applicable.

2.    <u>Additional Bids; Modifications</u>: All Qualified Bidders shall have the right to submit additional Bids and make additional modifications to the Stalking Horse Agreement or Asset Purchase Agreement at the Auction, as applicable, provided that any such modifications to such Stalking Horse Agreement or the Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Seller's business judgment, in consultation with the Consultation Parties, be less favorable to the Seller than the terms of such original agreement.

3.    <u>Subsequent Bids</u>: Each Qualified Bidder must submit a subsequent Bid that satisfies the Minimum Overbid Increment in each round of bidding in order to continue participating in the Auction. Unless approved by the Seller, in consultation with the Consultation Parties, Qualified Bidders shall not be allowed to skip rounds of bidding for the entire Campus and/or applicable Lot(s) once they participate in the Auction for the entire Campus and/or applicable Lot(s).

4.    <u>Continuance/Adjournment of Auction</u>: Subject to the deadlines set forth herein, the Seller reserves the right, in its reasonable business judgment, in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Seller and individual Qualified Bidders, allow individual Qualified Bidders to consider how they wish to proceed, modify or supplement any or all of the Auction procedures or rules, or give Qualified Bidders the opportunity to provide the Seller with such additional evidence as the Seller, in its reasonable business judgment, in consultation with the Consultation Parties may require, that the Qualified Bidder has sufficient

12

internal resources, or has received sufficient funding commitments, to consummate the proposed Transaction at the prevailing Overbid amount.

G.    <u>Additional Procedures</u>

The Seller (after consulting with the Consultation Parties) may announce at the Auction other or additional procedural rules for conducting the Auction or may modify the rules specified in these Bidding Procedures in any manner the Seller reasonably determines will result in the highest and otherwise best Qualified Bid(s). Any Auction rules adopted by the Seller that would modify any of the terms of the Stalking Horse Agreement or the rights of the Stalking Horse Purchaser to Bid Protections (as may be consensually modified at the Auction) requires the consent of the Stalking Horse Purchaser.

H.    <u>Sale Is As Is/Where Is</u>

Except as otherwise may be provided in any Stalking Horse Agreement or Asset Purchase Agreement, or any order by the Court approving any Sale as contemplated hereunder, the property sold pursuant to the Bidding Procedures, whether as an entire Campus or in one or more Lots, shall be conveyed at the closing of the purchase and sale in its then-present condition, "**AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED."**

I.    <u>Closing the Auction</u>

The Auction will continue until the Seller selects, after consulting with the Consultation Parties, the Bid(s) that represent the highest and otherwise best offer(s) for the entire Campus and/or Lot(s) (a "<u>Successful Bid</u>," and the Bidder(s) submitting such Successful Bid(s), a "<u>Successful Bidder</u>"). The Successful Bidder(s) shall have the rights and responsibilities of the purchaser as set forth in the Asset Purchase Agreement. In selecting each Successful Bid, the Seller, in consultation with the Consultation Parties, will consider the Bid Assessment Criteria.

The Seller will announce that the Auction is closed upon receipt of fully executed sale and Transaction documents memorializing the terms of the Successful Bid(s) from the Successful Bidder(s). Unless otherwise agreed to by the Seller in consultation with the Consultation Parties, within one (1) business day after the conclusion of the Auction, each Successful Bidder(s) shall supplement its Good Faith Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Good Faith Deposit equals ten (10%) percent of the Successful Bid(s) plus the amount required for the payment of Bid Protections, if any.

The Seller shall not consider any Bids submitted after the conclusion of the Auction.

J.    <u>Backup Bidder</u>

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest and otherwise best Bid at the Auction with respect to the entire Campus and/or one or more Lot(s), as applicable, as determined by the Seller, in the exercise of its business judgment and after consulting with the Consultation Parties, will be designated as a backup bidder (a "<u>Backup Bidder</u>"). A Backup Bidder shall be required to keep

its last submitted Bid (the "Backup Bid") open and irrevocable until the earlier of (i) ninety (90) days following entry of the final Sale Order, and (ii) closing of the Sale.

Following the Sale Hearing, if a Successful Bidder fails to consummate the purchase of the entire Campus and/or one or more Lot(s), as applicable, the Seller, in consultation with the Consultation Parties, may deem the Backup Bidder for such property to have the new Successful Bid, and the Seller will be authorized, without further order of the Court, to consummate the Transaction with such Backup Bidder at the price of its last bid. Such Backup Bidder will be deemed to be the Successful Bidder and the Seller will be authorized, but not directed, to effectuate a sale to such Backup Bidder subject to the terms of the Backup Bid without further order of the Court. All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Seller on and as of the date that the Court approves the Successful Bid. The Seller, on its behalf and on behalf of each of its estate, specifically reserves the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

## VII.    BID PROTECTIONS

Pursuant to the Bidding Procedures Order, a Stalking Horse Purchaser is entitled to a Termination Fee in an amount to be negotiated as between the Debtor and the Stalking Horse Purchaser after consultation with the Consultation Parties and not to exceed two (2) percent of the cash purchase price (the "Bid Protections") as further set forth in, and in accordance with the terms of, the Stalking Horse Agreement and the Bidding Procedures Order. In the event that there is more than one Successful Bid, the Bid Protections will be calculated and allocated on a pro rata basis.

Pursuant to the Bidding Procedures Order, except for any Stalking Horse Purchaser, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment unless Seller, in consultation with the Consultation Parties, agrees in writing to provide any such bid protections.

## VIII.    SALE HEARING

The Successful Bid and Backup Bid will be subject to approval by the Court. The sale hearing to approve the Successful Bids and any Backup Bids shall take place on **[December 19], 2024** at 10:00 a.m. (EDT) before the Court (the "Sale Hearing").

Nothing herein or contemplated hereby constitutes, or will be deemed to constitute or otherwise result in, the consent or approval of any Consultation Party or any other party in interest to the Sale, any Sale Order, or any Bid, or to any agreement or motion or other pleading relating thereto, or the waiver or modification of any of the terms of, or any rights under, any existing agreement, instrument or document, or any default arising thereunder or relating thereto. Any and all rights of such parties and parties in interest to object or otherwise oppose any Sale, Sale Order, or Bid, or any agreement or pleading related thereto are hereby expressly preserved and reserved.

The Sale Hearing may be adjourned by the Seller, in consultation with the Consultation Parties and the Stalking Horse Purchaser.

## IX.    RETURN OF GOOD FAITH DEPOSITS

The Good Faith Deposits of all Qualified Bidders shall be held in one or more escrow accounts by the Seller, but shall not become property of the Seller's estate absent further order of the Court or as expressly provided below. The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after entry of the Sale Order. The Good Faith Deposit of a Backup Bidder, if any, shall be returned to such Backup Bidder no later than five (5) business days after the closing of the Transaction with the Successful Bidder or as otherwise provided in these Bidding Procedures. If the Successful Bidder (or Backup Bidder, if applicable) timely closes on the winning Transaction, its Good Faith Deposit shall be credited towards the applicable purchase price. If the Successful Bidder (or Backup Bidder, if applicable) fails to consummate a Transaction because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Successful Bidder (or Backup Bidder, if applicable), shall forfeit the Good Faith Deposit as liquidated damages, Seller will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Good Faith Deposit shall irrevocably become property of the Seller.

## X.    CONSENT TO JURISDICTION AND AUTHORITY AS CONDITION TO BIDDING

All Potential Bidders shall be deemed to have (A) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to the Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale Transaction, (B) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale Transaction, and (C) consented to the entry of a final order or judgment in any way related to the Bidding Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## XI.    RESERVATION OF RIGHTS OF THE SELLERS

The Seller further reserves the right as it may reasonably determine to be in the best interest of its estate, in consultation with the Consultation Parties, to:

22484.3 21085169v3

A.      determine which Bidder(s) is a Qualified Bidder(s);

B.      determine which Bid(s) is a Qualified Bid(s);

C.      determine which Qualified Bid is the highest or best proposal for the entire Campus and/or Lot(s) and which is the next highest or best proposal for the entire Campus and/or Lot(s);

D.      reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Seller and its estate;

E.      impose additional terms and conditions with respect to all potential Bidders;

F.      extend the deadlines set forth herein; and

G.      modify the Bidding Procedures and implement additional procedural rules that the Seller determines, in its business judgment, will better promote the goals of the bidding process and discharge the Seller's fiduciary duties.

521951245v.2

22484.3 21085169v3

**Exhibit B**

**Purchase Agreement**

ASSET PURCHASE AGREEMENT

by and between

THE COLLEGE OF SAINT ROSE

and

[_____]

Dated as of [_____], 2024

Table of Contents

Page

ARTICLE I DEFINITIONS ........................................................................1
ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ...........9
2.1        Assets to be Sold to Buyer. ...............................................9
2.2        Excluded Assets ...............................................................9
2.3        Excluded Liabilities. ........................................................10
ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING......................11
3.1        Payment of Purchase Price. ..............................................11
3.2        Deposit. .........................................................................11
3.3        Closing and Closing Date. ...............................................11
3.4        Closing Deliveries. ..........................................................12
3.5        Transfer Taxes. ...............................................................13
3.6        Delivery of Records and Contracts. ..................................14
3.7        Further Conveyances. ......................................................14
3.8        Bulk Sales Laws. .............................................................14
ARTICLE IV SELLER'S REPRESENTATIONS AND WARRANTIES ....................................14
4.1        Organization of Seller. ....................................................14
4.2        Authorization of Transaction. ..........................................14
4.3        Qualification. ..................................................................15
4.4        Non-Contravention. .........................................................15
4.5        Brokers' Fees. .................................................................15
4.6        Events Subsequent ..........................................................15
4.7        Tax Matters. ....................................................................16
4.8        Property and Assets .........................................................16
4.9        Contracts. .......................................................................17
4.10       Seller's Consents and Approvals. .....................................18
4.11       Powers of Attorney. ........................................................19
4.12       Litigation. .......................................................................19
4.13       Employees .......................................................................19
4.14       Foreign Operations. .........................................................19
4.15       Insurance Coverage. ........................................................19
4.16       Restrictions on Acquisition. .............................................19
4.17       Environmental Matters. ...................................................19
4.18       Intentionally Omitted. ......................................................21
4.19       No Other Representations or Warranties; Schedules. .........21
ARTICLE V BUYER'S REPRESENTATIONS AND WARRANTIES......................................21
5.1        Organization of Buyer. ....................................................21
5.2        Authorization of Transaction. ..........................................21
5.3        Non-Contravention. .........................................................22
5.4        Brokers' Fees. .................................................................22
5.5        Buyer's Consents and Approvals. .....................................22
5.6        Acknowledgement Regarding Condition of the Acquired Assets.. ...................22
5.7        Financial Capability. .......................................................22
5.8        No Other Representations or Warranties; Schedules. .........22

ARTICLE VI BANKRUPTCY COURT MATTERS ....................................................23
   6.1      Termination Fee.......................................................................................23
   6.2      Competing Transaction. ..........................................................................23
ARTICLE VII PRE-CLOSING COVENANTS ........................................................24
   7.1      General. ....................................................................................................24
   7.2      Regulatory Approvals. .............................................................................24
   7.3      Operation of Business. ............................................................................24
   7.4      Access.. ...................................................................................................25
   7.5      Notice of Developments. .........................................................................26
   7.6      Employment Matters. ..............................................................................26
   7.7      Removal of Excluded Assets from Owned Real Property. ......................26
ARTICLE VIII POST-CLOSING COVENANTS .....................................................26
   8.1      General. ....................................................................................................26
   8.2      Intentionally Omitted. .............................................................................27
   8.3      Non-Disclosure. ......................................................................................27
   8.4      Further Assurances. .................................................................................28
   8.5      Sale of Certain Personal Property, including Furniture and Equipment...........28
   8.6      Removal of Necessary Records. ..............................................................28
ARTICLE IX EMPLOYEES .....................................................................................28
   9.1      Buyer Not Assuming Seller's CBAs or Benefit Plans. ...........................28
   9.2      No Obligation to Offer Employment. ......................................................29
   9.3      No Successor Liability. ............................................................................29
ARTICLE X CONDITIONS TO OBLIGATION TO CLOSE .................................29
   10.1     Conditions to Buyer's Obligation. ..........................................................29
   10.2     Conditions to Seller's Obligations. .........................................................30
ARTICLE XI DISPUTE RESOLUTION ...................................................................31
   11.1     Dispute Resolution. .................................................................................31
ARTICLE XII TERMINATION ................................................................................31
   12.1     Termination of Agreement. .....................................................................31
   12.2     Procedure For Termination. .....................................................................32
   12.3     Effect of Termination. .............................................................................33
ARTICLE XIII TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS...33
   13.1     Title Insurance.. ......................................................................................33
   13.2     Permitted Exceptions. .............................................................................34
   13.3     Apportionments. ......................................................................................34
ARTICLE XIV MISCELLANEOUS ..........................................................................37
   14.1     Survival. ...................................................................................................37
   14.2     Press Releases and Public Announcements. ............................................37
   14.3     No Third-Party Beneficiaries. .................................................................37
   14.4     Entire Agreement. ...................................................................................37
   14.5     Succession and Assignment. ...................................................................37
   14.6     Counterparts. ...........................................................................................38
   14.7     Headings. .................................................................................................38
   14.8     Notices. ....................................................................................................38
   14.9     Governing Law; Waiver of Jury Trial. ....................................................38
   14.10    Submission to Jurisdiction; Consent to Service of Process. ....................39
   14.11    Amendments. ...........................................................................................39
   14.12    Severability. ............................................................................................39

ii

| | | |
|---|---|---|
| 14.13 | Expenses. | 39 |
| 14.14 | Construction. | 39 |
| 14.15 | Incorporation of Schedules.. | 39 |
| 14.16 | No Waiver. | 40 |
| 14.17 | Non-Recourse Liability. | 40 |

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Knowledge |
| Schedule 4.6 | Events Subsequent |
| Schedule 4.7(b) | Tax Compliance |
| Schedule 4.7(c) | Lien or Claims for Taxes |
| Schedule 4.8(a) | Owned Real Property |
| Schedule 4.8(d) | Violations |
| Schedule 4.9(a) | Contracts |
| Schedule 4.9(d) | Notices and Approval for Contracts |
| Schedule 4.10 | Consents and Approvals (Seller) |
| Schedule 4.12 | Litigation of Seller |
| Schedule 4.15 | Insurance Coverage |
| Schedule 4.16 | Restrictions on Acquisition |
| Schedule 4.17(a) | Environmental Matters |
| Schedule 4.17(b) | Environmental Permits |
| Schedule 5.5 | Consents and Approvals (Buyer) |
| Schedule 13.2(a) | Permitted Exceptions |

22484.3 21176665v1

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of _____, 2024 (the "Execution Date") is by and between THE COLLEGE OF SAINT ROSE, an education corporation chartered by the Board of Regents of the State of New York New York ("CSR" or "Seller"), and _____ ("Buyer"), each a "Party" and collectively the "Parties."

## RECITALS

WHEREAS, on October __, 2024 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court"), Case No. ___-_____ (REL) (the "Chapter 11 Case"); and

WHEREAS, on _____, 2024, Seller filed a motion (the "Motion") seeking, *inter alia*, approval of the sale (the "Sale") of Seller's campus located in Albany, New York as more fully described in the Motion (the "Campus") to the successful bidder (the "Successful Bidder") as determined by the bidding procedures (the "Bidding Procedures"); and

WHEREAS, on _____, 2024, an order was entered by the Bankruptcy Court, approving, *inter alia*, Bidding Procedures for the Sale, and scheduling an auction ("Auction") and sale hearing in connection therewith (the "Bidding Procedures Order"); and

WHEREAS, the Bidding Procedures Order authorized the Seller, in its discretion, to enter into a form of "stalking horse" asset purchase agreement which contemplates a purchase and sale of the entire Campus; and

WHEREAS, subject to the terms and conditions of the Bidding Procedures Order and the results of the Auction scheduled for _____, 2024, Seller wishes to sell to Buyer and Buyer wishes to acquire from Seller the Acquired Assets (defined below) on the terms and conditions set forth in this Agreement; and

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to an order of the Bankruptcy Court, approving, *inter alia*, the Sale of the Campus to the Buyer (the "Sale Order"), consistent with terms, conditions and transactions contemplated by the Agreement; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions.  The following terms, as used herein, have the following meanings:

"Acquired Assets" has the meaning set forth Section 2.1.

"Affiliate" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

"Agreement" has the meaning set forth in the preface above.

"Alternate Transaction" means a transaction or series of related transactions consummated by Seller pursuant to which Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization, or bankruptcy plan of liquidation, or other similar transaction, including a Bankruptcy Court approved stand-alone plan of liquidation, all or substantially all of the Acquired Assets owned by Seller to a party or parties other than Buyer (or one or more designees of Buyer).

"Applicable Law" means, with respect to any Person, any foreign, federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, plan, order, injunction, judgment, decree, ruling, charge or other similar requirement, including any Labor and Employment Law and Requirements, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"Auction" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to Section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Case .

"Bidding Procedures Order" has the meaning set forth in the recitals.

"Board" means the governing board of an entity, including the board of directors, board of governors, board of trustees, or board of managers, as applicable.

"Business" means the limited business operations of Seller as conducted following Seller's cessation of operations as a provider of educational services (not including the Excluded Liabilities).

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"Buyer" has the meaning set forth in the preface above.

"Buyer Confidential Information" has the meaning set forth in Section 8.3(b).

"Buyer's Consents and Approvals" has the meaning set forth in Section 5.5.

"Buyer's Objection Notice" has the meaning set forth in Section 13.1.

2

"<u>Campus Agent</u>" means Jones Lang LaSalle Brokerage LLC.

"<u>CBA</u>" means collective bargaining agreement.

"<u>Chapter 11 Case</u>" has the meaning set forth in the recitals.

"<u>Claim</u>" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"<u>Closing</u>" has the meaning set forth in Section 3.3(a).

"<u>Closing Date</u>" has the meaning set forth in Section 3.3(a).

"<u>Closing Documents</u>" has the meaning set forth in Section 3.4(a).

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Competing Bid</u>" has the meaning set forth in Section 6.2(a).

"<u>Contemplated Transactions</u>" has the meaning set forth in Section 2.1.

"<u>Contract</u>" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense or other agreement or arrangements of any kind relating to Owned Real Property, the Acquired Assets or the operation thereof to which Seller is a party or by which any of the Acquired Assets are bound.

"<u>Covered Person</u>" means a current or former Employee, officer, director or consultant of Seller.

"<u>Debt</u>" means, with respect to Seller, the aggregate amounts of long-term and short-term indebtedness of Seller, including any amounts owing under any capital lease arrangement, amounts outstanding under notes payable to any financial institution or Governmental Authority, amounts owed to an Employee Benefit Plan, amounts outstanding under lines of credit, amounts owing under notes or dividends or distributions payable or other amounts payable by Seller, any other amounts outstanding under notes payable, and any prepayment penalties or expenses payable in connection with the foregoing transactions, but excluding the accounts payable arising in the Ordinary Course of Business of Seller.

"<u>Deeds</u>" has the meaning set forth in Section 3.4(a)(i).

"<u>Deposit</u>" has the meaning set forth in Section 3.2.

"<u>Effective Time</u>" has the meaning set forth in Section 3.3(b).

"<u>Employee Benefit Plan</u>" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship, relocation disability, accident, sick, vacation, holiday, unemployment incentive, commission, retention change in control, non-competition, and other plans, agreements, policies, trust funds (a)

established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or an ERISA Affiliate, or (b) with respect to which Seller or any ERISA Affiliate has or has had any obligation, in each case, under which any Employee of Seller may receive benefits or may otherwise be subject.

"Employees" means all individuals who are employed by Seller (including any employees not actively at work as of the Closing Date, as well as any employees who are on medical disability or leaves of absence and who worked for Seller immediately prior to such disability or leave).

"Environmental Claim" means any demand, assessment, Lien, investigation, claim, action or cause of action, complaint, citation, directive, information request issued by a Governmental Authority, legal proceeding, order, or notice of potential violation or potential responsibility arising under any applicable Environmental Law.

"Environmental Law" means any applicable statute, law, common law, rule, regulation, ordinance, or order of any federal, state, or local Government Authority in effect on or before the Closing Date relating to pollution, protection of human health (to the extent relating to exposure to Hazardous Materials) or the environment, or the processing, generation, management, distribution, use, handling, treatment, storage, transport, disposal, Remediation, or Release of Hazardous Materials.

"Environmental Permit" means any permit, registration, license, approval, identification number, exemption or other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, when used with respect to an Employee Benefit Plan, ERISA, the Pension Benefit Guaranty Corporation or a provision of the Code pertaining to employee benefit plans, any Person that is a member of any group of organizations within the meaning of Sections 414(b) or 414(c) of the Code (or, solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, or Sections 414(m) or 414(o) of the Code of which either Seller is a member).

"Exceptions" has the meaning set forth in Section 13.1.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth Section 2.3.

"Execution Date" has the meaning set forth in the preface above.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial,

reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.  As set forth in the Bidding Procedures Order, the Parties consent to the Bankruptcy Court issuing a Final Order in the Chapter 11 Case  with respect to, among other things, any matter or dispute relating to the Sale of the Campus, the Bidding Procedures, the Sale Hearing, the Auction, a Stalking Horse Bidder, a Backup Bid and/or any other matter that in any way relates to the foregoing.

"Furniture and Equipment" means all furniture, furnishings, machinery, appliances and other equipment owned by Seller and located on the Owned Real Property, including all such desks, chairs, tables, Hardware, telephone lines and other telecommunication equipment and miscellaneous office furnishings, but specifically excluding Non-Estate Property.

"Governmental Authority" means any domestic or foreign federal, state or local governmental authority, department, court or government, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other division, subdivision, department or branch of any of the foregoing.

"Governmental Authorizations" means any approval, consent, license, permit, waiver, registration, accreditation or other authorization issued, granted, given, made available or otherwise required by any Governmental Authority or pursuant to Applicable Law.

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Materials" means:  (i) any chemical, substance, material, or waste listed, defined, or classified as a "pollutant," "contaminant," "hazardous substance," "toxic substance," "solid waste," "hazardous waste," "hazardous material," or "special waste" under any applicable Environmental Law; (ii) any substance regulated under any applicable Environmental Law; (iii) petroleum or any derivative or by-product thereof; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, methyl tertiary butyl ethyl, radioactive material, or radon; (v) mold; and (vi) any asbestos-containing materials.

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after reasonable inquiry by the chief restructuring officer of Seller as of or immediately prior to the Closing, which individual is identified in Schedule 1.1.

"Labor and Employment Law and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) hours of work

and/or payment of wages, (b) notices to Employees, (c) discrimination, harassment and retaliation, (f) leaves of absence, (g) employee benefits, or (h) duty to bargain collectively with bargaining unit representative of Employees.

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Licenses" means any licenses, approvals, authorizations, consents, permits, orders, registrations, certificates, decrees, franchises, permits variances, and similar rights obtained from any Governmental Authority.

"Lien" means any claim, charge, easement, encumbrance, encroachment, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Applicable Law, equity or otherwise.

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has or could be reasonably expected to have a material adverse effect on (a) the value of the Acquired Assets, (b) a significant portion of the Owned Real Property is destroyed or damaged by fire or other casualty, or (c) the ability of Seller to consummate the Contemplated Transactions on a timely basis, in each case as determined by Buyer.

"Material Contracts" has the meaning set forth in Section 4.9(b).

"Material Development" means any change in the nature, scope, strategy, parties or other aspect of a Material Litigation or Proceeding that would have a Material Adverse Effect.

"Material Litigation or Proceeding" means any action, suit, investigation, proceeding or audit (a) the settlement or adjudication of which would (i) cause a material breach of this Agreement, (ii) have the effect of making the Contemplated Transactions illegal or (iii) materially prohibit or interfere with the consummation of the Contemplated Transactions.

"Necessary Records" has the meaning set forth in Section 2.2(j).

"Non-Estate Property" means that certain personal property that is either not owned by the Seller or which may be a Restricted Asset.

"Ordinary Course of Business" means the ordinary course of business of the Seller following its cessation of operations as a provider of educational services.

"Owned Real Property" has the meaning set forth in Section 4.8(a).

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Permitted Exceptions" has the meaning set forth in Section 13.2.

"Petition Date" has the meaning set forth in the recitals.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Authority.

"Pre-Closing Tax Returns" has the meaning set forth in Section 4.7(a).

"Predecessor" means (a) any Person that has ever merged with or into Seller, (b) any Person, a majority of whose capital stock (or similar outstanding ownership interests) or equity securities has ever been sold, transferred or assigned by Seller and (iii) any Person that has had all or substantially all of its assets acquired by Seller.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, or disposing of Hazardous Materials into the environment, including the ambient air, surface and subsurface soils, surface water and groundwater.

"Remediation" means any investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, reclamation, closure, or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"Representatives" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"Restricted Assets" has the meaning set forth in Section 2.2(c).

"RE Tax Returns" means that returns, questionnaires, certificates, affidavits and other documents required by the Title Company in connection with the payment of any Transfer Taxes.

"Sale Order" has the meaning set forth in the Recitals.

"Seller" has the meaning set forth in the preface above.

"Seller Confidential Information" has the meaning set forth in Section 8.3(a).

"Seller's Consents and Approvals" has the meaning set forth in Section 4.9.

"Survey" has the meaning set forth in Section 13.1.

"Tax" or "Taxes" means any federal, state, local, or foreign income, prohibited transaction, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, net worth or capital, profits, withholding, social security (or similar), unemployment,

disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"Tax Return" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2) and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Fee" means a fee in the amount to be negotiated between the Buyer and Seller. **[only to be used in a Stalking Horse Agreement]**

"Time is of the Essence" means with regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

"Title Company" has the meaning set forth in Section 13.1.

"Title Defect" has the meaning set forth in Section 13.1.

"Title Report" has the meaning set forth in Section 13.1.

"Transfer Taxes" means any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges payable in connection with the Contemplated Transactions.

1.2      Other Definitional and Interpretative Provisions.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions and headings used herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. The terms "Dollars," "dollars" and "$" shall mean United States dollars. Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time at or prior to the Closing in accordance with the terms hereof and thereof; provided that with respect to any agreement or contract listed on any schedules hereto, any substantive amendments, modifications or supplements must also be listed in the appropriate schedule.  References to any Person include the successors and permitted assigns of that Person.  References herein to a Person

in a particular capacity or capacities shall exclude such Person in any other capacity. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

ARTICLE II
PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    <u>Assets to be Sold to Buyer</u>.  On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, Seller shall sell, transfer, convey, assign and deliver to Buyer, or to an entity or entities designated by Buyer, on the Closing Date, all of its right, title and interest in the assets described in this Section 2.1 (the "<u>Acquired Assets</u>"), free and clear of all Liens and Claims, other than Liens securing the Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code (the "<u>Contemplated Transaction</u>").  The Acquired Assets shall be comprised of the following assets:

(a)    All Owned Real Property of Seller listed on <u>Schedule 4.8(a)</u>, including all fixtures and improvements owned by Seller and located on the Owned Real Property;

(b)    Intentionally Omitted.

(c)    Subject to Seller's right to remediate any such damage with insurance proceeds, all proceeds or proceeds receivable of Seller's insurance and unliquidated or unsatisfied Claims that relate to property damage with respect to the Owned Real Property occurring after the Execution Date and prior to the Closing, and all other insurance proceeds and insurance proceeds receivable (including applicable deductibles, co-payments or self-insured requirements) arising from any Claim made under Seller's insurance policies with respect to the Acquired Assets arising after the Execution Date and prior to the Closing; and

(d)    All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided, if any, after the Closing, or to the extent affecting any Acquired Assets arising after the Closing.

2.2    <u>Excluded Assets</u>.  For the avoidance of doubt, the following assets are not intended by the Parties to be a part of the Contemplated Transaction and are excluded from the Acquired Assets (the "<u>Excluded Assets</u>"):

(a)    Seller's cash, cash equivalents, bank deposits and similar items;

9

(b)    Seller's Furniture and Equipment, including, without limitation,

(i)    all computer equipment containing or capable of containing data including, but not limited to, computer servers and related equipment (uninterruptable power supply devices, blade racks, cables, adaptors, etc.), desktop PCs, laptops, tablets, hard drives and other data and/or media storage devices (tapes, discs, floppy drives, etc.); and

(ii)    All cleaning and maintenance supplies, spare parts and other disposables located on the Owned Real Property and used in the ordinary course of the Seller's operations prior to the Closing Date;

(c)    All personal property, whether or not located on the grounds of the Owned Real Property;

(d)    All property and equipment that is leased by the Seller;

(e)    All intellectual property and intangible property including, but not limited to, computer software, licenses, maintenance or support contracts, related to excluded computer equipment, IPv4 addresses, patents, trademarks, copyrights, domain addresses, e-mail addresses and phone numbers;

(f)    All Non-Estate Property, including donor restricted assets (including, without limitation, special library collections, art collections, or religious artifacts) and endowment funds held by, or for the benefit of, Seller, the income and/or corpus of which has been designated for use in support of, for the benefit of, or otherwise relating to, any of Seller's mission, operations, programs, services, and/or assets (collectively, the "Restricted Assets") to the extent transferable and subject to any approvals required by Applicable Law;

(g)    Seller's accounts receivable;

(h)    Organizational documents, corporate records and minute books of Seller;

(i)    Any books and records which by Applicable Law or policy Seller is required to retain in its possession (the "Necessary Records");

(j)    Seller's Contracts, except for the Material Contracts, contract rights and receivables, rebates, credit balances and refunds due from third parties, pledges, commitments, available credit lines;

(k)    All Claims and causes of action of Seller, including counterclaims that may be asserted in response to any proofs of Claim filed against Seller; and

(l)    Rights that will accrue to Seller under this Agreement.

2.3    Excluded Liabilities.    Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall not have any obligation with respect to

10

any other Liabilities of Seller, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "Excluded Liabilities").  It shall not affect the status of a Liability as an Excluded Liability to the extent Buyer affirmatively elects in its sole and absolute discretion to assume responsibility for a given Excluded Liability.

ARTICLE III
PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1    Payment of Purchase Price.

(a)    Consideration.  Subject to the terms and conditions hereof, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer (or its designee(s)) at Closing, shall be [            ] Dollars ($              ) (the "Purchase Price"), subject to the adjustments and credits described in Section 3.1(b) and Section 13.3. The Purchase Price shall be allocated as among the parcels of the Owned Real Property as set forth in Schedule 3.1(a). Such allocation shall not be binding on the parties to the Seller's bankruptcy case.

(b)    Payment.  Subject to the terms and conditions hereof, on the Closing Date, Buyer shall pay to Seller the amount of the Purchase Price less the Deposit.

(c)    Title Discharge.  In the event there is any Lien or Title Defect which Seller is obligated or elects to pay and discharge at Closing, Seller may pay and discharge such Lien or Title Defect out of the balance of the Purchase Price, provided Seller has made arrangements with the Title Company in advance of Closing for Seller to deposit with the Title Company sufficient monies (which shall include all recording charges) required by the Title Company to issue an ALTA Owner's Title Policy to Buyer free of any such Lien or Title Defect.  The existence of any such Lien, Title Defect or real estate taxes shall not be deemed objections to title if Seller shall comply with the foregoing requirements.

3.2    Deposit.  Buyer shall have made a cash deposit in the aggregate amount of six and one-half (6 ½ %) of the Purchase Price (the "Deposit"), which Deposit shall be supplemented to equal ten percent (10%) of the Purchase Price in the event Buyer is designated as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures Order) at the conclusion of the Auction.  Seller shall retain the Deposit as liquidated damages if this Agreement is properly terminated by Seller pursuant to Section 12.1(c)(ii) or upon the failure of Buyer to consummate the Sale, provided that all conditions precedent to Closing have been satisfied and there shall not have been a material breach by Seller of any representation, warranty or covenant contained in this Agreement.

3.3    Closing and Closing Date.

(a)    The closing of the Contemplated Transaction (the "Closing") shall take place at a location agreed upon by Buyer and Seller, within 10 days after satisfaction or waiver of all conditions to the obligations of Seller and Buyer, to consummate the Contemplated Transaction (other than conditions with respect to actions Seller and Buyer will take at the Closing) or such other date as Buyer and Seller may mutually determine in writing (the "Closing Date").

11

(b)     Unless otherwise agreed in writing by the Parties, the Contemplated Transaction shall be effective as of 12:00:01 a.m. on the calendar day immediately following the Closing Date (the "Effective Time").

3.4     Closing Deliveries.

(a)     Seller Deliveries.   At the Closing, contemporaneously with Buyer's delivery to Seller of all of the Closing Documents required to be delivered by Buyer hereunder, Seller shall deliver or cause to be delivered to Buyer, duly executed by Seller in recordable form, where applicable (the documents and other deliverables described in this Section 3.4(a) and in Section 3.4(b) and all other documents required to be delivered hereunder are referred to collectively as the "Closing Documents") the following items:

(i)     fully-executed and acknowledged bargain and sale deeds with covenants against grantor's acts conveying the Owned Real Property to Buyer (or its designee(s)) (the "Deeds");

(ii)     copies of any reasonably required RE Tax Returns properly executed and acknowledged by Seller;

(iii)     a Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended;

(iv)     a fully-executed bill of sale from Seller in a form acceptable to Buyer;

(v)     to the extent in the possession of Seller or Seller's agents, all keys or key cards and alarm codes to, and all combinations to, any locks on, all entrance doors to, and any equipment and utility rooms located in, the Owned Real Property, appropriately tagged for identification;

(vi)     a good standing certificate for Seller from the appropriate offices of the State of New York, dated within 30 days prior to the Closing Date, and such evidence, delivered to Buyer and the Title Company, as reasonably required to evidence the due authorization, execution, and delivery by Seller of the Deeds and other Closing Documents to which Seller is a party;

(vii)     a certificate from an officer of Seller to the effect that each of the conditions specified in Section 10.1(a), Section 10.1(b), Section 10.1(c) and Section 10.1(d)_____ is satisfied in all respects;

(viii)     a certificate from an officer of Seller dated as of the Closing Date (which shall include a certified copy of such Seller's certificate of incorporation, bylaws, relevant resolutions of Seller's Board approving the Contemplated Transaction and such other customary items as Buyer may reasonably request), in form and substance reasonably satisfactory to Buyer;

12

(ix)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Seller; and

(x)    any other document, instrument, agreement or other item (A) required to be delivered by Seller at or prior to the Closing hereunder or (B) otherwise necessary to consummate the Contemplated Transaction as reasonably requested by Buyer or the Title Company; *provided, however*, that Seller shall not be obligated to cause the delivery of any such documentation under clause (B) to the extent it would increase or expand Seller's obligations or liability in any material respect.

(b)    <u>Buyer Deliveries</u>.   At the Closing, contemporaneously with Seller's delivery to Buyer of all of the Closing Documents required to be delivered by Seller hereunder, Buyer shall deliver or cause to be delivered to Seller the following items:

(i)    in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price;

(ii)    copies of any reasonably required RE Tax Returns properly executed and acknowledged by Buyer;

(iii)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Buyer;

(iv)    a certificate from an officer of Buyer to the effect that each of the conditions specified in Section 10.2(a) and Section 10.2(b) is satisfied in all respects;

(v)    a secretary's certificate of Buyer dated as of the Closing Date; (which shall include a certified copy of Buyer's certificate of incorporation, Buyer's bylaw, relevant resolutions of Buyer's Board approving the Contemplated Transactions and such other customary items as Seller may reasonably request), in form and substance reasonably satisfactory to Seller; and

(vi)    any other document, instrument, agreement or other item (A) required to be delivered by Buyer at or prior to the Closing hereunder or (B) otherwise necessary to consummate the Contemplated Transaction herein reasonably requested by Seller or the Title Company.

3.5    <u>Transfer Taxes</u>.   To the extent applicable, Buyer shall pay at the Closing any Transfer Taxes (or any other transfer, conveyance or similar tax is imposed in connection with the sale, assignment, transfer and conveyance of the Owned Real Property) payable by it pursuant to Section 14.13.

13

3.6    <u>Delivery of Records and Contracts</u>.  Seller shall use reasonable efforts to make available to Buyer on the Closing Date all records, keys and other information in Seller's possession as of the Closing Date relating to the Acquired Assets under Section 2.1.

3.7    <u>Further Conveyances</u>.  From time to time following the Closing, each Party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the other Closing Documents, to ensure that Buyer is relieved of all Excluded Liabilities and to otherwise make effective the Contemplated Transactions.  If Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller.  If Seller retains or receives any Acquired Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.8    <u>Bulk Sales Laws</u>.  The Parties hereby waive compliance by Seller with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.9    <u>Time is of the Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, Time is of the Essence.

ARTICLE IV
SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE IV).

4.1    <u>Organization of Seller</u>.  Seller (a) is duly organized, validly existing under the laws of the State of New York, the jurisdiction of its formation, and (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets.

4.2    <u>Authorization of Transaction</u>.  Except for such authorization as is required by the Bankruptcy Court, Seller has full not-for-profit corporate power and authority to execute and deliver this Agreement and, subject to such authorization as is required by the Bankruptcy Court and any required approval by a Court of competent jurisdiction to perform its obligations hereunder.  Without limiting the generality of the foregoing, the Board of Seller has duly authorized the execution, delivery and performance of this Agreement by Seller.  This Agreement constitutes, and any and all other Closing Documents to be executed by Seller pursuant hereto, when executed, will constitute, the valid and legally binding obligation of Seller, enforceable in

14

accordance with their terms and conditions, except as enforceability against Seller may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3     Qualification.  Seller is duly qualified or licensed to own and manage the Campus, and is in good standing, in the State of New York, which is the only jurisdiction (domestic and foreign) in which the character or the location of the Acquired Assets requires such licensing or qualification.  To the extent necessary, Seller agrees to comply with the requirements of Sections 510 and 511 of the New York Not-for-Profit Corporation Law, as modified by Section 216-1 of the New York Education Law, made applicable hereto by Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code.

4.4     Non-Contravention.  Subject to Bankruptcy Court approval and any other required approval by a Court of competent jurisdiction, if any, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transaction (including each Closing Document required to be delivered by Seller at Closing), nor the fulfillment of the terms hereof by Seller, will (i) violate any order or award of any court, administrative agency or governmental body applicable to Seller; (ii) result in the imposition of any Lien or Claim upon any Acquired Asset pursuant to the terms of any such mortgage, bond, indenture, lease, franchise or other instrument or obligation; (iii) constitute a violation by Seller of any Applicable Law; or (iv) conflict with or violate any charter document of Seller.

4.5     Brokers' Fees.  Seller has engaged the Campus Agent and shall be solely responsible for the commission and expenses due the Campus Agent in accordance with that certain agreement dated [_____], 2024.  For the avoidance of doubt, Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transaction for which Buyer could become liable or obligated.

4.6     Events Subsequent.  Except as set forth in Schedule 4.6, since the Petition Date, there have not been any of the following:

(a)     Any amendment or other modification or alteration (including through merger, liquidation, reorganization, or restructuring) of the articles of incorporation (or similar organizational documents) or corporate structure or ownership of Seller;

(b)     Any material damage to or destruction or loss of any Acquired Assets or Owned Real Property, whether or not covered by insurance, material adversely affecting the Acquired Assets;

(c)     Any sale, transfer, lease to others or other disposition of any Acquired Asset unless in the Ordinary Course of Business or if such item has been rendered obsolete;

(d)     Any change in any Tax election or Tax status of Seller; or

(e)     Any Claims made or actions, suits or proceedings or, to the Knowledge of Seller, any investigation by a Governmental Authority commenced or, to the Knowledge of Seller, threatened, against Seller in relation to the Acquired Assets.

4.7    <u>Tax Matters</u>.

(a)    Seller has received a determination letter from the Internal Revenue Service to the effect that it is exempt from federal income taxation under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code. Such tax-exempt status has not been revoked or suspended, and to the Knowledge of Seller, there are not currently any proceedings to revoke or suspend such tax-exempt status.

(b)    Except as disclosed on <u>Schedule 4.7(b)</u>, Seller has duly and timely paid in accordance with all Applicable Law, all Taxes with respect to the Acquired Assets that are due and payable with respect to any period prior to Closing and has properly accrued on its books and records any Tax with respect to any such period that is not yet due and payable. Except as disclosed on <u>Schedule 4.7(b)</u>, Seller has duly and timely withheld or collected, paid over and reported all Taxes with respect to the Acquired Assets required to be withheld or collected by it in any period prior to Closing.

(c)    Except as disclosed on <u>Schedule 4.7(c)</u>, to Seller's Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable, and no issue has been raised by written inquiry of any Governmental Entity respecting Taxes, which, by application of the same principles, would reasonably be expected to result in a Lien or Claim on the Acquired Assets in any taxable period (or portion thereof) ending after the Closing Date.

(d)    No extension or waiver of the limitation period applicable to the assessment or collection of any Tax has been granted with respect to Seller; and Seller has not entered into any agreement or arrangement with any Governmental Authority with regard to any Liability for any Tax affecting any Tax period for which the applicable statute of limitations, after giving effect to extensions or waivers, has not expired.

(e)    No Governmental Authority has asserted in writing or, to Seller's Knowledge, orally (i) an adjustment that could result in an additional Tax for which Seller is or may be liable or that could result in a Lien or Claim on the Acquired Assets or (ii) a threat to the tax-exempt status of Seller. There is no proceeding pending relating to any Liability for any Tax or asset of Seller or the tax-exempt status of Seller and, to Seller's Knowledge, no Governmental Authority has threatened any audit, examination, investigation, inquiry, dispute, proceeding or Claim.

4.8    <u>Property and Assets</u>.

(a)    <u>Schedule 4.8(a)</u> contains a complete list of all real property which comprises the Campus which is the subject of this Agreement and to which Seller owns fee simple title. Seller has not received any written notice of any pending expropriation, eminent domain or similar proceeding affecting all or any material portion of any such Owned Real Property or, to Seller's Knowledge, that any such activities are currently being threatened. Except as set forth in Section 4.8(c) and <u>Schedule 4.9(a)</u>, there are no oral leases or subleases; there are no (x) written subleases or (y) written or oral licenses, concessions, occupancy agreements or other Contracts granting to any other Person the right of use or

occupancy of the Owned Real Property or any portion thereof; and there is no Person in possession of the Owned Real Property or any portion thereof other than Seller. The real property identified on Schedule 4.8(a) represents all of the real property owned, leased, subleased, licensed or otherwise occupied by Seller that comprises the Campus and which is the subject of the Contemplated Transaction.

(b)    Seller has title to, or, in the case of personal property held under a lease or other Contract (subject to the terms of the lease or other Contract), an enforceable leasehold interest in, or right to use, the Acquired Assets, free and clear of all Liens and Claims other than Liens securing the Permitted Exceptions. The foregoing notwithstanding, with respect to the Owned Real Property, Seller shall convey and Buyer shall accept such title as any reputable title company that is a member of the New York Board of Title Underwriters will be willing to approve and insure at standard rates in accordance with its standard form of title policy, clear of all Liens, except for Permitted Exceptions. Except as otherwise provided, the Owned Real Property shall be conveyed together with (a) all right, title and interest of Seller in and to all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Owned Real Property, and (b) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Owned Real Property and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Owned Real Property to the center line thereof, and (c) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Owned Real Property by reason of a change of grade of any street, road or avenue.

(c)    None of the Acquired Assets owned or leased by Seller is subject to any sublease or sublicense or any other agreement granting to any other Person by Seller any right to the use, occupancy or enjoyment of such property or any portion thereof.

(d)    To Seller's Knowledge, Schedule 4.8(d) lists all violations of law or municipal ordinances, orders or requirements noted in or issued by the departments of buildings, fire, labor, health or other federal, state, county, city or other departments and governmental authorities having jurisdiction against or affecting the Owned Real Property.

4.9    Contracts.

(a)    Schedule 4.9 (a) sets forth a complete and correct list of the following:

(i)    each Material Contract (or group of related Material Contracts), in each case, the performance of which relates to the Campus and will extend over a period of more than one (1) year from the Execution Date or which provides for annual payments to or by Seller in excess of $50,000;

(ii)    each Contract that relates to the borrowing or lending by Seller of any money or that creates or continues any Lien or Claim against, or right of any third party with respect to, the Acquired Assets, except for those Liens and Claims

not related to the borrowing of any money but arising in the Ordinary Course of Business;

(iii)    each Contract (or group of related Contracts) under which Seller has permitted any Acquired Asset to become encumbered; and

(iv)    each Contract by which Seller leases any real or personal property in relation to the Campus or pursuant to which Seller is a lessor of, or permits any third party to operate, any real or personal property in relation to the Campus.

(b)    As used in this Agreement, the term "Material Contracts" means all Contracts that are material to the Acquired Assets.  Except (i) as otherwise provided in the Bankruptcy Code and (ii) for events of default arising as a result of Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of the Seller.  Except for cure amounts, if any, for which Buyer is responsible, there are no material Liabilities of any party to any Material Contract arising from any breach or default of any provision thereof and no event has occurred that, with the passage of time or the giving of notice or both, would constitute a breach or default by any party thereto.

(c)    Intentionally Omitted.

(d)    Each Material Contract is enforceable against the applicable counterparty and is in full force and effect, and, subject to obtaining any necessary consents or delivering any necessary notices, as disclosed on Schedule 4.9(d), will continue to be so enforceable and in full force and effect following the consummation of the Contemplated Transaction.

(e)    No Material Contract to which Seller is a party may be terminated by any other party thereto as a result of the Contemplated Transaction.

(f)    There are no notes receivable of Seller or any other amount payable to Seller owing by any director, officer, member or Employee of Seller.  Neither Seller nor any Employee, officer, director, or shareholder, no individual, related by blood, marriage or adoption to any such individual, and no entity in which any such Person or individual owns any beneficial interest is a party to any agreement, contract, commitment or transaction with Seller or any loan, arrangement, understanding, agreement or contract for or relating to indebtedness of Seller, or has any interest in any property, tangible or intangible, used by Seller.

4.10    Seller's Consents and Approvals.  Schedule 4.9 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Seller to consummate the Contemplated Transaction (including this Agreement and each other Closing Document required to be delivered by Seller at Closing) (collectively, "Seller's Consents and Approvals"), other than (a) entry of the Sale Order, and (b) any required approval by any other Court of competent jurisdiction, if any.

4.11    Powers of Attorney.  There are no outstanding powers of attorney executed on behalf of Seller.

4.12    Litigation.

(a)    Except as set forth on Schedule 4.12, (i) there is no action, suit, investigation or proceeding pending or, to Seller's Knowledge, threatened (x) against Seller with respect to the Acquired Assets before any arbitrator or Governmental Authority, whether any of the same are covered by insurance or whether any applicable carrier has denied coverage or reserved rights with respect to or assumed the defense thereof and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of the Contemplated Transaction or that questions the validity, legality or propriety of the Contemplated Transactions or that could reasonably be expected to have a Material Adverse Effect; and (ii) Seller is not subject to any judgment, order or decree of any Governmental Authority with respect to the Acquired Assets involving an amount in excess of $50,000.00.

(b)    Seller has delivered to Buyer correct and complete copies of all correspondence, pleadings, and other relevant documents in connection with the actions, suits, investigations or proceedings set forth on Schedule 4.12.

4.13    Employees.  Seller shall be solely responsible for any notices to Employees that may be required under any CBA as a consequence of the Contemplated Transaction, and shall defend, indemnify and hold harmless Buyer against any liability resulting from failure to provide such notices as may be required.

4.14    Foreign Operations.  Seller has no operations outside the United States.

4.15    Insurance Coverage.  Schedule 4.15 lists, and Seller has furnished to Buyer, true and complete copies of, all insurance policies (including any insurance renewal binders) and fidelity or surety bonds currently in force relating to the Acquired Assets.  The policy limits and deductibles of such policies are not subject to Claims by any other entities.  Except as set forth on Schedule 4.15, all premiums currently due and payable under all such policies and bonds have been paid in full.  Schedule 4.15 lists all of Seller's current commercial general liability coverages.

4.16    Restrictions on Acquisition.  Except as set forth on Schedule 4.16, there is no agreement, judgment, injunction, order or decree binding upon Seller or the Acquired Assets or, to Seller's Knowledge, threatened, that has or could reasonably be expected to have the effect of prohibiting or materially impairing the acquisition of the Acquired Assets, in each case either individually or in the aggregate.

4.17    Environmental Matters.

(a)    To Seller's Knowledge and except as set forth on Schedule 4.17(a):

(i)    Seller's ownership or leasing of the Owned Real Property are, and at all times have been, in compliance in all material respects with all applicable Environmental Laws;

22484.3 21176665v1

(ii)      Seller has not received any written notice from a Governmental Authority or other Person regarding any Environmental Claim related to or arising out of Seller's ownership or leasing of the Owned Real Property that currently remains pending or unresolved and, to Seller's Knowledge, there are no events or conditions with respect to the ownership or leasing of the Owned Real Property or otherwise existing or occurring at the Owned Real Property that could reasonably be expected to result in an Environmental Claim;

(iii)      Seller is in compliance in all material respects with such Environmental Permits and there is not now pending nor, to Seller's Knowledge, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any Environmental Permit, and all of the Environmental Permits are and shall be effective and in good standing now and as of the Closing Date;

(iv)      There has been no Release or threatened Release of Hazardous Materials at, on, under, to or from the Owned Real Property required to be reported or subject to required Remediation, and Seller has not received any written notice from any Governmental Authority or other Person alleging that Seller has liability under any applicable Environmental Law with respect to the Release of Hazardous Materials at any real property off-site of the Real Property, including, where Hazardous Materials from the Owned Real Property have been taken for disposal, nor, to Seller's Knowledge, are there any events or conditions with respect to off-site disposal of Hazardous Materials that are reasonably likely to result in such liability or in the issuance of such notice to Seller;

(v)      None of the Owned Real Property is listed on the National Priorities List or similar state lists.  No Remediation is pending or being conducted at the Owned Real Property.  Seller has not received any notice from a Governmental Authority that Remediation is required at or about the Owned Real Property, nor to Seller's Knowledge are there any events or conditions at, about or with respect to the Owned Real Property that could reasonably be expected to result in the need for Remediation or in the issuance of such notice to Seller; and

(vi)      Seller has delivered to Buyer copies of all assessment reports, audits, studies, and correspondence in Seller's possession or control relating to the environmental conditions of the Owned Real Property, Environmental Claims, Environmental Permits, Hazardous Materials, Releases, Remediation or Seller's compliance with or violation of Environmental Laws and related to the Owned Real Property.

(b)      A list of all Environmental Permits pertaining to the Owned Real Property and the Acquired Assets as they are currently being operated by Seller is set forth on Schedule 4.17(b).

(c)      None of the matters set forth on Schedule 4.17(a) could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

4.18    Intentionally Omitted.

4.19    <u>No Other Representations or Warranties; Schedules</u>.  Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Acquired Assets, or the Contemplated Transaction, and Seller disclaims any other representations or warranties, whether made by Seller or any of its respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), Seller (a) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller). Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules).

ARTICLE V
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE V).

5.1    <u>Organization of Buyer</u>.  Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of [_____], the jurisdiction of its formation, (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted, and (c) has identified all principals of Buyer entity on <u>Schedule 5.1 (c)</u>.

5.2    <u>Authorization of Transaction</u>.  Buyer has full power and authority to execute and deliver this Agreement and, subject to such authorizations as required by the Bankruptcy Court and any other required approval by a Court of competent jurisdiction, if any, to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite corporate action of Buyer.  This Agreement constitutes, and any and all other Closing Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

21

5.3    <u>Non-Contravention</u>.

(a)    Subject to Bankruptcy Court approval, and any other required approval by a Court of competent jurisdiction, if any, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transaction (including each Closing Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, bylaws, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)    Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transaction (including each Closing Document required to be delivered by Buyer at Closing), except for such notices, consents and approvals as have already been given or obtained, those required under or in relation to those required by the Bankruptcy Court.

5.4    <u>Brokers' Fees</u>.  Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transaction.

5.5    <u>Buyer's Consents and Approvals</u>.  <u>Schedule 5.5</u> lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Buyer to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing) (collectively, "<u>Buyer's Consents and Approvals</u>"), other than (a) entry of the Sale Order, and (b) any other required approval by a Court of competent jurisdiction, if any.

5.6    <u>Acknowledgement Regarding Condition of the Acquired Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges that (a) Buyer has had the opportunity to conduct due diligence prior to execution of this Agreement, (b) Buyer is relying solely upon Buyer's own independent review and investigation and not upon any written or oral representation of Seller, (c) Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by it to Buyer in ARTICLE IV (as modified by the Schedules), and (d) Buyer agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred to Buyer on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7    <u>Financial Capability</u>.  Buyer has or on the Closing Date will have the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

5.8    <u>No Other Representations or Warranties; Schedules</u>.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), neither Buyer nor any other Person makes any other representation or warranty, whether express or implied, written

or oral, with respect to Buyer or the Contemplated Transaction, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), Buyer disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to them by any director, officer, member, manager, employee, agent, consultant, or other Representative of Buyer or any of its Affiliates).

ARTICLE VI
BANKRUPTCY COURT MATTERS

6.1     Termination Fee.[**Omit if not Stalking Horse Agreement**]

(a)     In consideration for Buyer having expended considerable time and expense in connection with this Agreement and negotiation thereof and the identification and quantification of assets of the Seller, the Seller believes that the Buyer is entitled to certain bid protections to be approved by the Bankruptcy Court. Seller agrees to promptly seek approval the bid protections set forth in this Agreement following due execution of the same by Buyer. Subject to approval by the Bankruptcy Court, and provided the Buyer is in all material respects in compliance with the terms hereof, if Buyer's bid embodied in the Purchase Price as set forth in this Agreement is exceeded by a Competing Bid, or Seller enters into an Alternate Transaction, then Seller shall, or shall cause the purchaser in an Alternate Transaction, as applicable, to pay to Buyer the Termination Fee upon consummation of the Alternate Transaction from the proceeds of such Alternate Transaction paid at the closing thereof.

(b)     If this Agreement is terminated pursuant to Section 12.1(b)(i) (provided that the failure to close was due in whole or in part to any action or inaction by Seller); Section 12.1(b)(iii); Section 12.1(b)(iv); Section 12.1(b)(v); or 12.1(c)(ii), then the Termination Fee shall not be payable.

6.2     Competing Transaction.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, a "Competing Bid").

(b)     Notwithstanding the execution of this Agreement, Seller is permitted to cause its Representatives to further market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Representatives) in connection with any sale or other disposition of all or any other asset of Seller. In addition, Seller shall have the responsibility and obligation to respond to any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the assets of Seller to prospective purchasers. Prior to Seller furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Acquired Assets, Seller must enter into a customary confidentiality agreement with such Person.

23

(c)    If a Competing Bid is selected in conjunction with an auction (the "Auction") but such bidder does not consummate the purchase of the Acquired Assets and Buyer is the second highest bidder (the "Backup Bidder"), Buyer shall be subject to the rights and responsibilities of the Backup Bidder as set forth in the Bidding Procedures.

6.3    Treatment of Monetary Obligations. **[Omit if not Stalking Horse Agreement]**The Termination Fee payable to Buyer under this Agreement shall be entitled to administrative expense priority in Seller's Chapter 11 Case  pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code.

ARTICLE VII
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Execution Date and the Closing:

7.1    General.  Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things reasonably necessary in order to consummate and make effective the Contemplated Transactions (including satisfaction, but not waiver, of the Closing conditions set forth in ARTICLE IX) and to reasonably ensure that Buyer is relieved of all Excluded Liabilities in compliance with applicable non-bankruptcy law and in accordance with Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code.

7.2    Regulatory Approvals.

(a)    In compliance with applicable non-bankruptcy law and in accordance with Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code, Seller and Buyer will promptly confer with the appropriate federal, state and local regulators to obtain their support for the approval of the Contemplated Transaction, including the Office of the New York State Attorney General Charities Bureau.

(b)    If necessary, each of Buyer and Seller shall use their reasonable best efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transaction under any Applicable Law, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Schedule 4.9 or Schedule 5.5, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Authority in respect of such filings or the Contemplated Transaction, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by Applicable Law, providing copies of all such documents to the non-filing Parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Authority under such Laws with respect to any such filing or any such transaction.

7.3    Operation of Business.  Seller will manage it properties in the Ordinary Course in accordance with any post-petition financing approved by the Bankruptcy Court.  Seller will

24

maintain its tax-exempt status. Without limiting the generality of the foregoing, Seller will not, without Buyer's prior written consent (which shall not be unreasonably withheld or delayed):

(a)    enter into or amend any Material Contract;

(b)    terminate any Material Contract other than upon the expiration of its term or for the counterparty's breach of such Material Contract;

(c)    fail to perform when due all material obligations under any Material Contracts except for any Material Contract pertaining to Debt and except to the extent such performance is excused under the Bankruptcy Code, by the Bankruptcy Court, or by the counterparty's breach of such Material Contract;

(d)    fail to give prompt notice to Buyer of the commencement of or any Material Development of which Seller becomes aware;

(e)    fail to give prompt notice to Buyer of any Material Adverse Change;

(f)    sell, transfer, or convey any Acquired Asset (other than obsolete or worn out immaterial equipment disposed of in the Ordinary Course of Business and replaced if necessary with adequate replacement equipment);

(g)    adopt or propose any change to its governing documents;

(h)    merge or consolidate with any entity or acquire any assets from any entity (other than purchases of goods in the Ordinary Course of Business);

(i)    except as permitted by the terms of any Material Contract pertaining to any Debt, incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities or guarantee any debt securities of others other than as disclosed to Buyer and excluding any accounts payable arising in the Ordinary Course of Business of a Seller;

(j)    enter into any operating lease;

(k)    terminate, fail to renew or materially reduce the amount of any insurance coverage provided by the existing insurance policies of Seller in relation to the Acquired Assets following the cessation of educational services;

(l)    remove from Seller's premises or modify (other than in the Ordinary Course of Business) any books or records of Seller that are Acquired Assets;

(m)    fail to keep in full force and effect its Licenses; and

(n)    agree or commit to do any of the foregoing.

7.4    <u>Access</u>. Seller will permit Representatives of Buyer (including its accountants) to have access at all reasonable times, and in a manner so as not to interfere with the normal business

operations of Seller, to the premises, properties, personnel, books, records (including Tax records, provided that those portions of any records or discussions pertaining to the entry into or consummation of the Contemplated Transaction may be withheld and/or redacted), contracts, and documents of or pertaining to Seller. Seller will used best efforts to deliver to Buyer true and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect as of the Execution Date.

7.5     <u>Notice of Developments</u>.

(a)     Seller shall promptly notify Buyer of:

(i)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transaction;

(ii)     any notice or other communication from any Governmental Authority in connection with the Contemplated Transaction; or

(iii)     its obtaining Knowledge of (A) a breach or violation of any representation or warranty made by it contained in this Agreement that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation of warranty that is not so qualified becoming untrue or inaccurate in any material respect and (B) the failure of it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or any other Closing Document.

(b)     No notification under this Section 7.5 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

7.6     <u>Employment Matters</u>.  Buyer shall not be permitted to contact the Employees.

7.7     <u>Removal of Excluded Assets from Owned Real Property</u>.  Prior to the Closing or as soon thereafter as is reasonably practical, Seller will remove from the Owned Real Property all Excluded Assets, except that Necessary Records will be removed in accordance with Section 8.6.

ARTICLE VIII
POST-CLOSING COVENANTS

Seller and Buyer agree as follows with respect to the period following the Closing:

8.1     <u>General</u>.  After the Closing, each of Buyer and Seller will take such further action as is necessary on its part to carry out the purposes of this Agreement (including the execution and delivery of such further instruments and documents) as either may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expenses).  Without limiting the foregoing, each of Buyer and Seller will cooperate in providing access to all books, records, ledgers, files, documents, correspondence, lists and other

26

documents and information related to the matters covered by this Agreement as the other may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expense).

8.2     Intentionally Omitted.

8.3     <u>Non-Disclosure</u>.

(a)     From and after the date hereof, Buyer shall, and shall direct its Representatives, to maintain in confidence, not disclose to any third party (other than their Representatives) without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this Section 8.3(a), "<u>Seller Confidential Information</u>" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, student information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; *provided, however*, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Buyer or any of its Representatives, (ii) becomes available to Buyer on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Buyer to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Buyer from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure, or (iv) can be shown by Buyer through written documents or evidence maintained by Buyer to have been independently developed by it without the use of Seller Confidential Information; and *provided further*, that upon the Closing, the restrictions contained in this Section 8.3(a) shall not apply to confidential or proprietary information related primarily to the Acquired Assets, or the Business. Buyer may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who are directed to keep it confidential. Buyer shall instruct its Representatives having access to Seller Confidential Information in writing of such obligation of confidentiality. If Buyer or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Confidential Information, Buyer shall, to the extent permissible by Applicable Law, provide Seller with prompt notice within two (2) business days of becoming aware of such required disclosure prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 8.3(a), Buyer and its Representatives shall furnish only that portion of the Seller Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(b)     It is understood by the Parties that the information, documents and instruments delivered to Seller by Buyer or its Representatives in connection with the negotiation of this Agreement (the "<u>Buyer Confidential Information</u>") are of a confidential

and proprietary nature. Seller agrees that both prior and subsequent to Closing it will maintain the confidentiality of all Buyer Confidential Information and only disclose such information, documents and instruments (w) to the Consultation Parties (as defined in the Bidding Procedures Order), (x) to duly authorized Representatives, (y) as necessary to comply with Applicable Law, or (z) to assist or defend Claims as provided herein. Buyer Confidential Information does not include any information that (i) becomes generally available to the public other than as a result of a disclosure by Seller, or any of its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Buyer or its Representatives, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Buyer, (iii) is lawfully received by Seller from a third party having the right to disseminate the Buyer Confidential Information without restriction on disclosure, or (iv) can be shown by Seller through written documents or evidence maintained by them to have been independently developed by it without the use of Buyer Confidential Information. If Seller or anyone to whom it has transmitted Buyer Confidential Information is required by Applicable Law to disclose any of such Buyer Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 8.3(b), Seller and its Representatives shall furnish only that portion of the Buyer Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(c)      The obligations contained in this Section 8.3 shall survive the Closing.

8.4      <u>Further Assurances</u>. Each Party agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under Applicable Laws and regulations to effectuate the consummation of the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Seller at Closing).

8.5      Intentionally Omitted.

8.6      <u>Removal of Necessary Records</u>. Seller will use its best efforts, and will hire a records removal/storage company, to remove all required Necessary Records from the Owned Real Property prior to the Closing Date. If the Necessary Records are not removed by the Closing Date, then Seller shall ensure that the records removal/storage company has appropriate insurance coverage in place, naming Buyer and its designee as additional insureds, through the date on which the Necessary Records have been removed from the Owned Real Property.

ARTICLE IX
EMPLOYEES

9.1      <u>Buyer Not Assuming Seller's CBAs or Benefit Plans</u>. Buyer is not assuming any of Seller's CBAs or Employee Benefit Plans.

28

9.2     No Obligation to Offer Employment.  Buyer shall have no right or obligation to offer employment to any of the Employees.

9.3     No Successor Liability.  Buyer shall have no liability, as successor or otherwise, for any breach by Seller of any of its CBAs, nor for any arrears by Seller in payments to Employees for wages or otherwise, nor for contributions due to any Employee Benefit Plan pursuant to any such CBA or any trust agreement, nor for any liability or Claim arising out of or relating to the termination of Seller's obligations under any CBA or any trust agreement.  Seller shall remain liable for all of its pre-Petition Date and post-Petition Date arrears to any such Employee Benefit Plans.

ARTICLE X
CONDITIONS TO OBLIGATION TO CLOSE

10.1     Conditions to Buyer's Obligation.  Buyer's obligation to consummate the Contemplated Transaction is subject to satisfaction of the following conditions:

(a)     The representations and warranties set forth in ARTICLE IV shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date.

(b)     Seller shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Seller shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)     No breach or default on the part of Seller shall have occurred under any covenant or agreement hereunder or any Closing Document or any other agreement of the Parties;

(d)     No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transactions contemplated illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transaction;

(e)     No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transaction;

(f)     Seller and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred

29

to in Section 4.9, Section 5.5 and Section 7.2, as applicable, all of which shall be in form and substance reasonably satisfactory to Buyer;

(g)    Seller shall have received all other Seller's Consents and Approvals;

(h)    No Governmental Authority shall have objected to the sale of the Acquired Assets pursuant to the Sale Order or, if any Governmental Authority shall have objected to the sale of the Acquired Assets pursuant to the Sale Order, such objection shall have been overruled or consensually resolved;

(i)    The Sale Order shall have become a Final Order;

(j)    All actions to be taken by Seller in connection with consummation of the Contemplated Transactions and all certificates, opinions, instruments, and other documents required to effect the Contemplated Transaction shall be reasonably satisfactory in form and substance to Buyer;

(k)    Buyer shall have received all of the Closing Documents described in Section 3.4(a); and

(l)    the Title Company shall have irrevocably committed to issue a title policy to Buyer with respect to the Owned Real Property at standard rates in accordance with its standard form of title policy, clear of all Exceptions set forth in a Buyer's Objection Notice, subject to the Permitted Exceptions; provided that this condition shall be deemed satisfied if Buyer does not timely deliver to Seller a Buyer's Objection Notice as set forth in Section 13.1 hereof, and provided further that any Exceptions.

Buyer may waive in its sole and absolute discretion any condition specified in this Section 10.1 if it executes a writing so stating at or prior to the Closing.

10.2    <u>Conditions to Seller's Obligations</u>.    Seller's obligations to consummate the Contemplated Transactions are subject to satisfaction of the following conditions:

(a)    The representations and warranties of Buyer set forth in ARTICLE V shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date;

(b)    Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Buyer shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)      No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transaction illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transaction;

(d)      No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transaction;

(e)      Seller and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.10, Section 5.5 and Section 7.2, as applicable;

(f)      Buyer shall have received all other Buyer's Consents and Approvals;

(g)      The Sale Order shall have become a Final Order; and

(h)      Seller shall have received all of the Closing Documents described in Section 3.4(b).

Seller may waive any condition specified in this Section 10.2 if it executes a writing so stating at or prior to the Closing.

ARTICLE XI
DISPUTE RESOLUTION

11.1    Dispute Resolution.  The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute that arises under this Agreement.

ARTICLE XII
TERMINATION

12.1    Termination of Agreement.  In respect of the Contemplated Transaction, this Agreement may be terminated prior to the Closing as follows:

(a)      Termination Due to Events in Chapter 11 Case .  Buyer may terminate this Agreement immediately upon written notice to Seller if: (i) the Chapter 11 Case  is dismissed, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Chapter 11 Case; (ii) relief from the automatic stay to permit foreclosure is granted or there is an exercise of other remedies on the Acquired Assets; or (iii) Seller consents to any modification of this Agreement without the prior written agreement of Buyer.

(b)      Termination by Buyer.  Buyer may terminate this Agreement immediately upon written notice to Seller of the occurrence of any of the following, at which time all obligations of Buyer hereunder shall be of no further force and effect:

31

(i)      Buyer is ready, willing, and able to perform and has properly served Seller with a Time is of the Essence demand and Seller has not properly rejected the same and not performed;

(ii)      if any of the conditions to the obligations of Buyer that are set forth in Section 10.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(iii)      if there shall be a material breach by Seller of any material representation or warranty, or any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within fifteen (15) Business Days after the giving of written notice by Buyer to Seller of such breach; or

(iv)      if Seller is unable or unwilling to close within one hundred and twenty (120) days following the date that the Sale Order becomes a Final Order.

(c)      <u>Termination by Seller</u>.  Seller may terminate this Agreement upon written notice to Buyer of the occurrence of any of the following, unless Seller is in material breach of this Agreement prior to the occurrence of the following, at which time all obligations of Seller hereunder shall be of no further force and effect, except for those obligations specified in this Agreement to survive termination:

(i)      if any of the conditions to the obligations of Seller to close that are set forth in Section 10.2 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; or

(ii)      if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within 15 Business Days after the giving of written notice by Seller to Buyer of such breach; or

(iii)      Is Buyer is unable or unwilling to close within one hundred and twenty (120) days following the date that the Sale Order becomes a Final Order.

(d)      <u>Termination by Buyer or Seller</u>.  Subject to Bankruptcy Court approval, the Parties may terminate this Agreement by mutual written consent of Seller and Buyer.

(e)      <u>Extension of Time Periods</u>.  The time periods for termination of this Agreement set forth in this Section 12.1 may be extended upon the written agreement of the Parties without the further approval of the Bankruptcy Court.

12.2      <u>Procedure For Termination</u>.  If this Agreement is terminated by Buyer or Seller, or both, pursuant to Section 12.1, written notice thereof shall promptly be given to the other Party, and upon the giving of such notice (or at such time as specified in the particular termination right

22484.3 21176665v1

set forth in Section 12.1), the Contemplated Transaction shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 12.3, without further action by the Parties.

12.3    <u>Effect of Termination</u>.  If either Seller or Buyer terminates this Agreement pursuant to Section 12.1, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement); *provided* that if such termination is the result of a breach or default hereunder by the non-terminating Party, then the non-breaching Party shall be entitled to seek any and all remedies available to the terminating Party at law or in equity.

ARTICLE XIII
TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS

13.1    <u>Title Insurance</u>.  Buyer (i) has ordered from [_____] the "<u>Title Company</u>") a current title report with respect to the Owned Real Property, and Buyer shall request the Title Company to perform continuation searches of title prior to the Closing (collectively, the "<u>Title Report</u>"), and (ii) has ordered a current ALTA survey of the Owned Real Property (the "<u>Survey</u>").  Buyer has notified Seller, in writing (a "<u>Buyer's Objection Notice</u>") delivered to Seller prior to the deadline for the submission of bids pursuant to the Bidding Procedures Order, of any exception, Lien, mortgage, security interest, Claim, charge, reservation, lease, tenancy, occupancy, easement, right of way, encroachment, restrictive covenant, condition, limitation or other encumbrance affecting the Owned Real Property (collectively, "<u>Exceptions</u>") disclosed by same that is not a Permitted Exception and to which Buyer objects.  Notwithstanding anything herein to the contrary, Buyer shall be deemed to have objected to and is not obligated to deliver a Buyer Objection Notice with respect to the following in order for same to constitute a Title Defect (defined below): (x) any and all monetary Liens, including all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' Liens recorded against the Owned Real Property (or any portion thereof), all monetary Liens or penalties arising out of violations on the Owned Real Property and all real property taxes (other than real property taxes that constitute Permitted Exceptions), and (y) any and all tenancies, except for the Mercy Lease disclosed on <u>Schedule 4.9(a)</u>.  Except as otherwise provided herein, Seller may elect (but shall not be obligated) to attempt to cure or remove any such title objections (collectively and individually, a "<u>Title Defect</u>") set forth in the Title Report, the Survey, a Buyer's Objection Notice or otherwise. The Parties acknowledge that Seller may rely on the Sale Order to discharge certain Title Defects and hereby agree that the Title Company's issuance of a title insurance policy, in reliance on the Sale Order, without taking exception for those Title Defects shall be sufficient to constitute Seller's cure and removal of such Title Defects.  If Seller is obligated or elects to attempt to cure or remove any Title Defect and are unable to do so on or before the Closing Date, then Seller shall be entitled to adjourn the Closing in order to cure or remove such Title Defect for a period of not more than 30 days in the aggregate.  If Seller elects not to cure or remove, or after electing to cannot cure or remove, any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement or shall, for any reason, be unable to cure or remove any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement within the time periods set forth in the preceding sentence, then Seller shall notify Buyer in writing and Buyer shall have the right to either (i) terminate this Agreement or (ii) accept such title as Seller

33

shall be able to convey without abatement in the Purchase Price and without any liability on the part of Seller.

13.2     Permitted Exceptions.  "Permitted Exceptions" means:

(a)     all matters set forth on Schedule 13.2(a) attached hereto and made a part hereof;

(b)     building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

(c)     any state of facts that a current, accurate survey or visual inspection of the Owned Real Property would disclose, provided same do not render title uninsurable at standard rates;

(d)     all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Owned Real Property;

(e)     any variations between the tax diagram or the tax map and the record description, provided same does not render title uninsurable at standard rates;

(f)     rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Owned Real Property existing as of the date hereof, provided that the Title Company shall insure (at no additional cost to Buyer) that no third parties have any Claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Owned Real Property;

(g)     real property taxes, water rates and charges, sewer taxes and rents, and similar items with respect to the Owned Real Property, not yet due and payable and subject to apportionment as provided herein; and

(h)     assessments or installments thereof arising after the date of Closing, whether or not a Lien as of Closing, which are due and payable on or after Closing.

13.3     Apportionments.

(a)     Items Subject to Apportionment.  Subject to the terms of this Section 13.3, the following items, without duplication, are to be apportioned between Seller and Buyer with respect to the Owned Real Property 12:00:01 a.m. on the calendar day immediately following the Closing Date, and at the Closing the net amount thereof shall, as applicable, either be (x) paid by Buyer to Seller by wire transfer of immediately available federal funds to a bank account designated by Seller or (y) credited by Seller against the Purchase Price:

(i)     real property taxes and assessments, if any;

(ii)     water rates and charges;

(iii)     sewer taxes and rents;

(iv)     electricity, steam, gas and all other utilities, including, without limitation, taxes thereon;

(v)      deposits on account with any municipality having jurisdiction over the Property, to the extent transferred to Buyer; and

(vi)     all other items that reasonably require apportionment in accordance with local custom and practice to effectuate the Contemplated Transaction.

Seller and Buyer shall adjust any apportionments made under this Section 13.3 after the Closing to account for errors or incorrect estimates made as of the Closing Date (it being agreed that the Parties' aforesaid agreement to make such adjustments shall survive the Closing for a period of twelve (12) months). For the avoidance of doubt, any deposits on account with any utility company servicing the Property shall not be subject to apportionment and shall remain property of Seller.

(b)     Governmental Charges. Apportionment of real property taxes, water rates and charges, sewer taxes and rents and other similar items shall be made on the basis of the fiscal year for which assessed. If the Closing Date occurs before the real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Owned Real Property are finally fixed for the fiscal year in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation. After the real property taxes, water rates and charges, sewer taxes and rents or similar items, as the case may be, are finally fixed for the fiscal year in which the Closing occurs, Seller and Buyer shall make a recalculation of the apportionment thereof based on the amounts finally fixed for the fiscal year in which the Closing occurs, and Seller or Buyer, as the case may be, shall make an appropriate payment to the other Party based on such recalculation. Seller or its Representatives shall have the right (x) at any time before the Closing, to institute tax reduction or other proceedings to reduce the assessed valuation of the Owned Real Property with respect to any tax period ending at or prior to the end of the tax year in which the Closing occurs and (y) to continue, after the Closing, any such proceedings commenced by Seller prior to the Closing; *provided, however*, that (A) Seller (or its Representatives) shall notify Buyer of, and keep Buyer reasonably informed with respect to, any such proceedings and no such proceeding shall be finally settled by Seller without the prior consent of Buyer, which consent shall not be unreasonably withheld, and (B) upon notice to Seller, Buyer shall have the right to assume control of and prosecute any such proceeding relating to the tax year in which the Closing occurs, provided that no such proceeding shall be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld. If Buyer, at any time following the Closing shall institute tax reduction or other proceedings to reduce the assessed valuation of the Owned Real Property with respect to the tax period ending at the end of the tax year in which the Closing occurs, such proceeding shall not be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld. If any refund of any real property tax,

35

water rates and charges, sewer taxes and rents or similar items is issued after the Closing Date for any period ending prior to or including the Closing Date, such refund shall be applied as follows: first, to the cost incurred in obtaining such refund; and, second, the balance of such refund, if any, shall be apportioned between Seller, for the period prior to the Closing Date, and Buyer, for the period from and after the Closing Date.

(c) Water Meters. If there shall be any meters measuring water consumption at the Owned Real Property, Seller shall attempt to obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time, shall be apportioned on the basis of such readings, or if such readings are not obtained, the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

(d) Payment of Certain Items. The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Seller is obligated to pay and discharge with respect to the Owned Real Property, with interest and penalties thereon to the date which is three (3) Business Days following the Closing Date, may, at the option of Seller, be allowed to Buyer out of the Purchase Price, provided that official bills therefor with interest and penalties thereon are furnished to Buyer by Seller at the Closing. Buyer, if request is made at least two (2) Business Days prior to the Closing, shall provide Seller at the Closing with separate wire transfers of immediately available federal funds, in an aggregate amount not exceeding the balance of the Purchase Price due to Seller at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Closing Date. Without limiting the foregoing, Seller is solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Owned Real Property that are delinquent as of the Closing Date, subject to apportionment as herein provided.

(e) Utilities. With respect to the utilities described in Section 13.3(a)(iv), where possible, Seller shall secure cutoff readings for all utilities as of the apportionment time. To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the Parties as of the apportionment time on the basis of the most recent actual (not estimated) bill for such service, and, after Closing, upon determination of the final meter readings shall be readjusted based on same as of the apportionment time. Buyer shall be responsible for causing such utilities and services to be changed to its name (or the name of any affiliate, manager or tenant of Buyer) as of the Closing Date, and shall be liable for and shall pay all utility bills for services rendered after the apportionment time. With respect to deposits of Seller on account with any utility company servicing the Owned Real Property, Seller shall have the right to a return of such deposits and Buyer shall be responsible for posting any deposits required from and after the Closing.

(f) Assessments. If, on the Closing Date, the Owned Real Property, or any part thereof, is affected by any real property tax assessments, then Seller shall pay such

assessments; *provided, however*, that if such assessments are payable in installments, then Seller shall pay such installments due prior to the Closing Date, and Buyer shall pay such installments due after the Closing Date.

(g)     Survival.  The provisions of this Section 13.3 shall survive the Closing.

ARTICLE XIV
MISCELLANEOUS

14.1     Survival.    All representations, warranties, covenants and obligations in this Agreement and in the certificates delivered pursuant to this Agreement shall survive the Closing and the consumption of the Contemplated Transaction. Any remedy based upon such representations, warranties, covenants and obligations shall not be affected by any investigation (including any environmental investigation or assessment) conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with any such representation, warranty, covenant or obligation. The waiver of any condition based upon the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect such right to set-off or other remedy based upon such representations, warranties, covenants and obligations.

14.2     Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to advise the other Party prior to making the disclosure).

14.3     No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.4     Entire Agreement.  This Agreement and the other Closing Documents constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

14.5     Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; *provided, however*, that Buyer may (a) assign any or all of its rights and interests herein, including but not limited to, any not-for-profit corporation of which Buyer is a member and which succeeds to the interest of Buyer in the Seller and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all

37

of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

14.6    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  The delivery of an executed signature page of this Agreement or any other Closing Document by fax or portable document format (.pdf) shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

14.7    <u>Headings</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14.8    <u>Notices</u>.    All notices, requests, demands, Claims, and other communications hereunder shall be in writing.  Any notice, request, demand, Claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four (4) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Seller: | The College of Saint Rose<br>432 Western Avenue<br>Albany, New York 12203 |
| Copy to: | Cullen and Dykman LLP<br>333 Earle Ovington Boulevard<br>Uniondale, New York 11553<br>Attn:   Matthew G. Roseman Esq.<br>          Bonnie L. Pollack, Esq. |
| If to Buyer: | [BUYER] |
| Copy to: | [BUYER] |

Any Party may change the address to which notices, requests, demands, Claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

14.9    <u>Governing Law; Waiver of Jury Trial</u>.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY

AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

14.10    <u>Submission to Jurisdiction; Consent to Service of Process</u>.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transaction, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 14.8 hereof; *provided, however*, that, if the Chapter 11 Case  has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of New York sitting in Albany, New York or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in Albany County and any appellate court from any thereof, for the resolution of any such Claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 14.8.

14.11    <u>Amendments</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.  Seller may consent to any such amendment at any time prior to the Closing with the prior authorization of Seller's Board.

14.12    <u>Severability</u>.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

14.13    <u>Expenses</u>.  Except with respect to the Termination Fee, each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Contemplated Transaction, it being expressly understood that Buyer shall pay all Transfer Taxes payable with respect to the conveyance of the Owned Real Property, if any.

14.14    <u>Construction</u>.  The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel.  Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

14.15    <u>Incorporation of Schedules</u>.    The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the Schedules attached hereto may be updated after the Execution Date with Buyer's consent, which consent shall not be unreasonably withheld.

14.16  <u>No Waiver</u>.  The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

14.17  <u>Non-Recourse Liability</u>.  All Claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement may be made only against (and expressly limited to) the persons that are expressly identified as Parties hereto or thereto (the "<u>Contracting Parties</u>" and each a "<u>Contract Party</u>").  In no event shall any Contract Party have any shared or vicarious liability for the actions or omissions of any other person.  No person who is not a Contracting Party, including a director, officer, trustee, employee, incorporator, member, partner, manager, stockholder, affiliate, agent, attorney or representative of, and any financial advisor or lender (including the financial sources) to, any of the foregoing (the "<u>Non-Party Affiliates</u>"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any causes of action or liabilities arising under, out of, in connection with or related in any manner to this agreement or related agreements or their negotiations, execution, performance or breach; and, to the maximum extent permitted by law, each Contracting Party waives and releases all such causes of action and liabilities against any such Non-Party Affiliates. Without limited to the foregoing, to the maximum extent permitted by Law , (a) each Contracting Party hereby waives and releases any and all rights, Claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon Non-Party Affiliates with respect to the performance of this Agreement or related agreements or any representation or warranty made in, in connection with, or as inducement to this Agreement or related agreements. The Parties acknowledge and agreed that the Non-Party Affiliates are intended third-party beneficiaries of this Section.

*{signature page follows}*

40

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

THE COLLEGE OF SAINT ROSE

By:_____
Name:
Title:

By:_____
Name:
Title:

[BUYER]

By:_____
Name:
Title:

41

Schedule 3.1(a)

[TO BE INSERTED]

22484.3 21176665v1

Schedule 4.8(a)

[TO BE INSERTED]

# Exhibit C

## Auction and Sale Notice

CULLEN AND DYKMAN LLP
80 State Street, Suite 900
Albany, New York 12207
Matthew G. Roseman, Esq. (admission pro hac vice pending)
Bonnie L. Pollack, Esq. (admission pro hac vice pending)
Kelly McNamee Esq. (admission pro hac vice pending)
Kyriaki Christodoulou, Esq. (admission pro hac vice pending)
(516) 357-3700

*Proposed Attorneys for The College of Saint Rose*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                             :
In re:                                                       :   Chapter 11
                                                             :
THE COLLEGE OF SAINT ROSE,                                   :   Case No. 24-11131 (REL)
                                                             :
                    Debtor.                                  ::
------------------------------------------------------------- x

## NOTICE OF AUCTION AND PROPOSED SALE OF CAMPUS

**PLEASE TAKE NOTICE THAT:**

1.      On October 16, 2024, The College of Saint Rose (the "Debtor"), debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case") filed a motion (the "Motion")[1] seeking entry of an order (the "Bidding Procedures Order") pursuant to sections 105, 363, 365 and 503 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002(a)(2), 6004, 9006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) approving bidding procedures ("Bidding Procedures"), substantially in the form annexed to the Bidding Procedures Order as Exhibit "1", related to the sale and proposed auction of the Campus pursuant to sections 363(b), (d) (f), and (m) of the Bankruptcy Code; (b) approving the proposed asset purchase agreement (the "Purchase Agreement"), a copy of which is

---

[1] Any capitalized terms used but not otherwise defined herein shall have the meanings ascribed in the Motion.

annexed to the Motion as Exhibit "B", solely to the extent of its use as a form which all bidders for the Campus must follow; (c) approving proposed bid protections in favor of any potential stalking horse purchaser (a "Stalking Horse Purchaser"), if one is selected; (d) scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") to approve the sale of the Campus; (e) approving the form and manner of notice (the "Auction Notice") of the Auction and Sale Hearing substantially in the form annexed to the Motion as Exhibit "C". On _____, 2024, the Bankruptcy Court entered the Bidding Procedures Order (Dkt. No. __).

2.      [On _____, 2024, the Debtor filed a *Notice of Selection of Stalking Horse Purchaser* (the "Notice of Stalking Horse") in which the Debtor designated [_____] as the stalking horse purchaser (the "Stalking Horse Purchaser") in connection with its proposed asset purchase agreement (the "Stalking Horse Agreement"), a copy of which was annexed to the Notice of Stalking Horse as Exhibit 1.  A final, fully executed copy of the Stalking Horse Agreement has been or will be filed with the Bankruptcy Court.]

3.      A copy of the Motion, the Bidding Procedures, the Bidding Procedures Order [and the Stalking Horse Agreement] may be obtained by: (i) accessing the Bankruptcy Court's website at www.nynb.uscourts.gov (password required); (ii) going in person to the Office of the Clerk of the Bankruptcy Court at the United States Bankruptcy Court, Northern District of New York, 445 Broadway, Suite 330, Albany, New York,  12207 or (iii) contacting Bonnie L. Pollack, Esq. of Cullen and Dykman LLP, proposed counsel to the Debtor, at bpollack@cullenllp.com.

4.      As set forth in the Bidding Procedures, the sale of the Campus will be sold to the highest or best offer, subject to Bankruptcy Court approval.

5.      All interested parties are invited to make offers for all or a portion of the Campus in accordance with the terms of the Bidding Procedures and Bidding Procedures Order. The

deadline to submit bids (the "Bid Deadline") is **[December 6], 2024 at 5:00 p.m. (EST)**. Pursuant to the Bidding Procedures Order, if multiple Qualified Bids (including the Stalking Horse Agreement) with respect to the entire Campus and/or certain Lot(s) are submitted by the Bid Deadline, the Debtor shall conduct an Auction to determine the highest and otherwise best Qualified Bid with respect to such Campus. The Auction will take place at the offices of Cullen and Dykman LLP, 80 State Street, Suite 900, Albany, New York 12207, **[December 12], 2024**, starting at **10:00 a.m.** (prevailing Eastern Time), or at such other later date and time or other place, as may be determined by the Debtor at or prior to the Auction.

6.      The Bidding Procedures Order further provides that a Sale Hearing will be held on **[December 19], 2024 at 10:00 a.m.** before the Honorable Robert E. Littlefield, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court, Northern District of New York, 445 Broadway, Suite 330, Albany, New York, 12207 (the "Bankruptcy Court"), which hearing may be adjourned from time to time, including, without limitation, by announcing such adjournment on the record at the Sale Hearing.

7.      At the Sale Hearing, the Debtor will request that the Bankruptcy Court enter an order, among other things, approving the sale of the Campus to the Successful Bidder(s) who submitted the highest and best bid(s) for the Campus. In addition, the Debtor requests that the Bankruptcy Court provide that the transfer of the Campus be free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon.

8.      At the Sale Hearing, the Bankruptcy Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of this Chapter 11 Case. Objections, if any, to the Motion must be made in writing, must state with particularity the reasons for the objection or response, and must be filed with the Clerk of the Bankruptcy Court,

with copies delivered to the Bankruptcy Court and received by the Chambers of the Honorable Robert E. Littlefield, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court, Northern District of New York, 445 Broadway, Suite 330, Albany, New York, 12207, must conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and basis of the objection and the specific grounds therefore and must be served upon: (a) United States Trustee for Northern District New York, 10 Broad Street, Room 105, Utica, New York 13501; (b) proposed counsel to the Debtor, Cullen and Dykman LLP, 80 State Street, Suite 900, Albany, New York 12207, Attn: Matthew G. Roseman, Esq. and Bonnie L. Pollack, Esq.; (c) counsel to the Debtor's Pre-Petition Bondholders and proposed DIP Lenders: (i) Eversheds Sutherland LLP, 999 Peachtree Street, NE, Atlanta, BA 30309, Attn. Todd Meyers, Esq.; and (ii) Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: P. Miyoko Sato, Esq.; and (d) counsel to any the Committee appointed, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven (7) days prior to the Sale Hearing (the "Sale Objection Deadline"), provided any party that files a timely objection may supplement such objection not later than 5:00 p.m. (prevailing Eastern Time) one (1) day prior to the Sale Hearing to address matters determined at the Auction, if any.

9.      Requests for information concerning the sale of the Campus should be directed by written (including e-mail) or telephonic request to: (i) Jones Lang La Salle Brokerage, 330 Madison Avenue, 4th Floor, New York, NY 10017, Attn: David Carlos, david.carlos@jll.com, (Tel: 917-541-5888).

4

**Exhibit D**

**Sale Order**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                    :
In re:                                              :   Chapter 11
                                                    :
THE COLLEGE OF SAINT ROSE,                          :   Case No. 24-11131  (REL)
                                                    :
                    Debtor.                         :
                                                    :
                                                    :
------------------------------------------------------------- x

### ORDER (I) APPROVING SALE OF THE CAMPUS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[1] filed by The College of Saint Rose, the above captioned

debtor and debtor-in-possession (the "Debtor"), by and through its proposed attorneys, Cullen

and Dykman LLP, for entry of an order (this "Sale Order"), pursuant to sections 105, 363, and

503 of chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532, et seq. (the

"Bankruptcy Code"), and Rules 2002, 6004, 9006 and 9007 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), inter alia, approving and authorizing the sale (the "Sale") of

the Campus, free and clear of any pledges, liens, security interests, encumbrances, claims, charges,

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

options and interests thereon, pursuant to the Purchase Agreement (the "Purchase Agreement"),

by and among the Debtor and the Successful Bidder; and this Court having reviewed the Motion

and the Purchase Agreement and upon this Court's prior order, dated _____ , 2024, approving

certain bidding procedures (the "Bidding Procedures Order" at Dkt. No. ___) and bid protections,

and  scheduling a hearing (the "Sale Hearing") on the Motion; and a Sale Hearing having been

held on _____, 2024; and upon the Declaration of David Carlos having been filed by the

Debtor in support of the Sale (the "Carlos Declaration"); and due and sufficient notice of the Sale

Hearing and the relief sought therein having been given under the particular circumstances; and it

appearing that no other or further notice need be provided; and it appearing that the relief requested

in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties in

interest; and upon the entire record of the hearings held on _____, 2024 and _____, 2024 and this

chapter 11 case including, without limitation, all proffers and other evidence admitted at the Sale

Hearing, and after due deliberation thereon and good cause appearing therefore, it is hereby:

**FOUND, CONCLUDED AND DETERMINED THAT:**[2]

A.    Jurisdiction and Venue. This Court has jurisdiction over the Motion and the relief

requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion and the

relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Notice. Due, sufficient and adequate notice of the Motion and the relief requested

therein, the Sale Hearing, and the Sale, as set forth in the Bidding Procedures Order, and the related

transactions collectively described in the Purchase Agreement (all such transactions being

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of
fact, when appropriate. See FED. R. BANKR. P. 7052.

collectively referred to as the "Sale Transaction"), has been given in accordance with section 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9006 and 9007 and in compliance with the Bidding Procedures Order. Such notice was good and sufficient in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required.

C.    Opportunity to Object. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

D.    Sale is Appropriate.    The sale of the Campus pursuant to the Purchase Agreement is authorized pursuant to section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(f). The Sale of the Campus outside the ordinary course of business represents the sound business judgment of the Debtor and is appropriate in light of the facts and circumstances surrounding the Sale Transaction and the chapter 11 case.

E.    Corporate Authority. The Debtor has full not-for-profit corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and to consummate the transactions contemplated therewith, and no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtor to consummate the Sale Transaction.

F.    Best Interests/Business Justification.    The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, and approval of the Purchase Agreement and the consummation of the Sale Transaction is in the best interests of the Debtor, its estate, creditors, and other parties in interest. The Debtor has marketed the Campus and conducted the sale process in compliance with the Bidding Procedures Order. The Bidding Procedures provided a full, fair and reasonable opportunity for any entity to make an offer to

3

purchase the Campus.   The terms and conditions of the Purchase Agreement are fair and reasonable.   The Purchase Agreement represents the highest and best offer for the Campus, and the Purchase Price set forth therein is fair and reasonable and constitutes fair consideration and reasonably equivalent value under the Bankruptcy Code and New York law.

G.      Highest or Otherwise Best Bid.  The Successful Bidder's bid for the purchase of the Campus, as set forth in the Purchase Agreement, is (i) fair and reasonable and (ii) the highest or otherwise best offer received for the Campus at an auction conducted on [December 9], 2024. The bid submitted by [ _____ ] was determined by the Debtor to be the Back-Up Bid.

H.      Arm's Length Transaction.  The Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Successful Bidder without collusion, in good faith and from arm's-length bargaining positions. The Successful Bidder is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Neither the Debtor nor the Successful Bidder has engaged in any conduct that would cause or permit the Sale Transaction or any part of the transactions contemplated by the Purchase Agreement to be avoidable under section 363(n) of the Bankruptcy Code.  Specifically, the Successful Bidder has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement with unrelated third parties.

I.      Good Faith Purchaser.  The Successful Bidder is a good faith purchaser for value and, as such, is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.  The Successful Bidder will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in connection with the transactions contemplated by the Purchase Agreement at any time after the entry of this Sale Order.

J.      Free and Clear.  The Debtor has complied with section 363(f) of the Bankruptcy Code because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy

4

Code has been satisfied with regard to each such lien, claim, interest, obligation, right, or encumbrance. Those holders of liens, claims, interests, obligations, rights, or encumbrances on or with respect to the Campus who did not file a timely objection, or who withdrew such objections, are deemed to have consented to the sale of the Campus free and clear of those non-Debtor parties' interests in the Campus pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of liens, claims, interests, obligations, rights, or encumbrances on or with respect to the Campus who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, to the extent such liens, claims, interests, obligations, rights, or encumbrances constitute valid and enforceable liens or other similar interests, are adequately protected by having such liens, claims, interests, obligations, rights, or encumbrances attach to the proceeds of the Sale Transaction ultimately attributable to the property against or in which they assert a lien or other similar interest.

K.      The Successful Bidder would not have entered into the Purchase Agreement and would not consummate the Sale Transaction if (i) the Sale of the Campus were not free and clear of all liens, claims, interests, obligations, rights, or encumbrances, or (ii) the Successful Bidder would, or in the future could, be liable for any such liens, claims, interests, obligations, rights, or encumbrances, including any rights or claims based on, or otherwise arising under, any doctrines of successor or transferee liability. Except as provided in the Purchase Agreement, and with the exception of the Excluded Assets as defined in the Purchase Agreement, the transfer of the Campus will be a legal, valid, and effective transfer of the Campus, and will vest the Successful Bidder with all right, title, and interest of the Debtor in and to the Campus, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, free and clear of all liens, claims, interests, obligations, rights, and encumbrances, except as otherwise specifically provided in the Purchase Agreement.

5

L.      Legal and Factual Bases.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED, to the extent set forth herein.

2.      All objections to entry of this Sale Order or to the relief provided herein and requested in the Motion that have been withdrawn, waived, resolved, or settled are hereby denied and overruled in their entirety.

3.      This Sale Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

### Approval of Sale

4.      Sale Approval.  The Sale, and all of the terms and conditions  and transactions contemplated by the Purchase Agreement are hereby authorized and approved pursuant to, inter alia, Sections 105(a) and 363(b) of the Bankruptcy Code.  Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Purchase Agreement. The Debtor is authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and effectuate the provisions of this Sale Order and the transactions approved hereby. The net proceeds of sale shall be distributed in accordance with the Loan Agreement between the Debtor and the DIP Lender, and the financing documents between the Debtor and the Pre-Petition Bondholders.

6

22484.3 21176668v1

Applicable Nonbankruptcy Law. The approval of the Sale is consistent and in accordance with

Sections 510 and 511 of the New York Not-for-Profit Corporation Law.**Transfer of Acquired**

**Assets**

5.      Transfer of Acquired Assets.   Except as otherwise provided in the Purchase

Agreement, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, upon the Closing,

the Acquired Assets as defined in the Purchase Agreement (including good and marketable title to

the Campus) shall be transferred to the Successful Bidder free and clear of all liens, claims or

encumbrances, with all such liens, claims or encumbrances to attach to the net proceeds of the Sale

Transaction in the order of their priority, with the same validity, force and effect which they now

have as against the Campus, subject to any claims and defenses, setoffs or rights of recoupment

the Debtor may possess with respect thereto. Except as specifically provided in the Purchase

Agreement, all persons and entities (and their respective successors and assigns) including, but not

limited to, all debt security holders, equity security holders, governmental, tax, and regulatory

authorities, lenders, trade, and other creditors, asserting or holding any claims or interests in or

with respect to the Debtor, the Campus, the operation of the Debtor's business prior to the Closing,

or the transfer of the Campus to the Successful Bidder (whether legal or equitable, secured or

unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated),

howsoever arising, hereby are forever barred, estopped, and permanently enjoined from asserting,

prosecuting, or otherwise pursuing such claims or interests against the Successful Bidder and/or

its affiliates, designees, assignees, successors, properties, or assets. Except as otherwise provided

in the Purchase Agreement, effective upon the Closing, the Successful Bidder shall have no

liability for any Claims (as defined in Section 101(5) of the Bankruptcy Code) against the Debtor

or its estate.

7

6.      Successor Liability.  Successful Bidder is not a successor corporation or successor entity to the Debtor, the Debtor's estate, or the claims or liabilities of either.

7.      Surrender of Assets and Real Property.  All entities who are presently, or who as of the Closing may be, in possession of some or all of the Acquired Assets, including the Campus, hereby are directed to surrender possession of the Acquired Assets, including the Campus, to the Successful Bidder as of the Closing.

8.      Good Faith Purchaser/No Collusion.  The Successful Bidder is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.  The consideration provided by the Successful Bidder is fair and reasonable, and the Sale Transaction may not be avoided under section 363(n) of the Bankruptcy Code.

### Additional Provisions

9.      Additional Documents.  Prior to or upon the Closing of the Sale Transaction, each of the Debtor's creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release their interests, if any, in the Campus as such interests, liens, claims and/or other encumbrances may have been recorded or may otherwise exist.

10.     Payment of Broker Commissions and Expenses. At the Closing, JLL shall be paid a brokerage commission in the amount of $_____ and reimbursement of expenses in the amount of $_____ in accordance with the terms of their engagement as real estate broker in the Debtor's case, as requested on the record at the Sale Hearing.

11.     Release and Discharge of Liens.  Except as otherwise provided in the Purchase Agreement, this Sale Order (a) shall be effective as a determination that, upon the Closing, all liens existing with respect to the Debtor and/or the Campus prior to the Closing have been

8

unconditionally released, discharged, and terminated as to the Successful Bidder and the Campus, and that the conveyances described herein have been effected, and (b) shall be binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Campus.

12.     <u>Financing Statements</u>. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing interests with respect to the Debtor and/or the Campus shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtor, the Campus or otherwise, then (a) the Debtor or the Successful Bidder is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Campus and (b) the Successful Bidder and/or the Debtor is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests and liens in, against or with respect to the Debtor and/or the Campus. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

13.     <u>Modifications</u>. The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a

9

writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement is not material.

14.    <u>Automatic Stay</u>.    The automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without further order of the Court to allow the Successful Bidder to (i) give the Debtor any notice provided for in the Purchase Agreement, and (ii) take any and all actions permitted by the Purchase Agreement and ancillary agreements in accordance with the terms and conditions thereof.

15.    <u>Recording</u>. Each and every federal, state, and local governmental agency, recording office or department and all other parties, persons or entities is hereby directed to accept this Sale Order and any and all documents and instruments necessary and appropriate for recordation as conclusive evidence of the free and clear and unencumbered transfer of title to the Campus conveyed to the Successful Bidder.

16.    <u>Non-Bankruptcy Law</u>.    Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (including but not limited to  environmental laws or regulations), and any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of the Closing. Nothing contained in this Order or in the Asset Purchase Agreement shall in any way diminish the obligation of any entity, including the Debtors, to comply with environmental laws.  Nothing in this Order or the Asset Purchase Agreement authorizes the transfer to the Purchaser of any licenses, permits, registrations, or governmental authorizations and approvals without the Purchaser's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

10

17.    <u>Successors, Assigns</u>. The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, creditors, the Successful Bidder, and any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Debtor's creditors, all prospective and actual bidders for the Campus, and all persons and entities receiving notice of the Motion, the Auction and/or the Sale Hearing notwithstanding any subsequent appointment of any trustee(s), examiner(s), or receiver(s) under any Chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, its estate, creditors, or any trustee(s), examiner(s), or receiver(s).

18.    <u>Non-Severability/Failure to Specify</u>. The provisions of this Sale Order are non-severable and mutually dependent. The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

19.    <u>Order Immediately Effective</u>.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7052, 9014 or otherwise, the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

20.    <u>Service</u>.    Within three (3) business days of entry of this Order, the Debtor shall serve a copy of this Order on the parties so designated in the *Order Establishing Notice Procedures*. [Dkt. No. _____]

11

21.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Sale Order and the Purchase Agreement.

22484.3 21176668v1

**Exhibit E**

**Pre-Petition Real Estate Liens**

| Tax Map # | | Street # | Street Name | Full Street # and Name | |
|---|---|---|---|---|---|
| 64-58-1- | 19 | 90 | S. Manning | | |
| 64.60-2- | 1 | 420 (400) | Western | 420 (400) Western | Bond Mortgage - Events and Athletics Center |
| 64.60-2- | 2 | 420 (404) | Western | 420 (404) Western | Bond Mortgage - Events and Athletics Center |
| 64.60-2- | 3 | 420 (408) | Western | 420 (408) Western | Bond Mortgage - Events and Athletics Center |
| 64.60-2- | #REF! | 432 | Western | 432 Western | Bond Mortgage - Albertus Hall |
| 64.60-2- | 18 | 1009 (1015) | Madison | 1009 (1015) Madison | Bond Mortgage - Albertus Hall |
| 64.60-2- | 19 | 1009 (1009) | Madison | 1009 (1009) Madison | Bond Mortgage - Thelma P. Lally School of Education |
| 64.60-2- | 20 | 1009 (1007) | Madison | 1009 (1007) Madison | Bond Mortgage - Thelma P. Lally School of Education |
| 64.60-2- | 21 | 1009 (1005) | Madison | 1009 (1005) Madison | Bond Mortgage - Thelma P. Lally School of Education |
| 64.60-2- | 22 | 1009 (1003) | Madison | 1009 (1003) Madison | Bond Mortgage - Thelma P. Lally School of Education |
| 64.60-2- | 25 | 993 | Madison | 993 Madison | Bond Mortgage - Science Center |
| 64.60-2- | #REF! | 985 (983) | Madison | 985 (983) Madison | Bond Mortgage - St. Joseph Hall |
| 64.60-2- | #REF! | 979 | Madison | 979 Madison | Bond Mortgage - Morgan Hall |
| 64.68-2- | 1 | 1006 | Madison | 1006 Madison | Bond Mortgage - Arts and Humanities |
| 64.68-2- | 2 | 1002 | Madison | 1002 Madison | Bond Mortgage - Massry Center for the Arts |
| 64.68-2- | 3 | 996-1000 (1000) | Madison | 996-1000 (1000) Madison | Bond Mortgage - Administration Center, Hearst Center for Communications & Interactive Media & Campus Theatre and Storage Building |
| 64.68-2- | 4.2 | 994 | Madison | 994 Madison | Bond Mortgage - Huether School of Business |
| 64.68-2- | 17 | 930 | Madison | 930 Madison | Bond Mortgage - Centennial Hall |

**Exhibit F**

**DIP Real Estate Liens**

| Tax Map # | | Street # | Street Name | Full Street # and Name | |
|---|---|---|---|---|---|
| 64.59-1 | 10 | 90 | Manning | 90 S. Manning | Summit - President's Residence |
| 64.59-4 | 3 | 1020 | Madison | 1020 Madison | Summit - Bienvenu '60 House |
| 64.60-3 | 4 | 399 | Western | 399 Western | Summit - Calotta Hall |
| 64.60-1 | 8 | 405 (415) | Western | 405 Western (6/6/a 415) | Summit - Kreshan Hall |
| 64.60-1 | 8.401 | 401 (415) | Western | 401 (415) Western | Summit - Residence Hall |
| 64.60-1 | 8.405 | 405(409) | Western | 405 (409) Western | Summit - Mandlle Hall (409) |
| 64.60-1 | 8.409 | 411 (415) | Western | 411 (415) Western | Summit - Avila Hall (415 but assessed as 413) |
| 64.60-1 | 9 | 417 | paper street | 417 Western | Summit - No Building Name provided |
| 64.60-3 | 20 | | Hodson (157 Erie) | Hodson (157 Erie) | Summit - 157 Erie Street |
| 64.60-2 | #REF! | 428 | Western | 428 Western (aka 1001 Madison) | Summit - No Building Name provided |
| 64.60-2 | #REF! | 438 | Western | 438 Western | Summit - No Building Name provided |
| 64.60-2 | #REF! | 442 | Western | 442 Western | Summit - Dolan Hall |
| 64.60-2 | #REF! | 444 | Western | 444 Western | Summit - Marcelle Hall |
| 64.60-2 | #REF! | 450 | Western | 450 Western | Summit - Griffin Hall |
| 64.60-2 | #REF! | 454 | Western | 454 Western | Summit - Snyder Hall |
| 64.60-2 | #REF! | 458 | Western | 458 Western | Summit - No Building Name provided |
| 64.60-2 | #REF! | 460 | Western | 460 Western | Summit - No Building Name provided |
| 64.60-2 | #REF! | 464 | Western | 464 Western | Summit - No Building Name provided |
| 64.60-2 | #REF! | 1001 | Madison | 1001 Madison | Summit - Scanlan Hall |
| 64.60-2 | #REF! | 989 | Madison | 989 Madison | Summit - No Building Name provided |
| 64.69-1 | 1 | 392 (394) | Western | 392 (394) Western | Summit - Heilman Library (394) |
| 64.69-1 | 2 | 384 | Western | 384 Western | Summit - Lourdes Hall |
| 64.69-1 | 3 | 380 | Western | 380 Western | Summit - McCormick Hall |
| 64.69-1 | 4 | 376 (378) | Western | 376 (378) Western | Summit - Cotter Hall (378) |
| 64.69-1 | 5 | 374 | Western | 374 Western | Summit - Hahn Hall |
| 64.68-1 | 6 | 368 (370) | Western | 368 (370) Western | Summit - Delaney Hall (370) |
| 64.68-1 | 7 | 366 468 (366) | Western | 366 468 (366) Western | Summit - Alumni Hall and Lima Hall |
| 64.68-1 | 8 | 358 | Western | 358 Western | Summit - Collins Hall |
| 64.68-1 | 9 | 354 | Western | 354 Western | Summit - Kateri Hall |
| 64.68-1 | 10 | 350 | Western | 350 Western | Summit - Kelly Hall |
| 64.69-1 | 11 | 178 | Partridge | 178 Partridge | Summit - Residence Hall |
| 64.69-1 | 12 | 186 | Partridge | 186 Partridge | Summit - Residence Hall |
| 64.69-1 | 13 | 188 | Partridge | 188 Partridge | Summit - Residence Hall |
| 64.69-1 | 14 | 190 | Partridge | 190 Partridge | Summit - Health Services |
| 64.69-1 | 15 | 192 | Partridge | 192 Partridge | Summit - No Building Name provided |
| 64.69-1 | 16 | 194 | Partridge | 194 Partridge | Summit - No Building Name provided |
| 64.69-1 | 17 | 196 | Partridge | 196 Partridge | Summit - No Building Name provided |
| 64.69-1 | 18 | 198 | Partridge | 198 Partridge | Summit - No Building Name provided |
| 64.69-1 | 20 | 200/202 | Partridge | 200/202 Partridge | Summit - Residence Hall (notes 200) |
| 64.69-1 | 21 | 204 | Partridge | 204 Partridge | Summit - Residence Hall |
| 64.69-1 | 22 | 206 | Partridge | 206 Partridge | Summit - Residence Hall |
| 64.69-1 | 23 | 210 | Partridge | 210 Partridge | Summit - Residence Hall |
| 64.68-1 | 24 | 212 | Partridge | 212 Partridge | Summit - Rooney Hall |
| 64.68-1 | 44 | 917 | Madison | 917 Madison | Summit - Rooney Hall |
| 64.69-1 | 45 | 919 (915) | Madison | 919 (915) Madison | Summit - No Building Name provided |
| 64.69-1 | 46 | 921 | Madison | 921 Madison | Summit - Maginn Hall |
| 64.69-1 | 47 | 923 | Madison | 923 Madison | Summit - Charter Hall |
| 64.69-1 | 48 | 935 | Madison | 935 Madison | Summit - Fontbonne Hall |
| 64.69-1 | 49 | 939-943 (937) | Madison | 939-943 (937) Madison | Summit - No Building Name provided |
| 64.69-3 | 50 | 939-943 (943) | Madison | 939-943 (943) Madison | Summit - Concealed Hall 941 Madison and Cavanaugh Hall 943 Madison |
| 64.69-3 | 51 | 947 | Madison | 947 Madison | Summit - Madison Hall |
| 64.68-3 | 52 | 951 (955) | Madison | 951 (955) Madison | Summit - Quillinan Hall |
| 64.68-3 | 53 | 959 | Madison | 959 Madison | Summit - InterFaith Sanctuary |
| 64.68-3 | 54 | 969 | Madison | 969 Madison | Summit - Wellworth Hall |
| 64.68-3 | 55 | 967 | Madison | 967 Madison | Summit - Casey Hall |
| 64.68-3 | 56 | 971 | Madison | 971 Madison | Summit - Roberts Hall |
| 64.68-3 | 57 | 975 | Madison | 975 Madison | Summit - No Building Name provided |
| 64.68-3 | 2,697 | 969-974 | Morris | 969-974 Morris | Summit Residence Hall (address 988 on Mortgage) |
| 64.68-2 | 7 | 968-974 (988) | Madison | 968-974 (988) Madison | Summit - No Building Name provided |
| 64.69-2 | 8.2 | 962 | Madison | 962 Madison | Summit - Residence Hall |
| 64.69-2 | 10 | 958 | Madison | 958 Madison | Summit - Residence Hall |
| 64.69-2 | 12 | 946-950 | Madison | 946-950 Madison | Summit - Residence Hall and Marketing and Communications |
| 64.69-2 | 13 | 944 | Madison | 944 Madison | Summit - Carey Hall |
| 64.69-2 | 14 | 940 | Madison | 940 Madison | Summit - Office and Staff Housing |
| 64.69-2 | 23 | 912 | Madison | 912 Madison | Summit - Residence Hall |
| 64.69-2 | 25 | 908 | Madison | 908 Madison | Summit - McCarthy Hall |
| 64.69-2 | 70 | 957-583 | Morris | 957-583 Morris | Summit - No Building Name provided |
| 64.69-2 | 72 | R398-958 | Madison | R398-958 Madison | Summit - No Building Name provided |
| 64.68-3 | 12 | 568 | Morris | 568 Morris | |
| 65.61-4 | 1 | 340 | Western | 340 Western | |
| 76.70-1 | 28 | N/A | 5 O'Connell | 5 O'Connell | Summit - Security Headquarters |
| 76.70-1 | 29 | N/A | 5 O'Connell | 5 O'Connell | |
| 76.70-1 | 30 | N/A | 5 O'Connell | 5 O'Connell | |
| 76.70-1 | 31 | N/A | 5 O'Connell | 5 O'Connell | |
| 76.70-1 | 32 | N/A | 5 O'Connell | 5 O'Connell | |
| 76.70-1 | 33 | N/A | 5 O'Connell | 5 O'Connell | |
| 76.70-1 | 34 | N/A | 5 O'Connell | 5 O'Connell | |

**Exhibit G**

**Carlos Declaration**

CULLEN AND DYKMAN LLP
80 State Street, Suite 900
Albany, New York 12207
Matthew G. Roseman, Esq. (admission pro hac vice pending)
Bonnie L. Pollack, Esq. (admission pro hac vice pending)
Kelly McNamee Esq. (admission pro hac vice pending)
Kyriaki Christodoulou, Esq. (admission pro hac vice pending)
(516) 357-3700

*Proposed Attorneys for The College of Saint Rose*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
THE COLLEGE OF SAINT ROSE,                                       :    Case No. 24-11131 (REL)
                                                                 :
                          Debtor.                                ::
-----------------------------------------------------------------x

## DECLARATION OF DAVID CARLOS
## IN SUPPORT OF BIDDING PROCEDURES AND SALE MOTION

I, **DAVID CARLOS**, hereby declare under penalty of perjury as follows:

1.      I am a Vice Chairman and the Head of the Nonprofit, Education and Government

Practice at Jones Lang LaSalle Brokerage LLC ("JLL"), a real estate consulting firm.  JLL has

been engaged to market and sell the Debtor's real estate in this Chapter 11 case.  The Debtor has

or is contemporaneously filing an application seeking to retain JLL to continue its service post-

petition.

2.      JLL is a diversified real estate consulting and advisory firms with offices located

throughout the country. JLL evaluates, restructures, facilitates the acquisition of, and disposes of

all types of real estate, and has significant experience in the disposition of properties in

bankruptcy. JLL has been retained as real estate consultant in a variety of bankruptcy cases

involving issues relating to the review, analysis, renegotiation, and disposition of key real

1

property and lease agreements.  Subject to the Court's approval, JLL will continue to conduct a marketing process and solicit and manage offers to purchase the Campus.

3.        I have been employed by JLL since September 2023.  I have over 20 years of experience in the commercial real estate industry. My responsibilities at JLL primarily involve leading the Nonprofit, Education & Government Practice in the Tri-State region.  Prior to JLL, I worked in real estate industry since 2004.

4.        I submit this declaration in support of the *Debtor's Motion for Entry of Orders (I) (A) Approving Bidding Procedures for the Sale of the Debtor's Campus; (B) Approving the Form of Purchase Agreement; (C) Approving Bid Protections in Favor of Any Stalking Horse Purchaser; (D) Approving the Form and Manner of Service of the Auction Notice; and (E) Scheduling an Auction;  (II) Approving Sale of the Campus Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* (the "Bidding Procedures Motion")[1] filed on the date hereof.  Except as otherwise indicated, all facts set forth in this Declaration are based upon personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and marketing process. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.        I have reviewed the Bidding Procedures Motion, which was prepared by counsel with my input.  I believe that the information contained in the Bidding Procedures Motion is accurate and correct.  As set forth more fully below, I believe that the entry of the Bidding Procedures Order is critical to the Debtor's ability to preserve the value of its estate and succeed in its efforts to maximize the value of its estate.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Motion.

22484.3 21176666v4

6.      The Debtor has determined that a sale of its main campus, comprised of 72 buildings on 92 parcels of land located in Albany, New York (the "Campus"), in whole or in Lots, is the best and only way to maximize the value of the estate.

The Campus includes eighteen (18) academic, student and administrative buildings, three (3) dormitories, and fifty-one (51) residential houses on and abutting Madison and Western Avenues and Partridge Street.  Campus highlights include:
-72 individual buildings with a mix of asset types including: academic, residential, dorm/multi-family, office, and athletic facilities
-The property presents educational institutions, government agencies or nonprofits with move-in-ready facilities in excellent condition
-Property is a prime candidate for a residential conversion as many of the buildings are residential and dormitories and/or were previously private homes.
-Plug-and-play space for existing education, public sector and nonprofit users
-Large scale residential conversion
-Opportunity for upscaling workforce training center for tech sector growth
-Conveniently located in downtown Albany

7.      At the beginning of JLL's retention by the Debtor, JLL engaged in information gathering including several tours of the property and discussions with staff, prepared and finalized marketing materials and participated in initial discussions with local elected officials, the Pine Hills Neighborhood Association, and the City's Planning Department. Beginning in June 2024, and continuing to the Petition Date, JLL has conducted property tours with potential purchasers and prepared and distributed offering memoranda to potential buyers.

8.      More specifically, since the launch of the marketing campaign, JLL has disseminated eBlast and Email teaser ads, an offering memorandum for bidders and a marketing strategy and activity report for the Debtor.  JLL sent  an email advertisement to 22,631 prospective investors, developers, brokers, schools and intermediaries, contacted more than 1100 priority buyers, obtained 71 signed non-disclosure agreements, conducted 32 tours and has arranged for 4,186 documents to be downloaded from a data room established for this transaction.

3

9.      Preliminary interest in purchasing the Campus has run the spectrum from Capital Region, New York and National developers, corporate end users, and other education, public sector or nonprofit users.   In addition, the Albany County Pine Hills Land Authority, convened in September 2024 is exploring  development options for the Campus. (The Authority was created through the passage of legislation by the NYS Legislature in June and signed by Governor Hochul on June 30, 2024). Subject to the Court's approval, JLL will continue the marketing process that has been underway for several months and solicit and manage offers to purchase the Campus.

10.      I anticipate that the chapter 11 filing and related approval of Bidding Procedures and an expedited timeline for the Sale will promote a final round of interest in the Campus. However, given that the pre-petition marketing efforts have already spanned several months, I am concerned that a further lengthy post-petition campaign will have a negative impact on achieving a robust and competitive sale process.

11.      Prior to the Petition Date, the Campus Agents solicited offers for stalking horse bidders. While a Stalking Horse Purchaser has not been identified to date, the Debtor is currently considering the offers that have been received, and the Debtor reserves the right throughout the marketing process and at any time prior to the Bid Deadline to enter into a Stalking Horse Agreement and thereafter proceed to an Auction to maximize the value that the Debtor may realize from the sale of the Campus.

12.      To provide an incentive and to compensate a Stalking Horse Purchaser for negotiating a Stalking Horse Agreement, the Debtor will likely need to agree to a breakup fee in an amount to be negotiated and included in a Stalking Horse Agreement (the "Termination Fee") if one is executed by a Stalking Horse Purchaser.

4

13.      I believe that offering the Termination Fee to any Stalking Horse Purchaser will benefit the Debtor's estate by establishing a floor and promoting more competitive bidding. Without such a fee, I believe that bidding on the Campus would likely be reduced. I believe that the availability of the Termination Fee is necessary in order to provide any Stalking Horse Purchaser with some assurance of compensation for the time and expense spent in putting together an offer for the Campus.

14.      Based on my discussions with the Debtor's advisors, I believe that the Bidding Procedures are reasonably designed to ensure that the Debtor's estate receives the maximum benefit available from the sale of the Campus, and therefore warrant Court approval.

15.      Absent a negotiated sale of its Campus to a third party in this chapter 11 case, I believe, based on discussions with the Debtor's advisors, that the Debtor would likely be forced to sell its real estate at a distressed fire sale, without the opportunity for any reasonable and appropriate market test of value. I believe that a reasonably prompt marketing and sale of the Campus is necessary because the Debtor has limited independent liquidity and access to funding under a proposed post-petition financing facility will be limited in duration.

16.      Based on the foregoing, I believe that the Sale of the Campus is justified by sound business reasons and in the best interests of the Debtor and its estate. I believe that the proposed Sale is proper and necessary, and serves the best interests of the Debtor, its estate, and its creditors, and that the Bidding Procedures are designed to accomplish a sale process that would generate the highest and best bids for the real estate.

22484.3 21176666v4

I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct, to the best of my knowledge, information and belief, and as to those statements made upon information and belief, I believe them to be true.


                        s/ David Carlos
                        DAVID CARLOS

Dated: October 7, 2024