**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| THE COLLEGE OF SAINT ROSE,[1] | Case No. 24-11131 (REL) |
| Debtors. | |

**FINAL ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING, (B) USE BOND COLLATERAL AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II) MODIFYING AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF**

---

[1]    The last four digits of the Debtor's federal tax identification number is 8371.

51638959.2

Upon the motion (the "<u>Motion</u>")[2] of above-captioned debtor and debtor-in-possession

(the "<u>Debtor</u>"), pursuant to sections 105, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2),

364(c)(3), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et*

*seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Local Bankruptcy Rules for the Northern

District of New York (the "<u>Local Bankruptcy Rules</u>"), seeking entry of a final order (the "<u>Order</u>")

including:

    (a)    authorizing the Debtor to obtain postpetition financing pursuant to a senior secured debtor-in-possession credit facility (the "<u>DIP Facility</u>") in an aggregate principal amount equal to $10.8 million (the commitments in respect thereof, the "<u>DIP Commitments</u>"), on the terms and conditions set forth in the DIP Documents (as defined below), including a credit agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), a copy of which in substantially final form is attached hereto as **Exhibit A**, by and between the Debtor, as borrower, and the DIP Lender;

    (b)    authorizing the Debtor to execute, deliver, and perform under the DIP Credit Agreement and all other loan documentation related thereto, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively with this Order, the "<u>DIP Documents</u>"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

    (c)    authorizing the Debtor to incur obligations, including to borrow under the DIP Facility (collectively, the "<u>DIP Obligations</u>") and to use the proceeds thereof as provided in the DIP Documents, this Order, and the Approved Budget (as defined below);

    (d)    granting to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations and authorizing and approving the Carve-Out Provisions (as defined below);

    (e)    subject to Permitted Prior Liens (as defined below), granting to the DIP Lender valid, enforceable, non-avoidable, and automatically perfected first priority liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on the DIP Collateral (as defined below);

---

[2]    Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the Motion.

(f)    authorizing the Debtor to pay principal, interest, fees, expenses and other DIP Obligations payable under the DIP Documents as they become due, including DIP Fees and Expenses (each as defined below);

(g)    authorizing the Debtor to pay the Origination, Extension and Exit Fees, the Break-Up Fee to the extent due and payable, and approving the prior payment of the Deposit;

(h)    authorizing the Debtor to use Bond Collateral associated with the Bonds and providing the Bond Trustee adequate protection for its interests in the Bond Collateral from and after the Petition Date;

(i)    vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") on the terms set forth herein, including to the extent necessary to permit the Debtor to implement and effectuate the terms and provisions of this Order and the other DIP Documents, and for the DIP Lender to deliver any notices of termination described below and as further set forth herein;

(j)    authorizing the Debtor, the DIP Lender and the Bond Trustee to take all commercially reasonable actions to implement and effectuate the terms of this Order;

(k)    authorizing the Debtor to waive its right to surcharge the DIP Collateral or the Bond Collateral pursuant to section 506(c) of the Bankruptcy Code; and

(l)    waiving any applicable stay and providing for immediate effectiveness of this Order.

The hearing to approve the Motion having been held by this Court on [_____], 2024 (the "Hearing"), and this Court having considered the relief requested in the Motion, the exhibits attached hereto and thereto, the Declaration of Sean Harding filed in support of the Motion [Docket No. [  ] (the "Harding Declaration"), the available DIP Documents, and the evidence submitted and arguments made at the Hearing; due and sufficient notice of the Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001, and all applicable Local Bankruptcy Rules; and the Hearing having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the relief requested in the Motion is fair and reasonable and in the best interests of the Debtor and its estate, and is essential for the administration of this Chapter 11 Case, the continued

51638959.2

operation of the Debtor in the ordinary course, and the preservation of the value of the Debtor's

assets; and it appearing that the Debtor's entry into the DIP Documents is a sound and prudent

exercise of the Debtor's business judgment; and after due deliberation and consideration, and good

and sufficient cause appearing therefor,

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THE COURT**

**MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

      A.    *Petition Date*.  On October 10, 2024 (the "<u>Petition Date</u>"), the Debtor filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

      B.    *Debtor in Possession*.  The Debtor has continued in the management and operation

of its business and properties as a debtor in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Case.

      C.    *Jurisdiction and Venue*.  This Court has core jurisdiction over the Chapter 11 Case,

the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*Northern District of New York*.  Consideration of the Motion constitutes a core proceeding pursuant

to 28 U.S.C. § 157(b)(2).  The Court may enter this Order consistent with Article III of the United

States Constitution.  Venue for the Chapter 11 Case and proceedings on the Motion is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are

sections 105, 362, 363(c), 363(e), 363(m), 364(c), 364(e), and 507 of the Bankruptcy Code and

Bankruptcy Rules 2002, 4001, 6004 and 9014.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

51638959.2

D. *Notice*. The Hearing was held pursuant to Bankruptcy Rule 4001(c)(2). Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Order shall be required.

E. *Findings Regarding the DIP Facility*.

(i) Good and sufficient cause has been shown for the entry of this Order and for authorization of the Debtor to obtain financing pursuant to the DIP Documents.

(ii) The Debtor has a critical need to obtain the DIP Facility and to use the proceeds thereof to maintain an orderly wind down of the operations of its not-for-profit business, to meet payroll obligations, to satisfy other operational needs, and to fund expenses of this Chapter 11 Case. Access to sufficient working capital and liquidity through the incurrence of new indebtedness under the DIP Documents is necessary and vital to the successful wind down of the Debtor's operations.

(iii) The Debtor is unable to obtain financing on more favorable terms, taken as a whole, including on a timetable sufficient to meet the Debtor's liquidity needs, from sources other than the DIP Lender under the DIP Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code solely as an administrative expense. The Debtor is also unable to obtain credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims (each as defined herein) under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code, as applicable, in each case, subject to the Permitted Prior Liens, and otherwise on the terms and conditions set forth in this Order and in the other DIP Documents.

51638959.2

(iv)     Based on the Motion, the Harding Declaration, and the record presented to the Court at the Hearing, the terms of the DIP Facility and the DIP Documents are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(v)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtor and the DIP Lender, and the Debtor's obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Documents shall be deemed to have been for credit extended by the DIP Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender (and any successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vi)     The Debtor has prepared and delivered to the DIP Lender and the Bond Trustee an initial budget (collectively, the "Initial DIP Budget"), attached hereto as **Exhibit "B"**. The Initial DIP Budget reflects, among other things, the Debtor's anticipated cash receipts and anticipated disbursements for each calendar week covered thereby, including the funding of an interest reserve account and a professional fee carve-out reserve.[4] The Initial DIP Budget may be modified, extended, amended, and updated from time to time in accordance with the DIP Credit Agreement and this Order, and such modified, extended, amended and/or updated budget shall, for the period covered thereby, supplement, modify, extend or replace, as applicable, the Initial

---

[4]     The DIP Documents require as a condition to the extension of the initial maturity that the interest reserve account be replenished through any extended maturity.

DIP Budget (the Initial DIP Budget and each subsequently approved budget shall constitute for the then applicable period, the "Approved Budget"). The Debtor believes that the Initial DIP Budget is reasonable under the facts and circumstances of the Debtor and this Chapter 11 Case.

F.    *Relief Essential; Best Interest.*    The Hearing was held in accordance with Bankruptcy Rule 4001(c)(2). Consummation of the DIP Facility in accordance with this Order and the other DIP Documents is therefore in the best interests of the Debtor's estate and consistent with the Debtor's exercise of its fiduciary duties.

G.    *Prepetition Bond Financing.*

(i)    The Debtor is indebted to Manufacturers and Traders Trust Company, in its capacity as indenture trustee (the "Bond Trustee") for those certain City of Albany Capital Resource Corporation Tax-Exempt Revenue Refunding Bonds (The College of Saint Rose Project), Series 2021 (the "Bonds"). The Bonds were issued in the original aggregate principal amount of $48,150,000. As of the Petition Date, the amounts due and owing on account of the Bonds (collectively, the "Bond Obligations") are (i) the outstanding principal due on the Bonds, in the amount of $45,093,609.29, (ii) the accrued interest on the Bonds as of the Petition Date, in the amount of $3,447,109.66, and (iii) other amounts due and owing under the documents that evidence and otherwise secure the Bonds, subject to review and reconciliation of funds applied by the Bond Trustee to the amounts due at the time of acceleration of the Bond Obligations.

(ii)    The Bonds are secured by duly perfected liens and security interests in gross revenues, selected campus facilities and real property, tangible personal property located in, on, or around the mortgaged campus facilities and real property, and certain other personal property (collectively, the "Bond Collateral") as described and defined in the documents that evidence and otherwise secure the Bonds (each a "Bond Document"). The Debtor has reserved rights as to the

51638959.2

extent to which funds held by the Debtor as of the Petition Date are Pre-Petition Bond Collateral but does not otherwise dispute the existence and scope of the Pre-Petition Bond Collateral.

(iii)    The Debtor's obligations under the Bond Documents constitute legal, valid, binding, enforceable and non-avoidable obligations of the Debtors not subject to subordination.

(iv)    Events of default have occurred under the Bond Documents. The Bond Trustee has demanded adequate protection for its Bond Collateral.

(v)    There is no overlap in the Bond Collateral and the collateral securing the DIP Facility. None of the Bond Collateral shall be encumbered by DIP Liens or otherwise serve as collateral for the DIP Facility. For the avoidance of doubt, the security for the Bonds does not constitute a Permitted Prior Lien.

(vi)    The Court previously entered its *Interim Order (I) Authorizing Use of Pre-Petition Bond Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief* [Dkt. No. 60] (the "Interim Order").

(vii)    The Bond Trustee is entitled to adequate protection for its interests in the Bond Collateral from and after the Petition Date.

(viii)    The Debtor has a need to use Bond Collateral to continue an orderly wind down of the operations of its not-for-profit business and the fund expenses of this Chapter 11 Case. In the absence of the use of Pre-Petition Bond Collateral, immediate and irreparable harm to the Debtor, its estate and its creditors would occur. The Debtor and the Bond Trustee have negotiated at arm's-length and in good faith regarding the Debtor's consensual use of Bond Collateral. Entry of this Order is in the best interests of the Debtor, its estate and its creditors.

51638959.2

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    *Motion Granted*.  The relief sought in the Motion is granted on a final basis.  The DIP Facility is authorized and approved, subject to the terms and conditions set forth in this Order and the other DIP Documents.  The use of Bond Collateral is authorized and approved, subject to the terms and conditions set forth in this Order.  All objections to this Order, to the extent not withdrawn, waived, settled, or resolved on the terms of this Order, are hereby denied and overruled on the merits.

2.    *Authorization of the DIP Facility and the DIP Documents*.

(a)    The Debtor is hereby authorized to execute, deliver, enter into and, as applicable, perform all of its obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Debtor is hereby authorized to borrow money pursuant to the DIP Credit Agreement in an aggregate principal amount not to exceed $10.8 million, the proceeds of which shall be allocated in accordance with the Approved Budget, and used only for the purposes permitted herein, under the DIP Credit Agreement and the Approved Budget.

(b)    In furtherance of the foregoing and without further approval of this Court, the Debtor hereby is authorized and directed to perform all acts, to make, execute, and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation financing statements and other similar documents), to file any necessary confirmatory or corrective deeds with respect to the DIP Collateral, including to add,

51638959.2

where applicable, a metes and bounds description of the relevant property based on an authorized survey thereof, and to pay all fees and expenses in connection with, or that may be reasonably required, necessary, or desirable for the Debtor's performance of its obligations under or related to the DIP Facility, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents, including to the extent reasonably requested by the DIP Lender to record one or more mortgages on the DIP Collateral;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, including any extensions of the maturity thereof, in each case, in such form as the Debtor and the DIP Lender may agree, it being understood that except as expressly provided in this Order no further approval of this Court shall be required for (A) any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder or (B) any updates, modifications, extensions, and supplements to the Approved Budget;

(iii)   the payment to the DIP Lender, as the case may be, of (A) all fees (which when paid shall be fully earned and nonrefundable), including, to the extent applicable: (a) an origination fee equal two and one quarter percent (2.25%) on the principal amount of the DIP Facility to be capitalized into the DIP Facility (the "Origination Fee"); (b) a one and a one-half percent (1.5%) exit fee on the principal amount of the DIP Facility payable upon the repayment in full of the DIP Facility (the "Exit Fee"), (c) if the maturity date is extended in accordance with the DIP Documents, a one percent (1%) fee for the extension (the "Extension Fee"); and (d) a break-up fee of fifty thousand dollars ($50,000) (the "Break-Up Fee"), if applicable;[5] (B) any amounts due (or that may become due) in respect of the indemnification and other reimbursement obligations, in each case referred to in the DIP Credit Agreement or the other DIP Documents; and (C) reimbursement of all reasonable and documented out-of-pocket expenses of the DIP Lender, including the reasonable

---

[5]    The Break-Up Fee shall only be payable at the closing of an alternative debtor-in-possession facility that is approved by the Court.

fees and expenses of its counsel (subject to the review procedures set forth in paragraph [22]), as provided for in the DIP Documents (the "Expense Reimbursement" and, together with the foregoing (A) and (B), the "DIP Fees and Expenses"), including the Debtor's payment of an initial fifty thousand dollar ($50,000) deposit to the DIP Lender (the "Deposit") toward the Expense Reimbursement; and

(iv)      the performance of all other acts required under or in connection with the DIP Documents, or reasonably requested by the DIP Lender, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens as provided herein and therein.

3.      *Segregation of DIP Loan Proceeds.* Other than the Interest Payment Reserve (as defined in the DIP Credit Agreement), the Debtor shall deposit and maintain the proceeds of the DIP Loan or any DIP Collateral in the Segregated Funding Account (as defined in the DIP Credit Agreement) until disbursed in accordance with the DIP Documents and shall not commingle the funds on deposit in the Segregated Funding Account with funds received from any other source. From the Segregated Funding Account, the Debtor shall only make withdrawals in order to make payments in accordance with the Approved Budget.

4.      *DIP Obligations.* Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute (and shall continue to constitute) legal, valid, binding, and non-avoidable obligations of the Debtor, enforceable against the Debtor and its estate, and any successors thereto, including any trustee appointed in the Chapter 11 Case, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (the "Successor Case"), in accordance with the terms of this Order and the other DIP Documents. Upon execution and delivery of the DIP Documents, the DIP Obligations shall include (and shall continue to include) all loans and any other indebtedness which may now or from time to time be owing by the Debtor to the DIP Lender under the DIP Documents, including all principal, interest, costs, fees, expenses,

11

51638959.2

indemnities and other amounts payable to the DIP Lender under the DIP Documents.   No

obligation incurred, transfer or grant of security hereunder or under the other DIP Documents to

the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the

Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d),

544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable

Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or

similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment,

offset, recharacterization, subordination (whether equitable, contractual, or otherwise),

disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the

Bankruptcy Code or any applicable law or regulation by any person or entity.

     5.    *Carve-Out.*

     (a)    *Generally.*  As used in this Order, the term "Carve-Out" means the sum of:

(i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under

section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any,

pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses up to $25,000 incurred by a

trustee under section 726(b) of the Bankruptcy Code; (iii) subject, in each case, to application of

any retainers that may be held, the aggregate fees and expenses as provided for in any Approved

Budget less any fees and expenses already paid, and to the extent allowed at any time, whether by

interim order, procedural order, final order or otherwise (the "Allowed Professional Fees")

incurred by persons or firms retained by the Debtor pursuant to section 327, 328 or 363 of the

Bankruptcy Code and the fees of any statutory committee pursuant to sections 328 or 1103 of the

Bankruptcy Code (collectively, the "Professional Persons"), at any time on or prior to the first

business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined

below), whether allowed prior to or after delivery of a Carve-Out Trigger Notice by interim order, procedural order, final order or otherwise, and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $100,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise (the amounts set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap").  For purposes of the foregoing, the "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the DIP Notice Parties,[6] which notice may be delivered following the occurrence and during the continuation of an uncured Event of Default (as defined in the DIP Credit Agreement), stating that the Post Carve-Out Trigger Notice Cap has been invoked.

(b)    *Carve-Out Reserve.*  Consistent with the Approved Budget, a portion of the proceeds of the DIP Facility shall be set aside in a carve-out reserve for the sole benefit of Professional Persons (the "Carve-Out Reserve") to fund Carve-Out expenses when due.  The DIP Liens shall not attach to the Carve-Out Reserve and the DIP Obligations shall have no recourse to the Carve-Out Reserve unless and until all Carve-Out expenses in subparagraph (a) above have been fully paid.  Nothing in this Order, the Approved Budget, Carve-Out, the Carve-Out Reserve, or any of the foregoing shall be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable to Professional Persons.  The DIP Lender shall not be responsible for funding the Carve-Out Reserve except as provided in this paragraph and to the extent the Debtor lacks funds to fund the Carve-Out Reserve, the DIP Lender shall not be obligated

---

[6]    The "DIP Notice Parties" shall include: (a) Debtor's counsel, Cullen and Dykman, LLP; (b) the U.S. Trustee; (c) counsel to any statutory committee; (d) counsel to the Bond Trustee; and (e) counsel to the DIP Lender, Eversheds Sutherland (US) LLP.

to fund the Carve-Our Reserve. The foregoing shall be referred to herein as the "Carve-Out Provisions."

(c) *Reservation of Rights*. The payment of any fees or expenses of the Professional Persons pursuant to the Carve-Out shall not, and shall not be deemed to, (i) reduce any of the DIP Obligations or (ii) modify, alter, or otherwise affect any of the liens and security interests of such parties, except as provided herein.

(d) *No Direct Obligation to Pay Allowed Professional Fees*. The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Case or any Successor Case under any chapter of the Bankruptcy Code. Nothing in this Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.

(e) *Payment of Carve-Out on or after the Carve-Out Trigger Date*. Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred thereafter shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

6.    *Limitation on Use of Funds*. Except as expressly provided in this Order, no funds of the Debtor or the estate, whether in the form of the Carve-Out, proceeds of any DIP Obligations or Bond Collateral or otherwise may be used to (or support any other party to) investigate, litigate, prosecute, object to, contest or challenge in any manner or raise any defenses to the debt, collateral position, liens or claims of the DIP Lender or the Bond Trustee, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the indebtedness under the DIP Facility or

the Bond Documents, as applicable, or the validity, extent, perfection, priority or enforceability of any mortgage, security interest or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of the DIP Lender or the Bond Trustee, or by seeking to subordinate or recharacterize the DIP Facility or the Bonds (or amounts outstanding thereunder) or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or by asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Lender or the Bond Trustee, or any of their respective officers, directors, agents, or employees, in each case in their respective capacities as such.  In addition, no funds of the Debtor or the estate, whether in the form of the Carve-Out, proceeds of any DIP Obligations or Bond Collateral or otherwise shall be used in connection with (a) preventing, hindering or delaying the DIP Lender's or Bond Trustee's enforcement or realization upon the DIP Collateral or Bond Collateral, as applicable, or the exercise of rights by the DIP Lender or the Bond Trustee or (b) selling or otherwise disposing of the DIP Collateral or the Bond Collateral other than as provided herein, permitted under the DIP Credit Agreement or the Bond Documents or with the consent of the DIP Lender or the Bond Trustee, as applicable.  Notwithstanding the foregoing, up to $25,000 may be made available to any Committee (if appointed) to investigate the Bonds, the Bond Liens and/or any potential Challenge, and nothing in this paragraph shall impair the Debtor's ability to assert that funds in its accounts do not constitute Bond Collateral.

7.    *DIP Superpriority Claims*.  Subject to and junior to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtor (without the need to file any proof of claim), with priority over any and all unsecured claims against the Debtor, now existing or

hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under section 105, 326, 327, 328, 330, 331, 361, 363, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable in accordance with the DIP Documents, including this Order. The DIP Superpriority Claims shall include recovery against the proceeds of avoidance actions of the Debtor's estate arising under chapter 5 of the Bankruptcy Code, provided that the DIP Lender shall first look to be paid from all other assets from which the Debtor's obligations under the DIP Facility may be paid. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.     *DIP Liens.* As security for the DIP Obligations, effective and automatically and properly perfected as of the date of this Order without the necessity of the execution, recordation or filing by the Debtor or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Lender of, or over, the DIP Collateral, subject and junior to the Carve-Out, the DIP Lender is granted valid, binding, continuing, enforceable, and non-avoidable first priority security interests and liens (all such liens and security interests granted to the DIP Lender pursuant to this Order and

16

the DIP Documents, the "DIP Liens") in the DIP Collateral as defined in the DIP Agreement (the

"DIP Collateral"), subject only to the exceptions contained in the DIP Documents, including the

Permitted Prior Liens (as defined below). The DIP Liens shall not attach to any Bond Collateral,

avoidance actions of the Debtor's estate arising under chapter 5 of the Bankruptcy Code, or any

proceeds thereof. This Order shall be sufficient and conclusive evidence of the creation, validity,

perfection and priority of all liens and security interests granted herein, including the DIP Liens.

9.     *Authorization to Use Bond Collateral.* The Debtor is authorized to use the Bond

Collateral of the Bond Trustee on the terms and conditions set forth in this Order and in accordance

with the Approved Budget.

10.     *Adequate Protection to the Bond Trustee.*

(a)     The Bond Trustee shall be granted to secure any diminution in value from

and after the Petition Date in the value of its valid, enforceable and non-avoidable interest in the

Bond Collateral (the "Diminution Claim") replacement security interests and liens upon all assets

of the Debtor, whether now existing or hereafter acquired and the proceeds and products thereof,

which security interests and liens shall be, however, junior to the Carve-Out and the DIP Liens.

The replacement liens shall not attach to avoidance actions of the Debtor's estate arising under

chapter 5 of the Bankruptcy Code or any proceeds thereof.

(b)     The Bond Trustee shall receive a superpriority administrative expense claim

pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, junior to the Carve-Out and the

DIP Superpriority Claim, equal to the Diminution Claim to the extent not satisfied under paragraph

(10)(a) hereof, which shall include recovery against the proceeds of avoidance actions of the

Debtor's estate arising under chapter 5 of the Bankruptcy Code, provided that the Bond Trustee

shall first look to be paid first from all other assets from which the Debtor's obligations to the

17

Bond Trustee may be paid. Other than the Carve Out and DIP Superpriority Claims, no cost or expense of administration under sections 105, 503 or 507 of the Bankruptcy Code shall be senior to, or pari passu with, the superpriority claim described in this paragraph.

(c)    The security interests and liens granted to the Bond Trustee herein as adequate protection (the "Adequate Protection Liens") shall be effective and automatically and properly perfected as of the date of entry of the Interim Order without the necessity of the execution, recordation or filing by the Debtor or the Bond Trustee of mortgages, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the Bond Trustee of any collateral subject to such Adequate Protection Liens.

(d)    The Debtor shall substantially comply with the Approved Budget. The Debtor shall not amend the Approved Budget without providing prior written notice and a copy of the proposed amended budget to the Bond Trustee. The Bond Trustee shall have three (3) business days from the date of receipt to give to the Debtor and DIP Lender written objections to the proposed amendment setting forth the nature of the objections and identifying the line items subject to such objection (a "Budget Objection"). If no Budget Objection is timely given, the amendment shall take effect without further order. If a Budget Objection is timely given, any line items that are not subject to the Budget Objection shall, but only with DIP Lender's consent, also take effect, provided the balance shall not take effect until such Budget Objection is resolved. The Debtor, DIP Lender and Bond Trustee shall attempt to consensually resolve the any Budget Objection, and any Budget Objection shall otherwise be presented to the Court for resolution and the parties shall support any request for an expedited determination by the Court. The foregoing

51638959.2

shall be without prejudice to the Debtor's right to seek approval from the Court of any budget amendment on an expedited basis.

(e)    The Debtor shall provide to the Bond Trustee a timely copy of each notice or report given to the DIP Lender, whether pursuant to the DIP Documents or otherwise. The Debtor shall provide the Bond Trustee such other information as the Bond Trustee reasonably requests.

11.    *No Obligation to Extend Credit*.  The DIP Lender has no obligation to make any loan under the DIP Documents unless (and subject to the occurrence of the Closing Date, as defined in the DIP Credit Agreement) all of the conditions precedent to the making of such extension of credit under the DIP Documents have been satisfied in full or waived by the DIP Lender in accordance with the terms of the DIP Credit Agreement.

12.    *Limitation on Charging Expenses*.  No costs or expenses of administration of the Chapter 11 Case or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Bond Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Bond Trustee, as the case may be, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or Bond Trustee, and nothing contained in this Order shall be deemed to be a consent by the DIP Lender or Bond Trustee to any charge, lien, assessment or claim against the DIP Collateral or the Bond Collateral under section 506(c) of the Bankruptcy Code or otherwise.

13.    *Disposition of Collateral*.  The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Documents

51638959.2

or consented to by the DIP Lender, or any portion of the Bond Collateral, except as permitted by the Bond Documents, consented to by the Bond Trustee, or, with respect to Bond Collateral, as otherwise authorized by order of the Court.  Upon any disposition of any portion of the DIP Collateral (other than any Release Parcel (as defined in the DIP Credit Agreement)), the net cash proceeds thereof will be paid directly to the DIP Lender to the extent provided in the DIP Credit Agreement until the DIP Obligations are satisfied in full. Upon any disposition of any Release Parcel (as defined in the DIP Credit Agreement), the Release Prepayment Amount (as defined in the DIP Credit Agreement) will be paid directly to the DIP Lender to the extent provided in the DIP Credit Agreement until the DIP Obligations are satisfied in full; provided that, for the avoidance of doubt, no payment to the DIP Lender on account of a Release Payment amount shall be satisfied, in any part, from Bond Collateral or proceeds thereof unless and until the Bond Obligations have been satisfied in full.

14.     *Maintenance of Collateral.*  Until the payment in full of all DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, the Debtor shall continue to maintain and insure the DIP Collateral as required under the DIP Documents.  The Debtor shall continue to maintain and insure the Bond Collateral consistent with existing practices.

15.     *Insurance Proceeds and Policies.*  As of the date of entry of this Order and to the fullest extent provided by applicable law, the DIP Lender shall be deemed to be and shall continue to be, as applicable, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtor that in any way relates to the DIP Collateral and in accordance with the priorities set forth herein.

16.     *Perfection of DIP Liens.*

51638959.2

(a)    The DIP Lender is authorized, but not required, to file or record mortgages, financing statements, notices of lien or similar instruments in any jurisdiction, including as may be reasonably required or deemed appropriate by the DIP Lender, under applicable local laws, to validate the liens and security interests granted to them under this Order and hereunder (the "Perfection Actions").  Whether or not the DIP Lender shall take such Perfection Actions, the liens, mortgages, and security interests granted under this Order and the other DIP Documents shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination.

(b)    A certified copy of this Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a certified copy of this Order for filing and/or recording, as applicable, without any requirement to pay transfer or mortgage recording taxes.

17.    *Automatic Stay.*  The Automatic Stay shall be modified to the extent necessary to permit the Debtor, the DIP Lender and the Bond Trustee to take all actions, as applicable, referenced in or contemplated by this Order, including to (i) permit the Debtor to grant the DIP Liens and DIP Superpriority Claims; (ii) permit the Debtor to perform such acts as the DIP Lender may reasonably request to assure the perfection and priority of the liens and security interests granted herein; (iii) permit the Debtor to incur all liabilities and obligations to the DIP Lender under the DIP Documents, the DIP Facility, and this Order, as applicable; and (iv) authorize the Debtor to pay and the DIP Lender to retain and apply any payments made to it in accordance with the terms of this Order.

51638959.2

18.    *Preservation of Rights Granted under This Order.*

(a)    Subject to the Prior Permitted Liens, no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the DIP Lender against the DIP Collateral shall be permitted, other than the claims and liens granted hereunder and, with respect to all other assets, no claim or lien shall be granted or permitted on any property of the Debtor's estate having a value in excess of $100,000 (other than liens in Bond Collateral associated with the Bonds), while any of the DIP Obligations remain outstanding, and, except as otherwise expressly provided in this Order, the DIP Liens shall not be: (i) subject or junior to any lien or security interest in the DIP Collateral that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest in the DIP Collateral, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens on the DIP Collateral arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtor; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtor in the DIP Collateral. As used in this Order, "Permitted Prior Liens" shall mean liens on the DIP Collateral that are valid and non-avoidable senior liens in existence immediately prior to the Petition Date or a valid and non-avoidable lien in existence immediately prior to the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, except that existence of a Permitted Prior Lien may result in an Event of Default under the DIP Documents if not otherwise expressly permitted thereunder.

22

(b)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Liens incurred prior to the actual receipt of written notice by the DIP Lender and Bond Trustee of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens, the Adequate Protection Liens or the Carve-Out Provisions.  The DIP Lender shall be entitled to, and is hereby granted, all the rights, remedies, privileges and benefits arising under section 364(e) of the Bankruptcy Code, this Order and the DIP Documents with respect to all DIP Obligations.

(c)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and all other rights and remedies of the DIP Lender or the Bond Trustee granted by the provisions of this Order and the DIP Documents and the Carve-Out Provisions shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, dismissing the Chapter 11 Case; (ii) the entry of an order approving the sale of any assets, including any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code; or (iii) the entry of an order confirming a chapter 11 plan in the Chapter 11 Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this Order and the DIP Documents shall continue in the Chapter 11 Case, in any Successor Case, and in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and all other rights and remedies of the DIP Lender and the Bond Trustee granted by the provisions of this Order and the DIP Documents shall continue in full force and effect until

51638959.2

the DIP Obligations or the Bond Obligations, as applicable, are indefeasibly paid in full, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated, and the Carve-Out shall continue in full force and effect.

19.    *Credit Bidding.*    In connection with any sale process authorized by the Court, whether effectuated through section 363, 725, or 1123 of the Bankruptcy Code, the DIP Lender may credit bid for any of the DIP Collateral up to the full amount of the outstanding DIP Obligations (other than any contingent obligations for which no claim has been asserted), as applicable, including any accrued and unpaid interest, expenses, fees, and other obligations (each such bid, a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code, subject to the right of any party in interest under section 363(k) of the Bankruptcy Code to object to any such Credit Bid. The Bond Trustee shall also have the right to Credit Bid for any of the Bond Collateral in connection with any sale process authorized by the Court up to the full amount of the obligations on the Bonds.

20.    *Proceeds of Subsequent Financing.*    If the Debtor, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in this Chapter 11 Case or any Successor Case shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Documents or this Order at any time prior to the repayment in full of all DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then all the cash proceeds derived from such credit or debt shall immediately be paid directly to the DIP Lender to the extent provided herein and in the DIP Credit Agreement until the DIP Obligations are satisfied in full.

21.    *No Marshaling; 552 Waiver; Applications of Proceeds.*  In no event shall the DIP Lender or Bond Trustee be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Bond Collateral, except as provided in paragraph 7 and 10 hereof. In addition, the Debtor has waived any "equities of the case" claims as against the DIP Lender, Bond Trustee, and the Bondholders under section 552(b) of the Bankruptcy Code.

22.    *Payment of Fees and Expenses.* The Debtor was and hereby is authorized to and shall pay the DIP Fees and Expenses, including the Deposit which has already been paid, in each case as provided for in this Order and the other DIP Documents.  Subject to the review procedures set forth in this paragraph 22, payment of all DIP Fees and Expenses shall not be subject to allowance or review by the Court. Professionals for the DIP Lender entitled to payment under this Order shall not be required to comply with the U.S. Trustee fee guidelines, however any time that any such professional hereinafter seeks payment of fees and expenses from the Debtor prior to confirmation of a chapter 11 plan, such professional shall provide summary copies of its invoices including aggregate amounts of fees and expenses and total amount of time to the Debtor, the Bond Trustee and the U.S. Trustee (together, the "Review Parties").  Any objections raised by any Review Party with respect to such invoices must be in writing, limited to reasonableness, and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) business days after the receipt by the Review Parties (the "Review Period").  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the Debtor shall pay such invoices within five (5) business days thereafter.  If an objection to a professional's invoice is received within the Review Period, the Debtor shall promptly pay the undisputed amount of the invoice, without the necessity of filing formal fee applications,

51638959.2

regardless of whether such amounts arose or were incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtor is authorized and directed to pay, including application of the previously paid Deposit, on the Closing Date (as defined in the DIP Credit Agreements) the DIP Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Lender to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtor). If the Debtor is invoiced for DIP Fees and Expenses incurred prior to the Closing Date after closing, the Debtor shall pay such DIP Fees and Expenses promptly after receipt of invoice. Invoices delivered to the Debtor and other Review Parties may be redacted for privilege. No attorney or advisor to the DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

23. *Released Parties*. Effective as of the date of entry of this Order, the Debtor absolutely and unconditionally releases and forever discharges and acquits the DIP Lender, the Bond Trustee, the Bondholders, and their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, each in such capacity (collectively, the "Lender Released Parties") from any and all obligations and liabilities to the Debtor (and its successors and assigns) and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type (in each case,

26

arising on or prior to the date of this Order), whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, in each case, arising in connection with or relating to the DIP Facility, the DIP Liens and security interests or any of the DIP Documents, or the Bonds, the Bond Collateral or any of the Bond Documents; provided, that nothing herein shall relieve the Lender Released Parties from fulfilling their obligations under the DIP Documents or the Bond Documents, as the case may be, and/or this Order or release the DIP Lender, Bond Trustee, or Bondholders from fraud or gross negligence.

24.    *Challenge Procedures.*  Subject to the challenge rights described in this Order, the Debtor's stipulations respecting the Bonds in the Interim Order and herein and the release in paragraph 23 shall be binding upon the Debtor and its estate and any representatives, successors and assigns thereto (including, without limitation, any chapter 7 or chapter 11 trustee in the Chapter 11 Case or any successor case).  Nothing in this Order prejudices the right of any Committee or other party in interest, in each case, if and to the extent granted standing by the Court, to seek to avoid, object to or otherwise challenge the findings or Debtor's stipulations or to challenge, initiate any proceeding or assert any claim or cause of action with respect to (i) the validity, enforceability, extent, priority or perfection of the Bond Documents or the pre-petition liens in Bond Collateral; or (ii) the validity, allowability, priority, secured status or amount of the Bond Obligations (each, a "Challenge"), no later than the date that is the earlier of (60) days after the entry of this Order or (90) days after the Petition Date (such time period, the "Challenge Period").  If no Challenge is timely brought within the Challenge Period, then: (i) any Challenge by any party in interest shall be deemed to be forever released, waived and barred; (ii) the obligations on account of the Bonds

27

shall be deemed to be fully allowed and secured (to the extent of the value of Bond Collateral) within the meaning of section 506 of the Bankruptcy Code; and (iii) the Debtor's stipulations shall be binding on all parties in interest, including any trustee subsequently appointed in the Chapter 11 Case (or any successor case). Nothing in this Order vests or confers on any person or entity, including any Committee, standing or authority to bring, pursue or settle any claim or cause of action belonging to the Debtor or its estate with respect to the Bond Documents, the Bonds or the Bond Collateral.

25.    *Events of Default; Exercise of Remedies.*

(a)    Except as otherwise provided herein, or to the extent the DIP Lender may otherwise agree in writing, (a) any violation of any of the terms of this Order or (b) any occurrence of an "Event of Default" under the DIP Credit Agreement or the other DIP Documents, as applicable, shall be deemed to be an Event of Default under this Order. Unless this Court orders otherwise, the Automatic Stay shall be modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default (as defined herein and in the DIP Credit Agreement), all rights and remedies provided for under the DIP Documents, including accelerating the DIP Obligations, but subject to the terms of this Order; provided that no less than five (5) business days' prior written notice (which may run concurrently with any notice required to be provided under the DIP Documents following an Event of Default) (the "Remedies Notice Period") shall first be provided via email to the DIP Notice Parties, which notice shall also be filed on the docket of the Court (the Carve-Out Trigger Notice shall constitute such notice). During the Remedies Notice Period, the Debtor shall be entitled to contest before the Bankruptcy Court that an Event of Default has occurred, and the Bankruptcy Court shall address such matter on an expedited basis. On the first calendar day following the end of the

Remedies Notice Period, except as provided herein or unless otherwise ordered by this Court, the Debtor will immediately cease using the DIP Lender's cash collateral and the proceeds of the DIP Facility, and the automatic stay under section 362 of the Bankruptcy Code shall be deemed immediately modified and terminated so that the DIP Lender may exercise the rights and remedies available under the DIP Documents or applicable law, including, without limitation, foreclosing upon and selling all or a portion of the DIP Collateral in order to collect any amounts payable to the DIP Lender pursuant to this Order and the other DIP Documents and apply the same to the DIP Obligations.

(b)     The authority to use Bond Collateral pursuant to this Order, including under the Bond Collateral, shall terminate upon the occurrence and continuation of any of the following events, unless waived in writing by the Bond Trustee: (i) this Order is reversed, vacated or stayed, (ii) the appointment of a chapter 11 trustee or an examiner in the Chapter 11 Case; (iii) expiration of any Remedies Notice Period; (iv) the Debtor uses or seeks to use Bond Collateral for any purpose or in a manner other than permitted in this Order and in accordance with the Approved Budget; (v) the Debtor seeks to incur indebtedness secured by Bond Collateral on a priming basis or to sell any assets constituting Bond Collateral without the prior written consent of the Bond Trustee; (vi) the Debtor fails to cure any material non-compliance with this Order within five (5) business days after written notice from the Bond Trustee; or (vii) the dismissal or conversion of the Chapter 11 Case.  The Debtor's and Bond Trustee's rights as to continued use of Bond Collateral thereafter are reserved.

26.     *Order Governs*.  In the event of any inconsistency between the provisions of this Order and the other DIP Documents, the provisions of this Order shall govern.

27.    *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the DIP Lender, the Bond Trustee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case, the Debtor and its respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the DIP Lender, the Bond Trustee and the Debtor and its respective successors and assigns.

28.    *Exculpation; No Liability to Third Parties.* Nothing in this Order, the other DIP Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or Bond Trustee of any liability for any claims arising from the prepetition or postpetition activities of the Debtor in the operation of its business, or in connection with its restructuring efforts.  Neither the DIP Lender nor the Bond Trustee shall, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Bond Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral and Bond Collateral shall be borne by the Debtor.  Neither the DIP Lender nor the Bond Trustee, including in connection with exercising any rights or remedies as and when permitted pursuant to this Order, shall be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any

51638959.2

similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute), nor shall the DIP Lender or Bond Trustee owe any fiduciary duty to the Debtor, its creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with the Debtor.

29.     *Effectiveness.*  This Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rule 4001(a)(3), 6004(h), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

30.     *Modification of DIP Documents.*  The Debtor is hereby authorized, without further order of this Court, to enter into agreements with the DIP Lender providing for any consensual non-material amendments, modifications, waivers or supplements to the DIP Documents, or of any other amendments, modifications, waivers or supplements to the DIP Documents necessary to conform the terms of the DIP Documents to this Order, in each case consistent with the amendment provisions of the DIP Documents; provided, however, that notice of any amendment, modification, waivers or supplement to the DIP Documents shall be provided to the DIP Notice Parties; and provided, further, that if such amendment, modification, waiver or supplement is material, than each Notice Party shall have five (5) business days from the date of such notice within which to object, in writing, to the amendment, modification, waiver or supplement.  If any such party timely objects to any such material amendment, modification, waivers or supplement to the DIP Documents, the material amendment, modification, waiver or supplement shall only be permitted

pursuant to an order of the Court. The foregoing shall be without prejudice to the Debtor's right to seek approval from the Court of any amendment, modification, waiver or supplement agreed to by the DIP Lender on an expedited basis.

31.   *Modification of Order*.   The Debtor irrevocably waives any right to seek any modification or extension of this Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

32.   *No Waiver*.   The failure of the DIP Lender or Bond Trustee to seek relief or otherwise exercise its rights and remedies, as applicable, under the DIP Documents, this Order or otherwise, shall not constitute a waiver of any of the DIP Lender's or Bond Trustee's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Lender or Bond Trustee under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Lender or Bond Trustee to (i) request conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Case, or the appointment of a trustee in the Chapter 11 Case, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code and this Order, a plan, or (iii) exercise any of the rights, claims, or privileges (whether legal, equitable or otherwise) the DIP Lender or Bond Trustee may have pursuant to this Order, the DIP Documents or applicable law. Nothing herein shall constitute a finding by the Court or an acknowledgement by the Bond Trustee that the adequate protection granted herein does in fact adequately protect the Bond Trustee.

33.   *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Order.

51638959.2

34.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

35.    *No Third Party Rights*. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

36.    *Discharge*.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in the Chapter 11 Case, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such plan of reorganization.  No plan of reorganization shall be confirmed pursuant to section 1129 unless the DIP Obligations are paid in full or the DIP Lender otherwise consents.

37.    *Survival*.  The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Chapter 11 Case; (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Case or any Successor Case; provided, that in no event shall an order be entered dismissing the Chapter 11 Case or any Successor Case or converting the Chapter 11 Case to a case under chapter 7 on less than 30 days' prior written notice to the DIP Lender.  The terms and provisions of this Order shall continue in the Chapter 11 Case, in any Successor Case, or following dismissal of the Chapter 11 Case or any Successor Case notwithstanding the entry of any orders described in clauses (a)-(d) above, and all claims, liens, security interests, and other protections granted to the DIP Lender and the Bond Trustee pursuant

33

to this Order and/or the DIP Documents shall maintain their validity and priority as provided by this Order until, in respect of the DIP Facility, all the DIP Obligations or, in respect of the Bonds, all the Bond Obligations, have been paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted).

38.      *Necessary Action*. The Debtor, the DIP Lender and Bond Trustee are authorized to take all actions as are necessary or appropriate to implement the terms of this Order.

39.      *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtor notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

51638959.2

<u>Exhibit A</u>

DIP Credit Agreement

## SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement") is dated as of November ___, 2024, and is between **THE COLLEGE OF SAINT ROSE**, a New York non-profit education corporation and a debtor and debtor-in-possession ("Borrower"), and **SUMMITBRIDGE NATIONAL INVESTMENTS VIII LLC**, a Delaware limited liability company ("DIP Lender").

## WITNESSETH:

WHEREAS, on October 10, 2024 (the "Petition Date"), Borrower filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court"), Case No. 24-11131 (REL);

WHEREAS, Borrower is continuing in the possession of its assets and in the management of its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested DIP Lender to provide a senior secured single draw term loan credit facility (the "DIP Facility") to Borrower in an aggregate principal amount not to exceed $10,800,000 for the purposes described herein;

WHEREAS, to provide security for the repayment of the loan made available pursuant hereto and payment of the other obligations of Borrower hereunder, Borrower has agreed to provide DIP Lender with first-priority Liens on the DIP Collateral (as defined below); and

WHEREAS, DIP Lender is willing to make the DIP Facility available only upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, Borrower and DIP Lender agree as follows:

1.      **Definitions**. The terms listed below shall be defined as follows:

"Affiliate" shall mean, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Allowed Professional Fees" shall have the meaning set forth in the definition of Carve-Out.

"Approved Budget" shall have the meaning set forth in Section 7(a).

"Authorized Officer" shall mean any executive officer of Borrower and any other officer or similar official thereof with significant responsibility for the administration of the obligations of Borrower in respect of this Agreement and the other DIP Loan Documents.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bond Collateral" shall have the meaning set forth in the DIP Financing Order.

30013782V.19

"Bondholders" shall mean the current or future holders of the Bonds.

"Bonds" shall mean the $48,150,000 City of Albany Capital Resource Corporation Tax-Exempt Revenue Refunding Bonds (The College of Saint Rose Project), Series 2021.

"Borrower" shall have the meaning set forth in the Preamble.

"Budget" shall mean the Initial Approved Budget, as replaced from time to time by each subsequent Approved Budget as provided in Section 7(a).

"Business Day" shall mean any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve-Out" shall have the meaning assigned to such term in the DIP Financing Order, but, for the avoidance of doubt, shall be exclusive of the Carve-Out Exclusions.

"Carve-Out Exclusions" shall mean any and all fees or expenses incurred by any party, including Borrower, the Committee, any other committee established with respect to the Chapter 11 Case, or any professional, (a) to litigate, object to, contest or challenge in any manner or raise any defenses to the debt, collateral position, liens or claims of DIP Lender, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the indebtedness under the DIP Facility or the validity, extent, perfection, priority or enforceability of any mortgage, security interest or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of DIP Lender, or by seeking to subordinate or recharacterize the DIP Facility (or amounts outstanding thereunder) or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or by asserting any claims or causes of action, including any actions under chapter 5 of the Bankruptcy Code, against DIP Lender, or any of its officers, directors, agents, or employees, in each case in their respective capacities as such, and (b) in connection with (i) preventing, hindering or delaying DIP Lender's enforcement or realization upon the DIP Collateral or the exercise of rights by DIP Lender following DIP Lender's delivery of no less than five Business Days' prior written notice (which may run concurrently with any notice required to be provided hereunder following an Event of Default) to DIP Notice Parties once an Event of Default has occurred and is continuing or (ii) selling or otherwise disposing of the DIP Collateral other than as provided herein, permitted under this Agreement or with the consent of DIP Lender.

"Carve-Out Reserve" shall have the meaning assigned to such term in the DIP Financing Order.

"Carve-Out Trigger Notice" shall mean a written notice delivered by electronic mail (or other electronic means) by DIP Lender as required by the DIP Financing Order following the occurrence and during the continuation of an Event of Default, stating that the Post Carve-Out Trigger Notice Cap has been invoked and that the Remedies Notice Period has commenced.

"Chapter 11 Case" shall mean Case No. 24-11131 (REL) currently pending before the Bankruptcy Court.

"Closing Date" shall mean the first Business Day following the satisfaction of the conditions set forth in Section 4.

"Code" shall mean the Internal Revenue Code of 1986.

"Commitment" shall have the meaning set forth in Section 2(a).

2

"<u>Committee</u>" shall mean the official committee of unsecured creditors in the Chapter 11 Case appointed pursuant to Section 1102 of the Bankruptcy Code.

"<u>Committee Professionals</u>" shall have the meaning set forth in the definition of the DIP Financing Order.

"<u>Control</u>" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appoint of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Debtor Professionals</u>" shall have the meaning set forth in the definition of the DIP Financing Order.

"<u>Default</u>" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"<u>Default Rate</u>" shall mean a per annum variable interest rate equal to the Interest Rate <u>plus</u> 4.00%.

"<u>DIP Bank Accounts</u>" shall mean the debtor-in-possession bank accounts used by Borrower and either approved by the U.S. Trustee or authorized by an order of the Bankruptcy Court.

"<u>DIP Collateral</u>" shall have the meaning set forth on <u>Schedule I</u>.

"<u>DIP Facility</u>" shall have the meaning set forth in the Recitals.

"<u>DIP Financing Order</u>" shall mean a Final Order of the Bankruptcy Court approving the DIP Facility and entered in the Chapter 11 Case, in form and substance satisfactory to DIP Lender in its sole discretion.

"<u>DIP Lender</u>" shall have the meaning set forth in the Preamble.

"<u>DIP Liens</u>" shall mean the Liens against the DIP Collateral authorized by the DIP Financing Order.

"<u>DIP Loan</u>" shall have the meaning set forth in <u>Section 2(a)</u>.

"<u>DIP Loan Documents</u>" shall mean this Agreement, the DIP Financing Order, the DIP Note, the DIP Mortgage, and all other agreements, guaranties, instruments, certificates and documents executed or delivered in connection with, as contemplated by or as support for this Agreement or any of the Obligations, whether by Borrower or any other Person.

"<u>DIP Mortgage</u>" shall mean that certain Mortgage, Assignment of Rents and Leases, Security Agreement, and Fixture Filing, dated as of the Closing Date, by and between Borrower and DIP Lender, as may be amended, restated, supplemented or otherwise modified from time to time.

"<u>DIP Note</u>" shall mean that certain note, dated as of the date hereof, issued by Borrower to DIP Lender.

"<u>DIP Notice Parties</u>" shall mean, collectively: (a) counsel to Borrower, Cullen & Dykman LLP; (b) the U.S. Trustee; (c) counsel to any statutory committee; (d) counsel to DIP Lender, Kilpatrick Townsend & Stockton LLP and (e) counsel to the Bondholders.

"Environmental Laws" shall mean any and all federal, national, supranational, state, provincial and local laws, statutes, ordinances, rules, regulations, permits, licenses, approvals, rules of common law and orders of courts or Governmental Authorities, relating to the protection of human health, occupational safety with respect to exposure to Hazardous Substances, or the environment, now or hereafter in effect, and in each case as amended from time to time, including requirements pertaining to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, handling, reporting, licensing, permitting, investigation or remediation of Hazardous Substances.

"Event of Default" shall have the meaning set forth in Section 8.

"Excluded Personal Property" shall have the meaning set forth on Schedule I-B.

"Excluded Taxes" shall mean (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed by the United States of America or the jurisdiction where DIP Lender's principal office or lending office is located, (b) U.S. Federal withholding Taxes imposed on amounts payable hereunder pursuant to the Law in effect as of the date of this Agreement and (c) U.S. Federal withholding Taxes imposed pursuant to FATCA.

"Exit Event" shall mean the earlier to occur of the (a) Maturity Date and (b) full repayment of the DIP Loan and all other Obligations (other than any contingent obligations for which no claim has been asserted) whether as a result of the acceleration of the DIP Loan or otherwise.

"Exit Fee" shall mean a fee owed by Borrower to DIP Lender in an amount equal to $162,000.

"Expense Deposit" shall mean that certain $50,000 nonrefundable deposit paid to DIP Lender by Borrower for the purpose of having such deposit applied in a manner and priority acceptable to DIP Lender in its sole discretion to the reasonable transaction costs, fees and expenses incurred by DIP Lender in connection with the DIP Loan or the DIP Loan Documents, including reasonable legal fees, the Origination Fee, the Exit Fee, other fees, costs and expenses of DIP Lender, title searches, title policies and updates to third party reports.

"Extraordinary Receipts" shall mean any cash received by Borrower not in the ordinary course of business, including (a) foreign, United States, state or local Tax refunds, (b) proceeds of insurance (other than to the extent such insurance proceeds are immediately payable to a Person that is not Borrower or is used for repairs or remediation as permitted by the Budget), (c) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (d) condemnation awards (and payments in lieu thereof), (vi) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not Borrower), and (e) any purchase price adjustment received in connection with any purchase agreement, in each case, solely with respect to any of the DIP Collateral described in clauses (a) through (g) and (i) of the definition of DIP Collateral.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Final Order" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, stayed or modified and as to which (a) the time to appeal, petition for certiorari, or move for a new trial,

reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing will then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment will have been affirmed by the highest court to which such order was appealed, or certiorari will have been denied, or a new trial, reargument, or rehearing will have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing will have expired.

"Governmental Authority" shall mean any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing, including any central bank stock exchange regulatory body arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Gross Sales Price" shall mean, in respect of each Release Parcel, the aggregate consideration paid by a purchaser to Borrower as a result of the sale, transfer or disposition of such Release Parcel regardless of the application of such proceeds to the direct costs relating to such sale, transfer or other disposition (including sales commissions and legal fees) or taxes paid or to be payable as a result thereof.

"Hazardous Substance" shall mean any substance or material meeting any one or more of the following criteria: (a) it is or contains a substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any Environmental Law; (b) it is toxic, explosive, corrosive, ignitable, infectious, radioactive, mutagenic or otherwise hazardous to human health or the environment and is or becomes regulated by any Governmental Authority; (c) its presence may require investigation or response under any Environmental Law; (d) it constitutes a nuisance, trespass or health or safety hazard to Persons or neighboring properties; or (e) it is or contains, without limiting the foregoing, friable asbestos, polychlorinated biphenyls, urea formaldehyde foam insulation, petroleum hydrocarbons, petroleum derived substances or wastes, crude oil, nuclear fuel, natural gas or synthetic gas.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under this Agreement or any other DIP Loan Document, and (b) without duplication of any Taxes covered in subclause (a) of this definition, Other Taxes.

"Initial Approved Budget" shall mean the Budget attached hereto as Exhibit A.

"Interest Determination Date" means the Closing Date and the first day of each calendar month thereafter.

"Interest Payment Date" shall mean the first Business Day of each calendar month and the Maturity Date.

"Interest Payment Reserve" shall mean a reserve held in an account owned by DIP Lender and established for the sole benefit of DIP Lender to fund interest payments when due as provided in this Agreement, which reserve shall (a) be held by DIP Lender or its designee and (b) be, at all times, in an amount equal to at least the aggregate amount of interest to accrue at the applicable interest rate from the Closing Date until the Maturity Date, as such amount is (i) reduced by any such interest payment from time to time or (ii) increased to reflect changes in Term SOFR, imposition of the Default Rate or the extension of the Maturity Date.

"Interest Rate" shall mean a per annum variable interest rate equal to Term SOFR plus 6.50%.

"Law" shall mean any international, foreign, Federal, state or local statute, treaty, rule, guideline, regulation, ordinance, code, or administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lien" shall mean, with respect to any asset, any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or other), or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Laws of any jurisdiction).

"Main Office" shall mean the main office of DIP Lender, currently located at 1700 Lincoln Street, Suite 2150, Denver, Colorado 80203, or such other location as DIP Lender may designate as its main office from time to time.

"Material Adverse Effect" shall mean, with respect to any event, act, condition, or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in a material adverse change in, or a material adverse effect on, (a) the business, condition (financial condition or otherwise), operations, properties, projections or prospects of Borrower, any facilities or operations being financed, the property serving as collateral for the DIP Facility or the industry in which Borrower operates, other than customary impacts from a chapter 11 filing, (b) the ability of Borrower to perform any of its Obligations under the DIP Loan Documents, (c) the rights and remedies of DIP Lender under any of the DIP Loan Documents, (d) the legality, validity or enforceability of any of the DIP Loan Documents, (e) the value of the DIP Collateral, or (f) the perfection or priority of the DIP Liens.

"Maturity Date" shall mean the earliest of: (a) 270 days from the Closing Date, unless extended pursuant to Section 16; (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a plan of reorganization filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Bankruptcy Court for Borrower in the Chapter 11 Case; (c) the closing of a sale, or the closing of the final sale (excluding de minimis sales of assets and sale of assets not subject to the DIP Liens) in the event of multiple sales that results in the sale of all or substantially all of the assets of Borrower; and (d) the acceleration of the DIP Obligations as a result of an Event of Default.

"Net Sales Price" shall mean, in respect of each Release Parcel, the aggregate consideration paid by a purchaser to Borrower as a result of the sale, transfer or disposition of such Release Parcel less the direct costs relating to such sale, transfer or other disposition (including sales commissions and legal fees) and taxes paid or to be payable as a result thereof.

"Obligations" shall mean all indebtedness, liabilities, obligations, covenants and duties now or at any time or times hereafter owing by Borrower to DIP Lender pursuant to or in connection with this Agreement or any other DIP Loan Document including all principal, interest, fees, expenses, indemnification, and reimbursement payments, costs, and expenses (including all reasonable fees and expenses of counsel to DIP Lender), whether direct or indirect, absolute or contingent, due or to become due, joint or several, liquidated or unliquidated or now existing or hereafter arising hereunder or thereunder.

"Origination Fee" shall mean a fee owed by Borrower to DIP Lender in an amount equal to $243,000.

"Other Taxes" shall mean, collectively, all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement, or registration of, from the receipt of security interests in, or otherwise with respect to this Agreement or any other DIP Loan Document.

"PATRIOT Act" shall mean the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, limited liability partnership, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Post Carve-Out Trigger Notice Cap" shall have the meaning set forth in the DIP Financing Order.

"Premises" shall have the meaning set forth in Schedule I.

"Professional Persons" shall have the meaning set forth in the DIP Financing Order.

"Related Parties" shall mean, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release Parcel" shall mean each parcel of real property which constitutes DIP Collateral.

"Release Prepayment Amount" shall mean, in respect of each Release Parcel sold pursuant to a Specified Release Parcel Sale, the greater of (i) one hundred percent (100%) of the Net Sales Price for such Release Parcel and (ii) eighty five percent (85%) of the Gross Sales Price for such Release Parcel; provided, however, that such percentages may be adjusted from time to time in respect of any particular sale of a Release Parcel with the consent of DIP Lender in its sole and absolute discretion.

"Relevant Governmental Body" means CME Group Inc., or a committee officially endorsed or convened by the CME Group, Inc. or any successor thereto.

"Remedies Notice Period" shall have the meaning set forth in the DIP Financing Order.

"Requirements of Law" shall mean, as to Borrower, the articles or certificate of incorporation and by-laws or other organizational or governing documents of Borrower, and each federal, state, local and foreign Law or determination of an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding upon Borrower or any of its property or to which Borrower or any of its property is subject.

"Segregated Funding Account" shall mean the segregated deposit account of Borrower bearing account number #9856540331.

"SOFR" means with respect to any applicable determination date, the secured overnight financing rate published on such day by the SOFR Administrator; provided that in no event shall SOFR be less than SOFR as in effect on November 5, 2024.

"SOFR Administrator" means the Relevant Government Body.

"Specified Release Parcel Sale" shall mean each sale, transfer or disposition of one or more Release Parcels pursuant to one or more transactions which do not result in the sale, transfer or disposition of the remaining Release Parcels as a whole.

"Superpriority DIP Claims" shall mean all of the claims of DIP Lender on account of the Obligations, which claims shall be entitled to the benefits of Section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in Sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Permitted Prior Liens (as such term are defined in the DIP Financing Order) and, to the extent expressly provided in the DIP Financing Order, the Carve-Out.

"Tax" or "Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholding (including backup withholding), assessments, fees, value added tax or any other goods, services, use or sales tax, or other charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

"Term SOFR" means the forward-looking term rate based on SOFR for a one-month period that has been selected or recommended by the Relevant Governmental Body.

"U.S. Trustee" shall mean the United States Trustee for Region 2.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of DIP Lender in any DIP Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

Unless otherwise defined herein or the context otherwise requires, any uncapitalized terms used herein which are defined in the UCC have the respective meanings provided in the UCC, including commercial tort claims, goods, proceeds and supporting obligations.

2.     **Borrowing, Conversions, Renewals and Payments**.

(a)     Subject to the terms and conditions set forth herein (including the conditions to borrowing set forth in Section 4), DIP Lender agrees to extend an advance under a single-draw term loan facility (the "DIP Loan") to Borrower on the Closing Date in the amount of $10,800,000 (the "Commitment"). Borrower shall be entitled to prepay the DIP Loan in accordance with the terms and conditions of this Agreement; provided, however, that Borrower may not re-borrow any amount of the DIP Loan that has been repaid or otherwise paid. The Commitment shall terminate concurrently with the making of the advance of the DIP Loan on the Closing Date. On the Closing Date, DIP Lender shall, subject to the satisfaction of all applicable conditions precedent and all other terms and conditions set forth herein with respect thereto, disburse the proceeds of the DIP Loans as set forth in the initial Approved Budget (which shall include the direct funding of the Interest Payment Reserve by DIP Lender and reimbursement of payment of fees, costs and expenses payable by Borrower hereunder) with any remainder to be remitted to the Segregated Funding Account. DIP Lender is not required to keep any external or internal notations in respect of the advance of the DIP Loan and the failure to make such notations or keep any such records shall not limit or affect Borrower's obligations to pay all amounts owing hereunder as and when due; provided, however, that to the extent DIP Lender prepares or maintains any such notations or records, the notations and records of DIP Lender shall be deemed conclusive absent manifest error.

(b)    The advance made available to Borrower through the DIP Loan shall be used as follows, subject to the DIP Financing Order and the restrictions set forth in <u>Section 2(c)</u>:

(i)    payment of transaction costs, fees and expenses incurred by DIP Lender in connection with the DIP Loan and the DIP Loan Documents, including reasonable legal fees, the Origination Fee, the Exit Fee, other reasonable fees, costs and expenses of DIP Lender, title searches, title policies, recording fees and updates to third party reports not otherwise paid by the Expense Deposit;

(ii)    funding of the Interest Payment Reserve on the Closing Date;

(iii)    funding of the Carve-Out Reserve on the Closing Date, and the payment of accrued and unpaid fees and expenses of the Professional Persons and the U.S. Trustee as provided in the definition of Carve-Out contained in the DIP Financing Order; and

(iv)    funding of Borrower's operations and other working capital needs to the extent made in accordance with the Budget.

Borrower and DIP Lender acknowledge and agree that a portion of the proceeds of the DIP Loan advanced on the Closing Date will be used to reimburse DIP Lender for the transaction costs and expenses incurred by DIP Lender in connection with the closing of the DIP Loan Documents, including its legal costs and expenses.

(c)    Notwithstanding anything to the contrary herein, no proceeds of the DIP Loan may be used or otherwise made available for any fees or expenses incurred by any Person in connection with:

(i)    the investigation, initiation or prosecution of any claims (including for the avoidance of liens or security interests) against DIP Lender or any of its affiliates, or preventing, hindering, or delaying the assertion of enforcement of any lien, claim, right or security interest or realization upon any collateral that secures any loan, including the DIP Loan, made to Borrower by DIP Lender;

(ii)    a request to use cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) other than cash collateral that is secured by the Bonds without the prior consent of DIP Lender;

(iii)    a request, without the prior consent of DIP Lender, for authorization to obtain debtor-in-possession financing or other financial accommodations without the prior written consent of DIP Lender, unless such financing would pay DIP Lender in full;

(iv)    any act which has the effect of materially or adversely modifying or compromising the rights and remedies of DIP Lender, or which results in the occurrence of an Event of Default under the DIP Loan Documents, unless otherwise agreed by DIP Lender; or

(v)    to the extent not otherwise identified above in this clause (c), any Carve-Out Exclusion.

(d)    Borrower hereby promises to pay to the order of DIP Lender via wire transfer or ACH transfer to its Main Office the principal amount of the DIP Loan on the Maturity Date, plus all accrued interest, fees, and other Obligations then outstanding in full in cash.

(e)    Borrower shall have the right to make prepayments of principal in whole or in part at any time or from time to time, <u>provided</u> that: (i) Borrower shall give DIP Lender irrevocable notice of each prepayment by 12:00 noon New York City time at least two Business Days prior to the date of any such prepayment of the DIP Loan; and (ii) all prepayments of the DIP Loan shall be in a minimum amount

9

equal to the lesser of $250,000 or the total of the unpaid Obligations; and (iii) in the event that Borrower should repay the DIP Facility prior to the Maturity Date, all other Obligations shall be due and payable on the date of such repayment.

      (f)    <u>Mandatory Prepayments.</u>

      (i)    If at any time the aggregate outstanding principal amount of the DIP Loan exceeds the Commitment or the amount permissible pursuant to the DIP Financing Order (other than, in each case, as a result of the capitalization of the Extension Fee as contemplated in Section 16, as applicable), Borrower shall immediately repay the aggregate outstanding DIP Loan to the extent required to eliminate such excess.

      (ii)    Within three Business Days of receipt by Borrower of cash proceeds of any disposition of DIP Collateral (other than any Release Parcel), Borrower shall prepay the DIP Loan in an amount equal to 100% of such cash proceeds, net of (A) reasonable commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrower in connection therewith to non-affiliates, (B) income, transfer, sales, or other taxes paid or payable by Borrower in connection with such disposition, (C) cash escrows (until released from escrow) and (D) applicable US Trustee fees.  Any such prepayment shall be applied in accordance with <u>Section 2(g)</u>; <u>provided</u>, <u>however</u>, that no such prepayment shall be a cure or waiver of any Event of Default resulting from the occurrence of such disposition.

      (iii)    Within one Business Day of receipt by Borrower of any Extraordinary Receipts received in cash, Borrower shall prepay the DIP Loan in an amount equal to 100% of such cash Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts and payable by Borrower in connection therewith to non-affiliates.  Any such prepayment shall be applied in accordance with <u>Section 2(g)</u>; <u>provided</u>, <u>however</u>, that no such prepayment shall be a cure or waiver of any Event of Default resulting from the receipt of such Extraordinary Receipts.

      (iv)    On or before the receipt by Borrower of cash proceeds of any disposition of any Release Parcel sold pursuant to a Specified Release Parcel Sale, Borrower shall prepay the DIP Loan in an amount equal to the Release Prepayment Amount for such Release Parcel.  Any such prepayment shall be applied in accordance with <u>Section 2(g)</u>; <u>provided</u>, <u>however</u>, that no such prepayment shall be a cure or waiver of any Event of Default resulting from the occurrence of such disposition.

      (g)    Each payment made hereunder shall be credited as follows:  <u>first</u>, to fees and reimbursable expenses of DIP Lender then due and payable pursuant to any of the DIP Loan Documents; <u>second</u>, to interest accrued but unpaid on the DIP Loan until paid in full; <u>third</u>, to the principal balance of the DIP Loan until the same has been paid in full; and <u>fourth</u>, to all other Obligations.

      3.    Interest and Fees.

      (a)    Interest shall accrue on the outstanding principal amount of the Obligations calculated on the basis of a year of 360 days for the actual number of days elapsed.  Borrower promises to pay accrued interest on all outstanding principal amount of the Obligations at the Interest Rate on each applicable Interest Payment Date commencing on the first Interest Payment Date occurring after the Closing Date.  Each payment due hereunder shall be paid from the Interest Payment Reserve to the extent funds are available therein.  After the occurrence of an Event of Default, all outstanding Obligations (to the fullest extent permitted by applicable Law) shall bear interest from and including the date of such Event of Default until paid in full at the Default Rate. On each Interest Determination Date, the Interest Rate will be either increased or decreased, as applicable, to reflect the changes in the Term SOFR and shall remain fixed for the entire, applicable calendar month.  If DIP Lender determines in good faith (which determination shall

be deemed presumptively correct absent manifest error) that the Term SOFR is no longer available or ascertainable by DIP Lender, then from and after the date that the Term SOFR ceased to be so available or ascertainable, the Interest Rate shall mean a variable rate of interest per annum reasonably determined by DIP Lender to equal to the sum of (i) the United States Prime Rate, as shown in the Wall Street Journal on such date (the "U.S. Prime Rate"), minus (ii) a percentage as is reasonably determined by Agent as the difference at such time between the Term SOFR as most recently available and such U.S. Prime Rate; provided, that prior to such determination by DIP Lender, DIP Lender and Borrower shall endeavor to establish an alternate rate of interest to the Term SOFR that gives due consideration to the then prevailing market convention for determining a rate of interest for similar loans in the United States at such time and if they are so able to establish an alternate interest rate, they shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes as may be applicable. Any change in said rate shall be effective as to Borrower as of the date of the relevant change in the U.S. Prime Rate. In the event Term SOFR increases or the outstanding principal amount of the DIP Loan is accruing at the Default Rate, Borrower shall immediately deposit with DIP Lender or its designee the amount needed to replenish the Interest Payment Reserve to reflect such increase.

(b)     Fees. Subject only to Section 15 and notwithstanding any other term or condition to the contrary contained in this Agreement, Borrower shall, on the applicable date set forth below, pay the following fees:

(i)     Origination Fee. On the Closing Date, Borrower shall pay the Origination Fee to DIP Lender. The Origination Fee will be paid with a portion of the proceeds of the DIP Loan.

(ii)     Exit Fee. Upon the occurrence of an Exit Event, Borrower shall pay the Exit Fee to DIP Lender on the date of such occurrence.

All of the foregoing fees described above in this Section 3(b) shall be fully earned upon becoming due and payable in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to the DIP Loan Documents.

(c)     All payments hereunder shall be made in lawful money of the United States and in immediately available funds, free and clear of and without deduction for any and all present or future applicable Taxes and liabilities with respect thereto (with appropriate gross-up for withholding taxes) and shall not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute Borrower may have. Any extension of time for the payment of any Obligation resulting from the due date falling on a non-Business Day shall be included in the computation of interest. The date, amount, and the interest rate with respect to the DIP Loan, and all payments of any Obligations with respect thereto, shall be recorded by DIP Lender on its books and, at the discretion of DIP Lender prior to any transfer of this Agreement at any other time, may be endorsed by DIP Lender on a schedule. Any such endorsement shall be conclusive absent manifest error. Borrower waives presentment, demand, notice of dishonor, protest, and any other notice or formality with respect to this Agreement or any other DIP Loan Document (other than the DIP Financing Order).

4.     **Conditions Precedent**. The effectiveness of this Agreement and the other DIP Loan Documents and the obligation of DIP Lender to make the advance of the DIP Loan is subject to the following conditions precedent, each of which must be satisfied in a manner satisfactory to DIP Lender in its sole but reasonable discretion:

(a)     DIP Lender (or its counsel) shall have received the following:

(i)     a counterpart of this Agreement duly executed by Borrower;

11

(ii)     a certificate signed by the secretary or assistant secretary of Borrower, including a certificate of incumbency with respect to each Authorized Officer of such Person executing a DIP Loan Document, together with appropriate attachments which shall include the following: (A) a copy of the certificate of formation of Borrower certified to be true, complete and correct by the Secretary of State of the State of New York; (B) a true, complete and correct copy of the other governing documents of Borrower; (C) a true, complete and correct copy of the resolutions of all of the directors of Borrower authorizing the execution, delivery and performance by Borrower of the DIP Loan Documents and authorizing the borrowing hereunder; and (D) a certificate of good standing from the Secretary of State of the State of New York;

(iii)    copies of all other DIP Loan Documents (other than the DIP Financing Order), duly executed by the parties thereto;

(iv)    [Intentionally Omitted];

(v)     [Intentionally Omitted];

(vi)    DIP Lender's receipt of (A) evidence satisfactory to DIP Lender of the recording of the DIP Mortgage, (B) ALTA loan policy of title insurance insuring the DIP Lender's Liens in the Premises arising under the DIP Mortgage and the DIP Financing Order, in form and substance satisfactory to DIP Lender in its reasonable discretion, and copies of any title affidavits or other documentation reasonably required by the title company in connection with the issuance of such policy, and (C) evidence that any liens identified in the title commitment have been insured over by the title company providing affirmative coverage following underwriting approval;

(vii)    any third-party reports reasonably requested by DIP Lender and any updates to third party reports previously received by DIP Lender; and

(viii)   any other documents reasonably requested by DIP Lender in connection with the DIP Loan, Borrower, or the DIP Collateral;

(b)     DIP Lender shall have executed this Agreement and each of the other DIP Loan Documents;

(c)     All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to DIP Lender in its sole discretion;

(d)     The Bankruptcy Court shall have entered the DIP Financing Order, which order shall provide that the automatic stay shall be vacated to the extent necessary to allow DIP Lender to exercise any rights or remedies it has upon the occurrence and continuance of an Event of Default and following the expiration of the Remedies Notice Period, and the DIP Financing Order shall be in full force and effect and shall not have been vacated, reversed, or rescinded or, without the prior written consent of DIP Lender, in its sole discretion, amended or modified and no appeal of the DIP Financing Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective;

(e)     DIP Lender shall have a valid and perfected Lien on and security interest in the DIP Collateral on the basis and with the priority set forth in the DIP Financing Order, and such Lien of DIP Lender shall be senior to all other Liens except as otherwise provided in the DIP Financing Order;

(f)     DIP Lender shall have a valid and enforceable superpriority administrative expense claim for all Obligations owing to DIP Lender by Borrower pursuant to the terms of the DIP Loan

Documents, regardless of whether such Obligations are currently due, as may be provided for pursuant to 11 U.S.C. 364(c)(1), except as otherwise expressly provided in the DIP Financing Order;

(g)     Borrower shall have paid, and DIP Lender shall have received, the non-refundable Expense Deposit;

(h)     DIP Lender and its counsel shall have completed their due diligence review (the scope of which shall include, without limitation, satisfactory in-person inspections, review of environmental conditions and other circumstances affecting marketability, market valuation analysis, zoning and entitlement review, title and lien searches and confirmation of acceptable insurance coverage) and the results thereof shall be satisfactory to DIP Lender;

(i)     The representations and warranties made by Borrower herein shall be true and correct in all material respects (unless any such representation or warranty is qualified as to materiality, Material Adverse Effect or similar language, in which case such representation and warranty shall be true and correct in all respects) as of the Closing Date except to the extent they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in material respects (unless any such representation or warranty is qualified as to materiality, Material Adverse Effect or similar language, in which case such representation and warranty shall be true and correct in all respects) on and as of such earlier date;

(j)     DIP Lender shall have approved the Initial Approved Budget in its reasonable discretion;

(k)     There shall not exist any Law, ruling, judgment, order, injunction, or other restraint that, in the judgment of DIP Lender, prohibits, restricts or imposes a materially adverse condition on Borrower, the DIP Facility, or the exercise by DIP Lender of its rights as a secured party with respect to the DIP Collateral.

(l)     No Material Adverse Effect shall have occurred;

(m)     All legal matters incident to this Agreement and the borrowing hereunder shall have been resolved satisfactorily to DIP Lender, in its reasonable discretion; and

(n)     DIP Lender shall have received such other documents, approvals (including, without limitation, all necessary internal approvals and consents of DIP Lender) and items as required herein or as DIP Lender may reasonably request.

(o)     The representations and warranties of Borrower in this Agreement and the other DIP Loan Documents shall be true and correct in all respects with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date);

(p)     No Default or Event of Default shall exist or be continuing either prior to or after giving effect to the making such advance of the DIP Loan;

(q)     A Budget approved by the DIP Lender shall be in effect;

(r)     The making of the advance of the DIP Loan (and the use of the proceeds therefrom) shall not violate any Requirements of Law and shall not be enjoined, temporarily, preliminarily or permanently or otherwise; and

13

(s)    DIP Lender shall have received such other documents, approvals (including, without limitation, all necessary internal approvals and consents of DIP Lender) and items as required herein or as DIP Lender may reasonably request.

5.    **Indemnifications**.

(a)    <u>Indemnified Taxes</u>. Borrower agrees that all payments made pursuant to or on account of this Agreement or any of the DIP Loan Documents shall be made by Borrower free and clear and without deduction or withholding for any Tax, except as required by applicable Law. If any applicable Law requires the deduction of or withholding of any Tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower pursuant to or on account of this Agreement or any DIP Loan Documents shall be increased as necessary so that after such deduction or withholding has been made (including any such deduction or withholding that may be applicable to additional sums payable under this <u>Section 5(a)</u>) DIP Lender shall receive an amount equal to the amount it would have received had no such deduction or withholding been made. Borrower, upon request, shall provide to DIP Lender evidence of such payment made to the relevant Governmental Authority within 10 Business Days thereof and shall also provide to DIP Lender any official tax receipt or other documentation issued by the appropriate Governmental Authorities with respect to the payment of Indemnified Taxes. Borrower hereby agrees that it shall indemnify and reimburse DIP Lender, on demand, for any loss, liability, or expense incurred by DIP Lender as a result of any failure by Borrower to pay Indemnified Taxes as and when due, whether or not such Indemnified Taxes were correctly or legally imposed by the relevant Governmental Authority. Borrower shall timely pay to the relevant Governmental Authority or, at the option of DIP Lender, reimburse it for Other Taxes

(b)    <u>Indemnification by Borrower</u>. Borrower shall indemnify DIP Lender and each Related Party (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including Borrower) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other DIP Loan Documents, (ii) the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by Borrower, or any environmental liability related in any way to Borrower, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any of Borrower's trustees or creditors, and regardless of whether any Indemnitee is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)    <u>No Liability</u>. Borrower acknowledges and agrees that no Indemnitee shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Borrower or creditors of any of the foregoing arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly

14

from the gross negligence or willful misconduct of such Indemnitee in performing the services that are the subject of the DIP Loan Documents.

6.    **Representations**.  Borrower represents and warrants that the following statements are true and correct as of the Closing Date and as of the date of each advance of the DIP Loan and each delivery of financial information pursuant to Section 7(a):

(a)    The exact legal name of Borrower is as set forth on the signature pages to this Agreement. Borrower is non-profit education corporation, duly organized, validly existing and in good standing under the laws of the State of New York.  Subject to the approval of the Bankruptcy Court, Borrower has the right and power to enter into and discharge all of its Obligations under the DIP Loan Documents.

(b)    The execution, delivery and performance of the DIP Loan Documents by Borrower have been duly authorized by all necessary corporate actions of Borrower.

(c)    Upon approval of the Bankruptcy Court, the DIP Loan Documents constitute the legal, valid, and binding obligations of Borrower, enforceable against Borrower in accordance with their terms.

(d)    Upon approval of the Bankruptcy Court, the execution, delivery, and performance by Borrower of the DIP Loan Documents and all other documents contemplated hereby or thereby, and the use of the proceeds of the DIP Loan, do not and will not: (i) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any Lien, charge, or encumbrance upon the property or assets of Borrower pursuant to any other agreement or instrument (other than any pledge of or security interest granted in any DIP Collateral pursuant to any DIP Loan Document) to which Borrower is a party or is bound or by which their properties may be bound or affected; or (ii) violate any provision of any Requirement of Law (including Regulation U of the Federal Reserve Board) or any order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to Borrower.

(e)    Upon entry of the DIP Financing Order, no consent, approval, or authorization of, or registration, declaration, or filing with, any Governmental Authority or other Person is required as a condition to or in connection with the due and valid execution, delivery and performance by Borrower of any DIP Loan Document.

(f)    Except for the Chapter 11 Case, as disclosed therein, and except for any other litigation identified to DIP Lender in writing, there are no actions, suits, investigations, or proceedings pending or threatened at law, in equity, in arbitration or by or before any other authority involving or affecting: (i) Borrower that, if adversely determined, are likely to have a Material Adverse Effect; (ii) any material part of the assets or properties of Borrower or any part of the DIP Collateral under any DIP Loan Document; or (iii) the execution, delivery or performance of any of the DIP Loan Documents or the consummation of any of the transactions contemplated therein. There are currently no material judgments entered against Borrower, other than as disclosed to DIP Lender in writing, and Borrower is not in default with respect to any judgment, writ, injunction, order, decree or consent of any court or other judicial authority, which default is likely to have or has had a Material Adverse Effect.

(g)    Borrower is in compliance with all Requirements of Law in all material respects.

(h)    Except from the Bondholders who have sent Borrower a default and acceleration notice with respect to the Bonds, Borrower has not received any request for payment of the indebtedness or other obligations that are purported to be secured by the liens, security interests and other encumbrances

of the Bondholders in the Bond Collateral, and such indebtedness and other obligations have been paid in full.

      (i)     This Agreement, taken together with the DIP Financing Order, is effective to create in favor of DIP Lender legal, valid, enforceable, and continuing first-priority Liens on, and security interests in, the DIP Collateral pledged hereunder or thereunder, in each case subject to no Liens other than with respect to Liens permitted under the DIP Financing Order. Pursuant to the terms of the DIP Financing Order, no filing or other action will be necessary to perfect or protect such Liens. Pursuant to and to the extent provided in the DIP Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case under Sections 364(c)(1) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, except as otherwise expressly permitted under the DIP Financing Order.

      (j)     Borrower is in compliance with the terms and conditions of the DIP Financing Order. The DIP Financing Order is in full force and effect and has not been vacated, reversed, or rescinded or, without the prior written consent of DIP Lender, in its sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

      (k)     The proceeds from the DIP Facility will be used only to make only those payments and reserve deposits set forth in Section 2(b) and will not be used for any purpose described in Section 2(c).

      (l)     A true and complete copy of the Initial Approved Budget, as agreed to with DIP Lender as of the Closing Date, is attached as Exhibit A.

      (m)     Borrower, the Premises and the use thereof comply in all material respects with all applicable Requirements of Law, including building and zoning ordinances and codes. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower. Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Premises or any part thereof or any monies paid in performance of Borrower's obligations under any of the DIP Loan Documents. Borrower has all necessary certificates, consents, licenses, authorizations, registrations, permits or approvals necessary for the operation of the Premises, the construction of any improvements that are, or to be, located on any portion of the Premises or the commencement or continuance of construction thereon, as the case may be, including, where appropriate, all permits required under Environmental Law, all of which as of the date of the signing hereof are in full force and effect and not, to the knowledge of Borrower, subject to any revocation, amendment, release, suspension, forfeiture or the like. Borrower has obtained all approvals necessary from each applicable Governmental Authority from, and has given all such notices to, and has taken all such other actions with respect to such Governmental Authority as may be required under applicable Requirements of Law for the construction of any improvements that are, or to be, located on any portion of the Premises.

      (n)     No proceedings are pending or, to the best of Borrower's knowledge, threatened to acquire by power of condemnation or eminent domain any portion of the Premises, or any interest therein, or to enjoin or similarly prevent the construction or use of any portion of the Premises.

      (o)     There are no pending or proposed special or other assessments for public improvements or otherwise affecting any portion of the Premises, nor are there any contemplated improvements to any portion of the Premises that may result in such special or other assessments except

for any taxes and/or assessments that may arise solely as a result of the Premises being returned to the tax rolls and no longer having tax-exempt status.

(p)    None of the improvements that are located on any portion of the Premises are located in an area identified by the Federal Emergency Management Agency as a special flood hazard area.

(q)    Neither the Premises nor any portion thereof is now damaged or injured as result of any fire, explosion, accident, flood or other casualty. There are no proceedings pending, or, to the best of Borrower's knowledge, threatened, to acquire by power of condemnation or eminent domain, any portion of the Premises, or any interest therein, or to enjoin or similarly prevent the construction or use of any improvements that are located on any portion of the Premises. Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Premises, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(r)    All of the improvements that are located on any portion of the Premises lie wholly within the boundaries and building restriction lines of the Premises, no improvements on adjoining properties encroach upon the Premises, and no easements or other encumbrances affecting the Premises encroach upon any of the improvements that are located on any portion of the Premises so as to affect the value or marketability of the Premises, except those which are insured against by title insurance.

(s)    All written information, reports, other papers and data relating to Borrower furnished by or at the direction of Borrower to DIP Lender were, at the time furnished, complete and correct in all material respects and none contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading as of the time when made or delivered. All financial statements provided to DIP Lender fairly present the financial position and results of operations of Borrower as at the respective dates thereof and for the periods therein referred to and are consistent with the books and records of Borrower. No fact is currently known to Borrower which is likely to have or has had a Material Adverse Effect. With respect to projections, estimates and forecasts given to DIP Lender, such projections, estimates and forecasts are based on Borrower's good faith assessment of the future of the business at the time made, and Borrower had a reasonable basis for such assessment at the time made.

(t)    Borrower has timely filed all tax returns and reports required by law to have been filed by it and has paid all income taxes and other taxes, assessments and governmental charges or levies imposed upon it, upon its income or profits or upon any of its properties due and payable with respect to such return or otherwise owing by Borrower except for any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings and as to which Borrower is maintaining adequate reserves with respect thereto in accordance with generally accepted accounting principles in the United States.

7.    **Covenants**. Borrower agrees that so long as any Commitment hereunder or any Obligation or other amount payable hereunder or under any DIP Loan Document (other than any contingent obligations for which no claim has been asserted) remains unpaid:

(a)    Borrower shall provide to DIP Lender, as soon as possible but, in any event, no later than the twentieth (20th) calendar day following the last calendar day of the immediately preceding calendar month, (i) copies of the monthly operating reports together with monthly banking statements filed in the Chapter 11 Case simultaneously with their filing, which reports will be timely filed by Borrower in accordance with the applicable United States Trustee guidelines and regulations and (ii) an updated weekly cash flow forecast in form and substance satisfactory to DIP Lender in its sole but reasonable discretion for the subsequent 13-week period (each such forecast approved by DIP Lender, consistent with the form of

17

the Initial Budget and otherwise in accordance with the provisions hereof, an "Approved Budget"), together with a comparison to the then current Approved Budget of the actual results, expenditures and performance of Borrower for such period. Borrower will promptly provide notice to DIP Lender of any Material Adverse Effect, Default or Event of Default and reasonable details thereof.

(b)     From time to time and promptly (and in any event within ten calendar days of) upon the reasonable request of DIP Lender, Borrower shall provide to DIP Lender (i) such data, certificates, reports, statements, documents or further information regarding the business, assets, liabilities, financial position, projections, results of operations or business prospects of Borrower, and (ii) such information and documentation reasonably requested by DIP Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(c)     Borrower will execute any and all further documents, financing statements, agreements, and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which may be required under any applicable Law, or which DIP Lender may reasonably request, to effectuate the transactions contemplated by this Agreement and the other DIP Loan Documents or to grant, preserve, protect, or perfect the Liens created by this Agreement, the DIP Mortgage, the DIP Financing Order or any other DIP Loan Document or the validity or priority of any such Lien, all at the expense of Borrower.

(d)     Except for and to the extent permitted under the DIP Financing Order, Borrower shall not, directly or indirectly, incur, create, assume, suffer to exist, or permit any administrative expense claim or Lien that is *pari passu* with or senior to the claims or Liens, as the case may be, of DIP Lender against Borrower hereunder or under the DIP Financing Order, or apply to the Bankruptcy Court for authority to do so. Borrower shall not have any new indebtedness to any party except expressly permitted by DIP Lender in writing. Without the prior written consent of DIP Lender, Borrower shall not, directly or indirectly, incur, create, assume, suffer to exist, or permit any Lien in any asset or property (whether real or personal) that is unencumbered as of the Closing Date or apply to the Bankruptcy Court for authority to do so.

(e)     Borrower shall not, directly or indirectly (i) seek, support, consent to, or suffer to exist any modification, stay, vacation, or amendment of the DIP Financing Order, except for any modifications and amendments agreed to in writing by DIP Lender in its sole discretion, (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of DIP Lender) or (iii) seek authorization for, or permit the existence of, any claims other than that of DIP Lender entitled to a superpriority under Section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the Superpriority DIP Claims, except as otherwise expressly permitted under the DIP Financing Order.

(f)     Borrower shall not make or commit to make payments to critical vendors (other than those critical vendors that are approved in writing by DIP Lender or by a Final Order of the Bankruptcy Court) in respect of prepetition amounts in excess of the amount included in the Budget. Borrower shall not make any payments in respect of any indebtedness except to DIP Lender or as expressly permitted in writing by DIP Lender. Borrower shall not permit any amendment, modification or waive any of its rights under any indebtedness without the prior written consent of DIP Lender.

(g)     Except as otherwise provided herein or approved by DIP Lender, Borrower will not, and will not permit any subsidiary, affiliate or other Person to, directly or indirectly (i) use any cash or the proceeds of the DIP Loan in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Order and the Budget or (ii) make any payment (as adequate protection or otherwise) on account of any claim or debt arising prior to the Petition Date other than payments authorized by the Bankruptcy Court and in compliance with the Budget subject to a variance on a per month cumulative basis

18

of not more than twelve and one half percent (12.5%) (a "<u>Permitted Variance</u>"). Other than a Permitted Variance, Borrower may, from time to time, request amendments to the then current Budget provided that any such amendments shall be subject to the Lender's consent in its sole and absolute discretion prior to effectiveness.

(h)     No DIP Collateral, or proceeds of the DIP Loan, may be used directly or indirectly by Borrower, any committee, any trustee, or other estate representative appointed in the Chapter 11 Case (or any successor case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(i)     to seek authorization to obtain Liens that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claims (except to the extent expressly permitted by this Agreement); or

(ii)     to prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of DIP Lender, any of its controlling Persons, affiliates, successors or assigns or any of each of the respective officers, directors, employees, agents, attorneys or advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority, and extent of, or asserting any defense, counterclaim, or offset to the Obligations, the Superpriority DIP Claims, the DIP Loan Documents, and any DIP Liens, (D) any action seeking to invalidate, modify, set aside, avoid, or subordinate, in whole or in part, the Obligations, the DIP Loan Documents, any DIP Liens or any payments made with respect to any of the foregoing, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections or benefits granted to DIP Lender in the DIP Financing Order or under any of the DIP Loan Documents (including claims, proceedings, or actions that might prevent, hinder, or delay DIP Lender's assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents or the DIP Financing Order), or (F) objecting to, contesting or interfering with, in any way, DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred.

(i)     [Intentionally Omitted].

(j)     Except as otherwise provided herein or approved by DIP Lender, Borrower will not use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with the Budget, this Agreement and the DIP Financing Order.

(k)     If Borrower obtains any financing other than the DIP Facility for any reason whatsoever, the proceeds of such alternative financing must be used to first repay all outstanding Obligations, including any fees, costs and expenses due to DIP Lender under the DIP Loan Documents.

(l)     Borrower shall permit, upon reasonable notice but no more than once very month to the extent that no Default or Event of Default is continuing, or if a Default or Event of Default is continuing, without notice and at any time, representatives of DIP Lender to (i) visit and inspect the properties of Borrower, (ii) inspect, audit and make extracts from the books and records of Borrower, including all records relating to any DIP Collateral and (iii) discuss, with the Authorized Officers, Borrower's financial advisors, consultants and independent accountants and persons providing management services to Borrower, Borrower's businesses, assets, liabilities, financial positions, results of operations and business prospects. This Agreement shall constitute Borrower's authorization to its financial advisors to discuss Borrower's affairs, finances and accounts with such representatives of DIP Lender.

(m)    Borrower shall maintain insurance with respect to its properties and business against such casualties and contingencies of such type (including product liability, workers' compensation, larceny, embezzlement or other criminal misappropriation insurance) and in such amounts and with such coverages, limits and deductibles as is customary in the business of Borrower. Borrower covenants not to make any material changes to these insurance coverages without the prior written consent of DIP Lender. Within 30 days of the Closing Date, Borrower shall name DIP Lender as (i) an additional insured under all liability insurance policies issued in favor of Borrower with respect to the DIP Collateral and (ii) lender loss payee under all casualty and other property insurance policies issued in favor of Borrower with respect to the DIP Collateral.

(n)    Borrower shall preserve all rights, franchises, licenses, permits, certifications, approvals, authorizations, privileges and other authority necessary for the conduct of its business; maintain its properties, equipment and facilities in good order and repair, working order and condition and from time to time make all necessary repairs to and renewals and replacements of such properties; conduct its business in an orderly manner without voluntary interruption; maintain executive personnel and management at a level of experience and ability equivalent to its present executive personnel and management; maintain and preserve its existence; and qualify and remain qualified and authorized to do business in the State of New York. Borrower shall (i) remain the sole and lawful owner of, and in possession of, its assets, (ii) use its assets only in its trade or business, (iii) use and maintain its assets only in compliance with all applicable Laws, regulations and insurance policies, including all Environmental Laws, in all material respects, (iv) undertake all diligence and other actions recommended by any environmental report or consultant with respect to any Premises and (v) conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions, required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except to the extent that the same are being contested in good faith by appropriate proceedings.

(o)    Borrower shall pay and discharge all income taxes and other taxes, assessments and governmental charges or levies imposed upon it, upon its income or profits or upon any of its properties, prior to the date on which penalties would attach thereto, and all lawful claims that, if unpaid, would become a Lien upon any of the DIP Collateral; provided, however, that Borrower shall not be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings and as to which Borrower is maintaining adequate reserves with respect thereto in accordance with generally accepted accounting principles in the United States.

(p)    Borrower shall not sell, assign, lease, exchange, convey, transfer or otherwise dispose of any of the DIP Collateral (including, without limitation, any Release Parcel) except to the extent permitted by DIP Lender in its sole and absolute discretion and with an order of the Bankruptcy Court approved by DIP Lender in its sole and absolute discretion.

(q)    Borrower shall not initiate or consent to any zoning reclassification of any portion of the Premises or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Premises in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of DIP Lender (which such consent shall not be unreasonably withheld or delayed). Borrower will promptly notify DIP Lender of any anticipated or proposed change in the zoning for any portion of the Premises or any portion thereof or any other property with respect to which a change in zoning would affect the zoning or Borrower's use and enjoyment of any portion of the Premises, or any part thereof, promptly upon its learning of any such anticipated or proposed change. DIP Lender shall have the right to participate (at Borrower's sole cost and expense) in any and all proceedings, judicial, administrative or otherwise, with respect to or in any way affecting any portion of the Premises, including zoning, environmental and other matters using counsel of DIP Lender's choosing.

(r)     Other than the Interest Payment Reserve, Borrower shall deposit and maintain the proceeds of the advance of the DIP Loan or any DIP Collateral in the Segregated Funding Account until disbursed in accordance herewith and shall not commingle the funds on deposit in the Segregated Funding Account with funds received from any other source. From the Segregated Funding Account, Borrower shall only make withdrawals in order to make the payments in accordance with the Approved Budget or as otherwise permitted by the Bankruptcy Court. Borrower shall deposit and maintain all other cash and cash receipts in the DIP Bank Accounts (subject to segregation for endowment or other restricted funds which for clarity is not included in the DIP Collateral).

(s)     The Debtors shall satisfy the following milestones as set forth below (each individually, a "Milestone" and collectively, the "Milestones"):

(i)     By October 31, 2024, 2024, Borrower shall file a bidding procedures motion, acceptable to DIP Lender, with the Bankruptcy Court pursuant to which, among other things, Borrower shall seek (A) approval of bidding procedures including a deadline of no later than January 2, 2025 for the submission of bids in respect of the DIP Collateral; (B) approval of the sale or sales of the DIP Collateral at one or more hearings and (C) the scheduling of such sale hearings (the "Bidding Procedures Motion");

(ii)    By November 29, 2024, Borrower shall have obtained an order from the Bankruptcy Court approving the Bidding Procedures Motion which shall be in form acceptable to DIP Lender (the "Bidding Procedures Order"); and

(iii)   By January 15, 2025, Borrower shall conduct an auction pursuant to the Bidding Procedures Order.

8.     **Events of Default**. If any of the following events of default shall occur (each, an "Event of Default"):

(a)     Borrower fails to (i) pay the principal amount of the DIP Loan or any other Obligation as and when due and payable or (ii) maintain the amount on deposit in the Interest Payment Reserve to at least the amount required in the definition thereof;

(b)     Any representation or warranty made or deemed made by Borrower in this Agreement or in any DIP Loan Document, or in any certificate, document, opinion, or financial or other statement furnished under or in connection with a DIP Loan Document, proves to have been incorrect in any material respect when made or deemed made;

(c)     Borrower fails to perform or observe any term, covenant, or agreement contained in any DIP Loan Document on its part to be performed or observed;

(d)     Borrower is involved in a proceeding which would reasonably be expected to result in a forfeiture of all or a substantial part of any such party's assets or a material judgment is entered against Borrower and such judgment is not stayed from enforcement;

(e)     Any Lien or security interest purported to be created by any DIP Loan Document or the DIP Financing Order shall cease to be, or shall be asserted by Borrower or any other Person not to be, a valid, enforceable, perfected, first-priority (except as otherwise expressly permitted under such DIP Loan Document or the DIP Financing Order) Lien or security interest in the DIP Collateral purported to be covered thereby in any respect;

(f)     a Material Adverse Effect occurs;

21

(g)     Any of the following shall occur in the Chapter 11 Case:

(i)     filing of a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code by Borrower that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by DIP Lender;

(ii)    Borrower files a pleading seeking to vacate or modify the DIP Financing Order without the prior written consent of DIP Lender;

(iii)   entry of an order without the prior consent of DIP Lender amending, supplementing, or otherwise modifying the DIP Financing Order;

(iv)    reversal, vacation, or stay of the effectiveness of the DIP Financing Order;

(v)     any violation of the terms of the DIP Financing Order;

(vi)    the DIP Financing Order shall be vacated, reversed, modified, rescinded or amended, without the prior written consent of DIP Lender, in its sole discretion, or shall be appealed and a stay pending appeal is effective;

(vii)   appointment of a Chapter 11 trustee in the Chapter 11 Case;

(viii)  appointment of a responsible officer (other than a Chief Restructuring Officer) or examiner with enlarged powers relating to the operation of the business of Borrower without the prior written consent of DIP Lender;

(ix)    Borrower files (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or *pari passu* with DIP Lender's claims and Liens under the DIP Facility, except as otherwise expressly permitted under the DIP Financing Order; or

(x)     Borrower's bankruptcy estate becomes administratively insolvent, with such determination being made by comparing the value of Borrower's assets to the amount of Borrower's post-petition administrative expense liabilities without regard to current cash flows; or

(h)     Borrower shall use cash collateral or DIP Loan proceeds, for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court or prepays any pre-petition debt except as approved by the Bankruptcy Court and DIP Lender; or

(i)     Borrower shall fail to complete any Milestone as and when required by Section 7(s) of this Agreement.

THEN, in DIP Lender's discretion, the automatic stay provided by Section 362 of the Bankruptcy Code shall be vacated and modified as set forth herein and in the DIP Financing Order. DIP Lender may deliver the Carve-Out Trigger Notice as required by the DIP Financing Order, and after expiration of the Remedies Notice Period, to take, subject to the provisions of the DIP Financing Order, any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(a)     declare the unpaid principal of and any accrued interest in respect of the DIP Loan and any and all other indebtedness or obligations of any and every kind owing by Borrower to DIP Lender hereunder to be due, whereupon the same shall be immediately due and payable in cash without presentment, demand, notice of dishonor, protest, and any other notice or formality of any kind, all of which are hereby waived by Borrower;

(b)    enforce any and all rights against the DIP Collateral, including disposition of the DIP Collateral reasonably for application towards the Obligations;

(c)    [Intentionally Omitted.]; or

(d)    take any other actions or exercise any other rights or remedies permitted under the DIP Financing Order, the DIP Loan Documents, applicable Law or equity to effectuate the repayment of the Obligations.

Borrower shall cooperate fully with DIP Lender in its exercise of rights and remedies, whether against the DIP Collateral or otherwise. Borrower hereby waives any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of DIP Lender set forth in the DIP Financing Order and in the DIP Loan Documents, except as otherwise expressly provided herein or therein.

In case any one or more of the covenants or agreements set forth in this Agreement or any other DIP Loan Document shall have been breached by Borrower, and not cured within any applicable notice and cure period, then DIP Lender may proceed to protect and enforce DIP Lender's rights either by suit in equity or by action at law, including an action for damages as a result of any such breach or an action for specific performance of any such covenant or agreement contained in this Agreement or such other DIP Loan Document. DIP Lender acting pursuant to this paragraph shall be indemnified by Borrower against all liability, loss or damage, together with all costs and expenses related thereto (including reasonable legal and accounting fees and expenses), which indemnification obligations of Borrower shall be joint and several.

9.    **Certain Bankruptcy Matters**.

(a)    Subject only to the Carve-Out, Borrower hereby agrees that the Obligations shall (i) constitute Superpriority DIP Claims over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expense claims of the kind specified in Section 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court; and (ii) not be subject to any claims against the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(b)    In the event of a conflict between, or inconsistency among, the DIP Financing Order, on the one hand, and any other DIP Loan Document, on the other hand, the DIP Financing Order shall control.

(c)    Notwithstanding anything to the contrary contained herein or elsewhere:

(i)    DIP Lender shall not be required to prepare, file, register, or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any DIP Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the DIP Collateral granted by or pursuant to this Agreement, the DIP Financing Order or any other DIP Loan Document. If DIP Lender shall, in its sole discretion, from time to time elect to prepare, file, register, or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any DIP Collateral, or take any other action to validate, render enforceable, or perfect all or any portion of the DIP Liens, (A) all such documents and actions shall be deemed to have been filed, registered, published, or recorded or taken at the time and on the date that the DIP Financing

23

Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 9 or of the perfection of any other Liens in favor of DIP Lender on the DIP Collateral.

(ii)    Except as otherwise agreed to by DIP Lender, the DIP Liens, lien priorities, Superpriority DIP Claims, and other rights and remedies granted to DIP Lender pursuant to this Agreement, the DIP Financing Order, or the other DIP Loan Documents (specifically including the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority DIP Claims provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of debt by Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Chapter 11 Case, or by any other act or omission whatsoever.

(d)    Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    subject only to the Carve-Out, (A) no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any proceedings related thereto and (B) no priority claims, are or will be prior to or on a parity with any claim of DIP Lender against Borrower in respect of any Obligations;

(ii)    other than as provided in the DIP Financing Order or the other DIP Loan Documents, DIP Liens on the DIP Collateral shall constitute valid, enforceable and perfected Liens, and shall be prior to all other Liens against the DIP Collateral, now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)    DIP Lender's Liens on the DIP Collateral shall continue to be valid, enforceable and perfected without the need for DIP Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the DIP Liens under applicable non-bankruptcy Law.

(e)    In connection with any sale of all or any portion of the DIP Collateral, including pursuant to Section 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of a plan of reorganization or liquidation subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by DIP Lender, in accordance with applicable Law, DIP Lender may "credit bid" up to the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral. In connection with the foregoing, DIP Lender shall have the right to assign its right to purchase all or any portion of Borrower's assets in connection with any such "credit bid" to a newly-formed acquisition vehicle that is an affiliate of DIP Lender; provided, however, that any such assignee of DIP Lender shall not have any shareholder, member, officer, director, or any Insider (as defined in Section 101(31) of the Bankruptcy Code ) of any of the foregoing in common with any of the management, officer or director of Borrower or any Insider of any of the foregoing.

10.    **Grant of Security**.

(a)    To secure the Obligations, effective immediately upon entry of the DIP Financing Order, pursuant to Sections 362, 364(c)(2) and 364(c)(3) of the Bankruptcy Code, DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first position post-petition security interests in and Liens on all DIP Collateral. In furtherance of the foregoing, Borrower hereby unconditionally grants, assigns, and pledges to DIP Lender, to secure the Obligations, a continuing lien on and security interest in and to the DIP Collateral.

(b)    To the extent permitted by applicable Law, Borrower hereby irrevocably authorizes DIP Lender and its affiliates, counsel, and other representatives, at any time and from time to time, to file in the name of Borrower or otherwise and without separate authorization or authentication of Borrower appearing thereon, such UCC financing statements or continuation statements as DIP Lender may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Lien of DIP Lender under this Agreement, and such financing statements and amendments may describe the DIP Collateral or such lesser part thereof as DIP Lender determines in its sole discretion. Borrower hereby also authorizes DIP Lender and its affiliates, counsel and other representatives, at any time and from time to time, to execute and file any and all agreements, instruments, documents and papers as DIP Lender may reasonably request to evidence the DIP Liens. Borrower agrees that, except to the extent that any filing office requires otherwise, a carbon, photographic, photostatic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. Borrower shall pay the costs of, or incidental to, any recording or filing of any financing or continuation statements or other assignment documents concerning the DIP Collateral.

(c)    Borrower will promptly deliver each instrument and any other document, and take any other action, that may be reasonably requested by DIP Lender in order to perfect the DIP Liens, all at the reasonable cost and expense of Borrower.

**11.    Fees and Expenses**.  Borrower shall pay or reimburse, as applicable, DIP Lender for all costs and expenses incurred by DIP Lender (including reasonable fees and expenses of legal counsel and due diligence expenses), in connection with (a) the preparation, negotiation, execution, delivery and administration of this Agreement and the other DIP Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (b) the enforcement or protection of its rights in connection with (i) this Agreement or any of the other DIP Loan Documents, or (ii) the DIP Loan, including all such costs and expenses incurred during any workout, restructuring or negotiations in respect of the DIP Loan. DIP Lender hereby acknowledges and agrees that, as of the Closing Date, Borrower has made a deposit of $[125,000] (the "Initial Deposit") with DIP Lender to be applied, in such order and priority as DIP Lender determines in its sole discretion, to (i) the fees and costs of Borrower hereunder, (ii) the funding of the Interest Payment Reserve and (iii) the out-of-pocket costs and expenses incurred by DIP Lender in connection with the negotiation, execution and delivery of this Agreement and the transactions contemplated herein.

**12.    Governing Law, Jurisdiction, Etc**.

(a)    This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of New York, except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.

(b)    Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against DIP Lender, or any Related Party of the foregoing in any way relating to this Agreement or any other DIP Loan Document (other than the DIP Financing Order) or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court or, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York sitting in Albany County and of the United States district court of the Northern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in the Bankruptcy Court or such New York state court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Nothing in this Agreement or in any other DIP Loan

Document shall affect any right that DIP Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other DIP Loan Document against Borrower or its properties in the courts of any jurisdiction.

(c)    Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other DIP Loan Document (other than the DIP Financing Order) in any court referred to in <u>Section 12(b)</u>. Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each of DIP Lender and Borrower irrevocably consents to service of process in the manner provided for notices in <u>Section 14(e)</u>. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

**13.    Waiver of Jury Trial**. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 13</u>.

**14.    Miscellaneous**.

(a)    The provisions of this Agreement are intended to be severable. If for any reason any provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

(b)    No amendment, modification, supplement, or waiver of any provision of this Agreement nor consent to departure by Borrower therefrom shall be effective unless the same shall be in writing and signed by Borrower and DIP Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(c)    No failure on the part of DIP Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by Law. The failure by DIP Lender at any time or times to require strict performance by Borrower of any provision of this Agreement or any of the other DIP Loan Documents shall not waive, affect or otherwise diminish any right of DIP Lender thereafter to demand strict compliance and performance with such provision.

(d)    The Obligations, representations and warranties of Borrower hereunder shall be joint and several. This Agreement shall be binding on Borrower and its successors and assigns and shall inure to the benefit of DIP Lender and its successors and assigns, except that Borrower may not assign,

transfer or delegate this Agreement, any other DIP Loan Document or any of its Obligations hereunder or thereunder without the prior written consent of DIP Lender in its sole discretion. With the consent of Borrower, not to be unreasonably withheld, DIP Lender may assign all or a portion of its rights and obligations under this Agreement; provided that such consent shall not be required (i) at any time that an Event of Default has occurred and is continuing, (ii) in connection with any assignment to an affiliate of DIP Lender, or (iii) in connection with any merger or consolidation of DIP Lender.

(e)    Unless otherwise agreed in writing, notices shall be given to DIP Lender and Borrower at their address set forth in the signature page of this Agreement, or such other address communicated in writing by either such party to the other, which notices shall be deemed to be effective upon receipt.

(f)    The obligations of Borrower under <u>Sections 5</u>, <u>11</u>, <u>12</u> and <u>13</u> shall survive the repayment of the DIP Loan, termination of the DIP Loan Documents, the occurrence of the effective date of any plan of reorganization and any discharge of claims against or interests in Borrower.

(g)    All representations and warranties made in this Agreement and the other DIP Loan Documents shall survive the making of any extension of credit hereunder and the delivery of any Note and shall continue in full force and effect until the full and final payment and performance of the Obligations and the termination of the DIP Loan Documents.

(h)    This Agreement and each other DIP Loan Document (other than the DIP Financing Order) may be executed in any number of counterpart signature pages, and by the different parties on different counterparts, each of which when executed shall be deemed an original but all such counterparts taken together shall constitute one and the same instrument. This Agreement and each other DIP Loan Document (other than the DIP Financing Order) will be deemed executed by the parties hereto when each has signed it and delivered its executed signature page to DIP Lender by facsimile transmission, electronic transmission or physical delivery. This Agreement and each other DIP Loan Document (other than the DIP Financing Order) constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. No party hereto or to any other DIP Loan Document (other than the DIP Financing Order) shall raise the use of a facsimile machine or digital imaging and electronic mail to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine or digital imaging and electronic mail as a defense to the formation of a contract and each such party forever waives any such defense. The words "execution," "signed," "signature," and words of like import in any DIP Loan Document (other than the DIP Financing Order) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(i)    The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. The section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. References in this Agreement to "Preamble", "Recital", "Sections", "Schedules" or "Exhibits" shall be to the Preamble, Recitals, Sections, Schedules or Exhibits of or to this Agreement unless otherwise specifically provided. All references in this Agreement or any other DIP Loan Document (other than the DIP Financing Order) to statutes shall include all amendments of same and implementing regulations and any successor or replacement statutes and regulations; to any

instrument or agreement (including any of the DIP Loan Documents (other than the DIP Financing Order)) shall include any and all modifications and supplements thereto and any and all restatements, extensions or renewals thereof to the extent such modifications, supplements, restatements, extensions or renewals of any such documents are permitted by the terms hereof and thereof; to any Person means and includes the administrators, legal representatives, successors and permitted assigns of such Person; to "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; or to the time of day means the time of day on the day in question in New York, New York, unless otherwise expressly provided in such DIP Loan Document. Unless the context of this Agreement or any other DIP Loan Document (other than the DIP Financing Order) clearly requires otherwise, references to the plural include the singular, references to the singular include the plural and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, with respect to any Default, is cured within any period of cure expressly provided in this Agreement. Whenever in any provision of this Agreement or any other DIP Loan Document (other than the DIP Financing Order) DIP Lender is authorized to take or decline to take any action (including making any determination) in the exercise of its "discretion" or "judgment," such provision shall be understood to mean that DIP Lender may take or refrain to take such action in its sole and absolute discretion.

15.     **Maximum Limit on Interest**. The provisions of this Agreement, the other DIP Loan Documents and all other agreements between Borrower and DIP Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that, in no contingency or event whatsoever, whether by reason of acceleration of the maturity of the DIP Loan or otherwise, shall the amount contracted for, charged, taken, received, paid or agreed to be paid to DIP Lender for the use, forbearance, or detention of the DIP Loan or otherwise, exceed the Highest Lawful Rate, as herein defined. If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Borrower and DIP Lender shall, at the time performance or fulfillment of such provision shall be due, exceed the Highest Lawful Rate or otherwise transcend the limit of validity prescribed by applicable law, then, ipso facto, the obligation to be performed or fulfilled shall be reduced to the Highest Lawful Rate, and if, from any circumstance whatsoever, DIP Lender shall ever receive anything of value deemed interest under applicable Law in excess of interest the Highest Lawful Rate, an amount equal to any excessive interest shall be applied to the reduction of the principal balance owing hereunder, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal of the DIP Loan, then such excess shall be refunded to Borrower. All sums paid or agreed to be paid to DIP Lender for the use, forbearance, or detention of the indebtedness of Borrower to DIP Lender shall, to the extent permitted by applicable Law, be amortized, prorated, allocated and spread through the full term of the DIP Loan until payment in full, so that the rate of interest on account of such indebtedness will not at any time exceed the Highest Lawful Rate. The provisions of this paragraph shall control all agreements between Borrower and DIP Lender. The term "*Highest Lawful Rate*" as used herein shall mean the maximum non-usurious rate of interest permitted by whichever of applicable federal or New York Law from time to time permits the highest maximum non-usurious interest rate with respect to the DIP Loan.

16.     **Extension Option**. Borrower may, prior to applicable Maturity Date, elect to request a single extension of the term of this Agreement for ninety (90) days by written notice to DIP Lender (an "Extension"); provided, however, that (a) no Default or Event of Default shall have occurred and be continuing at the time of such request and on the date of the exercise of such Extension (the "Extension Date") and (b) to the extent DIP Lender agrees to provide such Extension, on the Extension Date (i) at the option of DIP Lender in its sole discretion, (A) Borrower shall pay to DIP Lender the Extension Fee in cash or (B) such Extension Fee will be added to the principal portion of the Obligations and accrue interest pursuant to the terms and conditions set forth herein, and (ii) Borrower shall deposit with DIP Lender or its designee the amount needed to replenish the Interest Payment Reserve to reflect such Extension. In

connection with any such Extension, DIP Lender shall have the right to require amendments or other modifications to this Agreement and the other DIP Loan Documents prior to or contemporaneously with such Extension and such amendments and modifications shall be acceptable to DIP Lender in its sole discretion. The term "Extension Fee" shall mean a fee owed by Borrower to DIP Lender in an amount equal to $108,000.

17. **Power of Attorney**. Borrower hereby irrevocably makes, constitutes and appoints DIP Lender (and any of such DIP Lender's officers, employees or agents designated by DIP Lender), with full power of substitution, as Borrower's true and lawful attorney, in Borrower's name: (a) after the occurrence of an Event of Default and during the continuation thereof, to endorse such Person's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security constituting DIP Collateral that may come into DIP Lender's possession; (b) after the occurrence of an Event of Default and during the continuation thereof, to sign Borrower's name on drafts against account debtors, on schedules and assignments of accounts, on notices to account debtors and on any account invoice or bill of lading, in each case, to the extent constituting DIP Collateral; and (c) to the extent that either (i) Borrower fails to act after the reasonable request of DIP Lender or (ii) an Event of Default has occurred and is continuing, to do all other things necessary or advisable to accomplish the purposes of this Agreement or the other DIP Loan Documents. The foregoing power of attorney, being coupled with an interest, is irrevocable so long as any Obligations are outstanding. Borrower hereby ratifies and approves all acts of the attorney. Neither DIP Lender nor any of its employees, officers or agents shall be liable for any acts or omissions or for any error in judgment or mistake of fact or law except for gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction.

18. **Performance of Obligations**. If Borrower shall fail to discharge any covenant, duty or Obligation hereunder or under any of the other DIP Loan Documents, DIP Lender may, in its sole discretion at any time, for Borrower's account and at Borrower's expense, pay any amount or do any act required of Borrower hereunder or under any of the other DIP Loan Documents or otherwise lawfully requested by DIP Lender. All costs and expenses incurred by DIP Lender in connection with the taking of any such action shall be reimbursed to DIP Lender by Borrower on demand with interest at the Default Rate from the date such payment is made or such costs or expenses are incurred to the date of payment thereof. Any payment made or other action taken by DIP Lender under this Section 18 shall be without prejudice to any right to assert, and without waiver of, an Event of Default hereunder and without prejudice to the right of DIP Lender to proceed thereafter as provided herein or in any of the other DIP Loan Documents.

19. **PATRIOT Act**. DIP Lender hereby notifies Borrower that it may be required to obtain, verify and record information that identifies Borrower pursuant to the requirements of the PATRIOT Act, which information includes the name and address of Borrower and other information that will allow the DIP Lender to identify Borrower in accordance with the PATRIOT Act.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

**BORROWER:**

**THE COLLEGE OF SAINT ROSE**

By: _____
Name:
Title:

**Address for notices to Borrower:**

The College of Saint Rose
432 Western Avenue
Albany, New York 12203
Attention:  Ms. Marcia White
            Ms. Debbie Polley

With a copy to:

Cullen and Dykman LLP
333 Earle Ovington Blvd., 2nd Floor
Uniondale, New York 11593
Attention:  Matthew Roseman, Esq.
            Dina Vespia, Esq.

**DIP LENDER:**

**SUMMITBRIDGE NATIONAL
INVESTMENTS VIII LLC**

By: _____
Name:
Title:

**Address for notices to DIP Lender:**

Summit Investment Management LLC
1700 Lincoln Street, Suite 2150
Denver, CO 80203
Attention: Chief Operating Officer

With a copy to:

Eversheds Sutherland LLP
999 Peachtree Street, NE
Suite 2300
AtlantaGA 30309-3996
Attention: Todd C. Meyers, Esq.

## SCHEDULE I

## DIP COLLATERAL

"DIP Collateral" shall mean all right, title and interest of Borrower in and to the following assets, whether now owned or hereafter acquired and wherever located:

      (a)    the real properties set forth on Schedule I-A (collectively, the "Premises"):

      (b)    all betterments and improvements of every nature whatsoever now or hereafter made to the Premises (or any portion thereof), including all extensions, additions, substitutions and replacements to or for the Premises (or any portion thereof), and all of the right, title and interest of Borrower now or hereafter acquired in and to any of the foregoing;

      (c)    all machinery, apparatus, equipment, fittings and fixtures of every kind and nature whatsoever, now or hereafter made part of the Premises (or any portion thereof);

      (d)    all rents, issues, income, revenue, receipts, fees, and profits now due or which may hereafter become due under or by virtue of and together with all right, title and interest of Borrower in and to any lease, license, sublease, contract or other kind of occupancy agreement, whether written or verbal, for the use or occupancy of the Premises (or any portion thereof), together with all security therefor and all monies payable thereunder, including tenant security deposits, and all books and records which contain information pertaining to payments made thereunder and security therefor;

      (e)    all awards, compensation or settlement proceeds made by any Person for the threatened or actual taking or damaging of the Premises (or any portion thereof);

      (f)    all rights reserved, or otherwise granted, to Borrower under the provisions of any: (a) declaration of restrictive covenants and easements affecting the Premises (or any portion thereof); or (b) declaration of condominium ownership for the institution of a regime of condominium ownership affecting the Premises (or any portion thereof) or otherwise granted to Borrower;

      (g)    all other personal property of Borrower located on the Premises (or any portion thereof), including all goods other than Excluded Personal Property;

      (h)    all Extraordinary Receipts; and

      (i)    any and all (i) proceeds paid or payable with respect to any of the foregoing, (ii) supporting obligations and commercial tort claims with respect to any of the foregoing and (iii) all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing (or any portion thereof), any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the foregoing (or any portion thereof).

Notwithstanding the foregoing, in no event shall the term "DIP Collateral" be deemed to include any Excluded Personal Property, tuition receipts, bequests, endowments or donations.

Schedule I-A

## LEGAL DESCRIPTION

### Alumni Hall and Lima Hall, 366A and 366B Western Avenue, City of Albany Tax Map Number 64.68-1-7

ALL that certain lot, piece or parcel of land on the southerly side of Western Avenue, between Partridge Street and Main Avenue, in the 18th. Ward of the City and County of Albany, State of New York, and bounded and described as follows:

Beginning at a point in the said southerly line of Western Avenue 247.75 feet westerly from the westerly line of Partridge Street, and running thence westerly along said southerly line of Western Avenue 70 feet; thence southerly on a line parallel with the westerly line of Partridge Street 150 feet; thence again westerly on a line parallel with the southerly line of Western Avenue 102.62 feet to the easterly line of premises now or formerly owned by one Hagaman; thence southerly along the easterly line of the premises so owned by the said Hagaman 130.91 feet to a point 264.83 feet from the northerly line of Madison Avenue; thence easterly on a line parallel with the said northerly line of Madison Avenue 265.72 feet; thence northerly on a line parallel with the westerly line of Partridge Street 201.23 feet to a point 150 feet southerly from the south line of Westerly Avenue; thence westerly on a line parallel with he said southerly line of Western Avenue 105 feet, and thence northerly on a line parallel with the westerly line of Partridge Street 150 feet to the southerly line of Western Avenue, the point or place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Carondelet Hall, 941 Madison and Cavanaugh Hall, 943 Madison, City of Albany Tax Map Number 64.68-1-50

All those certain lots, pieces and parcels of land, situate, lying and being in the City and County of Albany and State of New York, and bounded and described as follows:

Beginning at a point at the south-easterly corner of the premises now or formerly owned by George Schwartz, said point being on the Northerly line of Madison Avenue in the said City of Albany, and being approximately four hundred fifty four and seventy five one-hundredths (454.75) feet West of the Westerly line of Partridge Street and running thence Northerly on the Easterly line of said property now or formerly of George Schwartz, a distance of two hundred sixty four feet and ten inches (264 ft. 10 in.); thence Easterly on a line parallel with the North line of Madison Avenue,

sixty seven and fifty eight one-hundredths (67.58) feet more or less, to the Westerly line of premises now or formerly owned by Jacob J. Horn and others; thence Southerly and along the Westerly line of said premises now or formerly owned by said Jacob J. Horn aforesaid, a distance of two hundred sixty four feet and ten inches (264 ft. 10 in.) to the Northerly line of Madison Avenue; and thence Westerly along said North line of Madison Avenue, sixty seven and fifty eight one-hundredths (67.58) feet, more or less to the point or place of beginning.

AND ALSO that certain piece, lot or parcel of property situate, lying and being in the Eighteenth (18th) ward of the City of Albany, Northerly of the Northerly line of Madison Avenue between Partridge Street and South Main Avenue and being in the rear of the aforesaid premises and more particularly described as follows:

Beginning at a point at the North-western corner of the property hereinbefore described which property is known as No. 943 Madison Avenue and running thence Northerly along the Easterly line of property now or formerly owned by George Schwartz, sixty seven feet and ten inches (67 ft. 10 in.) to a point two hundred (200) feet South of Western Avenue; thence Easterly and parallel with Western Avenue and two hundred (200) feet therefrom, fifty three feet and three and one-half inches (53 ft., 3-1/2 in.) to property formerly belonging to Michael Beck in his lifetime; thence Southerly and along the Westerly line of said property formerly of Michael Beck aforesaid, eighty two feet and one inch, (82 ft., 1 in.); thence Westerly and parallel with the Northerly line of Madison Avenue and along the Northerly line of the property hereinbefore described, a distance of fifty two feet and six inches (52 ft., 6 in.), to the point and place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Maginn Hall, 921 Madison Avenue,
### City of Albany Tax Map Number 64.68-1-46

ALL that certain lot, piece or parcel of land, situate, lying and being on the North side of Madison Avenue, between Partridge Street and Main Avenue, known and distinguished as Street number Nine-hundred twenty-one (921) Madison Avenue, in the City and County of Albany, and State of New York, bounded and described as follows, to wit:

BEGINNING at a point in the Northerly line of Madison Avenue one-hundred and twenty-six and five-tenths (126.5) feet Westerly from the Westerly line of Partridge Street, which point is the Southwest corner of premises conveyed to James Feeney by Elizabeth McGarvey Ryan by deed dated February 16, 1911, and recorded February 16, 1911 in Albany County Clerk's Office in Book of Deeds No. 598 at Page 358; and running thence Northerly and parallel with the Westerly line of Partridge Street two-hundred (200) feet; thence Westerly and parallel with the Northerly line of Madison Avenue eight and sixteen-hundredths (8.16) feet to a point in the so called Rossman line; thence Northerly and along the so called Rossman line sixty-four and eighty-three hundredths (64.83) feet to a point which is one-

hundred thirty-five and two-tenths (135.2) feet Westerly from the Westerly line of Partridge Street measured on a line parallel with the Northerly line of Madison Avenue; thence Westerly and on a line parallel with the Northerly line of Madison Avenue eighty-eight (88) feet; thence Southerly and on a line parallel with the aforesaid so called Rossman line two-hundred sixty-four and eighty-three hundredths (264.83) feet to a point in the Northerly line of Madison Avenue distant ninety-four and five-tenths (94.5) feet Westerly from the point of beginning and measured along the Northerly line of Madison Avenue; and thence Easterly and along the Northerly line of Madison Avenue ninety-four and five tenths (94.5) feet to the point of beginning, as represented upon a certain "Map of premises No. 921 Madison Avenue, Church of St. Vincent de Paul, Albany, N.Y. surveyed September 5, 1917, by Henry C. Parsons, Civ. Eng. & Surv'r, Albany".

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Charter Hall, 923 Madison Avenue,**
**City of Albany Tax Map Number 64.68-1-47**

ALL that tract or parcel of land situate in the City of Albany, on the northerly side of Madison Avenue between Partridge and Erie Streets and bounded and described as follows:

BEGINNING at a point in the northerly line of Madison Avenue at the southwest corner of a lot conveyed by Gurden G. Wolfe as trustee, and others to Elizabeth McGarvey Mills by deed dated October 21, 1889, and recorded in Albany County Clerk's Office, which point is distant along said northerly line of Madison Avenue about two hundred twenty-one (221) feet westerly from the westerly line of Partridge Street; and running thence northerly along the westerly line of the last mentioned lot two hundred sixty-four (264) feet ten (10) inches to a line which would be the southerly line of Hamilton Street, if the southerly line of Hamilton Street east of Partridge Street were continued west of said Partridge Street; thence westerly along the said line which would be the southerly line of Hamilton Street, if it were continued, as aforesaid, fifty-five (55) feet; thence southerly parallel with the west line of the last mentioned lot two hundred sixty-four (264) feet, ten (10) inches to the northerly line of Madison Avenue; and thence easterly along the northerly line of Madison Avenue fifty-five (55) feet to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Receiving & Facilities Building, Rear 919 Madison Avenue, and
Residence Hall, 210 Partridge Street
City of Albany Tax Map Number 64.68-1-23**

ALL that certain lot, piece or parcel of land situate, lying and being in the City of Albany, County of Albany and State of New York bounded and described as follows:

COMMENCING at a point in the westerly line of Partridge Street 194.5 feet northerly measured along the westerly line of Partridge Street from its intersection with the northerly line of Madison Avenue and runs thence westerly with an interior angle of 90 degrees 16' a distance of 135.0 feet; thence northerly with an interior angle of 89 degrees 44' a distance of 58.5 feet; thence easterly with an interior angle of 90 degrees 16' a distance of 135.0 feet to a point in the westerly line of Partridge Street; thence southerly with an interior angle of 89 degrees 44' along the westerly line of Partridge Street 58.5 feet to the point and place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Fontbonne Hall, 935 Madison Avenue,
City of Albany Tax Map Number 64.68-1-48**

ALL that tract or parcel of land situated in the County of Albany, City of Albany, on the northerly side of Madison Avenue between Partridge Street and Main Avenue and bounded and described as follows, viz:

PARCEL 1: BEGINNING at a point in the northerly line of Madison Avenue at the southwest corner of the lot conveyed by Gurdon G. Wolfe and others, as Trustees under the Last Will and Testament of John B. Rossman, to Catharine A. Ball, by Deed dated January 24th, 1890, which point is distant along said northerly line of Madison Avenue about two hundred and seventy-six (276) feet westerly from the Westerly line of Partridge Street, and running thence northerly along the westerly line of the last mentioned lot two hundred and sixty-four (264) feet ten (10) inches, to a line which would be the southerly line of Hamilton Street, if the southerly line of Hamilton Street at Partridge Street were continued west of said Partridge Street; thence westerly along the said line which would be the southerly line of Hamilton Street if it were continued as aforesaid, fifty-five (55) feet to the easterly line of the lot conveyed by said Gurdon G. Wolfe and others, as Trustees under the Last Will and Testament of John B. Rossman to Frederick S. Schwartz by deed dated June 1, 1988 and recorded June 20, 1988; thence southerly along the easterly line of the last mentioned lot two hundred sixty-four (264) feet ten (10) inches to the northerly line of Madison Avenue; thence easterly along the northerly line of Madison Avenue fifty-five (55) feet to the place of beginning.

PARCEL 2: BEGINNING at a point in the north line of Madison Avenue distant along that line three hundred thirty-one (331) feet from the intersection of the north line of Madison Avenue with the west line of Partridge Street, such point being the southeasterly corner of a lot owned by Frederick Schwartz; thence running northwardly along the eastern line of the last mentioned lot two hundred sixty-four (264) feet ten (10) inches to a line which would be the south line of Hamilton Street if that street were extended with its present direction west of Partridge Street; thence westerly along such line, being a continuation west of Partridge Street of the south line of Hamilton Street ten (10) feet; thence southerly in a straight line to a point in the north line Madison Avenue distant ten (10) feet westerly from the place of beginning and thence eastwardly along the north line of Madison Avenue ten (10) feet to the place of beginning, being a strip of land ten (10) feet in wide and two hundred sixty-four (264) feet ten (10) inches in depth of the easterly part of portion of the lot conveyed to said Frederick Schwartz by Gurdon G. Wolf and Timothy R. Rossman, as Trustee under the Will of John B. Rossman, deceased, by deed dated June 1, 1888 and recorded in Book 396 at page 283.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**McCarthy Hall, 908 Madison Avenue,**
**City of Albany Tax Map Number 64.68-2-25**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND situate, lying and being in the City of Albany, County of Albany, State of New York, more particularly bounded and described as follows:

BEGINNING at a point in the southwesterly line of Madison Avenue at its intersection with the northwesterly line of Partridge Street, running thence South 37° 36' 44" West, along the northwesterly line of Partridge Street, 76.00 feet to a point; thence North 52° 41' 23" West, along the northeasterly line of lands now or formerly of The College of

Saint Rose known as 930 Madison Avenue, 50.00 feet to a point; thence North 37° 36' 44" East, along the southeasterly line of other lands now or formerly of The College of Saint Rose known as 912 Madison Avenue, 76.00 feet to a point in the southwesterly line of Madison Avenue; thence along the same South 52° 41' 23" East, 50.00 feet to the point or place of beginning. The above premises are more commonly known as 908 Madison Avenue, Albany, New York.

Together with an easement in common with others over 930 Madison Avenue for ingress and egress between the rear of the above described premises and Partridge Street and for temporary parking purposes.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Residence Hall, 912 Madison Avenue,**
**City of Albany Tax Map Number 64.68-2-23**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND situate, lying and being in the City of Albany, County of Albany, State of New York, more particularly bounded and described as follows:

BEGINNING at a point in the southwesterly line of Madison Avenue located North 52° 41' 23" West, along the southwesterly line of Madison Avenue, 50.00 feet from the point of intersection of the southwesterly line of Madison Avenue and the northwesterly line of Partridge Street, running thence from said point of beginning South 37° 36' 44" West, along the northwesterly line of lands now or formerly of The College of Saint Rose known as 908 Madison Avenue, 76.00 feet to a point; thence along the northeasterly and southeasterly lines of other lands now or formerly of The College of Saint Rose known as 930 Madison Avenue the following two courses and distances: 1) North 52° 41' 23" West, 50.00 feet to a point; and 2) thence North 37° 36' 44" East, 76.00 feet to a point in the southwesterly line of Madison Avenue; thence along the same South 52° 41' 23" East, 50.00 feet to the point or place of beginning. The above premises are more commonly known as 912 Madison Avenue, Albany, New York.

Together with an easement in common with others over 930 Madison Avenue for ingress and egress between the rear of the above described premises and Partridge Street and for temporary parking purposes.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Golub Hall, 212 Partridge Street,**
**City of Albany Tax Map Number 64.68-1-24**

ALL that certain tract or parcel of land situate in the City of Albany, County of Albany and State of New York, on the West side Partridge Street, between Madison and Western Avenues, and bounded and described as follows:

COMMENCING at a point on the west side of Partridge Street distant one hundred and fifty-nine (159) feet and six (6) inches north of the northwest corner of Madison Avenue and Partridge Street, said point being opposite the center of a party wall of the building on lot intended to be conveyed and the one immediately on the north thereof; thence westerly and through the center of said party wall and a continuation thereof seventy-six (76) feet six (6) inches; thence southerly and parallel to Partridge Street thirty-five (35) feet; thence easterly and parallel to the first described line seventy-six (76) feet six (6) inches to the west line of Partridge Street; thence northerly along the west line of Partridge Street thirty-five (35) feet to the place of beginning. Said lot being thirty-five (35) feet front and rear and seventy-six (76) feet and six (6) inches deep.

ALSO

ALL that certain tract or parcel of land situate in the City of Albany, County of Albany and State of New York, on the West side of Partridge Street between Madison and Western Avenue, bounded and described as follows:

Commencing at a point in the west side of Partridge Street distant 159 feet and 6 inches North of the Northwest corner of Madison Avenue and Partridge Street, said point being opposite the center of a party wall of the building on said lot intended to be described and the one immediately on the south thereof; thence Westerly and through the center of said party wall and a continuation thereof 76 feet, 6 inches; thence Northerly and parallel to Partridge Street 35 feet; thence Easterly and parallel to the first described line 76 feet and 6 inches to the West side of Partridge Street; thence Southerly and along the West side of Partridge Street 35 feet to the place of beginning, said lot being 35 feet front and rear and 76 feet 6 inches deep.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Residence Hall, 200 Partridge Street,
### City of Albany Tax Map Number 64.68-1-20

All that tract, piece or parcel of land situate, lying and being in the City and County of Albany and State of New York, bounded and described as follows:

Beginning at a point in the westerly line of Partridge Street 299 feet northerly from the intersection of the north line of Madison Avenue with the west line of Partridge Street and running thence westerly along the north line of premises conveyed to John W. Gibbons 135 feet; thence northerly 51 feet to the south line of premises now or formerly owned by one Colwell; thence running easterly along the south line of said Colwell's premises 135 feet to the westerly line of Partridge Street; thence southerly 51 feet to the point or place of beginning. Said premises are now known as street number 200-202 Patridge Street, Albany, New York.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Gibbons Hall, 971 Madison Avenue,
### City of Albany Tax Map Number 64.68-1-56

All that certain lot or parcel of land, situate in the Eighteenth Ward of the City of Albany, County of Albany and State of New York, on the north side of Madison Avenue in said City, bounded and described as follows:

Beginning at a point in the north line of Madison Avenue distant thirteen hundred thirty one (1331) feet six (6) inches east from the point where the east line of West Lawrence Street intersects the north line of Madison Avenue and running thence eastwardly along the north line of Madison Avenue fifty five (55) feet; thence north on a line parallel with the east line of West Lawrence Street two hundred sixty four (264) feet ten (10) inches; thence westwardly on a line parallel with the north line of Madison Avenue fifty five (55) feet; and thence south on a line parallel with the east line of West Lawrence Street two hundred sixty four (264) feet ten (10) inches to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Residence Hall, 956 Madison Avenue,**
**City of Albany Tax Map Number 64.68-2-10**

ALL that certain piece or parcel of land situate, lying and being in the City and County of Albany, State of New York, being more particularly bounded and described as follows:

BEGINNING at a point in the southerly line of Madison Avenue distant 528.0 feet westerly along said southerly line of Madison Avenue from its intersection with the westerly line of Partridge Street and runs thence southerly with an interior angle of 89° 44' a distance of 220.0 feet to a point in the center line of Yates Street if the same were projected westerly; thence westerly with an interior angle of 90° 16' and along said center line 33.00 feet; thence northerly with an interior angle of 89° 44' a distance of 220.0 feet to a point in said southerly line of Madison Avenue; thence easterly with an interior angle of 90° 16' and along said southerly line of Madison Avenue 33.0 feet to the place of beginning.

Together with the easements appurtenant to the above-described premises contained in and subject to the terms and provisions of a Common Driveway Easement made by and between Richard F. Mosher, Ruth Hedwig Mosher and J. Wesley Jakovic dated August 6, 1992 recorded in the Albany County Clerk's Office October 29, 1992 in Deed Book 2470 page 1022.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Residence Halls, 968 Madison Avenue,
### City of Albany Tax Map Number 64.68-2-7

ALL that certain piece or parcel of land situate lying and being on the south side of Madison Avenue between Partridge Street and Main Avenue in the City of Albany and bounded and described as follows:

COMMENCING at a point in the southerly line of Madison Avenue at a point therein distant 751 17/100 feet easterly from the intersection of the southerly line of Madison Avenue with the easterly line of Main Avenue as the said easterly line of Main Avenue is designated on the map made for the commissioners for opening said Main Avenue and running thence southerly parallel with Main Avenue 187 feet to Yates Street; thence easterly parallel with Madison Avenue 44 feet; thence northerly and parallel with Main Avenue 187 feet to Madison Avenue; and thence westerly along Madison Avenue 44 feet to the place of beginning.

ALSO All that certain parcel or piece of land, situate, lying and being on the south side of Madison Avenue, between Partridge Street and Main Avenue in the City of Albany, and bounded and described as follows:

COMMENCING at a point in the southerly line of Madison Avenue at a point therein distant seven hundred and ninety-five and seventeen one-hundredths of a foot (795-17/100 feet) easterly from the intersection of the southerly line of Madison Avenue with the easterly line of Main Avenue, as the said easterly line of Main Avenue is designated on the map made for the Commissioners for opening said Main Avenue and running thence southerly parallel with Main Avenue, one hundred and eighty-seven (187) feet to Yates Street; thence easterly parallel with Madison Avenue, forth-four (44) feet; thence northerly and parallel with Main Avenue, one hundred and eighty-seven (187) feet to Madison Avenue; and thence westerly along Madison Avenue, forty-four (44) feet, to the place of beginning.

ALSO ALL THAT PARCEL OF LAND situate, lying and being on the south side of Madison Avenue, between Partridge Street and Main Avenue, in the City of Albany, County of Albany, New York, and bounded and described as follows:

Commencing at a point in the southerly line of Madison Avenue, at a point therein distant eight hundred and thirty-nine feet and seventeen one-hundredths of a foot (839 17/100 feet) easterly from the intersection from the southerly line of Madison Avenue with the easterly line of Main Avenue, as the said easterly line of Main Avenue is designated on the map for the Commissioners for opening said Main Avenue and running thence southerly parallel with Main Avenue one hundred and eighty-seven feet (187) to Yates Street; thence easterly parallel with Madison Avenue forty-four (44) feet; thence northerly and parallel with Main Avenue one hundred and eighty-seven (187) feet, to Madison Avenue; and thence westerly along Madison Avenue forty-four (44) feet to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Lourdes Hall, 384 Western Avenue,**
**City of Albany Tax Map Number 64.68-1-2**

ALL that certain tract or parcel of land situate, lying and being on the southerly side of Western Avenue between Partridge Street and Main Avenue, in the 18th Ward of the City of Albany in the County of Albany and State of New York, bounded and described as follows, viz:

Beginning at a point in the southerly line of Western Avenue distant about 1661 feet and 5 inches east of the point where the southerly line of Western Avenue intersects the easterly line of West Lawrence Street and running thence southerly on a line parallel or nearly parallel with the east line of West Lawrence Street 200 feet; thence easterly and parallel or nearly parallel with the south line of Western Avenue 50 feet; thence northerly on a line parallel or nearly parallel with the said east line of West Lawrence Street 200 feet to the southerly line of Western Avenue; and thence westerly on a line parallel with Western Avenue and along the southerly line of Western Avenue 50 feet to the place of beginning.

ALSO ALL that certain tract or parcel of land, situate, lying and being in the eighteenth ward of the City of Albany, County of Albany, State of New York south of Western Avenue, bounded and described as follows:

Beginning at a point which is the southwesterly corner of the premises owned by the grantor and known as 380 Western Avenue, such point of beginning is also the southeast corner of the lands formerly owned by Clara Gallup, deceased, and now owned by the grantee, which lands are now known as 384 Western Avenue; running thence easterly along a line which is parallel with the southerly side of Western Avenue to lands formerly owned by John Rossman and now owned by the grantee which lands are now known as 366 Western Avenue; thence northerly along the boundary line of the lands of the grantee fifty feet to a point which marks the southwest corner of the said lands now owned by the grantee; thence westerly along a line parallel to the southerly side of Western Avenue to the said lands formerly owned by Clara Gallup and now by the grantee; thence southerly along the aforementioned lands fifty feet more or less to the point and place of beginning. It is the intention of the grantor herein to convey by this deed of conveyance the rear 50 feet of the lands owned by the grantor and located at and known as 380 Western Avenue, Albany, New York. Said parcel of land 50 feet in depth is presently bounded on three sides by property owned by the grantee.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Keeshan Hall, 405 Western Avenue,
### City of Albany Tax Map Number 64.60-1-8

ALL that certain lot, piece or parcel of land situate, lying and being in the City of Albany, County of Albany and State of New York, lying and being on the north side of Western Avenue between Erie Street and Main Avenue, bounded and described as follows:

Beginning at a point about one hundred forty-eight (148) feet three and one-half (3½) inches westerly from the westerly intersection of Erie Street and Western Avenue, which point is also the easterly line of Lot No. 4 of the premises hereby conveyed as indicated on a map of the sub-division of property of Mary Birch Reid filed in the Albany County Clerk's Office September 16, 1898, and runs from thence north along said line and parallel with Erie Street about sixty-seven (67) feet five (5) inches; thence west at right angles to the first mentioned line about fifty 50 feet; thence south and parallel with Erie Street and about two hundred (200) feet distant therefrom about eighty (80) feet nine (9) inches to the north line of Western Avenue; thence east and along the north line of Western Avenue about fifty-one (51) feet eight and one-half (8½) inches to the place of beginning, intending hereby to convey Lot No. 4 according to the aforesaid map made for Mary Birch Reid and filed September 16, 1898 in the Office of the Clerk of Albany County. Said premises are known as Street No. 405 Western Avenue.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Hahn Hall, 374 Western Avenue,
### City of Albany Tax Map Number 64.68-1-5

ALL that tract or parcel of land with the buildings thereon, situate on the southerly side of Western Avenue, City and County of Albany, New York, and being more particularly known and designated as lot No. 372-374 on Map of lots entitled "Property belonging to the George E. Hohl Company, Albany, N.Y., 1911", surveyed by Howard Batchelder, 1911, and bounded and described on said map as follows:

BEGINNING at a point in the southerly line of Western Avenue, which point is 352.75 feet westerly of the westerly line of Partridge Street, and running thence southerly and in a straight line parallel to the westerly line of Partridge Street 150 feet; thence westerly and in a straight line parallel to the southerly line of Western Avenue 35 feet; thence northerly and in a straight line parallel to the westerly line of Partridge Street 150 feet to a point in the southerly line of Western Avenue, which point is 35 feet westerly of the point or place of beginning; thence easterly along the southerly line of Western Avenue 35 feet to the point or place of beginning, the said dimension being more or less.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### President's Residence, 90 South Manning Boulevard, City of Albany Tax Map Number 64.58-1-19

ALL that tract or parcel of land situate in the City of Albany, County of Albany and State of New York, bounded and described as follows:

BEGINNING at a point in the westerly line of Manning Boulevard South which point is 200 feet northerly from the intersection of Manning Boulevard South with the northerly line of Mercer Street; and running thence northerly and along said westerly line of Manning Boulevard South, 60 feet; thence westerly and parallel with the northerly line of Mercer Street, 216 feet, more or less, to a point; thence southerly and parallel to the westerly line of Manning Boulevard South, 60 feet; and thence easterly along the lands formerly of Franklin B. Fuld and parallel with the northerly line of Mercer Street, 216 feet, more or less, to the point and place of beginning. The above-described premises are generally known and assessed as Street No. 90 South Manning Boulevard in the City of Albany, New York.

### Residence Hall, 178 Partridge Street, City of Albany Tax Map Number 64.68-1-11

ALL THAT TRACT OR PARCEL OF LAND, situate in the 13th Ward of the City of Albany, County of Albany and State of New York, which is bounded and described as follows:

BEGINNING at the point of intersection of the south line of Western Avenue with the west line of Partridge Street, and running thence southerly along the west line of Partridge Street seventy-one and eighty one-hundredths (71.80) feet; thence westerly on a line at an angle of ninety (90) degrees with the west line of Partridge Street to a line which formerly formed the boundary between the lands of one Mitchell, on the east and on Rossman, on the west, being a distance of about one hundred and thirty-seven (137) feet, be the same more or less; thence northerly along said boundary line to the south line of Western Avenue; thence easterly along the south line of Western Avenue to the place of beginning. Said premises being known as and by street address 342 Western Avenue a/k/a 178 Partridge Street, Albany, New York 12203.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Kelly Hall, 350 Western Avenue,**
**City of Albany Tax Map Number 64.68-1-10**

ALL that tract or parcel of land situate on the southerly side of Western Avenue, City and County of Albany, and being more particularly known and designated as lot number 348 and 350 on map of lots entitled "Property belonging to the George E. Hohl Company, Albany, N.Y., 1911", surveyed by Howard Batchelder, 1911, and bounded and described on said map as follows:

Beginning at a point in the southerly line of Western Avenue, which point is 142.75 feet westerly of the westerly line of Partridge Street and running thence Southerly and in a straight line parallel to the westerly line of Partridge Street 150 feet; thence Westerly and in a straight line parallel to the southerly line of Western Avenue 35 feet; thence Northerly and in a straight line parallel to the westerly line of Partridge Street 150 feet to a point in the southerly line of Western Avenue, which point is 35 feet westerly of the point or place of beginning; thence Easterly along the southerly line of Western Avenue 35 feet to the point or place of beginning, the said dimensions being more or less. The above-mentioned map was filed in the Albany County Clerk's Office February 26, 1912 in Drawer 26, Book 26 of maps as #778.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Delaney Hall, 370 Western Avenue,**
**City of Albany Tax Map Number 64.68-1-6**

All THAT PIECE OR PARCEL OF LAND with the buildings thereon, situate on the southerly side of Western Avenue, City and County of Albany, and being more particularly known and designated as Lot Number Three Hundred, sixty-eight and three hundred seventy (368-370) on map of lots entitled "Property belonging to the George E. Hohl Company, Albany, N.Y., 1911", surveyed by Howard Batchelder, 1911, and bounded and described on said map as follows:

BEGINNING at a point in the southerly line of Western Avenue, which point is three hundred seventeen and seventy-five hundredths (317.75) feet westerly of the westerly line of Partridge Street, and running thence southerly and in a straight line parallel to the westerly line of Partridge Street one hundred fifty (150) feet; thence westerly and in a straight line parallel to the southerly line of Western Avenue thirty-five (35) feet; thence northerly and in a straight line parallel to the westerly line of Partridge Street one hundred fifty (150) feet to a point in the southerly line of Western Avenue, which point is thirty-five (35) feet Westerly of the point or place of beginning; thence easterly along the southerly line of Western Avenue thirty-five (35) feet to the point or place of beginning, the said dimensions being more or less.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Cullen Hall, 378 Western Avenue,**
**City of Albany Tax Map Number 64.68-1-4**

ALL THAT TRACT OR PARCEL OF LAND situate on the southerly side of Western Avenue, City and County of Albany, State of New York, and more particularly known and designated as lot number three hundred seventy-six and three hundred seventy-eight (376-378) on a map of lots entitled "Property belonging to George E. Hohl Company, Albany, N.Y., 1911", surveyed by Howard Batcheller, 1911, and bounded and described as follows:

BEGINNING at a point in the southerly line of Western Avenue, which point is three hundred eighty-seven and seventy-five one-hundredths (387.75) feet westerly of the westerly line of Partridge Street, and running thence southerly and in a straight line parallel to the westerly line of Partridge Street one hundred fifty (150) feet; thence westerly and in a straight line parallel to the southerly line of Western Avenue thirty-two and sixty-two one-hundredths (32.62) feet; thence northerly along the lands now or formerly of Hegeman Estate one hundred fifty and three one-hundredths (150.03) feet to a point in the southerly line of Western Avenue, which point is thirty-five and eighty-eight one-hundredths (35.88) feet westerly of the place of beginning; thence easterly along the southerly line of Western Avenue thirty-five and eighty-eight one-hundredths (35.88) feet to the point or place of beginning, the said dimensions being more or less.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Residence Hall and Marketing & Communications, 946 and 950 Madison Avenue, City of Albany Tax Map Number 64.68-2-12

ALL THAT TRACT OR PARCEL OF LAND situate in the eighteenth, formerly sixteenth, Ward of City of Albany, in the County of Albany and State of New York, on the Southerly side of Madison Avenue, between Partridge and Erie Streets, and known as part of Lot number fifty-eight (58) as laid down and designated on a map made by Evert Van Allen and filed in the Office of the County Clerk of Albany County May 2nd, 1808, which portion of said lot is more particularly bounded and described as follows:

COMMENCING in the Southerly line of Madison Avenue thirty-eight (38) feet Westerly of its intersection with the Westerly line of lot number fifty-seven (57) as laid down on said map, and running thence Southerly at right angles with the Southerly line of Madison Avenue about one hundred eight-seven (187) feet to the Northerly line of Yates Street; thence Westerly along the Northerly line of Yates Street twenty-eight (28) feet to the Easterly line of lot number fifty-nine (59) as laid down on said map; thence Northerly along said Easterly line about one hundred eighty-seven (187) feet to the Southerly line of Madison Avenue; thence Easterly along the Southerly line of Madison Avenue twenty-eight (28) feet to the place of beginning. Together with the Northern half of former or proposed Yates Street as now in possession, adjacent to the above-described premises.

ALSO ALL THAT CERTAIN PLOT, PIECE OF PARCEL OF LAND situate, lying and being in the 18th formerly 16th Ward, City of Albany, on the southerly side of Madison Avenue, between Partridge and Erie Streets, now known as part of Lot No. 58 as laid down and designated on a map made by Evart Van Allen and filed in the office of the Clerk of the County of Albany, May 2nd, 1808, which lot is more particularly bounded and described as follows:

COMMENCING in the southerly line of Madison Avenue at its intersection with the westerly line of Lot No. 57 as laid down on said map and running thence southerly along the westerly line of said Lot No. 57 and about one hundred eighty-seven (187) feet to the northerly line of Yates Street; thence westerly along the northerly line of Yates Street about thirty-eight (38) feet to the lands now or formerly of Annie L. Twist as conveyed to her by deed recorded in Book 727 of Deeds at page 458; thence northerly along the easterly line of lands now or formerly of Annie L. Twist about one hundred eighty-seven (187) feet to the southerly line of Madison Avenue; thence easterly along the southerly line of Madison Avenue about thirty-eight (38) feet to the place of beginning. Also the northerly half of Yates Street as proposed opposite to the lot above described.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications,

fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Collins Hall, 358 Western Avenue,**
**City of Albany Tax Map Number 64.68-1-8**

All that tract or parcel of land situate on the southerly side of Western Avenue, City and County of Albany, and being more particularly known and designated as Lot number three hundred fifty-six and three hundred fifty-eight (356 - 358) on a map of lots entitles "Property belonging to the George E. Hohl Company, Albany, N.Y., 1911," surveyed by Howard Batchelder, 1911, and bounded and described on said map as follows:

BEGINNING at a point in the southerly line of Western Avenue which point is two hundred twelve and seventy-five hundredths (212.75) feet westerly of the westerly line of Partridge Street and running thence southerly and in a straight line parallel to the westerly line of Partridge Street one hundred fifty (150) feet; thence westerly and in a straight line parallel to the southerly line of Western Avenue thirty-five (35) feet; thence northerly and in a straight line parallel to the westerly line of Partridge Street one hundred fifty (150) feet to a point in the southerly line of Western Avenue, which point is thirty-five (35) feet Westerly of the point or place of beginning; thence easterly along the southerly line of Western Avenue thirty-five (35) feet to the point or place of beginning, the said dimensions being more or less.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Carey Hall, 944 Madison Avenue,**
**City of Albany Tax Map Number 64.68-2-13**

ALL that tract or parcel of land situate in the City of Albany, County of Albany and State of New York, and bounded and described as follows:

BEGINNING at a point in the southerly line of Madison Avenue being the northwest corner of premises conveyed by Caroline Uhl to Ridie A. DeFreest by Deed dated February 1, 1905 and recorded in Albany County Clerk's Office February 2, 1905 in Book 555 of Deeds at Page 44 and running thence southerly parallel with Partridge Street and along the west line of said DeFreest lot, 187 feet to the north line of Yates Street; thence westerly along the north line of Yates Street 55 feet to premises now or formerly belonging to Shattuck; thence northerly parallel with Partridge Street and along the east line of said Shattuck lot 187 feet to the south line of Madison Avenue; thence easterly along the south line of Madison Avenue 55 feet to the place of beginning

Together with an easement in common with others over 930 Madison Avenue and Rear 936-358 Madison Avenue for ingress and egress between the rear of the above-described premises and Partridge Street.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Kateri Hall, 354 Western Avenue,
### City of Albany Tax Map Number 64.68-1-9

ALL that tract or parcel of land, with the buildings thereon, situate on the southerly side of Western Avenue, City and County of Albany, and being more particularly known and designated as lot number 352-354 on map of lots entitled, "Property belonging to George E. Hohl Company, Albany, New York, 1911", surveyed by Howard Batchelder, 1911, filed in the Albany County Clerk's Office, and bounded and described on said map as follows:

Beginning at a point in the southerly line of Western Avenue, which point is 177.75 feet westerly of the westerly line of Partridge Street, and running thence southerly and in a straight line parallel to the westerly line of Partridge Street 150 feet; thence westerly and in a straight line parallel to the southerly line of Western Avenue 35 feet; thence northerly and in a straight line parallel to the westerly line of Partridge Street 150 feet to a point in the southerly line of Western Avenue which point is 35 feet westerly of the point or place of beginning; thence easterly along the southerly line of Western Avenue 35 feet to the point or place of beginning, the said dimensions being more or less.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications,

fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Residence Hall, 401 Western Avenue,**
**City of Albany Tax Map Number 64.60-1-8./401**

ALL THAT PIECE OR PARCEL of land situate in the City of Albany, County of Albany and State of New York, lying and being on the north side of Western Avenue between Erie Street and Main Avenue, bounded and described as follows:

BEGINNING at a point about ninety-six (96) feet seven (7) inches westerly from the westerly intersection of Erie Street and Western Avenue, which point is also the easterly line of Lot No. 3 of the premises hereby conveyed as indicated on a map of the subdivision of property of Mary Birch Reid filed in the Albany County Clerk's Office September 16, 1898 and runs from thence northerly along said line and parallel with Erie Street about fifty-four (54) feet four and one half (4½) inches; thence westerly at right angles to the first mentioned line about fifty (50) feet; thence southerly and parallel with Erie Street about one hundred fifty (150) feet distant therefrom about sixty-seven (67) feet three and one half (3½) inches to the northerly line of Western Avenue; thence easterly and along the northerly line of Western Avenue about fifty-one (51) feet eight and one half (8½) inches to the place of beginning. Intending hereby to convey Lot No. 3 according to the aforesaid map made for Mary Birch Reid and filed September 16, 1898 in the Albany County Clerk's Office. Said premises being known as Street No. 401 Western Avenue, Albany, New York.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Residence Hall, 188 Partridge Street,**
**City of Albany Tax Map Number 64.68-1-13**

All that certain parcel of land situate in the City and County of Albany, New York, bounded and described as follows:

BEGINNING at a point in the west line of Partridge Street one hundred six and eighty hundredths (106.80) feet southerly from the point of intersection of the west line of Partridge Street with the south line of Western Avenue, which point is also the southeast corner of premises conveyed by Matthew J. Wallace and Mary his wife to George I. Bailey, and runs thence southerly along the west line of Partridge Street thirty-five (35) feet; thence westerly on a line parallel with the south line of Bailey's lot and at right angles to said west line of Partridge Street about one hundred and thirty-seven and ninety-three hundredths (137.93) feet be the same more or less to a line forming the boundary between the lands formerly owned by William M. Cunningham on the east and John B. Rossman on the west; thence northerly along the said boundary line thirty-five (35) feet to a point forming the southwest corner of Bailey's lot; thence easterly along the south line of said Bailey's lot about one hundred thirty-seven and ninety-three hundredths (137.93) feet more or less to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Medaille Hall, 409 Western Avenue,**
**City of Albany Tax Map Number 64.60-1-8.-405**

All that certain lot, piece or parcel of land situate, lying and being in the City and County of Albany and State of New York, bounded and described as follows:

Beginning at a point on the northerly line of Western Avenue about two hundred (200) feet eight (8) inches west of the intersection of the westerly line of Erie Street and the northerly line of Western Avenue, said point being the southeast corner of the lot hereby conveyed: thence northerly and parallel with the Erie Street about eighty (80) feet nine (9) inches to a point; thence westerly and at right angles to the last mentioned line fifty (50) feet to a point; thence southerly and at right angles to the line last mentioned ninety-three (93) feet eleven (11) inches to the northerly line of Western Avenue; thence easterly and along the northerly line of Western Avenue fifty-one (51) feet eight and one-half (81/2) inches to the point or place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications,

fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**McCormick Hall, 380 Western Avenue,**
**City of Albany Tax Map Number 64.68-1-3**

ALL THAT TRACT OR PARCEL OF LAND situate, lying and being in the 18th ward of the City of Albany, County of Albany, New York, on the south side of Western Avenue, bounded and described as follows:

BEGINNING at a point in the southerly line of Western Avenue distant about 1711 feet 5 inches east of the point where the southerly line of Western Avenue intersects the easterly line of West Lawrence Street, and running thence southerly along the east line of lands formerly of Clara J. Gallup about 200 feet; thence easterly and parallel or nearly parallel with the south line of Western Avenue about 57 feet to the west line of lands formerly owned by John B. Rossman, deceased; and thence northerly along the west line of said Rossman's land about 200 feet to the southerly line of said Western Avenue; and thence westerly along the southerly line of Western Avenue about 52 feet 10 inches to the place of beginning.

EXCEPTING AND RESERVING THEREFROM so much thereof as was conveyed by Kappa Delta Association, Inc. to the College of Saint Rose by a deed dated January 9, 1959 and recorded in the Albany County Clerk's Office in Liber 1604 of deeds at page 83 on February 6, 1959, such parcel being more particularly described as:

ALL THAT PARCEL OF LAND situate in the 18th Ward of the City of Albany, County of Albany, New York, south of Western Avenue bounded and described as follows:

BEGINNING at a point which is the southwesterly corner of the premises owned by the grantor (Kappa Delta Association, Inc.) known as 380 Western Avenue, said point of beginning also the southeast corner of the lands formerly owned by Clara Gallup, deceased, and now owned by the grantee (College of Saint Rose) which lands are now known as 384 Western Avenue; running thence easterly along a line parallel with the southerly line of Western Avenue to lands formerly owned by John Rossman and now owned by the grantee (College of Saint Rose) which lands are now known as 366 Western Avenue; thence northerly along the boundary line of the lands of grantee (College of Saint Rose) 50 feet to a point which marks the southwest corner of said lands now owned by grantee (College of Saint Rose); thence westerly along a line parallel to the southerly side of Western Avenue to the said lands formerly owned by Clara Gallup and now by grantee (College of Saint Rose); thence southerly along aforementioned lands 50 feet more or less to the point and place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Residence Hall, 186 Partridge Street,
### City of Albany Tax Map Number 64.68-1-12

ALL THAT TRACT OR PARCEL OF LAND situated in the City of Albany, County of Albany, State of New York, bounded and described as follows:

BEGINNING at a point in the west line of Partridge Street, said point being Seventy-one and eighty one- hundredths (71.80) feet southerly from the intersection of the west line of Partridge Street with the south line of Western Avenue, thence southerly along the west line of Partridge Street thirty-five (35) feet; thence westerly on a line at an angle of ninety (90) degrees unto the west line of Partridge Street one hundred thirty-seven and ninety three one-hundredths (137.93) feet, be the same more or less, to a line forming the boundary between the lands formerly owned by Wm. M. Cunningham on the east and John B. Rossman on the west; thence northerly along the said boundary line to a point forming the southwest corner of premises heretofore conveyed by M. J. Wallace to George I. Bailey; thence easterly along the south line of Bailey's lot to the place of beginning. Said premises are known as 186 Partridge Street, Albany, New York.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Quillinan Hall, 953 Madison Avenue,
### assessed as 955 Madison Avenue, City of Albany Tax Map Number 64.68-1-52

ALL THAT TRACT, PIECE OR PARCEL of land situate, lying and being on the north side of Madison Avenue in the 18th Ward of the City of Albany, County of Albany and State of New York, known as No. 953 Madison Avenue, and more particularly described as follows:

BEGINNING at a point in the north line of Madison Avenue distant along such north line sixteen hundred and six feet and six inches (1606' 6") East from the East line of West Lawrence Street and running thence northerly on a line parallel with the said East line of West Lawrence Street two hundred and four feet and ten inches (204' 10"); thence westerly on a line parallel with the said North line of Madison Avenue fifty-five feet (55' ); thence southerly on a line parallel with said East line of West Lawrence Street two hundred and four feet and ten inches (204' 10") to the said North line of Madison Avenue; and thence Easterly along the said north line of Madison Avenue fifty-five feet (55') to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Residence Hall, 198 Partridge Street,
### City of Albany Tax Map Number 64.68-1-18

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND situate, lying and being on the west side of Partridge Street, between Madison Avenue and Western Avenue, in the City of Albany and State of New York, and more particularly bounded and described as follows:

BEGINNING at a point in the westerly line of Partridge Street distant three hundred fifty (350) feet northerly from the point of intersection of the north line of Madison Avenue with the west line of Partridge Street, and RUNS THENCE westerly on a line parallel with the north line of Madison Avenue one hundred thirty-two (132) feet, more or less, to property now or formerly owned by John B. Rossman; THENCE northerly on a line parallel with the west line of Patridge Street and along the east line of the Rossman property thirty (30) feet; THENCE easterly on a line parallel with the north line of Madison Avenue one hundred thirty-two (132) feet, more or less, to the west line of Partridge Street; and THENCE southerly along the west line of Partridge Street thirty (30) feet to the place of beginning. BEING a portion of Great Lots 51 and 52, as laid down on a map of the City of Albany made by Evert Van Allen and being premises known as Street Number 198 Partridge Street.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**458 Western Avenue,**
**City of Albany Tax Map Number 64.60-2-11**

ALL that certain lot, piece or parcel of land situate lying and being on the southerly side of Western Avenue, between Main Avenue and Partridge Street, in the Eighteenth (18th) Ward of the City of Albany, in the County of Albany and State of New York, and more particularly described as follows:

BEGINNING at a point in the southerly line of Western Avenue, distant 240.50 feet easterly from the intersection of the easterly line of Main Avenue with the southerly line of Western Avenue, thence running southerly with an interior angle of one hundred and four degrees and forty-six minutes and parallel with the easterly line of Main Avenue, for a distance of 153.17 feet; thence running easterly, parallel with the northerly line of Madison Avenue, for a distance of 39.65 feet; thence running northerly parallel with the first described line and distant 39.65 feet (perpendicular distance) easterly therefrom for a distance of 163.41 feet to a point in the southerly line of Western Avenue, distant 41 feet easterly, measured along the southerly line of Western Avenue from the point of beginning; and thence running westerly along the southerly line of Western Avenue for a distance of 41 feet to the point and place of beginning; being known as lot number 458 Western Avenue on a map of property belonging to the George E. Hohl Company, filed in the Albany County Clerk's Office December 22nd, 1915, Drawer 39, Book 39, Map No. 869.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**464 Western Avenue,**
**City of Albany Tax Map Number 64.60-2-13**

ALL that certain piece or parcel or land situate, lying and being on the southerly side of Western Avenue, between Main Avenue and Partridge Street, and known as Number 464 Western Avenue, in the 18th Ward of the City of Albany, County of Albany and State of New York, and more particularly described as follows, to wit:

BEGINNING at a point in the southerly line of Western Avenue, distant 158.74 feet easterly from the intersection of the easterly line of Main Avenue with the southerly line of Western Avenue, thence running southerly with an interior angle of 104° 46' and parallel with the easterly line of Main Avenue for a distance of 132.74 feet; thence running easterly parallel with the northerly line of Madison Avenue for a distance of 39.40 feet; thence running northerly, parallel with the first described line and distant 39.40 feet (perpendicular distance) easterly therefrom for a distance of 142.93 feet to a point in the southerly line of Western Avenue, distant 40.76 feet easterly, measured along the southerly line of Western Avenue, from the point of beginning; and thence running westerly along the southerly line of Western Avenue for a distance of 40.76 feet to the point and place of beginning. Being known as lot number 464 on a certain map of property belonging to the George S. Hohl Company on Western Avenue, Albany, N.Y., made by Howard Batchelder, Assistant City Engineer and filed in the Albany County Clerk's Office on the 22nd day of December, 1915.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Wellworth Hall, 963 Madison Avenue,**
**City of Albany Tax Map Number 64.68-1-54**

All that certain lot, piece or parcel of land situate, lying and being on the north side of Madison Avenue in the Eighteenth (formerly Sixteenth) Ward of the City of Albany, bounded and described as follows:

Beginning at a point in the north line of Madison Avenue, distant along such north line fourteen hundred and forty one (1441) feet and six (6) inches east from its intersection with the easterly line of West Lawrence Street, and running thence eastwardly along the north line of Madison Avenue fifty five (55) feet; thence northerly, parallel with the easterly line of West Lawrence Street, two hundred and sixty four (264) feet and ten (10) inches, to a point, distant about two hundred and twenty five (225) feet south of the south line of Western Avenue; thence westwardly, on a line parallel with the north line of Madison Avenue fifty five (55) feet to a line drawn from said point of beginning, parallel with the easterly line of West Lawrence Street; and thence southwardly, along such parallel line, two hundred sixty four (264) feet ten (10) inches, to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Dolan Hall, 442 Western Avenue,
City of Albany Tax Map Number 64.60-2-7**

ALL THAT CERTAIN LOT, PIECE OR PARCEL of land in the City of Albany and State of New York, bounded and described as follows:

COMMENCING at a point in the south side of Western Avenue where the same is intersected by a line drawn parallel to the east line of West Lawrence Street and which said line intersects the north line of Madison Avenue at a point distant nine hundred fifty-nine (959) feet six (6) inches easterly from its intersection with the easterly line of West Lawrence Street and runs thence southerly along said line to a point distant on said line one hundred fifty (150) feet from the north line of Madison Avenue; thence easterly on a line parallel with the north line of Madison Avenue thirty eight (38) feet; thence northerly and parallel with the easterly line of West Lawrence Street to the southerly side of Western Avenue; and thence westerly along the said southerly side of Western Avenue about thirty-nine and thirty one-hundredths (39.30) feet to the point or place of beginning. Said premises are known as No. 442 Western Avenue, Alany, New York.


Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on,

over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### 460 Western Avenue,
### City of Albany Tax Map Number 64.60-2-12

ALL that tract or parcel of land situate, lying being on the southerly side of Western Avenue, between Main Avenue and Partridge Street, in the City and County of Albany, N.Y., described as follows:

BEGINNING at a point in the southerly line of Western Avenue 199.50 feet easterly from the point formed by the intersection of the southerly line of Western Avenue with the easterly line of Main Avenue and running thence southerly and parallel with the easterly line of Main Avenue 142.93 feet; thence easterly and parallel with the northerly line of Madison Avenue 39.65 feet; thence northerly and parallel with the easterly line of Main Avenue 153.17 feet to the southerly line of Western Avenue; and thence westerly along the southerly line of Western Avenue 41 feet to the point of beginning. Being known as Lot Number 460 Western Avenue, Albany, N.Y., on a Map of Property belonging to George E. Hohl Company, Western Avenue, Albany, N.Y., 1915, and filed in Albany County Clerk's Office December 22, 1915, Drawer 39, Book 39, Map No. 869.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Offices and Staff Housing, 940 Madison Avenue,
### City of Albany Tax Map Number 64.68-2-14

ALL that certain lot, piece or parcel of land situate, lying and being on the southerly side of Madison Avenue, between Partridge Street and Main Avenue, in the Eighteenth (18th) Ward of the City of Albany, County of Albany and State of New York, bounded and described as follows, viz:

BEGINNING in the southerly line of Madison Avenue, at a point three hundred and seventy-four (374) feet westerly of the point of intersection of the southerly line of Madison Avenue with the westerly line of Partridge Street, and running thence southerly, and parallel with Partridge Street, one hundred and eighty-seven (187) feet to Yates Street; thence westerly, along the northerly line of Yates Street, thirty-three (33) feet; thence northerly, and parallel with the westerly line of Partridge Street, one hundred and eighty-seven (187) feet to Madison Avenue; and thence easterly, along the southerly line of Madison Avenue thirty-three (33) feet to the point or place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Residence Life, 204 Partridge Street,**
**City of Albany Tax Map Number 64.68-1-21**

All that tract, piece of parcel of land situate, lying and being at street number 204 Partridge Street, in the City of Albany, County of Albany and State of New York bounded and described as follows:

BEGINNING at a point in the west line of Partridge Street two hundred and seventy-six and two tenths (276.2) feet north from the intersection of the north line of Madison Avenue and the west line of Partridge Street, and running thence westerly on a line parallel with the north line of Madison Avenue about one hundred and thirty-five (135) feet to the east line of Lot Number Fifty-three (53); and running thence northerly along the east line of Lot Number Fifty-three (53) on a line parallel with the west line of Partridge Street, twenty-two and eight tenths (22.8) feet; and running thence easterly on a line parallel with the north line of Madison Avenue about one hundred and thirty-five (135) feet to the west line of Partridge Street; and running thence southerly along the west line of Partridge Street twenty-two and eight tenths (22.8) feet to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Residence Life, 206 Partridge Street,**
**City of Albany Tax Map Number 64.68-1-22**

ALL that tract or parcel of land situate in the City of Albany, County of Albany, State of New York, more particularly bounded and described as follows:

BEGINNING at a point in the west line of Partridge Street two hundred and fifty-three (253) feet north from the intersection of the north line of Madison Avenue and the west line of Partridge Street, and running thence westerly on a line parallel with the north line of Madison Avenue about one hundred and thirty-five (135) feet to the east line of Lot Number Fifty-three (53); and running thence northerly along the east line of Lot Number Fifty-three (53) on a line parallel with the west line of Partridge Street, twenty-three and two tenths (23.2) feet; and running thence easterly on a line parallel with the north line of Madison Avenue about one hundred and thirty-five (135) feet to the west line of Partridge Street; and running thence southerly along the west line of Partridge Street twenty-three and two tenths (23.2) feet to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Casey Hall, 967 Madison Avenue,**
**City of Albany Tax Map Number 64.68-1-55**

ALL that tract or parcel of land situate on the northerly side of Madison Avenue in the Eighteenth (formerly Sixteenth) Ward of the City of Albany, County of Albany and State of New York, bounded and described as follows:

Beginning at a point in the north line of Madison Avenue distant along said north line thirteen hundred and eighty-six (1386) feet and six (6) inches east from its intersection with the easterly line of West Lawrence Street, and running thence easterly along the north line of Madison Avenue fifty-five (55) feet; thence northerly on a line parallel with the said easterly line of West Lawrence Street two hundred and sixty-four (264) feet and ten (10) inches to a point about two hundred and ten (210) feet south of the south line of Western Avenue; thence westerly on a line parallel with the north line of Madison Avenue fifty-five (55) feet to a line drawn from said point of beginning parallel with the said easterly line of West Lawrence Street; and thence southerly along such parallel line two hundred and sixty-four (264) feet and ten (10) inches to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Madison Hall, 947 Madison Avenue,
### City of Albany Tax Map Number 64.68-1-51

ALL that tract or parcel of land situate in the Eighteenth (formerly Sixteenth) Ward of the City of Albany, County of Albany and State of New York on the north side of Madison Avenue, and bounded and described as follows, to wit:

BEGINNING at a point in the north line of Madison Avenue distant along said north line sixteen hundred and six feet and six inches (1606 ft. 6 in.) east from its intersection with the east line of West Lawrence Street; running then from said point of beginning northwardly parallel with said east line of said West Lawrence Street, two hundred and sixty-four (264) feet and ten (10) inches to the land (now or formerly) of John J. Olcott; thence eastwardly along said Olcott's land and on a line parallel with the north line of Madison Avenue to the westerly line of the land now or formerly of Frederick Schwartz; then southwardly along the said westerly line of said Schwartz's land two hundred and sixty-four (264) feet and ten (10) inches to the north line of Madison Avenue; and then westwardly along the north line of Madison Avenue; fifty-four (54) feet and four (4) inches to the place of beginning.

ALSO ALL that other tract or parcel of land bounded and described as follows, to wit:

BEGINNING at the northwest corner of the above-described property distant two hundred and sixty-four (264) feet and ten (10) inches from the north line of Madison Avenue; and running thence easterly parallel to Madison Avenue and along the north line of the above described property and the projection thereof one hundred and five (105) feet and six and one-half (6½) inches; thence northerly at an angle of about eighty-nine (89) degrees and three (3) minutes with the last described line eighty-one (81) feet and ten (10) inches to a point distant two hundred (200) feet from the south line of Western Avenue measured on the projection of this line; thence westerly and parallel to the south line of Western Avenue one hundred and seven (107) feet; thence southerly and at an angle of one hundred and four (104) degrees and forty-six (46) minutes with the last described line fifty-five (55) feet and eleven (11) inches to the place of beginning.

EXCEPTING AND RESERVING out of the above-described premises all that certain lot, piece or parcel of land heretofore conveyed by Annie R. DuBois to Frederick Schwartz by deed dated November 9, 1903 and recorded in the Albany County Clerk's Office on March 1, 1904, in Liber 544 of Deeds at Page 292.

EXCEPTING AND RESERVING all that certain lot, piece or parcel of land heretofore conveyed by Walter Dunning Powell, Jr. and Alberta E. Powell to The College of Saint Rose by deed dated August 26, 1957 and recorded in the Albany County Clerk's Office on the same day in Book 1550 of Deeds at page 505.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Avila Hall, 415 Western Avenue,
### assessed as 413 Western Avenue, City of Albany Tax Map Number 64.60-1-8./409

All that certain lot, piece or parcel of land, with the buildings and improvements thereon, situate in the City of Albany, N.Y., lying and being on the northerly side of Western Avenue between Main Avenue and Erie Street.

BEGINNING at a point about three hundred and three (303) feet and five (5) inches westerly from the intersection of Western Avenue and Erie Street, which point is also the westerly line of lot number six (6) of the premises hereby conveyed as indicated on a map of the sub-division of property of Mary Birch Reid, filed in Albany County Clerk's Office September 16th, 1908, and runs from thence northerly along said line and parallel with Erie Street about One Hundred and Seven (107) feet One and One-quarter (1¼) inches; thence easterly at right angles to the first mentioned line about Fifty (50) feet; thence southerly and parallel with first mentioned line and Fifty (50) feet distant therefrom Ninety-three (93) feet and Eleven (11) inches to the northerly line of Western Avenue; thence westerly and along the northerly line of Western Avenue about Fifty-one (51) feet eight and one-half (8½) inches to the place of beginning. Intending hereby to convey lot number Six (6) according to the aforesaid Map made for Mary Birch Reid and filed September 16th, 1898, in the Office of the Clerk of Albany County. Said premises are now know as Nos. 413 and 415 Western Avenue, Albany, New York.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Scanlan Hall, 1001 Madison Avenue,
### City of Albany Tax Map Number 64.60-2-23

ALL that certain piece or parcel of land situate, lying and being in the Eighteenth (formerly Sixteenth) Ward of the City of Albany, County of Albany and State of New York, and known as St. No. 1001 Madison Avenue in said City of Albany, bounded and described as follows:

BEGINNING at a point in the northerly line of Madison Avenue, distant along said northerly line ten hundred thirty-four (1034) feet and six (6) inches easterly from the easterly line of West Lawrence Street; running thence northerly on a line parallel with said easterly line of West Lawrence Street, one hundred fifty (150) feet; thence westerly on a line parallel with the north line of Madison Avenue fifty-five (55) feet; thence southerly on a line parallel with said easterly line of West Lawrence Street, one hundred fifty (150) feet to the said northerly line of Madison Avenue; thence easterly along said northerly line of Madison Avenue fifty-five (55) feet to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Marcelle Hall, 444 Western Avenue, City of Albany Tax Map Number 64.60-2-8

ALL that certain lot, piece or parcel of land in the City of Albany and State of New York, bounded and described as follows, viz:

Commencing at a point in the south side of Western Avenue where the same is intersected by a line drawn parallel to the east line of West Lawrence Street and which said line intersects the north line of Madison Avenue at a point distant nine hundred and twenty-four feet six inches (924 ft. 6 in.) easterly from its intersection with the easterly line of West Lawrence Street, and runs thence southerly along said line to a point distant on said line one hundred and fifty feet (150 ft.) from the north line of Madison Avenue; thence easterly on a line parallel with the north line of Madison Avenue thirty-five feet (35 ft.); thence northerly and parallel with the easterly line of West Lawrence Street to the southerly side of Western Avenue; and thence westerly along the said southerly side of Western Avenue, about thirty-six and twenty one-hundredths feet (36.20 ft.) to the point or place of beginning. Said premises are known as Street No. 444 Western Avenue, Albany, New York.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**DeSales Hall, 919 Madison Avenue,**
**assessed as 915 Madison Avenue, City of Albany Tax Map Number 64.68-1-45**

ALL that certain tract or parcel of land situate in the Eighteenth Ward of the City of Albany, County of Albany and State of New York, on the northerly side of Madison Avenue between Partridge Street and Main Avenue, bounded and described as follows:

COMMENCING at a point in the northerly side of Madison Avenue seventy-one (71) feet six (6) inches west of the point of intersection of the north line of Madison Avenue with the west line of Partridge Street, and runs thence northerly on a line parallel with the west line of Partridge Street one hundred and twenty-four (124) feet six (6) inches to the south line of premises heretofore conveyed by James Feeney and Anna G. M. Feeney, his wife, to Ann Murray; thence westerly along said Murray's south line five (5) feet; thence northerly along the west line of property of said Murray and west line of property heretofore conveyed by James Feeney and Anna G. M. Feeney, his wife, to Mary J. Brown, seventy (70) feet to the northwest corner of said Brown's lot; thence westerly on a line parallel with the north line of Madison Avenue fifty (50) feet; thence southerly on a line parallel with Partridge Street one hundred and ninety-four (194 ) feet six (6) inches to the north line of Madison Avenue; thence easterly along the north line of Madison Avenue fifty-five (55) feet to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Interfaith Sanctuary, 959 Madison Avenue,**
**City of Albany Tax Map Number 64.68-1-53**

ALL that tract or parcel of land situate in the Eighteenth (formerly Sixteenth) Ward of the City of Albany, County of Albany and State of New York, being on the northerly side of Madison Avenue in the said City of Albany and described as follows:

BEGINNING at a point in the northerly line of Madison Avenue distant along such northerly line fourteen hundred ninety-six feet and six inches (1496 feet 6 inches) east from the easterly line of West Lawrence Street and running thence easterly along the northerly line of Madison Avenue fifty-five (55) feet; then northerly on a line parallel with the easterly line of West Lawrence Street two hundred sixty-four feet and ten inches (264 feet 10 inches) to a point distant, about two hundred forty (240) feet south of the south line of Western Avenue; thence westwardly on a line parallel with the north line of Madison Avenue fifty-five (55) feet to a line drawn northwardly from the point of beginning parallel with the easterly line of West Lawrence Street; and then southwardly along said line parallel with West Lawrence Street two hundred sixty-four feet and ten inches (264 feet 10 inches) to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Borisenok '80 House, 1020 Madison Avenue, City of Albany Tax Map Number 64.59-4-3

ALL that certain lot, piece or parcel of land in the 18th Ward of the City of Albany, N.Y. and situate, lying and being on the south side of Madison Avenue between Partridge Street and Main Avenue, bounded and described as follows:

BEGINNING at a point in the southerly line of Madison Avenue distant sixty and seventeen hundredths (60.17) feet easterly from the intersection of said southerly line of Madison Avenue with the easterly line of Main Avenue and running thence southerly on a line parallel to the said easterly line of Main Avenue two hundred twenty (220) feet to the center of Yates Street as the same is laid down on a map of the City of Albany; thence easterly along the center of Yates Street seventy-one (71) feet to the southwesterly corner of land conveyed by Alfred E. Whittle and wife to Winslow M. Mead by Warranty Deed recorded in the Albany County Clerk's Office June 25, 1906, in Book 561 of Deeds, page 223; thence northerly on line parallel with the easterly line of Main Avenue and along the line of said Mead two hundred twenty (220) feet to the said southerly line of Madison Avenue; and thence westerly along said southerly line of Madison Avenue seventy-one (71) feet to the point or place of beginning. Said premises are now designated as No.1020 Madison Avenue, Albany, N.Y.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications,

fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Griffin Hall, 450 Western Avenue,**
**City of Albany Tax Map Number 64.60-2-9**

ALL that certain lot, piece or parcel of land situate, lying and being on the southerly side of Western Avenue, between Main Avenue and Partridge Street, in the 18th Ward of the City of Albany, in the County of Albany and State of New York, and more particularly described as follows:

BEGINNING at a point in the said southerly line of Western Avenue distant 322.50 feet easterly from the intersection of the easterly line of Main Avenue with the southerly line of Western Avenue; running thence southerly, with an interior angle of 104° and 46' and parallel with the easterly line of Main Avenue for a distance of 173.65 feet; thence running easterly parallel with the northerly line of Madison Avenue for a distance of 39.65 feet; thence running northerly parallel with the first described line and distant 39.65 feet (perpendicular distant) easterly therefrom for a distance of 183.89 feet to a point in the southerly line of Western Avenue, distant 41 feet easterly, measured along the southerly line of Western Avenue from the point of beginning; and thence running westerly along the said southerly line of Western Avenue a distance of 41 feet to the point or place of beginning, being known as Street Number 450 Western Avenue, Albany, N.Y.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Rooney Hall, 917 Madison Avenue,**
**City of Albany Tax Map Number 64.68-1-44**

All that certain plot, piece or parcel of land situate, lying and being in the City of Albany, County of Albany and State of New York, beginning at the point of intersection of the northerly line of Madison Avenue and the westerly line of Partridge Street and runs thence northerly along the westerly line of Partridge Street 124.50 feet; thence westerly on a line parallel with the northerly line of Madison Avenue 71.50 feet; thence southerly on a line parallel with the westerly line of Partridge Street 124.50 feet to the northerly line of Madison Avenue; thence easterly along the northerly line of Madison Avenue 71.50 feet to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### Soulier Hall, 454 Western Avenue,
### City of Albany Tax Map Number 64.60-2-10

ALL that certain lot, piece or parcel of land situate, lying and being on the southerly side of Western Avenue between Main Avenue and Partridge Street in the 18th Ward of the City of Albany in the County of Albany and State of New York and more particularly described as follows:

Beginning at a point in the southerly line of Western Avenue 281.50 feet easterly from the intersection of the easterly line of Main Avenue with the said southerly line of Western Avenue and running thence easterly along the said southerly line of Western Avenue 41 feet; thence southerly on a line parallel to the easterly line of Main Avenue 173.65 feet; thence westerly on a line parallel with the northerly line of Madison Avenue 39.65 feet and thence northerly, parallel to the second described line and on a line parallel with the easterly line of Main Avenue 163.41 feet to a point in the said southerly line of Western Avenue, the point or place of beginning. Being known as lot number 454 on a certain map of property belonging to the George E. Hohl Company on Western Avenue, Albany, N.Y., made by Edward Batchelder, City Engineer, filed in the Albany County Clerk's Office on December 22, 1915.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but

not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Health Services, 190 Partridge Street,**
**City of Albany Tax Map Number 64.68-1-14**

ALL that tract or parcel of land situate in the Eighteenth (18th) Ward of the City of Albany, County of Albany, and State of New York, bounded and described as follows:

BEGINNING at a point in the west line of Partridge Street 141.80 feet southerly from the point of intersection of the west line of Partridge Street with the south line of Western Avenue, which point is also the southeast corner of premises heretofore conveyed by Matthew J. Wallace and wife to Walter C. Longleway; and runs thence southerly along the west line of Partridge Street 40 feet; thence westerly on a line at right angles to said west line of Partridge Street 137.93 feet, be the same more or less, to a point forming the boundary line between the lands formerly owned by William M. Cunningham on the east and now or formerly of John B. Rossman on the west; thence northerly along the said boundary line 40 feet to a point forming the southwest corner of said Longleway's lot; thence easterly along the south line of said Longleway's lot about 137.93 feet to the place of beginning. Said premises are known as No. 190 Partridge Street, in the City of Albany, New York.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Library, 394 Western Avenue,**
**City of Albany Tax Map Number 64.68-1-1**

**Parcel 1**

ALL THAT TRACT OR PARCEL OF LAND, situated in the Eighteenth Ward, formerly the Sixteenth Ward, of the City of Albany, on the south side of Western Avenue between Partridge Street and West Lawrence Street, bounded and described as follows:

BEGINNING at a point in the southerly line of Western Avenue distant sixteen hundred and fifteen (1615) feet and eleven (11) inches east of the east line of West Lawrence Street and running thence south on a line parallel to the said east line of West Lawrence Street about two hundred and forty-two (242) feet to a point distant two hundred and sixty-four (264) feet and ten (10) inches north of the north line of Madison Avenue; thence west on a line parallel with the north line of Madison Avenue twenty-two (22) feet; thence north on a line parallel with the east line of West Lawrence Street about two hundred and thirty-six (236) feet and four and one-half (4-1/2) inches to the southerly line of Western Avenue; thence east along said Avenue twenty-two (22) feet and nine (9) inches to the place of beginning.

**Parcel 2**

ALSO ALL THAT OTHER CERTAIN TRACT OR PARCEL OF LAND, situate on the south side of Western Avenue between Partridge Street and West Lawrence Street in the Eighteenth Ward, formerly the Sixteenth Ward, of the City of Albany, bounded as follows:

Beginning at a point in the southerly line of Western Avenue distant fifteen hundred and forty-seven (1547) feet and eight (8) inches east of the easterly line of West Lawrence Street and running thence south on a line parallel with the east line of West Lawrence Street about two hundred and twenty-five (225) feet to a point distant about two hundred and sixty-four (264) feet ten (10) inches north of the north line of Madison Avenue; then east on a line parallel with the north line of Madison Avenue forty-four (44) feet; then north on a line parallel with the east line of West Lawrence Street about two hundred and thirty-six (236) feet four and one-half (4-1/2) inches to the southerly line of Western Avenue; then west along the southerly line of Western Avenue forty-five (45) feet six (6) inches to the place of beginning.

**Parcel 3**

ALSO ALL that tract or parcel of land situate in the 18th Ward of the City of Albany on the south side of Western Avenue between Partridge and West Lawrence Streets, bounded and described as follows:

BEGINNING at a point in the southerly line of Western Avenue distant one thousand six hundred sixty-one (1661) feet, five (5) inches east of the east line of West Lawrence and running thence south on a line parallel with the said east line of West Lawrence Street about two hundred fifty-three (253) feet, four (4) inches to a point distant two hundred sixty-four (264) feet, ten (10) inches north of the north line of Madison Avenue; thence west on a line parallel with the north line of Madison Avenue, forty-four (44) feet; thence north of a line parallel with the east line of West Lawrence Street about two hundred forty-two (242) feet to the southerly line of Western Avenue; and thence east along said Avenue forty-five (45) feet six (6) inches to the place of beginning.

**Parcel 4**

ALSO ALL that tract, piece or parcel of land situate, lying and being in the Eighteenth Ward of the City of Albany, County of Albany and State of New York, more particularly described as follows:

BEGINNING at a point two hundred and four feet and ten inches (204' 10") northerly from the north line of Madison Avenue distant along such north line sixteen hundred and six feet and six inches (1606' 6") east from the east line of West Lawrence Street, and running thence northerly on a line parallel to the east line of West Lawrence Street sixty feet (60'); thence westerly on a line parallel to the said north line of Madison Avenue fifty-five feet (55'); thence southerly on a line parallel to the said east line of West Lawrence Street sixty feet (60'); and thence easterly on a line parallel to the said north line of Madison Avenue fifty-five feet (55") to the place of beginning.

Being a parcel of land sixty feet (60') deep and fifty-five feet (55') wide which constituted the northernmost portion of the premises know as #953 Madison Avenue, conveyed by John J. Glavin and Lilian C. Glavin, his wife, by deed dated January 25, 1947, and recorded on February 11, 1947 in the Albany County Clerk's Office in Book 1052 of Deeds at page 363.

**Parcel 5**

ALSO ALL that parcel of land situate in the 18th Ward of the City of Albany, County of Albany, State of New York bounded and described as follows:

BEGINNING at a point which is Three hundred twenty feet nine inches (320' 9") distant in a northerly direction from a point in the north line of Madison Avenue which is one thousand six hundred six feet and six inches (1606' 6") distant in an Easterly direction from the intersection of the North line of Madison Avenue and the East line of West Lawrence Street, said point of beginning being the Northwest corner of the parcel of land conveyed by Edmund Norris Powell to Walter Dunning Powell Jr. and Alberta E. Powell by deed dated June 22, 1956 and recorded in the Office of the Clerk of Albany County on the same date in Book 1497 of Deeds at Page 397; thence Easterly parallel with the south line of Western Avenue and running along the North line ofsaid parcel of land for a distance of fifty-three and seventy one hundredths feet (53.71'); thence Southerly making an interior angle of seventy-six degrees nine minutes (76° 09') with the last described course and running along the East line of said parcel of land for a distance of fifteen and forty-five hundredths feet (15.45'); thence westerly and parallel with the south line of Western Avenue for a distance of fifty-three and ninety-six hundredths feet (53.96'); thence Northerly along the West line of said parcel of land for a distance of fifteen and fifty-one hundredths feet (15.51') to the point and place of beginning.

Being a strip of land fifteen feet (15') in perpendicular width of the rear of premises conveyed to Walter Dunning Powell Jr. and Alberta E. Powell by the said Edmund Norris Powell by said deed dated June 22, 1956 and recorded in the Albany County Clerk's Office on the same day in Book 1497 of Deeds at Page 397.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Security Headquarters, 340 Western Avenue,**
**City of Albany Tax Map Number 65.61-2-1**

**Parcel 1**

ALL that tract, piece and parcel of land situate, lying and being in the City and County of Albany, State of New York, more particularly bounded and described as follows:

BEGINNING at a point at the intersection of the southerly bounds of Western Avenue with the easterly bounds of Partridge Street; thence easterly along the southerly bounds of Western Avenue a distance of 101.57 feet to a point; thence southerly making an interior angle of 75 deg. 56 min. 20 sec. with the last described course a distance of 69.91 feet to a point on the northerly bounds of Hudson Avenue; thence westerly making an interior angle of 89 deg. 43 min. 30 sec. with the last described course along said northerly bounds of Hudson Avenue a distance of 99.00 feet to a point at the intersection of the easterly bounds of Partridge Street with the northerly bounds of Hudson Avenue; thence northerly making an interior angle of 89 deg. 40 min. 14 sec. with the last described course a distance of 44.76

feet to the point of beginning, said last course making an interior angle of 104 deg. 39 min. 56 sec. with the first course of the herein described parcel.

**Parcel 2**

All that tract or parcel of land situated in the City of Albany, County of Albany, State of New York bounded and described as follows:

Beginning at a point in the southerly line of Western Avenue distant 128.34 feet easterly of the intersection of the easterly line of Partridge Street with the southerly line of Western Avenue; running thence southerly 79 feet to a point in the northerly line of Hudson Avenue distant 135 feet easterly from its intersection with the easterly line of Partridge Street; thence easterly along the northerly line of Hudson Avenue 19.75 feet; thence northerly about 84 feet to a point in the southerly line of Western Avenue distant 25 feet easterly from the place of beginning; and thence westerly along the southerly line of Western Avenue 25 feet to the place of beginning.

**Parcel 3**

ALL that certain plot, piece pr parcel of land situate, lying and being in the City of Albany, County of Albany and State of New York as more particularly described as follows:

Beginning at a point in the northerly line of Hudson Avenue, said point being located 99.0 feet southeasterly along said street line from its intersection with the southeasterly line of Partridge Street; Thence easterly with an interior angle of 90°-16'-30" 69.91 feet to a point in the westerly line of Western Avenue located 101.57 feet southeasterly along said street line from its intersection with the southeasterly line of Partridge Street; Thence Southeasterly along the westerly line of Western Avenue with an interior angle of 104°-03'-40" 26.17 feet; Thence southwesterly with an interior angle of 89°-50'-40" a distance of 77.17 feet to a point in the southeasterly line of Hudson Avenue; Thence northwesterly with an interior angle of 81°-49'-10" along said street line 36.0 feet to the point of beginning.

### Cabrini Hall, 399 Western Avenue,
### City of Albany Tax Map Number 64.60-1-4

ALL that tract or parcel of land, with the buildings thereon, situate in the City and County of Albany, State of New York, generally referred to and known as 399 Western Avenue and being on the northerly side of Western Avenue between Erie Street, also known as La Salle Street, and Main Avenue and bounded and described as follows:

Beginning at a point, which is the intersection of the northerly line of Western Avenue and the westerly line of Erie Street; thence northerly along Erie Street about 30 feet; thence westerly at right angles to Erie Street 93 feet 4.5 inches; thence southerly on a line parallel to Erie Street 54 feet 4.5 inches to Western Avenue; thence easterly along the northerly line of Western Avenue about 96 feet 7 inches to the place of beginning. Intending hereby to convey lots 1 and 2 according to the map of the aforesaid block made for Mary Birch Reid dated September 15, 1898 and filed in the Office of the Clerk of Albany County on May 24, 1909 in Drawer 41 as Map No. 695.

ALSO all that tract or parcel of land situate in the City and County of Albany and State of New York, lying and being on the northerly side of Western Avenue between Erie Street and Main Avenue, beginning at a point which is in the westerly line of Erie Street 30 feet more or less from the intersection of the northerly line of Western Avenue and the westerly line of Erie Street and continuing in a northerly direction therefrom along the westerly line of said Erie Street for a distance of 33 feet, more or less; thence westerly at right angles to Erie Street 93 feet 4.5 inches, more or less; thence southerly on a line parallel to the westerly line of Erie Street 33 feet more or less to a point; thence easterly along the northerly boundary line of the premises heretofore conveyed to May Tyner Wyer by Mary E. Parker by Warranty Deed, dated April 25, 1907 and recorded April 26, 1907, in Book 569 of Deeds at Page 540 in the Albany County Clerk's Office, for a distance of 93 feet 4.5 inches, more or less to the point and place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**157 Erie Street,**
**Bed of former Hudson Avenue, City of Albany Tax Map Number 64.60-1-20**

ALL that certain tract, piece or parcel of land situate in the City of Albany, County of Albany, State of New York, lying Southeasterly of North Main Street and generally Northeast of Western Avenue, and being more particularly bounded and described as follows:

AREA = 21,450± SQUARE FEET OF LAND

BEGINNING at a point on the Southeasterly street boundary of North Main Street at its point of intersection with the common division line between lands of the City of Albany (formerly a portion of Hudson Avenue as closed by City Ordinance dated November 15, 1909) on the Northeast and Lots 15, 14, 13, 12, 11, 10, 9, 8. 7, 6, 5, 4 and 3 as shown on a map entitled "Map Showing Subdivision Property Of Mary B. Reid On North Side Of Western Avenue," dated February 28, 1898 and filed in the Albany County Clerk's Office on September15, 1898 and refiled May 24, 1909 in Map Book 41 as Map No. 695 on the Southwest said point being situate North 38 deg. 27 min. 14 sec. East a distance of 225.73 feet from the point of intersection of the Southeasterly street boundary of North Main Street with the Northeasterly street boundary of Western Avenue; and runs thence from said point of beginning along said Southeasterly street boundary of North Main Street, North 38 deg. 27 min. 14 sec. East 33.00 feet to its point of intersection with the common division line between lands of said City of Albany (formerly a portion of Hudson Avenue) on the Southwest and lands of the Roman Catholic Diocese of Albany. N.Y., lands now or formerly of Saint Catherine Center for Children and other lands of the Roman Catholic Diocese of Albany, N.Y. as described in Bock 446 of Deeds at Page 176 on the Northeast; thence South 51 deg. 32 min. 46 sec. East along said common division line 650.00 feet to its point of intersection with the division line between lands of said City of Albany (formerly a portion of Hudson Avenue) on the Northwest and lands now or formerly of LaSalle School as described in Book 2357 of Deeds at Page 1151 on the Southeast; thence South 38 deg. 27 min. 14 sec. West 33.00 feet to its point of intersection with the common division line between said lands of the City of Albany (formerly a portion of Hudson Avenue) on the Northeast and Lots 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 as shown on the above described map; thence North 51 deg. 32 min. 46 sec. East along said common division line 650.00 feet to the point or place of beginning, containing 21,450± square feet of land.

AREA = 1,320± SQUARE FEET OF LAND

TOGETHER with a strip of land 33 feet in width and 40 feet in length, being a portion of the former Hudson Avenue previously conveyed to The College of Saint Rose as described in Book 2335 of Deeds at Page 79, and being more particularly bounded and described as follows:

BEGINNING at the point of intersection of the common division line between lands now or formerly of the City of Albany (formerly a portion of Hudson Avenue as closed by City Ordinance dated November 15, 1909) on the

Northeast and Lots 13,14 and 15 as shown on a map entitled "Map Showing Subdivision Property Of Mary B. Reid On North Side Of Western Avenue," dated February 28, 1898 and filed in the Albany County Clerk's Office on September 15, 1898 and refiled May 24, 1909 in Map Book 41 as Map No. 695 on the Southwest with the common division line between lands now or formerly of The College of Saint Rose as described in Book 2335 of Deeds at Page 79 on the Southeast and lands now or formerly of Dermot C. Reilly as described in Book 918 of Deeds at Page 287 and lands of the City of Albany (formerly a portion of Hudson Avenue) on the Northwest, said point being situate South 51 deg. 32 min. 46 sec. East a distance of 102.00 feet as measured along the above first mentioned common division line from the Southeasterly street boundary of North Main Street and runs thence from said point of beginning along the division line between the lands now or formerly of The College of Saint Rose on the Southeast and lands of said City of Albany (formerly a portion of Hudson Avenue) on the Northwest, North 38 deg. 27 min. 14 sec. East 33.00 feet to its point of intersection with the division line between the lands of The College of Saint Rose on the Southwest and lands now or formerly of the Roman Catholic Diocese of Albany, N.Y. on the Northeast; thence South 51 deg. 32 min. 46 sec. East along said division line 40.00 feet to its point of intersection with the division line between lands now or formerly of The College of Saint Rose as described in Book 2335 of Deeds at Page 79 on the Northwest and lands of said City of Albany (formerly a portion of Hudson Avenue) on the Southeast; thence South 38 deg. 27 min. 14 sec. West along the last mentioned division line 33.00 feet to its point of intersection with the above first mentioned common division line; thence North 51 deg. 32 min. 46 sec. East 40.00 feet to the point or place of beginning, containing 1,320± square feet of land.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

Excepting from the above described parcels so much thereof as has been conveyed by The College of Saint Rose to St. Catherine's Center for Children, by Deed dated August 25, 2023 recorded in the Albany County Clerk's Office August 30, 2023 as Instrument No. R2023-15619.

**417 Western Avenue,**
**City of Albany Tax Map Number 64.60-1-9**

All that certain piece or parcel of land in the City of Albany, County of Albany and State of New York, situate, lying and being on the Northerly side of Western Avenue, between Main Avenue and Erie Street, beginning at a point 413 feet, 8 inches from the Easterly intersection of Main and Western Avenues, which point of beginning is also the Southeasterly corner of premises conveyed by Mary Birch Reid to Benjamin F. Oppenheim, October 16, 1901, and runs thence along said Oppenheim's Easterly line Northerly and parallel with Main Avenue, about 120 feet, 3¼ inches; thence easterly at right angles to Main Avenue 50 feet; thence Southerly and parallel with first mentioned line and distant 50 feet therefrom about 107 feet, 1¼ inches to the Northerly line of Western Avenue; thence Westerly along

said Northerly line of Western Avenue, 51 feet, 8½ inches to the place of beginning. Intending hereby to convey Lot Number Seven as laid down on map a subdivision of property of Mary Birch Reid on the North side of Western Avenue, said map bearing date February 28th, 1898, and filed in the Office of the Clerk of Albany County in Drawer 41, Book 41 of Maps as #695.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### 438 Western Avenue,
### City of Albany Tax Map Number 64.60-2-6

ALL that certain lot, piece or parcel of land situate, lying and being in the City and County of Albany and State of New York, described and known as 438 Western Avenue in said City and County, State of New York, bounded and described as follows:

COMMENCING at a point in the south side of Western Avenue where the same is intersected by a line drawn parallel to the east line of West Lawrence Street, and which said line intersects the north line of Madison Avenue at a point distant 997 feet 6 inches easterly from its intersection with the easterly line of West Lawrence Street, and runs thence southerly along said line to a point distant on said line 150 feet from the north line of Madison Avenue; thence easterly on a line parallel with the north line of Madison Avenue 37 feet; thence northerly and parallel with the easterly line of West Lawrence Street to the southerly side of Western Avenue; and thence westerly along the said southerly side of Western Avenue about 38.28 feet to the point or place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### 194 Partridge Street,
### City of Albany Tax Map Number 64.68-1-16

ALL that tract or parcel of land situate in the City of Albany, County of Albany and State of New York, on the west side of Partridge Street between Madison Avenue and Western Avenue and bounded and described as follows:

BEGINNING at a point in the west line of Partridge Street four hundred ten (410) feet north from the point of intersection of the west line of Partridge Street with the north line of Madison Avenue and runs thence northerly along the west line of Partridge Street twenty eight (28) feet; thence westerly on a line at right angles to the west line of Partridge Street one hundred thirty two (132) feet more or less to the east line of property formerly owned by Dr. John B. Rossman; thence southerly along the east line of said Rossman property and on a line parallel with the west line of Partridge Street twenty eight (28) feet; and thence easterly on a line at right angles to the west line of Partridge Street one hundred thirty two (132) feet more or less to the west line of Partridge Street at the place of beginning. Being a portion of Great Lots 51 and 52 as designated on a map of the City of Albany made by Evert Van Allen in 1806.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### 192 Partridge Street,
### City of Albany Tax Map Number 64.68-1-15

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Albany, County of Albany and State of New York, on the West side of Partridge Street between Madison Avenue and Western Avenue, and bounded and described as follows:

BEGINNING at a point in the West line of Partridge Street four hundred thirty-eight (438) feet North from the point of intersection of the West line of Partridge Street with the North line of Madison Avenue, and runs thence northerly along the West Line of Partridge Street thirty-two (32) feet; thence westerly on a line at right angles with the West line of Partridge Street one hundred and thirty-two (132) feet more or less to the East line of property formerly owned by Dr. John B. Rossman; thence southerly along the East line of said Rossman property and on a line parallel with the West line of Partridge Street, thirty-two (32) feet, and thence easterly on a line at right angles with the West line of Partridge Street one hundred thirty-two (132) feet more or less to the West line of Partridge Street at the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**196 Partridge Street,**
**City of Albany Tax Map Number 64.68-1-17**

ALL that tract or parcel of land situate in the City of Albany, County of Albany, and State of New York on the west side of Partridge Street between Madison Avenue and Western Avenue and bounded and described as follows:

Beginning at a point in the west line of Partridge Street (380) feet north from the point of intersection of the north line of Madison Avenue with the west line of Partridge Street and runs thence northerly along the west line of Partridge Street (30) feet; thence westerly on a line at right angles to Partridge Street about (132) feet more or less to the east line of property formerly owned by Dr. John B. Rossman; thence southerly along the east line of said Rossman property and on a line parallel with Partridge Street (30) feet; thence easterly on a line at right angles to Partridge Street about (132) feet more or less to the west line of Partridge Street at the point of beginning. Said premises being commonly known as Street number 196 Partridge Street, Albany, New York.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on,

over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### 428 Western Avenue,
### City of Albany Tax Map Number 64.60-2-4

All that certain lot, piece or parcel of land situate in the City of Albany, State of New York, and bounded and described as follows, viz:

Commencing at a point in the south side of Western Avenue, where the same is intersected by a line drawn parallel to the east line of West Lawrence Street, and which said line intersects the north line of Madison Avenue at a point distant elven hundred and twenty-two (1122) feet and six (6) inches westerly from the intersection with the easterly line of West Lawrence Street (which point of beginning is also the northeast corner of a lot heretofore conveyed by Howard Van Rensselaer to Francis Blackall and Anna Blackall, by deed bearing date February 16, 1900, and recorded in Albany County Clerk's Office in Book of Deeds No. 513, at page 107, etc.) and runs thence southerly along said line to a point distant on said line one hundred and fifty (150) feet from the north line of Madison Avenue to a point which is the southeast corner of said lot conveyed to Francis Blackall and Anna Blackall; thence easterly on a line parallel with the north line of Madison Avenue, forty-four (44) feet; and thence northerly and parallel with the east line of West Lawrence Street to the southerly side of Western Avenue; and thence westerly about forty-five (45) feet and six (6) inches to the point of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

### 975 Madison Avenue,
### City of Albany Tax Map Number 64.68-1-57

All that certain lot piece or parcel of land situate in the City of Albany, New York, bounded and described as follows, viz:

Beginning at a point in the north line of Madison Avenue, distant one thousand and two hundred and seventy six (1276) feet and six (6) inches east of the intersection of the North line of Madison Avenue, with the east line of West Lawrence Street, running Easterly along the North line of Madison Avenue fifty-five (55) feet; thence Northerly at right angles with the North line of Madison Avenue and parallel with the East line of West Lawrence Street two hundred and sixty four (264) feet and ten (10) inches; thence Westerly and parallel with the North line of Madison Avenue fifty-five (55) feet; thence Southerly and parallel with East line of West Lawrence Street and at right angles with the North line of Madison Avenue two hundred and sixty four feet (264) and ten (10) inches to the point or place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**989 Madison Avenue,**
**City of Albany Tax Map Number 64.60-2-26**

All that tract or parcel of land situate in the City of Albany, County of Albany and state of New York, and being in the Sixteenth (16th) Ward of said City, bounded and described as follows:

Beginning at a point in the northerly line of Madison Avenue distant along said northerly line eleven hundred and sixty six (1166) feet and six (6) inches easterly from the easterly line of West Laurence Street, and running thence Northerly on a line parallel with said easterly line of West Lawrence Street one hundred and fifty (150) feet; thence westerly on a line parallel with said northerly line of Madison Avenue forty four (44) feet; thence southerly on a line parallel with said easterly line of West Lawrence Street, one hundred and fifty (150) feet to said northerly line of Madison Avenue; thence easterly along said northerly line of Madison Avenue forty four (44) feet to the place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**962 Madison Avenue,**
**City of Albany Tax Map Number 64.68-2-8.2**

All that parcel situate in the City of Albany, County of Albany, bound and described as follows:

Beginning at a point in the south line of Madison Avenue said point being 620.88 feet westerly as measured along the south line of Madison Avenue from its intersection with the west line of Partridge Street; thence westerly along the south line of Madison Avenue 38.59 feet; thence southerly parallel with the west line of Partridge Street 187.0 feet; thence easterly parallel with the south line of Madison Avenue 38.59 feet; thence northerly parallel with the west line of Partridge Street 187.0 feet to the point and place of beginning. The easterly two (2) feet of the premises hereby conveyed, which are known and designated as No. 962 Madison Avenue, and the westerly two (2) feet of the premises known and designated as No. 960 Madison Avenue, now or formerly owned by the State of Yetta Abramson, are hereby made subject to the right of use of the same as a private Right-of-Way four (4) feet in width and extending in depth one hundred sixty-seven (167) feet from the southerly line of Madison Avenue to the northerly line of the brick garages now situate on the premises known as Nos. 960 and 962 Madison Avenue, for the use and benefit of the owners of the premises known and designated as Nos. 960 and 962 Madison Avenue, which Right-of-Way shall be kept open perpetually for the free use and benefit of such owners, their tenants, heirs and assigns, who shall have free ingress and egress over such four (4) feet Right-of-Way.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Rear 936-958 Madison Avenue,**
**City of Albany Tax Map Number 64.68-2-72**

All that certain tract, piece or parcel of land situate, lying and being in the City of Albany, County of Albany, State of New York being more particularly bounded and described as follows:

BEGINNING at a point located N. 52°-41'-23" W., along the northerly line of former Yates Street and its extension northwesterly, 374.00 feet from the intersection of said northerly line of former Yates Street and the westerly line of Partridge Street, and running thence from said point of beginning along the westerly, northerly and westerly lines of lands now or formerly of The College of Saint Rose known as 930 Madison Avenue the following three courses and distances: 1) S. 37°-36'- 44" W. 33.00 feet to a point; 2) thence N. 52°-41'-23" W. 49.50 feet to a point; and 3) thence S. 37°-36'- 44" W. 33.00 feet to a point; thence N. 52°-41'-23" W., along the northerly line of other lands now or formerly of The College of Saint Rose known as Rear 573-583 Morris Street, 170.50 feet to a point; thence N. 37°-36'-44" E., along the easterly line of lands now or formerly of the Church of St. Vincent DePaul, Albany, New York, 33.00 feet to a point; thence S. 52°-41'-23" E., along the southerly line of lands now or formerly of Jakovic known as 958 Madison Avenue and along the southerly lines of other lands now or formerly of The College of Saint Rose known

as 956 and 946-950 Madison Avenue, 132.00 feet to a point; thence N. 37°-36'-44" E., along the easterly line of said lands now or formerly of The College of Saint Rose known as 946-950 Madison Avenue, 33.00 feet to a point; thence S. 52°-41'-23" E., along the southerly lines of other lands now or formerly of The College of Saint Rose known as 944 and 940 Madison Avenue, 88.00 feet to the point and place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Rear 573-583 Morris Street,**
**City of Albany Tax Map Number 64.68-2-70**

ALL THAT certain lot, piece or parcel of land, lying, situate and being in the City of Albany, County of Albany, State of New York, more particularly bounded and described as follows:

BEGINNING at a point located 446 feet westerly, measured along the southerly line of former Yates Street and its extension westerly, from the intersection of the southerly line of former Yates Street and the westerly line of Partridge Street; running thence westerly, in an extension thereof, along the southerly line of lands now or formerly of The College of Saint Rose known as Rear 936-958 Madison Avenue, 148 feet more or less to a point; thence southerly and parallel with Partridge Street, along the easterly line of lands now or formerly of the Church of St. Vincent DePaul, Albany, New York, 93.5 feet to a point; thence easterly and parallel with the northerly line of Morris Street, along the northerly line of lands known as 581, 579, 577, 575 and 573 Morris Street, 148 feet to a point; thence northerly and parallel with Partridge Street, along the easterly line of lands other lands now or formerly of The College of Saint Rose known as Rear 930 Madison Avenue, 93.5 feet to the point or place of beginning.

Together with the following easements, in common with others, appurtenant to the above-described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes:

a) Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances,

b) Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and

c) Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon.

Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above-described premises for the benefit of the remaining lands of The College of Saint Rose.

**Riley Hall, 937 and 939 Madison Avenue,**
**City of Albany Tax Map Number 64.68-1-49**

ALL that parcel of land situate on the north side of Madison Avenue between Partridge Street and South Main Avenue in the Eighteenth Ward of the City of Albany, N.Y., and now briefly known as Street Number 937 Madison Avenue, more particularly bounded and described as follows:

BEGINNING at a point in the north line of Madison Avenue distant along that line three hundred eighty-seven (387) feet west from the intersection of the north line of Madison Avenue with the west line of Partridge Street, such point being at the southeasterly corner of a lot of land formerly owned by Frederick Schwartz; thence running northerly along the easterly line of the last mentioned lot, two hundred sixty-four (264) feet and ten (10) inches to a line which would be the south line of Hamilton Street, if that street were extended with its present direction west of Partridge Street; thence easterly along such line forty-six (46) feet to the west line of the property now or formerly owned by Norman Burdick; thence southerly along said Burdick's line to a point in the north line of Madison Avenue distant forty-six (46) feet easterly from the place of beginning; and thence westerly along the north line of Madison Avenue, forty-six (46) feet to the place of beginning. Together with the following easements, in common with others, appurtenant to the above described premises, on, over, through and across other lands of The College of Saint Rose for the following purposes: Utility Services Purposes for the installation, construction, use, inspection, maintenance, repair, alteration and replacement of utility service lines, including, but not limited to, electric, natural gas, telephone. telecommunications, fiber optic cable, cable television, water, sanitary sewer, storm sewer, and storm water detention and/or retention, and all their customary and necessary appurtenances, Building Maintenance Purposes, including, but not limited to, deliveries, refuse removal, the installation, construction, use, inspection, maintenance, repair, alteration and replacement of building components, including, but not limited to, footings, above and below ground supports, walls, facades, eaves, windows and rooves, and all their customary and necessary appurtenances, and Ingress and Egress i) by vehicles and pedestrians for the provision of the foregoing Utility Services Purposes and Building Maintenance Purposes, and ii) by pedestrians on the sidewalks and travelways located thereon. Excepting and reserving, however, unto The College of Saint Rose, easements in common with others for Utility Services Purposes, Building Maintenance Purposes and Ingress and Egress as said easements are described above, on, over, through and across all of the above described premises for the benefit of the remaining lands of The College of Saint Rose.

**Lots 16, 17 and 18 South O'Connell Street - Hoffman Park,**
**City of Albany Tax Map Numbers 76.70-1-34, 33 & 32**

ALL THOSE TRACTS OR PARCELS of land situate in the City of Albany in the County of Albany and State of New York and being known and distinguished as lots laid down, numbered and represented on a map of subdivision of lot No. 6 of the Frisbie Estate made by William H. Slingerland Civil Engineer and Surveyor January 20th 1873, and filed in the Albany County Clerk's Office as lots numbered as follows: lots numbered sixteen (16), seventeen (17) and eighteen (18) on the east side of O'Connell Street in Block No. 3 on said map

**Lots 7, 8, 9 and 10 South O'Connell Street - Hoffman Park,**
**City of Albany Tax Map Numbers 76.70-1-28, 29, 30 & 31**

ALL THOSE CERTAIN LOTS, PIECES OR PARCELS OF LAND, situate in the City of Albany, County of Albany and State of New York, known, numbered and designated as follows:

BEGINNING at a point in the westerly line of South O'Connell Street, said point being the southeast corner of Lot No. 6 in Block No. 4 as the same is known and distinguished on a map of the subdivision of Lot No. 6 of the Frisbee Estate made by William H. Slingerland, Civil Engineer and Surveyor, January 20, 1873, and filed in the Albany County Clerk's Office as Map No. 79 in Book 3, Drawer 3; thence running from said point of beginning in a southerly direction along the westerly line of a South O'Connell Street, an unimproved highway (100) feet to a point in the northerly line of Avenue "B", an unimproved highway; thence westerly along the northerly line of Avenue "B" with an interior angle of 90 degrees (72) feet to a point; thence northerly along the westerly line of lands conveyed to Alfred J. Houghtaling, Jr. by deed dated September 7, 2007, recorded in the Office of the Albany County Clerk on September 21, 2007 in Book of Deeds 2897, Page 876 with an interior angle of 90 degrees (100) feet to a point; said point being the southwest corner of Lot No. 6 in Block No. 4 as abovementioned; thence easterly along the southerly of Lot No. 6 in Block No. 4 with an interior angle of 90 degrees (72) feet to the point of beginning, making an interior angle of 90 degrees with the first mentioned westerly line of South O'Connell Street. Containing (7,200) square feet of land.

## EXHIBIT A

## INITIAL APPROVED BUDGET

See attached.

Subject to Change

**The College of Saint Rose**
13-Week Cash Flow as of October 10, 2024

USD in 000s

| | Week 1[1] Forecast 10/13/2024 | Week 2 Forecast 10/20/2024 | Week 3 Forecast 10/27/2024 | Week 4 Forecast 11/3/2024 | Week 5 Forecast 11/10/2024 | Week 6 Forecast 11/17/2024 | Week 7 Forecast 11/24/2024 | Week 8 Forecast 12/1/2024 | Week 9 Forecast 12/8/2024 | Week 10 Forecast 12/15/2024 | Week 11 Forecast 12/22/2024 | Week 12 Forecast 12/29/2024 | Week 13 Forecast 1/5/2025 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Receipts** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Salaries | - | (119) | - | (107) | - | (97) | - | (97) | - | (97) | - | (264) | - | (780) |
| Fringe Benefits | - | (38) | (5) | (31) | (5) | (27) | - | (27) | (85) | (27) | - | (52) | - | (213) |
| Equipment, Supplies, and Other Expenses | - | (22) | (6) | (9) | (10) | (198) | - | (7) | (13) | (7) | (6) | (7) | (8) | (298) |
| Property Maintenance, Utilities, and Insurance | - | (114) | (4) | (28) | (25) | (94) | (5) | (28) | (24) | (94) | (9) | (57) | (59) | (540) |
| Digitization and Storage of Records | - | - | - | (19) | - | - | - | - | (8) | - | - | - | (8) | (35) |
| Close-Out Audits | - | (18) | - | - | (118) | - | - | - | (118) | - | - | - | (100) | (353) |
| P Card Payments | - | (4) | - | - | (10) | - | - | - | (10) | - | - | - | (10) | (34) |
| Contingency | - | (35) | (1) | (19) | (39) | (42) | (1) | (16) | (42) | (22) | (1) | (38) | (17) | (273) |
| **Administrative Expenses to Support Wind-Down** | $ - | $ (350) | $ (16) | $ (214) | $ (206) | $ (458) | $ (11) | $ (174) | $ (214) | $ (246) | $ (16) | $ (419) | $ (202) | $ (2,525) |
| FTI | - | - | - | - | (53) | - | - | - | (85) | - | - | - | - | (138) |
| Cullen | - | - | - | - | (53) | - | - | - | (105) | - | - | - | - | (158) |
| Nolan Heller | - | - | - | - | (10) | - | - | - | (10) | - | - | - | - | (20) |
| Other Restructuring Professional Fees | - | - | - | - | (120) | - | - | - | (56) | - | - | - | - | (176) |
| Restructuring Professional Fees | - | - | - | - | (236) | - | - | - | (256) | - | - | - | - | (492) |
| Utility Deposit | - | (35) | - | - | - | - | - | - | - | - | - | - | - | (35) |
| United States Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | (27) | (27) |
| **Restructuring Expenses** | $ - | $ (35) | $ - | $ - | $ (236) | $ - | $ - | $ - | $ (256) | $ - | $ - | $ - | $ (27) | $ (554) |
| **Total Expenses** | $ - | $ (385) | $ (16) | $ (214) | $ (442) | $ (458) | $ (11) | $ (174) | $ (470) | $ (246) | $ (16) | $ (419) | $ (229) | $ (3,079) |
| **Net Cash Flow** | $ - | $ (385) | $ (16) | $ (214) | $ (442) | $ (458) | $ (11) | $ (174) | $ (470) | $ (246) | $ (16) | $ (419) | $ (229) | $ (3,079) |
| Operating Cash | $ 1,604 | $ 1,604 | $ 1,220 | $ 1,204 | $ 10,207 | $ 9,765 | $ 9,306 | $ 9,296 | $ 9,122 | $ 8,651 | $ 8,405 | $ 8,390 | $ 7,971 | $ 1,604 |
| Short-Term Financing, Net | - | - | - | 9,217 | - | - | - | - | - | - | - | - | - | 9,217 |
| **Beginning Liquidity** | $ 1,604 | $ 1,604 | $ 1,220 | $ 10,420 | $ 10,207 | $ 9,765 | $ 9,306 | $ 9,296 | $ 9,122 | $ 8,651 | $ 8,405 | $ 8,390 | $ 7,971 | $ 10,821 |
| Net Cash Flow | - | (385) | (16) | (214) | (442) | (458) | (11) | (174) | (470) | (246) | (16) | (419) | (229) | (3,079) |
| **Ending Liquidity** | $ 1,604 | $ 1,220 | $ 1,204 | $ 10,207 | $ 9,765 | $ 9,306 | $ 9,296 | $ 9,122 | $ 8,651 | $ 8,405 | $ 8,390 | $ 7,971 | $ 7,742 | $ 7,742 |

1. Reflects partial week beginning on the Petition Date, October 10, 2024.

## EXHIBIT B

## EXCLUDED PERSONAL PROPERTY

<u>Excluded Asset List</u>

Book collection donated by Dr. David Dorsey Jr housed in the Seminar Room in the Women's Leadership Building at 1020 Madison Avenue.

Food truck stored in the garage at 409 Western Avenue.

Library books, including the special collection of rare books, housed in the library at 392 Western Avenue and the sanctuary at 959 Western Avenue.

All contents of the archival room, office and storage room at 392 Western Avenue.

Bronze seated Dante, and marble stand it is on, art slide show, pineapple table, and crucifix outside the archival office.

100 international flags and commencement staging at 917 Madison Avenue.

Artwork (list attached).

Religious artifacts housed in the sanctuary at 959 Madison Avenue.

Statue of the Blessed Virgin Mary, labeled Rosa Mystica, in the Alumni Garden.

Large indoor nativity set at 950 Madison Avenue.

| DESCRIPTION | Custom Lookup 1 | Location | Building/Location 2 | Quantity |
|---|---|---|---|---|
| STATUE; ARTWORK | R. POULA & J. MATL (Silver Madonna) | 3rd Floor | 1000 Madison | 1 |
| PRINT, ARTWORK | AUDIOTRONICS | WAITIN - LMHL | 366B Western | 1 |
| PRINT, ARTWORK | ROY LICTENSTEIN | WAITIN - LMHL | 366B Western | 1 |
| Sculptures | | First Floor Reference Area - 392 W | 392 Western | 4 |
| Asian Memorabilia | | Second Floor Bindery - 392 W | 392 Western | 1 |
| Bronze Statue of Robed Man | | Third Floor (Books 900-999) - 392 W | 392 Western | 1 |
| Marble Pedestal | | Third Floor (Books 900-999) - 392 W | 392 Western | 1 |
| Table, Pineapple pedestal | | Third Floor, Room 319 (Waiting Area) - 392 W | 392 Western | 1 |
| Marble Statue | | Third Floor, Room 323 - 392 W | 392 Western | 1 |
| Table, Marble Pedestal | | Third Floor, Room 323 - 392 W | 392 Western | 1 |
| PRINT, ARTWORK | MADELIN NOVLOTZKY | LIBRARY - HBBR | 959 Madison | 1 |
| PRINT, ARTWORK | Ansing | SECRETARY - HBBR | 959 Madison | 1 |

## Exhibit B

### Initial DIP Budget

*Subject to Change*

**The College of Saint Rose**
**13-Week Cash Flow as of October 10, 2024**

| USD in 000s | Week 1[1] Forecast 10/13/2024 | Week 2 Forecast 10/20/2024 | Week 3 Forecast 10/27/2024 | Week 4 Forecast 11/3/2024 | Week 5 Forecast 11/10/2024 | Week 6 Forecast 11/17/2024 | Week 7 Forecast 11/24/2024 | Week 8 Forecast 12/1/2024 | Week 9 Forecast 12/8/2024 | Week 10 Forecast 12/15/2024 | Week 11 Forecast 12/22/2024 | Week 12 Forecast 12/29/2024 | Week 13 Forecast 1/5/2025 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | |
| Salaries | - | (119) | - | (107) | - | (97) | - | (97) | - | (97) | - | (264) | - | (780) |
| Fringe Benefits | - | (38) | (5) | (31) | (5) | (27) | (5) | (27) | - | (27) | - | (52) | - | (213) |
| Equipment, Supplies, and Other Expenses | - | (22) | (6) | (9) | (10) | (198) | - | (7) | (13) | (7) | (6) | (7) | (8) | (298) |
| Property Maintenance, Utilities, and Insurance | - | (114) | (4) | (28) | (25) | (94) | (5) | (28) | (24) | (94) | (9) | (57) | (59) | (540) |
| Digitization and Storage of Records | - | - | - | - | (118) | - | - | - | (8) | - | - | - | (8) | (35) |
| Close-Out Audits | - | (18) | - | - | - | - | - | - | (118) | - | - | - | (100) | (353) |
| P Card Payments | - | (4) | - | - | (10) | - | - | - | (10) | - | - | - | (10) | (34) |
| Contingency | - | (35) | (1) | (19) | (39) | (42) | (1) | (16) | (42) | (22) | (1) | (38) | (17) | (273) |
| | | | | | | | | | | | | | | |
| Administrative Expenses to Support Wind-Down | $ - | $ (350) | $ (16) | $ (214) | $ (206) | $ (458) | $ (11) | $ (174) | $ (214) | $ (246) | $ (16) | $ (419) | $ (202) | $ (2,575) |
| FTI | - | - | - | - | (53) | - | - | - | (85) | - | - | - | - | (138) |
| Cullen | - | - | - | - | (53) | - | - | - | (105) | - | - | - | - | (158) |
| Nolan Heller | - | - | - | - | (10) | - | - | - | (10) | - | - | - | - | (20) |
| Other Restructuring Professional Fees | - | - | - | - | (120) | - | - | - | (56) | - | - | - | - | (172) |
| Restructuring Professional Fees | - | - | - | - | (236) | - | - | - | (256) | - | - | - | - | (490) |
| Utility Deposit | - | (35) | - | - | - | - | - | - | - | - | - | - | - | (35) |
| United States Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | (27) | (2) |
| Restructuring Expenses | $ - | $ (35) | $ - | $ - | $ (236) | $ - | $ - | $ - | $ (256) | $ - | $ - | $ - | $ (27) | $ (558) |
| Total Expenses | $ - | $ (385) | $ (16) | $ (214) | $ (442) | $ (458) | $ (11) | $ (174) | $ (470) | $ (246) | $ (16) | $ (419) | $ (229) | $ (3,079) |
| Net Cash Flow | $ - | $ (385) | $ (16) | $ (214) | $ (442) | $ (458) | $ (11) | $ (174) | $ (470) | $ (246) | $ (16) | $ (419) | $ (229) | $ (3,079) |
| Operating Cash | $ 1,604 | $ 1,604 | $ 1,220 | $ 1,204 | $ 10,207 | $ 9,765 | $ 9,306 | $ 9,296 | $ 9,122 | $ 8,651 | $ 8,405 | $ 8,390 | $ 7,971 | $ 1,604 |
| Short-Term Financing, Net | - | (385) | (16) | 9,217 | - | - | - | - | - | - | - | - | - | 9,211 |
| Beginning Liquidity | $ 1,604 | $ 1,604 | $ 1,220 | $ 10,420 | $ 10,207 | $ 9,765 | $ 9,306 | $ 9,296 | $ 9,122 | $ 8,651 | $ 8,405 | $ 8,390 | $ 7,971 | $ 10,831 |
| Net Cash Flow | - | (385) | (16) | (214) | (442) | (458) | (11) | (174) | (470) | (246) | (16) | (419) | (229) | (3,077) |
| Ending Liquidity | $ 1,604 | $ 1,220 | $ 1,204 | $ 10,207 | $ 9,765 | $ 9,306 | $ 9,296 | $ 9,122 | $ 8,651 | $ 8,405 | $ 8,390 | $ 7,971 | $ 7,742 | $ 7,744 |

1. Reflects partial week beginning on the Petition Date, October 10, 2024.