KAREN L. MORRIS
General Counsel
KARTAR S. KHALSA
Deputy General Counsel
SIMON J. TORRES
Assistant General Counsel
KELSEY L. OWENS
Attorney
PENSION BENEFIT GUARANTY CORPORATION
Office of the General Counsel
445 12th St S.W.
Washington, D.C. 20024-2101
Telephone: (202) 860-9329
Emails: owens.kelsey@pbgc.gov and efile@pbgc.gov

*Counsel for Pension Benefit Guaranty Corporation*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE COLLEGE OF SAINT ROSE, | ) Case No. 24-11131 (REL) |
| | ) |
| Debtor. | ) |

### RESPONSE OF THE PENSION BENEFIT GUARANTY CORPORATION TO THE MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING THE DEBTOR TO DISBURSE FUNDS FROM DEBTOR'S EMPLOYEE PENSION PLAN AND GRANTING RELATED RELIEF

The Pension Benefit Guaranty Corporation ("PBGC"), an agency of the United States, hereby responds to the Debtor's Motion for Entry of Order Authorizing the Debtor to Disburse Funds From Debtor's Employee Pension Plan and Granting Related Relief ("Motion"). Based on PBGC's understanding of the Motion and conversations with the Debtor's counsel, the Motion seeks authorization only to continue administering the plan in the ordinary course, including making monthly pension payments to Pension Plan participants and paying plan actuaries from

1

Pension Plan funds. Assuming that is the case, PBGC does not object to the relief requested in the Motion. However, PBGC seeks to clarify certain incorrect or incomplete statements in the Motion about the Pension Plan, the federal laws and regulations applicable to it, and PBGC and its processes.[1]

## BACKGROUND

### I. Parties

1. PBGC is a wholly owned United States government corporation that administers and enforces the pension insurance program established by Title IV of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"). 29 U.S.C. §§ 1301-1461 (2018 & Supp. IV 2023). Title IV of ERISA provides the exclusive means to terminate defined benefit pension plans, and PBGC regulates such terminations. *See* 29 U.S.C. §§ 1341(a)(1), 1342.

2. The College Of Saint Rose Non-Contract Employees Pension Plan ("Pension Plan") is a defined benefit pension plan covered by Title IV of ERISA.

3. The College of Saint Rose (the "College") is the contributing sponsor of the Pension Plan within the meaning of 29 U.S.C. § 1301(a)(13) and the plan administrator of the Pension Plan within the meaning of 29 U.S.C. §§ 1301(a)(1) and 1002(16).

### II. Statutory Background

4. Title IV of ERISA provides three ways to terminate a defined benefit pension plan. *See* 29 U.S.C. § 1341(a)(1). A plan can terminate in a "standard termination" under 29 U.S.C. § 1341(b), a "distress termination" under 29 U.S.C. § 1341(c), or a "PBGC-initiated termination" under 29 U.S.C. § 1342.

---

[1] Though not required to under the Court's rules, PBGC has conferred with Debtor about this Response, and Debtor did not take issue with PBGC's belief that it needed to file it.

5.  Distress terminations and most PBGC-initiated terminations involve the termination of a pension plan with insufficient assets to pay the plan's promised benefits. *See* 29 U.S.C. §§ 1341(c), 1342. PBGC guarantees the payment of certain pension benefits upon the distress termination or PBGC-initiated termination of a single-employer pension plan covered by Title IV of ERISA. When an underfunded pension plan terminates in a distress termination or PBGC-initiated termination, PBGC generally becomes statutory trustee of the plan and supplements any assets remaining in the plan with its insurance funds to pay to the retired employees their pension benefits, subject to statutory limits. *See* 29 U.S.C. §§ 1321-1322, 1342, 1361.

6.  By contrast, a standard termination requires that the pension plan has sufficient assets to pay all benefit liabilities as determined under the plan provisions in effect on the plan's termination date. 29 U.S.C. § 1341(b)(1)(D). The plan administrator must allocate and distribute assets to the plan's participants and beneficiaries in accordance with 29 U.S.C. §§ 1341 and 1344. Importantly, a standard termination is a voluntary process undertaken by the plan sponsor to terminate the pension plan.

7.  To effectuate a standard termination, a plan sponsor must take several steps. First, the plan administrator must notify plan participants of its intent to terminate the plan (the "NOIT"). *See* 29 U.S.C. §§ 1341(a)(2), (b)(1)(A). The NOIT must state, *inter alia*, that the plan is to be terminated and include a proposed plan termination date. 29 C.F.R. § 4041.23(b)(2).

8.  Second, within 180 days after the proposed termination date and before distributing any plan assets, the plan administrator must send PBGC a "Standard Termination Notice – PBGC Form 500" ("Form 500") with information about the plan assets and benefit liabilities. *See* 29 U.S.C. § 1341(b)(2)(A); 29 C.F.R. § 4041.25. On the Form 500, the plan

3

administrator and actuary must certify that the plan's assets equal or exceed the value of the plan benefits. Standard Termination Notice Single-Employer Plan Termination, https://www.pbgc.gov/sites/default/files/500and501a.pdf; *see also* 29 U.S.C. § 1341(b)(2)(A). After receiving the Form 500, PBGC has 60 days to determine, *inter alia*, whether the standard termination notice is complete. 29 CFR § 4041.26(b). PBGC audits a statistically significant number of standard terminations to ensure that participants receive their full benefit. 29 U.S.C. § 1303(a).

9. Third, absent PBGC issuing a notice of noncompliance under 29 CFR § 4041.31, the plan administrator must distribute the plan's assets to participants in accordance with Title IV of ERISA within a specified time-period. *See* 29 U.S.C. §§ 1341(b)(2)(D), (b)(3); 29 C.F.R. § 4041.28.

10. Fourth, once all plan assets have been distributed, the plan administrator must file a "Post-Distribution Certification for Standard Termination – PBGC Form 501" (the "Form 501"), attesting that all benefits under the plan were paid in accordance with Title IV of ERISA. *See* 29 U.S.C. § 1341(b)(3)(B); 29 C.F.R. § 4041.29.

11. A pension plan's standard termination is deemed to be valid and complete if both (i) the plan administrator has filed a Form 500 and PBGC has not issued a notice of noncompliance, and (ii) the plan administrator has filed a Form 501 and PBGC has not issued a notice of noncompliance. *See* 29 C.F.R. § 4041.31(f).

### III. The Pension Plan Administrator's Steps Toward Termination

12. PBGC understands that on or about May 22, 2024, the College issued a NOIT to the Pension Plan's participants stating that the College intended to complete a standard termination. The NOIT contained a proposed Pension Plan termination date of July 31, 2024.

4

13. To date, the College has not filed a Form 500 with PBGC. Based on the proposed termination date of July 31, 2024, the College has until January 27, 2025, to file the Form 500 if the College intends to proceed with a standard termination.

14. PBGC has not received an application from Debtors to terminate the Pension Plan in a distress termination under 29 U.S.C. § 1341(c) and PBGC has not initiated termination of the Pension Plan under 29 U.S.C. § 1342.

15. In a conversation on December 17, 2024, between PBGC officials and counsel for the College, counsel represented to PBGC that it is very unlikely that the College will be able to complete a standard termination, as the Pension Plan's assets do not currently equal or exceed the value of the plan benefits.

## ARGUMENT

16. The Motion states that "[t]he Plan was terminated on or about July 31, 2024." ECF No. 145 ¶ 10. This is incorrect. Rather, the Pension Plan is an ongoing plan until it is terminated in accordance with Title IV of ERISA, which it has not been. 29 U.S.C. § 1341(a)(1); *see also Air Line Pilots Ass'n Intern. v. PBGC*, 193 F. Supp. 2d 209, 217-18 (D.D.C. 2002) (finding that the plan administrator's action had to be and was "compatible with ERISA's termination procedures" and that no "independent termination authority" exists outside of Title IV). The NOIT merely started the process for attempting to terminate the Pension Plan and provided an *intended* standard termination date. Because PBGC has not initiated termination of the Pension Plan and no distress termination application has been filed, the Pension Plan can only be terminated if the College properly completes the standard termination under 29 U.S.C. § 1341(b). The College has not filed a Form 500 formally notifying PBGC of a standard termination and, therefore, PBGC has yet to review the notice for sufficiency. *See* 29 C.F.R. §

5

4041.26(a). To complete a standard termination, the College would still need to file Form 500, wait for the 60-day review period to pass, distribute plan assets to plan participants, and then submit a Form 501 certifying that all Pension Plan benefits have been paid. *See* 29 C.F.R. § 4041.25, 4041.26, 4041.28, 4041.29.

17. The Motion states that "[o]n or before January 27, 2025, the Debtor must file the Pension Benefit Guaranty Corporation ("PBCG") Form 500, *Standard Termination Notice, Single Employer Plan Termination*, regarding the Plan." ECF No. 145 ¶ 10. This is true only if the College still intends to complete a standard termination. And as stated above and below, PBGC believes that the College does not because it cannot.

18. A plan sponsor is not required to continue to pursue a standard termination after issuing a NOIT. But if it does, it must file Form 500, which requires the plan administrator and actuary to certify that the plan's assets equal or exceed the value of the plan benefits. *See* 29 U.S.C. § 1341(b)(2)(A). Because the College's counsel confirmed to PBGC that the Pension Plan does not have sufficient assets to complete a standard termination, the College should not file a Form 500.

19. The Motion states that, after the College files a Form 500, "the PBGC will have sixty (60) days to review same, and determine whether to convert the plan termination to a distressed, or involuntary, termination." ECF No. 145 ¶ 10. This is an inaccurate description of the applicable process. PBGC does not convert standard termination filings to distressed or involuntary terminations during this period. Rather, during this period, PBGC ensures that the filing is complete and properly signed. In the event that the College filed a Form 500 and it was incomplete, PBGC would issue a notice of noncompliance. 29 CFR § 4041.31. A notice of noncompliance ends the standard termination proceeding, nullifies all actions taken to terminate

6

the plan, and maintains the plan's status as an ongoing plan. 29 CFR § 4041.31(e).

20. Also inaccurate is the Motion's suggestion that whether the plan is underfunded cannot be determined until the 60-day review period is complete. ECF No. 145 ¶ 10. Whether a plan is underfunded must be determined by the plan's actuary *before* filing a Form 500. *See* 29 U.S.C. § 1341(b)(2)(A)(i). Moreover, a plan administrator should not file a Form 500 or initiate the standard termination process for a plan that is or may be underfunded. *See* 29 U.S.C. § 1341(b)(2)(A)(iii). If, at the time a Form 500 is filed, PBGC is aware a plan's assets are insufficient to satisfy all benefits due, it is obligated to issue a notice of noncompliance. 29 CFR § 4041.31(a)(1)(iv).

21. The Motion also states that "[t]o the extent that there is an underfunding of the Plan, it is guaranteed by the PBGC." ECF No. 145 ¶ 10. This is a partially correct but also incomplete statement. To clarify, PBGC guarantees private defined benefit pension plan underfunding *up to statutory limits*, but only for plans that have been terminated by distress or PBGC-initiated terminations, and not in the standard termination context. *See* 29 U.S.C. § 1322. If a plan sponsor who completed a standard termination is found in a post-termination audit under 29 U.S.C. § 1303(a) to have underpaid a participant, the plan sponsor (and not PBGC) is required to make the participant whole.

22. The Motion also suggests that PBGC limits what plan distributions the College can make to plan participants during bankruptcy. ECF No. 145 ¶ 10. Not so. Rather, the debtor's ability to distribute funds in bankruptcy is determined by the Internal Revenue Code, including limitations on distributions of plan funds after a plan sponsor has filed for chapter 11 bankruptcy. *See* 26 U.S. Code §§ 436(d)(2); 436(d)(5); 411(a)(11).

23. Finally, the Motion states that the College "confirmed in discussions with the

7

PBGC" that the College can make only limited plan distributions during bankruptcy. ECF No. 145 ¶ 11. PBGC clarifies that it does not and did not provide the College with legal advice, but merely pointed the College's counsel to the relevant code sections cited above.

## CONCLUSION

As stated above, PBGC does not object to the relief requested in the Motion but respectfully submits this Response to address certain inaccuracies contained in the Motion.

8

| | |
|---|---|
| Dated:  January 3, 2025<br>Washington, D.C. | Respectfully Submitted,<br><br>/s/  Kelsey L. Owens<br>KAREN L. MORRIS<br>General Counsel<br>KARTAR S. KHALSA<br>Deputy General Counsel<br>SIMON J. TORRES<br>Assistant General Counsel<br>KELSEY L. OWENS<br>Attorney<br>PENSION BENEFIT GUARANTY CORPORATION<br>Office of the General Counsel<br>445 12th St SW<br>Washington, D.C. 20024-2101<br>Telephone: (202) 860-9329<br>Emails: owens.kelsey@pbgc.gov and efile@pbgc.gov<br><br>*Counsel for Pension Benefit Guaranty Corporation* |