CULLEN AND DYKMAN LLP
80 State Street, Suite 900
Albany, New York 12207
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.
(516) 357-3700

*Attorneys for The College of Saint Rose*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------- x
                                          :
In re:                                    :   Chapter 11
                                          :
THE COLLEGE OF SAINT ROSE,                :   Case No. 24-11131 (REL)
                                          :
              Debtor.                     :
                                          :
-------------------------------------------------------------- x
```

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN
## FILED BY THE COLLEGE OF SAINT ROSE

### IMPORTANT DATES

- Date by which Ballots must be received: ____, 2025 at 5:00 p.m. Eastern Time.

- Date by which objections to Confirmation of the Plan must be filed and served: _____, 2025 at 5:00 p.m. Eastern Time.

- Hearing on Confirmation of the Plan: _____ 2025 at 10:30 a.m. Eastern Time.

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................................2

    A.    General ................................................................................................................2

    B.    Voting ................................................................................................................2

    C.    Confirmation Hearing ........................................................................................4

    D.    Recommendations .............................................................................................5

II. HISTORICAL INFORMATION ...........................................................................................5

    A.    The Debtor's History .........................................................................................5

III. THE REORGANIZATION CASE ......................................................................................12

    A.    Overview ..........................................................................................................12

    B.    Employment of Professionals and Other Entities .................................................12

    C.    Creditors' Committee .......................................................................................12

    D.    Debtor-in-Possession Financing and Use of Cash Collateral ...............................12

    E.    Sale of Real Estate ...........................................................................................13

    F.    Motion Practice ................................................................................................14

    G.    Claims Administration ......................................................................................14

        1.    Filing of Schedules and Statements ...............................................................15

        2.    Bar Dates for Pre-Petition Claims ..................................................................15

        3.    Bar Dates for Post-Petition Claims .................................................................15

    H.    Exclusivity .......................................................................................................16

IV. SUMMARY OF THE PLAN ...............................................................................................16

    A.    General ............................................................................................................16

    B.    Plan Overview/Asset Buckets ...........................................................................17

    C.    Treatment of Claims ........................................................................................19

        1.    Superpriority Claims – Not Classified .............................................................19

2. Administrative Claims – Not Classified .................................................................20

3. U.S. Trustee Fees – Not Classified .......................................................................21

4. Professional Fee Claims – Not Classified.............................................................21

5. Priority Tax Claims – Not Classified.....................................................................22

6. Allowed Other Priority Claims – Class 1 ..............................................................22

7. Allowed Bondholder Secured Claim – Class 2.......................................................23

8. Allowed Other Secured Claims – Class 3 ..............................................................24

9. Allowed Bondholder Deficiency Claims-Class 4 ....................................................24

10. Allowed General Unsecured Claims-Class 5..........................................................25

D.    Treatment of Executory Contracts and Unexpired Leases ...................................26

1. Rejection of Executory Contracts and Other Unexpired Leases ...........................26

2. Bar Date for Rejection Damages ..........................................................................26

E.    Summary of Distributions and Claims Resolution Provisions .............................27

1. Minimum Amount of Distributions .......................................................................27

2. Objections to Claims.............................................................................................27

2. Estimation of Claims............................................................................................27

3. Claims Filed After Bar Date. ...............................................................................29

4. Disallowance of Claims ........................................................................................29

5. Disputed Claims Reserve .....................................................................................29

6. Withholding Taxes and Expenses of Distribution .................................................30

7. Disputed Payment ................................................................................................30

8. Setoffs and Recoupment ......................................................................................31

9. Interest on Claims. ...............................................................................................31

10. Distributions Relating to Bonds...........................................................................32

V. MEANS OF IMPLEMENTATION OF THE PLAN; EFFECT OF CONFIRMATION .........32

A.    Funding of the Plan..............................................................................................32

B.    Plan Administrator ...................................................................32

C.    Injunction ...............................................................................33

D.    Discharge ................................................................................34

E.    Exculpation .............................................................................34

F.    Indemnification ......................................................................35

G.    Provisions as to Governmental Units......................................36

H.    Post-Confirmation Management ..............................................37

I.    Endowment and Restricted Funds ...........................................38

J.    Cancellation of Bonds..............................................................38

K.    Post-Confirmation Jurisdiction of the Court...........................39

VI. CONFIRMATION OF THE PLAN .................................................42

A.    Introduction .............................................................................42

B.    Conditions to Confirmation .....................................................42

C.    Conditions to the Effective Date .............................................43

D.    Voting Procedures and Standards ............................................43

E.    Voting Procedures Applicable to Bonds...................................47

F.    Acceptance ...............................................................................48

G.    Confirmation and Consummation.............................................49

1.    Best Interests of Holders of Claims .....................................50

2.    Financial Feasibility.............................................................51

3.    Acceptance by Impaired Classes ..........................................51

4.    Cram Down ...........................................................................52

5.    Classification of Claims .......................................................54

VII. CERTAIN RISK FACTORS TO BE CONSIDERED....................54

A.    Risk That Distributions Will Be Less Than Estimated ...........54

B.    Bankruptcy Risks .....................................................................54

a.    Objection to Classifications .................................................54

b.    Risk of Non-Confirmation of the Plan.................................55

VIII. TAX CONSEQUENCES ...............................................................55

iii

IX. CONCLUSION.....................................................................................................................56

21398947v1

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, AS APPLICABLE.  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO CAREFULLY READ THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.  **THE AMOUNTS OF CLAIMS AND DISTRIBUTIONS CONTAINED HEREIN ARE ESTIMATES ONLY.**

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT

BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

## I. INTRODUCTION

### A.    General

The College of Saint Rose (the "Debtor") files this Disclosure Statement (the "Disclosure Statement") with respect to the Chapter 11 Plan filed by it, dated April 11, 2025 (the "Plan").

This Disclosure Statement is provided pursuant to section 1125 of the Bankruptcy Code to all the known creditors of the Debtor.  The purpose of this Disclosure Statement is to provide sufficient information to enable creditors who are entitled to vote to make an informed decision on whether to accept or reject the Plan.

Most words or phrases used in this Disclosure Statement shall have their usual and customary meanings.  Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.   FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.

**THE DEBTOR URGES CREDITORS TO VOTE TO ACCEPT THE PLAN AS THE PLAN REPRESENTS THE BEST OPPORTUNITY FOR CREDITORS TO OBTAIN ANY RECOVERIES IN RESPECT OF THEIR CLAIMS.**

### B.    Voting

With respect to Claims in Classes that are Impaired under the Plan, each holder of a Claim in such Classes will receive a copy of this Disclosure Statement, a Ballot for the acceptance or rejection of the Plan, and other related voting materials.  Any holder of a Claim whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under

the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered Impaired.

Under the Plan, holders of Allowed Claims in all Classes are Impaired, and are therefore entitled to vote on the Plan (the "Voting Classes"). For a description of the Classes of Claims and their treatment under the Plan, see Section IV(C) below.

The date of entry of the Disclosure Statement Approval Order is fixed as the "Voting Record Date." Only Persons who hold Claims on the Voting Record Date are entitled to receive a copy of this Disclosure Statement and all of the related materials.  Only Persons who hold Claims on that date that are Impaired under the Plan and are not deemed to reject the Plan are entitled to vote on the Plan.

In voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement. Except as provided in Section VI(E) below with respect to Bondholders, please complete and sign your Ballot and return it in the enclosed pre-addressed envelope to the Balloting Agent:

> Cullen and Dykman LLP
> 333 Earle Ovington Boulevard, 2nd Fl.
> Uniondale, NY 11553
> Attn: Bonnie L. Pollack, Esq.

ALL PROPERLY COMPLETED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR TO _____, 2025 AT 5:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH CLASS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN HAS ACCEPTED THE PLAN.  <u>ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT</u>.  The Balloting Agent and the Debtor will prepare and file with the Court a certification of the results of the balloting with respect to the Plan.

Your vote on the Plan is important.  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under a plan vote to accept such plan, unless the "cramdown" provisions of the Bankruptcy Code are employed.  The Debtor reserves the right to seek to "cramdown" the Plan on non-accepting Classes of Claims.  See Section VI below.

## C.    Confirmation Hearing

The Court will hold the Confirmation Hearing commencing at 10:00 a.m. (Eastern Time), on _____, 2025 at the United States Bankruptcy Court for the Northern District of New York, 445 Broadway, Suite 330, Albany, New York, 12207, before the Honorable Robert E. Littlefield, Jr., United States Bankruptcy Judge. The Confirmation Hearing may be adjourned from time to time without further notice.  At the Confirmation Hearing, the Court will (i) determine whether the requisite vote has been obtained from the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously settled, withdrawn or overruled, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, (iv) determine whether to confirm the Plan, and (v) grant such other and further relief as the Court deems reasonable and appropriate.

Any objection to Confirmation of the Plan must be in writing and filed with the Court and served in a manner so as to be received on or before _____, 2025 at 5:00 p.m. Eastern Time by: (1) counsel to the Debtor, Cullen and Dykman LLP, 333 Earle Ovington Boulevard, 2nd Fl. Uniondale, NY 11553, Attn: Matthew G. Roseman, Esq. and Bonnie L. Pollack, Esq.; and (2) the Office of the United States Trustee, Leo O'Brien Federal Building, 11A Clinton Avenue, Room 620, Albany, New York 12207, Attn: Harrison Strauss, Esq.

**D.      Recommendations**

**THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES VOTE TO ACCEPT THE PLAN AS THE PLAN REPRESENTS THE BEST OPPORTUNITY FOR CREDITORS TO OBTAIN RECOVERIES WITH RESPECT TO THEIR CLAIMS.**

**II. HISTORICAL INFORMATION**

**A.      The Debtor's History**

The College of Saint Rose (the "College" or the "Debtor") was founded by the Sisters of Saint Joseph of Carondelet Albany Province with a commitment to educational excellence, care for the dear neighbor, and providing opportunities for women so their dreams of higher learning could be realized. Established by provisional charter granted by the New York State Board of Regents on June 24, 1920 to issue bachelor's degrees, the College enrolled its first class of 19 women from across upstate New York in September of 1920. Founded on the grounds of the Keeler estate in the Pine Hills neighborhood of Albany, New York with one house and $1,000, the College was intentionally located in New York's capital city due to its intellectual resources.  Today, the College owns 72 buildings on 92 parcels of real estate contiguous to its original house on Madison Avenue in Albany and has more than 50,000 alumni living across the United States and the world.

The College's provisional charter was made absolute on March 19, 1931, and was amended in 1949 to authorize the offering of master's degrees. It was again amended in 2019 to authorize the offering of an associate's degree as part of its jointly registered BSN program with St. Peter's Healthy Partners Schools of Nursing.

In 1969, the College became fully coeducational, and in the ensuing decades added Division II athletics, and a four-school structure with programs in arts and humanities, business,

education, and mathematics and sciences. Many of these programs were nationally recognized and/or accredited. Between 2000 and 2011, the College embarked on capital improvement/renovation plan to meet the needs of its students and faculty.

For more than 10 years, as the College's structural deficit grew—caused by unachieved enrollment goals, a rising tuition discount rate, the financing structure of the College's bond debt, and a relatively low unrestricted endowment—the Board of Trustees (the "Board") and College leadership worked to achieve financial sustainability. The College experienced a steady enrollment decline for more than a decade from 5,130 total enrollment in 2010 (3,048 undergraduates and 2,082 graduate students) to a total enrollment of 2,566 in Fall 2023 (1,256 undergraduates and 1,310 graduate students). This was due in part to a shrinking pool of high school graduates in New York State and the northeast region overall and, in recent years, the prolonged negative impact of the COVID-19 pandemic. Many of the College's undergraduate programs were feeder programs for the College's graduate programs especially in education and related fields so as undergraduate enrollment declined, graduate enrollment was negatively impacted.

In December 2015, the College implemented a comprehensive plan to consolidate or eliminate low-enrolled academic programs and invest in programs experiencing student demand. Investments were made in academic programs, retention efforts, and restructuring financial aid and scholarships. Enrollment stabilized during this time and the first-year class increased to 641 students in 2016. However, the College's first-year discount rate increased from 54% in 2015-2016 to 67% in 2022-2023, which, as enrollment declined, contributed to a significant decrease in net tuition revenue.

The College's restructuring efforts were impacted and the College's financial challenges were exacerbated by the COVID-19 pandemic.  In March of 2020, the Governor's Emergency

Executive Orders required that all colleges and universities transition immediately to remote instruction and close residence halls for the balance of the Spring 2020 semester, necessitating the College to provide room and board refunds to students.

The pandemic continued into the Fall of 2020, and New York State imposed operating restrictions that modified the student experience and curtailed in-person recruiting for the next two academic years, particularly in the hard-hit metro NYC area, one of the College's primary recruitment territories. Fundraising was hampered by the lack of in-person events, visits, and travel to see donors and alumni.

The effect of the COVID-19 pandemic on the enrollment of first-year students was immediate and significant, dropping from 640 in Fall 2019 to 491 in Fall 2020, 309 in Fall 2021, and 239 in Fall 2022. In July 2020, the College began the implementation of a multi-year deficit reduction plan (the "Deficit Plan"), which included, reducing administrative expenses by $8 million and the development of a recommendation to the Board to reduce academic expenses by $6 million to be finalized by December 2020. From July to November 2020, the College implemented phase one of the Deficit Plan, effectuating $8 million in administrative reductions for fiscal year 2021 by eliminating administrative positions, freezing of the pension plan for hourly wage employees, reducing salaries, offering an early retirement plan for long-serving faculty, reducing departmental operating expenses, and selling certain non-essential properties.

In December 2020, the Board reviewed and considered the report of the Joint Working Group, comprised of the Representative Committee of the Faculty and the College's management team, which identified $5.9 million in potential academic expense reductions. These reductions included the elimination of programs with net negative or marginal revenue. The Board then approved the implementation of these reductions which resulted in the College providing one

year's notice of termination to tenured and tenured-track faculty, and reducing some academic administrative and staff positions. That phase was implemented by the College through December 2021. In connection with the Deficit Plan, the College provided teach-out plans for all impacted students to complete their degrees at the College.

From September 2021 through September 2022, College leadership continued to assess the College's financial condition, which remained challenged due to the prolonged impact of the COVID-19 pandemic on enrollment and the lack of a large endowment to underwrite institutionally awarded scholarships and grants. The academic program eliminations combined with the COVID-19 pandemic significantly impacted the College's retention of Fall 2020 first-year students, resulting in only a 58% first- to second-year retention rate in Fall 2021. The College anticipated that a 3-year strategic plan approved in 2021 to strengthen academic programming and improve retention would expand enrollment and revenue. Other initiatives, including restructuring the College's bond debt, would reduce the structural deficit going forward. In November 2021, the College refinanced its bond debt, resulting in a restructuring of the bond covenants, deferred principal payments, and a reduced interest rate of 4.0%.

From January to July 2022, the College initiated the sale of certain non-essential properties. In June 2022, the College retained a national enrollment consultant to devise new enrollment strategies and a national marketing firm to conduct market research and work on the College's branding. In June 2022, the College also retained legal counsel experienced in higher education strategic alternatives to provide guidance and advice and engaged a national financial advisory firm with a focus on higher education to evaluate strategic alternatives and provide guidance on stabilizing finances and operations. Throughout 2022, the College continued to evaluate alternative sources of funding to support the College's cash flow needs. These strategies included working

with donors to modify or eliminate limitations on restricted endowed funds. In addition, the College terminated its long-term operating lease with the University at Albany for residence hall space, resulting in budget savings in excess of $1,000,000.

Notwithstanding considerable efforts to implement the strategic plan and increase enrollment, the College experienced a significant enrollment decline in first-year students to 239 in Fall 2022, with a slight increase to 288 in Fall 2023. Despite a more than 10% increase in first-year retention to 69% for Fall 2021 and 73% for Fall 2022, the small incoming class sizes for those years continued to negatively impact the College's budget. Following approval by the faculty, on July 1, 2023, the Board approved the next phase of the plan to achieve institutional stability by moving from a four-school to a two-school structure, reducing the number of deans and academic administrative support.

On September 13, 2023, the Board voted not to renew the ratings process with Fitch Ratings with respect to the College's tax-exempt revenue refunding bonds (The College of St. Rose Series 2021).

Over the course of a year, the President, Trustee leaders, management team, and consultants explored several potential opportunities for a merger or similar transaction with other institutions of higher education. When it was clear more time was needed, President White and Board leadership met multiple times with the Mayor of the City of Albany, the Albany County Executive, and elected leaders representing the College's district, including its Congressman, NYS Senator, and NYS Assemblypersons, to emphasize the critical and immediate need for bridge funding. This bridge funding would allow the College to continue serving students and the public good, while a potential affiliation, partnership, merger, or other possible relationship was formalized to sustain the College's mission. Unfortunately, these efforts did not come to fruition

in the timeframe needed to provide certainty of sufficient financial resources to complete the 2024-2025 academic year.

On November 30, 2023, the Board determined, based on the College's financial and enrollment projections, and in order to avoid as much disruption as possible, that it was in the best interests of the students and the College to cease academic instruction no later than June 30, 2024. At the time the College ceased academic instruction, the College offered 31 bachelor's, 5 undergraduate certificate, 23 master's and 16 advanced certificate programs.

The Board directed the implementation of a closure plan that provided for the cessation of academic instruction no later than June 30, 2024, and thereafter, for the wind-down of operations and settlement of the affairs of the College (the "Closure Plan"). The Closure Plan included the authorization to the College's leadership to develop a Teach-Out Plan that would provide all students with seamless pathways to complete their degrees at Saint Rose and/or other institutions. It also included the authorization to develop plans for the orderly reduction and eventual discharge of the College's workforce, distribution of College assets, maintenance of College records, and such other activities as are required for the wind-down and settlement of the College's affairs and eventual dissolution of the College in accordance with applicable state and federal laws and regulations and accreditor policies.

Prior to the College ceasing academic instruction on June 21, 2024, the College offered a summer session that enabled another 460 students to graduate from the College.

The College's teach-out plan was approved by the Middle States Commission on Higher Education ("MSCHE") on June 20, 2024. The Teach-Out Plan included teach-out agreements with 21 institutions and provided all enrolled undergraduate and graduate Saint Rose students with at least one teach-out option. The teach-out agreements included the waiver of application fees,

maximum transfer of credits, and were program-specific designed to enable the students to complete their degrees on time as they had planned.

As of the end of 2024, 785 students are enrolled with one of the College's 22 (one more was added following MSCHE's approval of the Teach-Out Plan) teach-out partner institutions to continue their education and complete their degrees.

As part of the Teach-Out Plan, MSCHE granted the College's request to retain its accreditation until December 31, 2024 so that the College can provide students who are able to complete the degree programs in Fall 2024 the option to receive a degree from The College of Saint Rose.  The New York State Education Department also approved the College's request to retain degree-granting authority through December 31, 2024 for this purpose. On December 20, 2024, the College conferred 211 degrees.

In connection with the Closure Plan, on May 2, 2024, the College retained Jones Lang LaSalle ("JLL") to market the Campus for sale, further described below.

Over the several months prior to the Petition Date the Board and/or its Executive Committee had met weekly, considered presentations by the College's administration and its financial and legal advisors regarding the liabilities and liquidity situation of the College, the strategic alternatives available to it, and the effect of the foregoing on the College's operations, creditors, and other parties in interest. The Board has also had the opportunity to consult with the College's administration, financial and legal advisors, and other professionals.

Based on its review of all available alternatives and advice provided by such advisors and professionals, the Board determined that it was in the best interests of the College to file a chapter 11 case to provide for an orderly liquidation of its assets, including a sale of the Campus, for the

benefit of creditors while implementing the academic components of the Closure Plan.  Thus, on

the Petition Date, the College filed for chapter 11 protection.

## III.  THE REORGANIZATION CASE

### A.      Overview

As of the Petition Date, all actions and proceedings against the Debtor and acts to obtain

property from the Debtor were stayed under section 362 of the Bankruptcy Code.    During the

administration of the Chapter 11 Case, the Debtor managed its affairs as a debtor-in-possession

pursuant to sections 1107 and 1108 of the Bankruptcy Code, subject to the control and supervision

of the Court.

### B.      Employment of Professionals and Other Entities

The Debtor retained the law firm of Cullen and Dykman LLP as its counsel in connection

with the Chapter 11 Case.  The Debtor also retained Nolan Heller Kauffman LLP (which merged

with and is now known as Whiteman Osterman & Hanna LLP) as counsel to the Board of Trustees

and FTI Consulting Inc. as Financial Advisors.

### C.      Creditors' Committee

There was no committee of unsecured creditors appointed by the Office of the United

States Trustee in the Debtor's case.

### D.      Debtor-in-Possession Financing and Use of Cash Collateral

Prior to the Petition Date, the Debtor determined that in order to finance its winddown

operations, it had a need to use its revenue, and also required immediate access to additional funds.

Those additional funds were sought from many alternative sources, and ultimately the Debtor

entered into the DIP Loan with the DIP Lender which provided the Debtor with $10.8 million of

liquidity.  The Debtor spent significant time negotiating the DIP Loan Agreement with the DIP

Lender, as well as the form of DIP Order and Budget with both the DIP Lender and the Bond Trustee.

Ultimately, an interim order approving the DIP Motion was entered by the Court on October 16, 2024 and a final order was entered on November 5, 2024. The DIP Order granted various forms of adequate protection to the DIP Lender and the Bondholders, including Liens and replacement Liens in the Debtor's Assets as well as the Superpriority Claims.

The Debtor has been operating in accordance with the DIP Order and the Budget approved hereby and has performed all actions required of it under the DIP Order.

**E.      Sale of Real Estate**

Prior to the Petition Date, the Debtor engaged JLL to market the Debtor's largest asset, its Albany Campus. The sale of the Campus was a substantial endeavor, not only by the Debtor, but by all other interested parties as well.

The bid procedures with respect to the Sale of the Campus were approved by the Bankruptcy Court by Order dated November 15, 2024. After the approval of the bid procedures, the marketing efforts continued, resulting in numerous bids being submitted. Thereafter, an auction was conducted on December 12, 2024. Based on the auction, the Debtor determined to sell the Campus (with the exception of the President's House) to the Land Authority for $35 million and the President's House to Becker for $625,000. The Sales were approved by the Court by Orders dated December 20, 2024. The Sale of the President's House closed on March 5, 2025 and the Sale of the Campus closed on March 13, 2025. The DIP Lender was paid in full from the sale and is no longer entitled to any distribution. The Bondholders received $22,352,791.90 in reduction of their Secured Claim from the Sale of the Campus.

The net proceeds of the Sale of the President's House, amounting to $624,529.57, will inure to the benefit of the Debtor's Estate for distribution under the Plan, and the Bond Trustee has waived any entitlement to participate in the distribution of the net proceeds of such Sale. In conjunction with the Sale of the Campus, the Debtor agreed to sell the remaining personal property at the Campus to the Authority for the amount of $155,000, which will be paid to the Bondholders in reduction of their Secured Claim. The Motion to approval that Sale is pending before the Court.

## F.      Motion Practice

While the Sale of the Campus and the negotiation and execution of the various DIP Loan documents predominated the Debtor's activity since the Petition Date, the Debtor also obtained entry of many orders: (a) authorizing the payment of a critical vendor; (b) authorizing the payment of accrued and unpaid wage claims of its employees; (c) authorizing the Debtor to continue to use its pre-petition cash management system; (d) establishing procedures for noticing and service of process in the Debtor's bankruptcy case; (e) approving the sale of *de minimus* assets; (f) authorizing employment of professionals utilized in the ordinary course of business; (g) establishing procedures for interim compensation and reimbursement of expenses for retained professionals; (h) authorizing the Debtor to enter into consignment agreements and authorizing the sales of artwork and pianos; (i) prohibiting utility providers from altering, refusing or discontinuing utility services; (j) authorizing the Debtor to continue to maintain pre-petition insurance policies; (k) authorizing the filing of a cy pres petition regarding the Endowment and Restricted Funds; (l) authorizing payments from the Pension Plan; (m) approval of the sale of personal property to the Authority; (n) authorizing record retention procedures; (o) rejection of executory contracts; and (p) authorizing abandonment of charitable gift annuity reserves.

## G.      Claims Administration

1.      **Filing of Schedules and Statements**

In accordance with the Bankruptcy Code, the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs was originally to have been filed by October 24, 2024. The Debtor sought and obtained an order of the Court authorizing the extension of its time to file its Schedules and Statement of Financial Affairs through and including November 22, 2024. On November 6, 2024, the Debtor filed its initial Schedules and Statement of Financial Affairs. On December 6, 2024, the Debtor amended certain of its Schedules.

2.      **Bar Dates for Pre-Petition Claims**

By Order dated October 11, 2024, the Court established January 8, 2025 as the Claims Bar Date by which proofs of Claims arising prior to the Petition Date must be filed with the Court. Claims of Governmental Units must be filed by April 8, 2025.

3.      **Bar Dates for Post-Petition Claims**

*Superpriority Claims and Administrative Claims*

**Under the Plan, all holders of Superpriority Claims and Administrative Claims arising subsequent to October 10, 2024 and before the Effective Date (not including Professional Fee Claims described below), and not paid prior to the Confirmation Date, must file with the Court proper requests for payment of such Superpriority Claims and Administrative Claims, and serve copies upon the parties listed in Section XII(F) of the Plan, on or before the Administrative Claims Bar Date.  Parties not complying with this deadline shall be forever barred from seeking payment of those Claims including, without limitation, against the Debtor, the Estate, or their property, or commencing or continuing any action, employment of process or act to collect, offset or recover any such Superpriority Claims and Administrative Claim.**   The notice of Confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will include notice of the Administrative Claims Bar Date.

*Professional Fee Claims*

**All parties requesting compensation or reimbursement of Professional Fee Claims pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered or expenses incurred on behalf of the Debtor prior to the Effective Date must file applications with the Court, with copies to the parties listed in Section XII(F) of the Plan, on or before the Professional Compensation Claims Bar Date or shall be forever barred from seeking payment of those Professional Fee Claims.** The notice of Confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will include notice of the Professional Fee Claims Bar Date.

**H.    Exclusivity**

The Debtor's initial exclusive period to file a Chapter 11 Plan in its case was to expire on February 7, 2025. On February 6, 2025, the Court extended the exclusive period to March 24, 2025. The Debtor did not further extend the exclusive period.

**IV.  SUMMARY OF THE PLAN**

**A.    General**

**SET FORTH IN THIS SECTION IS A SUMMARY OF CERTAIN OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND CAREFUL READING OF THE PLAN.  STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY THE DEBTOR BASED ON**

AVAILABLE INFORMATION AND ARE NOT A REPRESENTATION AS TO THE ACCURACY OF THESE AMOUNTS.

**B.      Plan Overview/Asset Buckets**

The Plan is a liquidating plan as all Assets of the Debtor have been or will be liquidated to pay Allowed Claims against the Debtor.  The Debtor's primary Asset, the Campus, was sold pursuant to Order of the Bankruptcy Court dated December 20, 2024. In connection with the Sale of the Campus, the Debtor paid costs and expenses of sale, broker commissions and withheld U.S. Trustee Fees attributable to the Sale, and satisfied the DIP Lender's Secured Claim in full.  The remaining proceeds were paid to the Bond Trustee for distribution to the Bondholders.

The Bondholders were not paid in full from the Sale of the Campus. Their remaining claims are at least partially secured by virtue of filings made under the Uniform Commercial Code against the Bondholder Collateral. In addition, the Bondholders have a Superpriority Claim pursuant to the DIP Order, which Claim takes priority in payment from Unencumbered Collateral, subject to the Carve-Out.

In addition to the Campus, the Debtor sold the President's House to Becker pursuant to Order of the Court dated December 20, 2024. The net proceeds of that Sale remaining after the payment of costs and expenses, and broker commissions attributable to the Sale will be held in an account by Debtor's counsel for payment to the holders of Administrative Claims, Priority Tax Claims and General Unsecured Claims under the Plan. The Bond Trustee on behalf of the Bondholders has relinquished any claim to payments from the President's House Proceeds.

The Debtor also has personal property including without limitation artwork, gymnasium equipment, furniture, fixtures, and miscellaneous assets which the Debtor is liquidating for the benefit of the Holders of Claims, as set forth above. In addition, the Unused Insurance Premiums,

the Workers' Compensation Recoveries and the UE Deposit, all of which constitute Bondholder Collateral, will be liquidated and paid to the Bond Trustee in reduction of the Bondholder Secured Claim. Finally, the Debtor may, but is not likely to, recover funds from the litigation of any Causes of Action. To the extent that the Bondholders have a Lien against any such personal property, either such assets or the net proceeds of such Sales shall be distributed to the Bond Trustee on account of the Bondholder Secured Claims. To the extent of any such Assets or Causes of Action constitute Unencumbered Collateral, the proceeds shall be distributed to Holders of all Claims under the Plan. The waterfall for the distribution of all Assets is as set forth on Exhibit "A" hereto.

On the Effective Date, the Plan Administrator Agreement will take effect. The Plan Administrator shall have the power and authority to take any action necessary to administer, liquidate and distribute the remaining Assets of the Estate, including the collection of any receivables still outstanding, pursuit of Causes of Action, making any distributions remaining to be made, cooperating with the New York State Attorney General's Office and New York State Supreme Court in connection with the cy pres petition, terminating the Pension Plan if not already terminated, and negotiating any Claim Objections which may be necessary after the Effective Date. The Plan Administrator shall have the authority to retain attorneys and consultants, including without limitation Cullen and Dykman LLP and FTI Consulting, Inc. in accordance with the Plan and the Plan Administrator Trust Agreement.

Debra Lee Polley will serve as the Plan Administrator. The compensation of the Plan Administrator will be as provided for in the Plan Administrator Agreement. The duties, responsibilities and powers of the Plan Administrator will terminate upon termination of the Plan Administrator Agreement.

### C.      Treatment of Claims

The Plan separates Claims into five (5) unclassified categories and five (5) Classes. A Claim is placed in a particular unclassified category or Class only to the extent that the Claim falls within the description of that category or Class. A Claim is also placed in a particular category or Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that category or Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Superpriority Claims, Administrative Claims, U.S. Trustee Fees, Professional Fee Claims and Priority Tax Claims have not been classified and, subject to compliance with the Administrative Bar Date and Professional Fee Claims Bar Date, will be paid in full, or as otherwise agreed by the Holders of such Claims, in Cash to the extent such Claims are Allowed. All other Claims have been classified.  Each holder of a Claim should refer to Articles II and III of the Plan for a full description of the classification and treatment of Claims provided under the Plan.

### 1.      Superpriority Claims – Not Classified

Superpriority Claims include Claims pursuant to Section 503(b) and 507(b) of the Bankruptcy Code equal to the Diminution Claims (as that term is defined in the DIP Order), allowable to the Bondholders under the DIP Order.

Unless otherwise agreed to by the Holder of an Allowed Superpriority Claim and the Debtor or Plan Administrator, each Holder of an Allowed Superpriority Claim will receive an exchange for full and final satisfaction, settlement, release, and compromise of its Superpriority Claim an amount of Cash equal to the amount of such Superpriority Claim either: (1) except as otherwise provided in the Confirmation Order, on the Effective Date or as soon as practicable

thereafter; or (2) if the Superpriority Claim is not Allowed as of the Effective Date, no later than

five (5) business days after the date in which an Order Allowing such Superpriority Claim becomes

a Final Order, or as soon as reasonably practicable thereafter.

The Superpriority Claims shall be paid prior to any Claims other than the Carve-Out as set

forth in the DIP Order, from the following Assets: Remaining Cash, Remaining Loan Proceeds,

Bondholder Collateral and the Unencumbered Collateral.

The Debtor estimates that the amount of Superpriority Claims payable to the Bondholders

totals $1,615,182.

**2.      Administrative Claims – Not Classified**

Administrative Claims include a Claim for costs and expenses of administration of the

Debtor's Estate pursuant to Sections 503(b) or 507(a)(2) of the Bankruptcy Code, including the

actual and necessary costs and expenses of preserving the Estate incurred after the Petition Date

and through the Effective Date.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the

Debtor or Plan Administrator, each Holder of an Allowed Administrative Claim will receive in

exchange for full and final satisfaction, settlement, release, and compromise of its Administrative

Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1)

except as otherwise provided in the Confirmation Order, on the Effective Date or as soon as

practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no

later than five (5) business days after the date on which an order Allowing such Administrative

Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed

Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of their

business after the Petition Date, such Allowed Administrative Claims shall be paid pursuant to the

terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims and without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtor estimates that there will be no unpaid Administrative Claims as the Debtor is current, and has sufficient funds to remain current, on its post-petition obligations. However, to the extent any such Claims exist, they shall be paid from the following Assets: (a) after payment in full of the Bondholder Superpriority Claims: Remaining Cash, Remaining Loan Proceeds and the Unencumbered Collateral; (b) after payment in full of the Bondholder Superpriority Claim and the Bondholder Deficiency Claim: Bondholder Collateral;  and (c) the President's House Proceeds.

### 3.    U.S. Trustee Fees – Not Classified

The Debtor and/or Plan Administrator shall pay all U.S. Trustee Fees by the Effective Date. Thereafter, U.S. Trustee Fees shall be paid by the Debtor and/or Plan Administrator until entry of a final decree closing the Chapter 11 Case, or order of dismissal or conversion of the Chapter 11 Case. All such payments are included in the Budget and shall be included in the Post-Effective Date Expenses.

### 4.    Professional Fee Claims – Not Classified

Professional Fee Claims are defined under the Plan as all Claims for accrued fees and expenses for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to any order of the Bankruptcy Court or the Local Bankruptcy Rules and regardless of whether a fee application has been Filed for such fees and expenses.

Except as otherwise specifically provided in the Plan, on and after the Effective Date, in the ordinary course of business and without any further notice to or action, order, or approval of

the Bankruptcy Court pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Debtor.

It is anticipated that this Class will include all retained Professionals identified above, and that as of the Effective Date of the Plan, unpaid fees to all Professionals will amount to approximately $277,000 in accordance with the Budget. All such Allowed Claims shall be paid from the Budget, and the Post-Effective Date Expenses, and otherwise *pari passu* with Administrative Claims.

### 5.        Priority Tax Claims – Not Classified

Priority Tax Claims are defined under the Plan as Claim of a Governmental Unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code. On the Distribution Date, in exchange for full and final satisfaction, settlement, release, and compromise of an Allowed Priority Tax Claim, each Holder of such a Claim, unless agreed to otherwise by the Debtor or Plan Administrator and the Holder of such a Claim, shall receive or amounts shall be reserved for payment of Cash up to the full amount of such Claims from the following Assets: (a) after payment in full of Allowed Superpriority Claims, Administrative Claims and Professional Fee Claims: Remaining Cash, Remaining Loan Proceeds and the Unencumbered Collateral; (b) after payment in full of the Bondholder Superpriority Claim, Bondholder Deficiency Claim, Administrative Claims and Professional Fee Claims: Bondholder Collateral; and (c) after payment in full of Administrative Claims and Professional Fee Claims: the President's House Proceeds. Priority Tax Claims amount to approximately $750,491.

### 6.        Allowed Other Priority Claims – Class 1

Class 1 consists of Allowed Other Priority Claims against the Debtor's estate, which includes any Claim against the Debtor entitled to priority in right of payment under Section 507

of the Bankruptcy Code, other than: (a) a Superpriority Claim; (b) an Administrative Claim; (c) a Professional Fee Claim; or (d) a Priority Tax Claim. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and compromise of each and every Allowed Other Priority Claim against the Debtor, each holder of an Allowed Other Priority Claim shall be paid on the Distribution Date in Cash up to the full amount of such Claims from the following Assets: (a) after payment in full of Allowed Superpriority Claims, Administrative Claims, Professional Fee Claims and Priority Tax Claims: Remaining Cash, Remaining Loan Proceeds and Unencumbered Collateral; (b) after payment in full of the Bondholder Superpriority Claim, Bondholder Deficiency Claim, Administrative Claims, Professional Fee Claims and Priority Tax Claims: Bondholder Collateral; and (c) after payment in full of Administrative Claims and Professional Fee Claims: the President's House Proceeds.

Allowed Other Priority Claims amount to $993.

### 7. Allowed Bondholder Secured Claim – Class 2

Class 2 consists of the Allowed Bondholder Secured Claims, in the amount of $48,540,719 as of the Petition Date. The net proceeds of the Sale of the Campus remaining after payment of Sale costs and expenses, broker commissions, U.S. Trustee Fees attributable to the Sale, and the DIP Loan, totaling $22,352,791.90, were paid to the Bond Trustee for distribution to the Bondholders. Additionally, the Bond Trustee received $49,945 during the Bankruptcy Case from the sale of Bondholder Collateral, and additional payments will be made to the Bond Trustee upon liquidation of Bondholder Collateral in the amount of approximately $1,274,083, further reducing the Bondholder Deficiency Claim. Finally, the Bondholders will receive payment on the Superpriority Claim in the amount of $1,615,182 in reduction of the Bondholder Secured Claim.

The estimated distribution in connection with the Bondholder Secured Claim amounts to approximately 50.46% of the Claim

As of the filing of the Plan, the Bondholder Deficiency Claims amount to approximately $26,137,982 and will amount to approximately $23,248,718 after payment of the Superpriority Claim and the additional proceeds of Bondholder Collateral are distributed to the Bond Trustee.

### 8.   Allowed Other Secured Claims – Class 3

Class 3 under the Plan consists of Allowed Other Secured Claims.  The only Claimant within this Class is identified as Canon Financial Services. Such Claimant has a security interest in the collateral included in their financing statements filed against the Debtor's Assets, valued at $34,000. On or before the Effective Date, the collateral securing this Allowed Other Secured Claims shall be turned over to the Holder of  such Claim in reduction or satisfaction of such Entity's Secured claim. The deficiency due and owing to such Claimant after liquidation of the collateral securing its Claim, amounting to $556,708, will be treated as a General Unsecured Claim and shall be paid in accordance with treatment of such Class.

### 9.   Allowed Bondholder Deficiency Claims-Class 4

Class 4 of the Plan consists of Allowed Bondholder Deficiency Claims. As set forth above, this Claim is estimated to amount to approximately $23,248,718. The Bondholder Deficiency Claims shall be paid Pro Rata with General Unsecured Creditors from the following Assets: Remaining Cash, Remaining Loan Proceeds and the Unencumbered Collateral. It is estimated that Claims in this Class will receive a distribution of approximately $2,046,833, which is approximately an additional 8.8% distribution. The Bondholder Deficiency Claims shall not be paid from the proceeds of the Sale of the President's House. In addition, the Bondholder Deficiency Claims shall be paid Pro Rata with General Unsecured Creditors from any unused

portion of the Post-Effective Date Reserve at such time as the Plan Administrator Agreement terminates. This amount is not included in the above estimate.

10.     **Allowed General Unsecured Claims-Class 5**

Class 5 of the Plan consists of General Unsecured Claims. Holders of such Claims shall receive their Pro Rata share of any funds remaining from the Bondholder Collateral after the payment of all Allowed Superpriority Claims, Bondholder Deficiency Claims, Administrative Claims, Professional Fee Claims and Priority Tax Claims. General Unsecured Claims shall also be paid their Pro Rata share, *pari passu* with the Bondholder Deficiency Claim from the Remaining Cash, Remaining Loan Proceeds and Unencumbered Collateral remaining after payment of the Bondholder Superpriority Claim, Administrative Claims, Professional Fee Claims and Priority Tax Claims. Finally, General Unsecured Creditors will receive their Pro Rata share of the President's House Proceeds after the payment of all Allowed Administrative Claims, Professional Fee Claims and Priority Tax Claims. Any payments to General Unsecured Creditors shall be made on the Distribution Date. The Debtor estimates that there will be $966,948 available for distribution to Allowed General Unsecured Claims, amounting to approximately 24.86% of Allowed General Unsecured Claims. In addition, holders of General Unsecured Claims will be paid Pro Rata with the Bondholder Deficiency Claims from any unused portion of the Post-Effective Date Reserve at such time as the Plan Administrator Agreement terminates. This amount is not included in the above estimate. The estimate is also subject to reduction based on the amount of Claims filed for rejection of Executory Contracts.

**D.**  **Treatment of Executory Contracts and Unexpired Leases**

    **1.**  **Rejection of Executory Contracts and Other Unexpired Leases**

Neither the Land Authority nor Becker requested to assume Executory Contracts and Unexpired Leases.  Thus, the Debtor made a motion to reject most Executory Contracts, particularly the ones dealing with the operation of the real estate, presently pending before the Court.  All Executory Contracts or Unexpired Leases other than those that are rejected pursuant to an Order prior to the Confirmation Date, shall pass through the Plan and shall neither be assumed or rejected.

    **2.**  **Bar Date for Rejection Damages**

**If the rejection of an executory contract or unexpired lease pursuant to Article V of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtor, the Debtor's Estate, and the Assets unless the party files an original proof of Claim (with supporting documentation) with the Bankruptcy Court <u>by the later of thirty (30) days after the effective date of the rejection or thirty (30) days after the Confirmation Date.</u>**

There shall be no restriction on the rights of the Debtor and/or Plan Administrator to object to any Claims relating to the rejection of executory contracts or unexpired leases, or to assert any defense or counterclaim to any such Claim, notwithstanding that such defenses or counterclaims may not have otherwise been identified in the Plan, Disclosure Statement or otherwise.

Any Allowed Claim arising from the rejection of an executory contract or unexpired lease shall constitute a Class 5 General Unsecured Claim.

### E.    Summary of Distributions and Claims Resolution Provisions

#### 1.    Minimum Amount of Distributions

The Debtor and the Plan Administrator shall have no duty to make a distribution on account of any Allowed Claim if the amount to be distributed on account of the Claim is less than $25.

#### 2.    Objections to Claims

The Debtor or, after the Effective Date, the Plan Administrator, shall have the exclusive authority but not the obligation to File objections to Claims against the Debtor, and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims against the Debtor, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim against the Debtor without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that settlement of Disputed Claims against the Debtor which will amount to $25,000 or more shall require the approval of the Bankruptcy Court.  From and after the Effective Date, the Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises of Claims against the Debtor without any further notice to or action, order, or approval of the Bankruptcy Court. Given the amounts available for distribution to Holders of Claims, the Debtor does not anticipate filing objections to Claims.

#### 2.    Estimation of Claims

The Debtor and/or the Plan Administrator may, at any time, and shall have the exclusive authority to, request that the Bankruptcy Court estimate (a) any Disputed Claim against the Debtor pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including Section 502(c) of the Bankruptcy Code, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to

estimate any Disputed Claim against the Debtor, contingent Claim against the Debtor or unliquidated Claim against the Debtor, including during the litigation concerning any objection to any Claim against the Debtor or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim against the Debtor that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim against the Debtor, contingent Claim against the Debtor, or unliquidated Claim against the Debtor, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtor or Plan Administrator may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding Section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim against the Debtor that has been estimated pursuant to Section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

3.      **Claims Filed After Bar Date.**

Any Claim filed after any applicable Bar Date shall, unless such Claim amends a Claim filed before the Bar Date or unless the Court otherwise directs, be deemed Disallowed in full and expunged without further order of the Court. Filed or Scheduled Claims may not be amended without prior authorization of the Bankruptcy Court, Debtor or Plan Administrator, and any such unauthorized new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to, or action, order or approval of the Bankruptcy Court.

4.      **Disallowance of Claims**

All Claims against the Debtor held by any Entity from which property is sought by the Debtor or the Plan Administrator under Section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtor or the Plan Administrator alleges is a transferee of a transfer that is avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtor on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned Sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

5.      **Disputed Claims Reserve**

On the Distribution Date (or as soon thereafter as is reasonably practicable), the Debtor or Plan Administrator shall deposit in the Disputed Claims Reserve the amount of Cash that would have been distributed to the Holders of all Disputed Claims against the Debtor as if such Disputed Claims had been Allowed on the Distribution Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution

purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to Section 502(c) of the Bankruptcy Code, or (c) amount otherwise agreed by the Debtor and the Holder of such Disputed Claim for reserve purposes.  To the extent the amount of Cash deposited in the Disputed Claims Reserve on account of Disputed Claims against the Debtor exceeds the amount of Disputed Claims against the Debtor (as of the funding of the Disputed Claims Reserve) that later become Allowed, the excess shall be distributed in accordance with the Plan.

6.    **Withholding Taxes and Expenses of Distribution**

In connection with the Plan, to the extent applicable, the Debtor and Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtor and Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

7.    **Disputed Payment**

Notwithstanding anything to the contrary in the Plan, no distribution shall be made to the holder of any Claim, including by way of setoff or recoupment by any such claimant, if at any time

before an otherwise applicable distribution is issued, the Debtor or Plan Administrator has taken action to recover on any causes of action or defenses against or with regard to the holder of such Claim (or the direct or indirect transferor to, or transferee of, such holder), until such cause of action or defense is resolved by Final Order or agreement of the Debtor.

Additionally, if any dispute arises as to the identity of a holder of an Allowed Claim who is entitled to receive any distribution, the Debtor or Plan Administrator may, in lieu of making such distribution to such Person, reserve for such distribution until the disposition thereof shall be determined by Court order or by written agreement among the interested parties to such dispute.

## 8.      Setoffs and Recoupment

Except as otherwise provided herein, the Debtor or Plan Administrator, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off or recoup against any Allowed Claim or the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtor or Plan Administrator of any such Claims, rights, and Causes of Action that the Debtor may possess against such Holder.

## 9.      Interest on Claims.

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, post-petition and post-confirmation interest shall <u>not</u> accrue or be

paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

**10.      Distributions Relating to Bonds**

For the avoidance of doubt, all distributions under this Plan relating to the Bondholders shall be made to the Bond Trustee.

## V.  MEANS OF IMPLEMENTATION OF THE PLAN; EFFECT OF CONFIRMATION

**A.      Funding of the Plan**

As detailed above, the distribution to Claimants under the Plan is being funded from several sources, first and foremost being the Sale of the Debtor's real estate. By Order dated December 20, 2024, the Bankruptcy Court approved and authorized the Sale of the Campus, other than the President's House, for the sum of $35,000,000 to the Land Authority and the Sale of the President's House to Becker for the sum of $625,000. The closings on the Sales occurred in March, 2025. The Debtor will also be funding the Plan from the Remaining Cash, Remaining Loan Proceeds, Bondholder Collateral and Unencumbered Collateral.

**B.      Plan Administrator**

The Plan Administrator shall be appointed as of the Effective Date to winddown the Bankruptcy Case, including the collection of any receivables still outstanding, pursuit of Causes of Action, making any distributions remaining to be made, cooperating with the New York State Attorney General's Office and New York State Supreme Court in connection with the cy pres petition, and negotiating any Claim Objections which may be necessary after the Effective Date. The Plan Administrator shall act in accordance with the Plan Administrator Agreement, the proposed form of which is annexed as Exhibit "C" hereto. The Plan Administrator shall have the right to continue to retain and pay Cullen and Dykman LLP and FTI Consulting, Inc. to assist in

her duties under the Plan without Bankruptcy Court approval in accordance with the Plan Administrator Agreement. The Plan Administrator shall not be required to post a bond.

## C.    Injunction

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.C; OR (3) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN OR THE CONFIRMATION ORDER.  ALL PARTIES ARE ENJOINED FROM INTERFERING IN ANY MANNER WITH ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

D.      **Discharge**

The Debtor is not entitled to, and will not receive, a discharge since the Plan is a liquidating plan and the Debtor will not be engaging in business after consummation of the Plan.

E.      **Exculpation**

**To the extent permitted under section 1125(e) of the Bankruptcy Code, the Debtor, the Bondholders, the Bond Trustee, the DIP Lender, the Plan Administrator, and all of their professionals, attorneys, consultants, representatives, employees, officers, trustees, directors, managers and agents, and their successors and assigns, shall neither have, nor incur, any liability to any person or entity for any postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, confirming, or effecting the consummation of the Plan, including but not limited to the marketing of and sales process relating to the Sale, the Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor; provided that the foregoing "Exculpation" shall have no effect on the liability of any of the parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct or limit the liability of any professional to its client pursuant to DR 6-102 of the Code of Professional Responsibility; provided, further, that each of the foregoing Entities shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.  Notwithstanding the foregoing, nothing set forth above shall**

operate to limit or excuse compliance by any Entity with any of their respective obligations under the Plan or otherwise or to modify the effect or consequence of any such failure to comply with such obligations.

**F.      Indemnification**

The Debtor's professionals, attorneys and consultants, the Plan Administrator, and all of their representatives, employees, principals, officers, trustees, directors, managers and agents, and their successors and assigns shall be indemnified and held harmless by Debtor and the Estate, to the fullest extent permitted by law, solely from the Estate and the Assets, and any proceeds thereof, for any losses, claims, damages, liabilities, and expenses, including, without limitation, reasonable attorneys' fees, disbursements, and related expenses which such indemnified parties may incur or to which such indemnified parties may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against one or more of such indemnified parties on account of the acts or omissions in connection with any Exculpated matter; provided, however, that the Debtor and the Estate shall not be liable to indemnify any such indemnified party for any act or omission that has been determined by a Final Order as constituting gross negligence or willful misconduct. Notwithstanding any provision herein to the contrary, such indemnified parties shall be entitled to obtain advances from the Estate to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of any such indemnified party in its capacity as such; provided, however, that the Entities indemnified pursuant to this Article receiving such advances shall repay the amounts so advanced upon the entry of a Final Order finding that such indemnified parties were not entitled to any indemnity under the provisions of this Article.

### G.    Provisions as to Governmental Units

As to any Governmental Unit, nothing in the Plan or Confirmation Order shall limit or expand the scope of the injunction to which the Debtor or Plan Administrator is entitled to under the Bankruptcy Code, if any. Nothing in the Plan or Confirmation Order provides a discharge to the Debtor or Plan Administrator from any liability to a Governmental Unit.  The injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to the Confirmation Order, pursuing any police or regulatory action.

Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall release, impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Governmental Unit against the Debtor; or (4) any liability of the Debtor or Plan Administrator under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Confirmation Date.  Nor shall anything in the Confirmation Order or the Plan: (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order, the Plan, or the Bankruptcy Code.

Moreover, nothing in the Confirmation Order or the Plan shall exculpate any non-debtor, including any exculpated parties, from any liability to any Governmental Unit, including but not

limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the exculpated parties, nor shall anything in the Confirmation Order or the Plan enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against any non-debtor for any liability whatsoever; provided that if a Governmental Unit does not have an Allowed Claim against the Debtor, they may not seek payment of such Claim from a non-Debtor.

Nothing contained in the Plan or Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtor, nor shall the Plan or Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in this Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

Nothing herein shall constitute a waiver of the necessity (if any) of a Governmental Unit to file a Claim by the Claims Bar Date or Administrative Claims Bar Date, or the rights of any party as a result of the failure of a Governmental Unit to do so.

## H.    Post-Confirmation Management

Continuing until June 30, 2025 or such longer period as agreed to by the Debtor and any of the following employees, Marcia J. White, Debra Lee Polley, Jennifer Richardson, Elizabeth Thomson and Jeffrey Knapp will continue to perform the services that they performed prior to the

Confirmation Date of the Plan. Following the Effective Date of the Plan, the Plan Administrator

will act in accordance with the Plan Administrator Agreement.

**I.      Endowment and Restricted Funds**

By their nature, the Endowment and Restricted Funds are restricted funds, unavailable for

distribution to the Debtor's creditors. The Debtor will shortly be filing a cy pres petition in the

New York State Supreme Court, with the concurrence of the New York State Attorney General's

Office, to distribute the Endowment and Restricted Funds as set forth in that petition. The Debtor

and Plan Administrator shall reasonably cooperate in providing information to the New York State

Attorney General's Office and the New York State Supreme Court, to the extent reasonably

available to the Debtor. In the event that such a petition is not agreed to by the Attorney General's

Office and approved by the Supreme Court prior to the termination of the Plan Administrator

Agreement, the Debtor or Plan Administrator shall move to deposit the Endowment and Restricted

Funds with the New York State Supreme Court or such other appropriate repository of charitable

assets as may be approved by the Supreme Court.

**J.      Cancellation of Bonds**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date,

the Bonds shall be cancelled, and the Bonds and related bond documents shall continue in effect

solely to the extent they relate to and are necessary to (1) allow distributions pursuant to the Plan,

(2) permit the Bond Trustee to be compensated for fees and reimbursed for expenses including

expenses of its professionals, assert its charging lien, enforce its indemnity and other rights and

protections with respect to and pursuant to the bond documents, (3) permit the Bond Trustee to set

one or more record dates and distribution dates with respect to the distribution of funds to

beneficial owners of the Bonds, (4) permit the Bond Trustee to appear in the Chapter 11 Case and

exercise its rights specified in the Plan, and (5) permit the Bond Trustee to perform any functions

that are necessary in connection with the foregoing clauses (1) through (4).

**K.      Post-Confirmation Jurisdiction of the Court**

Notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the Court

will retain such jurisdiction as is legally permissible, including, without limitation, for the

following purposes:

1.      Except as otherwise provided in the Plan, Allow, disallow, determine, liquidate,

classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim,

including the resolution of any request for payment of any Administrative Claim and the resolution

of any and all objections to the Secured or unsecured status, priority, amount, or allowance of

Claims;

2.      Decide and resolve all matters related to the granting and denying, in whole or in

part, any applications for allowance of compensation or reimbursement of expenses to

Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to:  (a) the assumption, assignment, or rejection of any

Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the

Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims

arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired

Lease, Cure Obligations pursuant to Section 365 of the Bankruptcy Code, or any other matter

related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation

under any Executory Contract or Unexpired Lease that is assumed and/or assigned; and (c) any

dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action or any conflicting claims or demands made or asserted with respect to Allowed Claims;

7.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      Enter and enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      Resolve any case, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation or enforcement of the Plan;

11.     Resolve any case, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such injunctions, and other provisions;

12.    Resolve any case, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI;

13.    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.    Determine requests for the payment of Claims entitled to priority pursuant to Section 507 of the Bankruptcy Code;

18.    Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.    Hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

20.    Hear and determine matters concerning Section 1145 of the Bankruptcy Code;

21.    Hear and determine all disputes involving the existence, nature, or scope of the Exculpations, the Indemnifications and the Injunctions;

22.    Enforce all orders previously entered by the Bankruptcy Court;

23.     Enter an order concluding or closing the Chapter 11 Case; and

24.     Enforce the Exculpations, the Indemnifications and the Injunctions, as set forth in

Article VIII.

## VI.  CONFIRMATION OF THE PLAN

### A.     Introduction

The Bankruptcy Code requires the Bankruptcy Court to determine whether a chapter 11

plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  It further

requires that a plan proponent's disclosures concerning such plan have been adequate and have

included information concerning all payments made or promised in connection with the plan.

To confirm the Plan, the Court must find that all of these and certain other requirements

have been met.  Thus, even if the requisite vote is achieved for each Class of impaired Claims, the

Court must make independent findings respecting the Plan's conformity with the requirements of

the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are

discussed below.

### B.     Conditions to Confirmation

It shall be a condition precedent to Confirmation of the Plan that the following conditions

shall have been satisfied or waived by the Debtor in its sole and absolute discretion:

1.     The Bankruptcy Court shall have entered the Disclosure Statement Approval Order

        and it shall have become a Final Order; provided that in accordance with

        Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other

        provision of the Bankruptcy Code or the Bankruptcy Rules), the Disclosure

        Statement Approval Order shall not be stayed and shall be effective immediately

        upon their respective entry; and

2.      The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry.

## C.      Conditions to the Effective Date

It shall be a condition precedent to the occurrence of the Effective Date of the Plan that the following conditions shall have been satisfied or waived by the Debtor in its sole and absolute discretion:

1.      The Confirmation Date shall have occurred;

2.      The Confirmation Order shall become a Final Order; and

3.      The Plan Administrator Agreement shall have been executed.

In no event shall the Effective Date occur prior to June 30, 2025, unless waived by the Debtor in its sole discretion. The Debtor shall file a Notice of the occurrence of the Effective Date with the Bankruptcy Court.

## D.      Voting Procedures and Standards

Holders of Claims in Classes that are "impaired" under the Plan (but not deemed to reject the Plan by virtue of receiving no distributions thereunder) will receive a Ballot with this Disclosure Statement for the acceptance or rejection of the Plan.  Any Claim whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered "impaired."  Instructions on how to complete a Ballot and the deadline for

voting on the Plan are contained in the solicitation materials accompanying this Disclosure Statement and the Plan.

The following procedures for allowance of Claims for purposes of voting on the Plan shall apply to votes upon the Plan:

(a)    Disputed Filed Claims.  With regard to a Claim that is the subject of an objection filed at least twenty (20) days prior to the Ballot Deadline, such Claim will be disallowed provisionally for voting purposes, except to the extent and in the manner that (i) the Debtor agrees that the Claim should be allowed for voting purposes in its objection to such Claim; or (ii) such Claim is allowed temporarily for voting purposes in accordance with Bankruptcy Rule 3018.

(b)    Claims Estimated for Voting Purposes.  With respect to a Claim that has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the amount and classification of such Claim will be that set by the Bankruptcy Court.

(c)    Wholly Unliquidated Claims.  A Claim recorded in the Schedules or in the Clerk's records as wholly unliquidated, contingent and/or undetermined will be accorded one vote, valued at $10.00, for the purposes of section 1126(c) of the Bankruptcy Code, unless the Claim is disputed as set forth in (a) above.

(d)    Late Claims.  With respect to a Claim as to which a proof of claim has not been timely filed (i.e., was filed after the Bar Date), the voting amount of such Claim (subject to any applicable limitations set forth below) will be equal to the amount listed, if any, in respect of such Claim in the Schedules, to the extent such Claim is not listed as contingent, unliquidated, or disputed, unless the Claim is disputed as set forth in (a) above.  If such Claim is either not listed in the Schedules, or is listed as contingent, unliquidated or disputed, then the Claim respecting such proof of claim will be disallowed provisionally for voting purposes.

(e)    <u>Duplicate Claim</u>.  A creditor will not be entitled to vote its Claim to the extent such Claim duplicates or has been superseded by another Claim of such creditor.

(f)    <u>Undisputed Scheduled Claims</u>.  With respect to a Claim that appears on the Schedules as undisputed, noncontingent and liquidated, and as to which no objection has been filed at least twenty (20) days prior to the Ballot Deadline, the amount and classification of such Claim shall be that specified in the Schedules unless superseded by an undisputed proof of claim.

(g)    <u>Court Determined Claims</u>.  With respect to a Claim for which an order has been entered reducing, reclassifying or allowing, the amount and classification of the Claim shall be that specified in such order.

The Ballots of creditors will be tabulated in accordance with the following procedures:

(i)    For the purpose of voting on the Plan, the Balloting Agent will be deemed to be in constructive receipt of any Ballot timely delivered to the address set forth above as designated for the receipt of Ballots cast on the Plan;

(ii)    Any Ballot received by the Balloting Agent after the Ballot Deadline shall not be counted;

(iii)    Pursuant to Bankruptcy Rule 3018(a), whenever a holder of a Claim submits more than one Ballot voting the same Claim prior to the Ballot Deadline, the last such Ballot sent and received shall count unless such holder has sufficient cause within the meaning of Bankruptcy Rule 3018(a) to submit, or the Debtor consents to the submission of, a superseding Ballot;

(iv)    If a Ballot does not include a Claim amount, the Ballot shall be deemed filed in the amount of a filed Claim, and if no Claim has been filed, in the amount of the

Claim as specified in the Schedules, as long as the Claim is listed in the Schedules as undisputed, non-contingent or liquidated; otherwise, the Ballot shall not be counted.

(v)      If a holder of a Claim casts simultaneous duplicative Ballots voted inconsistently, then such Ballots shall not be counted;

(vi)      The authority of the signatory of each Ballot to complete and execute the Ballot shall be presumed;

(vii)      Any Ballot that is not signed shall not be counted;

(viii)      Any Ballot received by the Balloting Agent by electronic communication (i.e. email) shall not be counted but signed Ballots received timely by the Balloting Agent by facsimile will be counted;

(ix)      A holder of a Claim must vote all of its Claims within a particular Class under the Plan either to accept or reject the Plan and may not split its vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan, or that indicates both a vote for and against the Plan, will not be counted; and

(x)      Any Ballot that is timely received and executed but does not indicate whether the holder of the relevant Claim is voting for or against the Plan will be deemed a vote in favor of the Plan.

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE BALLOTING AGENT.

A VOTE MAY BE DISREGARDED IF THE COURT DETERMINES, AFTER NOTICE AND A HEARING, THAT SUCH ACCEPTANCE OR REJECTION WAS NOT MADE OR

SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE.

Any impaired Class of Claims that fails to achieve the requisite "accepted" vote will be deemed to have rejected the Plan.

**E.     Voting Procedures Applicable to Bonds**

With respect to each owner of Bonds, the Debtor proposes to use procedures that are typical for bankruptcy plan solicitation matters that include publicly traded debt securities. The Debtor specifically proposes to have the Bond Trustee send Ballots to record owners of the Bonds, including, without limitation, brokers, banks, dealers, or other agents or nominees, or any mailing agents thereof (each a "Master Ballot Agent"), together with a reasonably sufficient number of copies of the other materials comprising the Solicitation Package (as defined in the Disclosure Statement Approval Order) to distribute to the beneficial owners of the Bonds for whom such Master Ballot Agent holds those securities. The actual, documented, and reasonable costs and expenses of each Master Ballot Agent associated with (i) the distribution of Solicitation Packages to the beneficial owners of Bonds and (ii) the tabulation of such Ballots, shall be paid from the Distribution to the Bond Trustee under the Plan. Each Master Ballot Agent shall either (i) forward the Solicitation Package to each beneficial owner of the Bonds entitled to vote on the Plan for voting and include a return envelope provided by and addressed to the Master Ballot Agent, so that the beneficial owner may return the completed Ballot to the Master Ballot Agent by a date calculated by the Master Ballot Agent to allow it to prepare and return a Master Ballot to the Bond Trustee by the Voting Deadline, or (ii) "prevalidate" Ballots contained in the Solicitation Package by (a) indicating thereon the name and address of the record owner of the Bonds to be voted, the amount of the Bonds held by the beneficial owner as of the Voting Record Date, and the

appropriate account numbers through which the beneficial owner's holdings are derived, and (b) executing the beneficial owner's Ballot, and then forwarding the Solicitation Package to the beneficial owner of the Bonds for voting within five (5) business days after the receipt by such Master Ballot Agent of the Solicitation Package, with the beneficial owner then returning Ballots directly to the Bond Trustee in the return envelope to be provided in the Solicitation Package by the Voting Deadline. The Master Ballot Agents would then complete Master Ballots according to the instructions set forth in the Master Ballots.

**F.      Acceptance**

The Bankruptcy Code defines acceptance of a plan by an impaired Class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of Claims of that Class that actually vote.  Acceptance of the Plan need only be solicited from holders of Claims whose Claims are "impaired" and not deemed to have rejected the Plan.  Except in the context of a "cram down" (i.e., confirmation of a plan that has not been accepted by all impaired classes), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each Class of impaired Claims accepts the Plan.

The Plan is predicated on the Voting Classes voting to accept the Plan.  In the event the requisite vote is not obtained, the Debtor has the right, assuming that at least one Class of impaired Claims has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more Classes of impaired Claims if the Bankruptcy Court finds that the plan does not discriminate unfairly and is "fair and equitable" with respect to the rejecting class or classes.  This procedure is commonly referred to in bankruptcy parlance as "cram down."  If the Voting Classes

vote to reject the Plan, the Debtor will seek a cram down of any such Class at the Confirmation Hearing.

## G.    Confirmation and Consummation

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.  Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponents of the plan have complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponents under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

- The proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponents must have disclosed the identity of any insider that the reorganized debtors will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims, either each holder of a claim of such class has accepted the plan, or will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims has either accepted the plan or is not impaired under the plan.

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the order for relief in a case, of a value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan (unless, as here, such liquidation or reorganization is proposed in the plan).

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Classes not receiving any distribution under the Plan, the Debtor believes that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

**1.    Best Interests of Holders of Claims**

The "best interests of creditors" test requires that the Bankruptcy Court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim of each impaired class of claims will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date. A liquidation analysis demonstrating the satisfaction of this requirement under the Plan is annexed as Exhibit "B".

This is a liquidating Plan, which is expressly permitted by the Bankruptcy Code. Creditors should also understand that the best interests test is hypothetical in part, that is, a Court must conclude that there is a reasonable likelihood that if the case were converted to Chapter 7, creditors would receive less than under this Plan.

If this case was converted to Chapter 7 (since the Debtor is a not-for-profit corporation, this case may only be converted with the Debtor's consent), no creditors other than the DIP Lender and Bondholders would be paid from a sale of the Assets, so all creditors are benefiting by this Plan as opposed to conversion to Chapter 7. Moreover, even if creditors would receive a distribution in Chapter 7, it would result in even more administrative expenses potentially reducing recoveries to unsecured creditors. A Chapter 7 trustee would be appointed who would be entitled to commissions on all monies disbursed by or turned over to the trustee. A trustee would also likely hire their own professionals who would engage in due diligence on the trustee's behalf. These added costs would result in less of a distribution in Chapter 7 than proposed by the Plan.

## 2.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor unless such liquidation or reorganization is proposed in the plan. The Plan is a liquidating plan. Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

## 3.    Acceptance by Impaired Classes

A class is "impaired" under a plan unless, with respect to each claim in such class, the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim; or (ii) notwithstanding any contractual provision or applicable law which entitles the holder of such claim to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based upon such claim. A class that

is not impaired under a chapter 11 plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

### 4.     Cram Down

**THE DEBTOR RESERVES THE RIGHT TO CRAM DOWN THIS PLAN AGAINST NON-ACCEPTING CLASSES OF HOLDERS OF CLAIMS.**

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan.  The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.  Under the "cram down" provisions, upon the request of a plan proponent the Bankruptcy Court will confirm a plan despite the lack of acceptance by an impaired class or classes if the Bankruptcy Court finds that (i) the plan does not discriminate unfairly with respect to each non-accepting impaired class, (ii) the plan is fair and equitable with respect to each non-accepting impaired class, and (iii) at least one impaired class has accepted the plan.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each Class identically, the Plan has been structured so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims.  In general, section 1129(b) of the Bankruptcy Code permits

confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before any junior class may receive anything under the plan. In addition, case law surrounding section 1129(b) requires that no class senior to a non-accepting impaired class receives more than payment in full on its claims.

With respect to a class of unsecured claims that does not accept the Plan, either (i) each holder of an unsecured claim in the dissenting class receives or retains under such plan property of a value equal to the allowed amount of its unsecured claim, or (ii) the holders of claims that are junior to the claims of the holders of such unsecured claims will not receive or retain any property under the plan. Additionally, the holders of claims that are senior to the claims of the dissenting class of unsecured claims receive no more than payment in full on their claims under the plan. The Plan is designed to satisfy these standards, and the Bond Trustee has agreed that the proceeds of the Sale of the President's House may be paid to creditors of a junior priority to the Bondholders.

If all the applicable requirements for confirmation of the Plan are met as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more of Classes of impaired Claims have failed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code, the Debtor will request that the Bankruptcy Court confirm the Plan over the dissenting votes of such Classes in accordance with section 1129(b) of the Bankruptcy Code. The Debtor believes that the Plan satisfies the "cram down" requirements of the Bankruptcy Code. The Debtor may seek confirmation of the Plan over the objection of dissenting Classes, as well as over the objection of individual Holders of Claims who are members of an accepting Class.

5.      **Classification of Claims**

The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code which require that a chapter 11 plan place each claim into a class with other claims which are "substantially similar."

## VII.  CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**A.      Risk That Distributions Will Be Less Than Estimated**

The projected distributions and recoveries set forth in this Disclosure Statement are based on the Debtor's estimate of Allowed Claims and Cash available for distribution. There can be no assurance that the estimates will prove accurate.

**B.      Bankruptcy Risks**

**a.  Objection to Classifications**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Court would reach the same conclusion.

### b.  Risk of Non-Confirmation of the Plan

Even if the Voting Classes accept the Plan, the Plan might not be confirmed by the Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a chapter 11 plan is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  The Debtor believes that the Plan satisfies all the requirements for confirmation of a liquidating plan under the Bankruptcy Code.  There can be no assurance, however, that the Court would also conclude that the requirements for confirmation of the Plan have been satisfied.

## VIII.  TAX CONSEQUENCES

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTOR WITH RESPECT THERETO.

NOTHING HEREIN CONSTITUTES TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED HEREIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

## IX.  CONCLUSION

The Debtor believes that confirmation and implementation of the Plan will provide each creditor with a greater recovery than it would receive if the Debtor were to liquidate and distribute its assets under chapter 7, in which case there would likely be a delay in making distributions to creditors and creditors would likely receive no distribution.  Thus, the Debtor recommends confirmation and implementation of the Plan as the best possible outcome for creditors.

The Debtor urges holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Ballot Deadline.


Dated: Albany, New York
        April 11, 2025

THE COLLEGE OF SAINT ROSE


By:    /s/*Marcia J. White*
Name: Marcia J. White
Title: President


CULLEN AND DYKMAN LLP


By:  /s/*Bonnie Pollack*
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.
80  State Street, Suite 900
Albany, New York 12207
(516) 357-3700
mroseman@cullenllp.com
bpollack@cullenllp.com

*Counsel for The College of Saint Rose*